**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, N.J. 07039
(973) 597-9100
Jonathan I. Rabinowitz
Henry M. Karwowski
jrabinowitz@rltlawfirm.com
Attorneys for Debtors/Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>CUSTOM ALLOY CORPORATION, *et al.*,<br><br>Debtors. | Case Nos. 22-18143, 22-18144 (MBK)<br><br>Jointly Administered<br><br>Chapter 11 |

**MOTION OF CHAPTER 11 DEBTOR-IN-POSSESSION CUSTOM ALLOY CORPORATION FOR ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND BANKRUPTCY RULES 2002, 6004, AND 6006 (1) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS; (2) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVAL OF HIGHEST AND BEST OFFER; (3) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (4) APPROVING FORM, MANNER, AND SUFFICIENCY OF NOTICES; (5) AUTHORIZING DEBTORS TO SELL SUBSTANTIALLY ALL OF THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS <u>AND UNEXPIRED LEASES; AND (6) GRANTING RELATED RELIEF</u>**

TO:   Honorable Michael B. Kaplan
       United States Bankruptcy Judge

      Custom Alloy Corporation, Chapter 11 Debtor-in-Possession in the above-captioned case

(the "<u>Debtor</u>"), and CAC Michigan, LLC ("<u>CAC</u>," and collectively with the Debtor, the

"<u>Debtors</u>"), by and through their counsel, hereby respectfully state as follows:

**<u>PRELIMINARY STATEMENT</u>**

      1.     The Debtors hereby submit this Motion for entry of an order pursuant to Bankruptcy

Code sections 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) approving bidding

procedures for the sale of substantially all of the Debtors' assets; (2) scheduling (A) an auction sale and (B) a hearing to consider approval of any highest and best offer for the assets; (3) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (4) approving the form, manner, and sufficiency of notices relating to the sale and to the assumption and assignment of certain executory contracts and unexpired leases; (5) authorizing the Debtors to sell substantially all of their assets free and clear of liens, claims, encumbrances, and interests and to assume certain executory contracts and unexpired leases; and (6) granting related relief.

2.      The Debtors intend to proceed in two steps, first for approval of procedures associated with the sale of substantially all of their assets and with assumption and assignment of certain executory contracts and unexpired leases; and then for approval of the sale, assumption, and assignment.

3.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408.

## STATEMENT OF FACTS

**Background**

4.      A thorough description of the Debtor's business and the events giving rise to the bankruptcy filing are set forth in the Certification of Adam M. Ambielli submitted in support of the Debtor's "First Day Motions."  Certif. ("Ambielli Certif.") (ECF No. 30).  The Debtor incorporates those facts herein by reference and briefly summarizes them below.

5.      The Debtor, a Delaware corporation formed in 1968, manufactures and sells fittings, forgings, and pipe products and provides highly engineered products, including for the U.S. Navy's Columbia and Virginia nuclear class submarines.  Ambielli Certif. ¶ 2.  The Debtor

employs approximately 200 employees at its principal place of business in High Bridge, New Jersey; in Michigan, through CAC; and North Carolina. Id. ¶¶ 3-6.

6.  The Debtor's primary assets are inventory, accounts receivable, and equipment. Id. ¶ 9.

7.  CIBC Bank USA (together with its successors and assigns, "CIBC") has a first priority perfected security interest in the Debtor's assets. As of the petition filing date, CIBC was owed approximately $25.9 million. Id. ¶ 8; Supplemental Certification of Adam M. Ambielli in Support of Debtors' Request for Final Approval of DIP Financing Facility ("Supp. Ambielli Certif.") (ECF No. 218-1).

8.  Barings BDC, Inc. ("Barings") asserts a perfected second priority security interest in substantially all of the Debtor's assets. As of the commencement of the bankruptcy proceeding, Barings was owed approximately $64,085,727.82. Based on certain pre-petition purchase offers for the Debtor's assets, it would appear that Barings is fully unsecured. Id. ¶ 8.

9.  Several other lenders assert perfected first priority purchase money security interests in certain items of equipment pursuant to equipment financing agreements. Id. ¶ 8. Other pieces of equipment are the subject of a capital lease.

10. Finally, unsecured creditors, including trade suppliers, landlords, and utilities, assert unsecured claims in the total amount of approximately $6,000,000, excluding the deficiency claims of secured creditors.

11. In 2019, the Debtor's annual sale revenues amounted to approximately $62,000,000. In 2020, the Debtor's sale revenues declined to approximately $53,600,000, and in 2021, declined further to approximately $47,800,000. These declines in sales, together with the

Debtor's pivot away from oil and gas to military and defense applications, and the Covid-19 pandemic, have created liquidity issues for the Debtor. <u>Id.</u> ¶ 7.

12.     As a result, on April 29, 2022, following several senior loan facility amendments and a Forbearance Agreement with CIBC in 2020 and 2021, the Debtors requested, and CIBC, as the Debtors' senior secured lender, agreed to enter into, a Forbearance and Amendment No. 19 to Loan and Security Agreement. In addition, in April 2022, the Debtors selected and engaged an investment banking firm and initiated an extensive marketing process for the sale of their businesses as a going concern.

13.     In August 2022, after the Debtors' initial sale effort did not result in a successful going concern sale transaction, CIBC, as a secured party seller, in cooperation and consultation with the Debtors, engaged in a further marketing process to maximize the value of the Debtors' assets in connection with a going concern sale of their businesses under Article 9 of the Uniform Commercial Code. The parties received multiple competing bids in connection with this process. Prior to the commencement of a competitive Article 9 sale auction, however, the Debtors determined that the sale process would not generate the highest and best possible offer for their businesses as a going concern and elected to file these cases. <u>Id.</u> ¶¶ 10-11, 13.

**<u>The Debtors File Chapter 11.</u>**

14.     As a result, and in accordance with its fiduciary duties to all creditors and stakeholders, the Debtor's board of directors decided to initiate a chapter 11 bankruptcy filing in order to pursue either the reorganization of the Debtor's financial affairs, or a sale of the Debtor's business as a going concern without any constraints that might chill interest in and inhibit competitive bidding for the assets. <u>Id.</u> ¶ 14.

15.     Thus, on October 13, 2022, the Debtor, faced with its liquidity issues and the pending Article 9 sale auction, filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code in this Court. Petition (ECF No. 1). On the same date, CAC also filed a chapter 11 petition. Petition (Case No. 22-18144 ECF No. 1).

16.     The Debtors are operating their business and managing their affairs as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner.

17.     On October 19, 2022, the Debtor filed a Motion for Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (A) Authorizing and Approving Debtors' Post-Petition Financing; (B) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (C) Authorizing Use of Cash Collateral and Affording Adequate Protection; (D) Modifying the Automatic Stay; (E) Scheduling Final Hearing and (F) Granting Related Relief. Motion (ECF No. 20). Pursuant to the Motion, the Debtor sought the entry of an order (i) authorizing the Debtor's use of cash collateral of CIBC, and to the extent Barings is not wholly unsecured, the cash collateral of Barings; (ii) authorizing the Debtor to obtain from Euro American Funding Inc. or its affiliate ("Euro") secured, post-petition financing in the principal amount of up to $2.0 million for the purpose of funding the Debtor's general operating and working capital needs and the administration of this chapter 11 case; (iii) granting in favor of Euro valid, fully perfected, first priority enforceable security interests and liens upon the Debtor's assets and an allowed superpriority administrative expense claim; and (iv) granting other relief (the "DIP Motion"). Ibid.

18.     On October 19, 2022, this Court entered an Interim Emergency Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Granting Related Relief. Order (ECF No. 31). Each week since then, this Court has continued to enter Interim Emergency Orders allowing the use of cash collateral.

19.     On November 2, 2022, this Court entered an Order providing for the joint administration of the Debtors' estates.  Order (ECF No. 86).

20.     On November 2 and December 7, 2022, the Debtor filed Motions for Order Authorizing Debtor to Obtain Post-Petition Purchase Money Financing from Electric Boat Corporation ("EB"), an administrator of "SDF Funds" for the United States Navy, for the purchase of certain equipment.  Motion (ECF No. 94); Motion (ECF No. 187).  On December 2 and December 29, 2022, this Court entered Final Orders granting the Motions.  Order (ECF No. 178); Order (ECF No. 228).

**The Debtor and CIBC Reach Agreement on DIP Financing,**
**Use of Cash Collateral, and Sale as Possible Exit Strategy.**

21.     On November 4, 2022, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  Notice of Appointment (ECF No. 106).

22.     Since the beginning of this case, CIBC has expressed its willingness, subject to certain conditions, to serve as the Debtor's DIP lender, to consent to a longer-term use of cash collateral, and to agree to a chapter 11 exit strategy for the Debtor.  Supp. Ambielli Certif. ¶ 5. Thus, since then, the Debtor, CIBC, and the Committee have discussed and they continue to negotiate the terms of a financing facility with terms more favorable than those proposed by Euro in the DIP Motion.  Id. ¶ 3.  Also, pending the negotiations, CIBC has consented to the use of cash collateral pursuant and subject to weekly interim orders entered by this Court and the budget terms set forth therein.  Ibid.

23.     On December 13, 2022, the Debtor filed an Application for Entry of Order Authorizing Employment and Retention of SierraConstellation Partners LLC as Financial Advisor. App. (ECF No. 200).

24.     On December 22, 2022, the Debtor filed a Motion Amending Its Prior Motion for Order Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364 and Granting Other Relief.  Motion (ECF No. 218).  Pursuant to the Motion, the Debtor seeks to amend its DIP Motion and seek final approval of a DIP financing facility whereby (i) the Debtor may borrow from CIBC an amount up to $2 million pursuant and subject to post-petition loan documents, on terms more favorable than those offered by Euro, to the extent necessary to meet its operating expenses; (ii) the Debtor will have ongoing authority to use CIBC's cash collateral for an initial 13 week period; (iii) the Debtor will deposit all such cash collateral into a lockbox or blocked deposit account, and pursuant to a "creeping rollup," such amounts will be applied first to the pre-petition debt until paid in full, and then to all post-petition debt until paid in full; (iv) the Debtors will pursue a competitive sale of their assets, including the assumption and assignment of certain executory contracts and unexpired leases, subject to their right to elect to seek confirmation of a plan of reorganization instead; (v) the Debtors will retain an investment banker to manage the sale process, a financial advisor, and an independent director; and (vi) the Debtors will promptly file a "sale procedures motion," which will schedule a bid deadline and an auction. Also, the DIP facility will provide for a "carveout" to fund the budgeted and awarded professional fees of designated professionals up to the termination date, subject to the terms and limitations of the post-petition loan documents.  Supp. Ambielli Certif. (ECF No. 218-1) ¶¶ 1, 13-19.

25.     The terms of the parties' agreement regarding the proposed sale and reorganization process appear in "Annex A" to the Term Sheet for the amended DIP financing arrangement; the Term Sheet is itself attached to the Ambielli Supplemental Certification filed in support of the Motion Amending Prior Motion for Order Authorizing Post-Petition Financing.  Id. Exh. A.  The Term Sheet has not yet been approved by order of this Court; if this Court ultimately does not enter

an order approving the DIP financing arrangement, all rights and remedies of all parties, including all rights under Bankruptcy Code section 1129, are reserved.

**Summary of Material Terms of Proposed Sale of the Debtors' Assets**

26.     The Debtors now seek authority to sell substantially all of their assets. The material terms of the proposed sale process including bidding procedures (as amended or modified from time to time in accordance with the term thereof, the "Bidding Procedures") are summarized as follows:

      (a)    Sale Assets. The Debtors seek to sell substantially all of their assets, including, without limitation, their right, title, and interest in (i) name; (ii) accounts receivable; (iii) inventory; (iv) equipment and machinery; (v) intellectual property; (vi) contracts and leases; (vii) books and records; and (viii) any tax credits and refunds, including any employee retention tax credits, provided, that either CIBC or the Debtors, in consultation with CIBC or the Debtors (as applicable), may require that any such tax credit or refund be withheld in the event that the prospective purchaser intends to ascribe less than face value to such tax credit or refund (in all events excluding the below-defined Excluded Assets, collectively, the "Sale Assets"), free and clear of all liens, claims, encumbrances, and interests, pursuant to Bankruptcy Code sections 363(b), (f), and (m), with all such liens, claims, encumbrances, and interests to attach to the proceeds of the sale of the Sale Assets with the same validity and priority as existed immediately prior to the consummation of such sale; provided that, on information and belief (but without any representation or warranty of any kind by the Debtors as to the accuracy of the following), the Debtors may currently possess equipment or other personal property in which they do not have an ownership interest or operate pursuant to one or more non-residential leases of commercial property, machinery and equipment leases, and other agreements, customer contracts, documents, leases, and instruments, and which may include operating licenses and permits (collectively, "Designated Agreements"). No rights under any Designated Agreement are or will be included in the Sale Assets, except and solely to the extent that any such rights are assignable under applicable law, including with the consent of the non-Debtor party as may be required. Additionally, the Debtors currently possess certain items of

equipment acquired pursuant to certain Supplier Development Funding Agreements ("SDF Agreements") with Electric Boat Corporation ("EB"), and such SDF Agreements are subject to limitations on the transferability of, or title to, such equipment. The Sale Assets will not include, and will in all events expressly exclude (collectively, the "Excluded Assets"): (a) any claims and causes of action of any Debtor against CIBC, in its capacity as a pre-petition lender and contemplated post-petition lender, or any of its affiliates, agents, or other related parties; (b) any causes of action of any Debtor arising under chapter 5 of the Bankruptcy Code; (c) any causes of action of any Debtor against any of its directors, officers, insiders, or affiliates; (d) unless CIBC consents otherwise in writing, any equity interests owned by the Debtors and issued by any Debtor or non-Debtor affiliates; and (e) certain other assets to be identified by the Debtors with the written consent of CIBC, and in consultation with the Committee and EB. The Sale Assets may be sold in a single lot to a single bidder or in multiple lots to multiple bidders; and the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, may exclude any portion of the Sale Assets. See Proposed Order Exh. 1 at "Assets to Be Sold" and "Sale Free of Any and All Liens, Claims, Encumbrances, and Interests."

(b)   Sale "As Is." The Sale Assets shall be sold "as is, where is" without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates or otherwise except as set forth in any asset purchase agreement to be executed by the Debtors with respect to the Sale Assets, subject to the written consent of CIBC.

(c)   Assumption and Assignment of Executory Contracts and Unexpired Leases. The Debtors shall assume certain executory contracts and unexpired leases and assign them to the ultimate purchaser in connection with sale. The contracts and leases include (i) oil and gas customer contracts; (ii) military customer contracts, to the extent that such contracts can be assumed and assigned under 11 U.S.C. § 365, and with the consent of the applicable contract counterparty, as and to the extent required under 11 U.S.C. § 365; (iii) service contracts; (iv) equipment leases; and (v) real property leases.

(d)   Sale Process Dates. This Court shall enter a "bidding procedures order" (the "Bidding Procedures Order") setting

dates and deadlines, subject to adjournment by the parties, for the following acts among others:

(1) On January 19, 2023, the Debtors filed an application to retain SSG Advisors, LLC as their investment banker (the "Investment Banker"); on February 2, 2023, this Court entered an Order approving the retention of the Investment Banker.

(2) On February 8, 2023, a data room for potential purchasers was established; CIBC and the Committee and their respective professionals shall have unrestricted access to the data room at all times prior to the closing of the sale.

(3) By not more than three business days after entry of the Bidding Procedures Order, notice of the Bidding Procedures, substantially in the form annexed as Exhibit 2 to the proposed Bidding Procedures Order, shall be sent to certain parties as set forth in the Bidding Procedures Order. A copy of the proposed Bidding Procedures in their entirety is annexed as Exhibit 1 to the proposed Bidding Procedures Order.

(4) By not later than March 13, 2023, the Debtors shall, with the written consent of CIBC, and in consultation with the Committee and EB, identify a "stalking horse bidder" that makes a qualified bid that is in form and substance acceptable to the Debtors and CIBC, in consultation with the Committee and EB, that offers to purchase in cash or cash equivalents the Sale Assets in their entirety or in lots pursuant to terms that are in form and substance acceptable to the Debtors and CIBC, and that is not an "insider" within the meaning of Bankruptcy Code section 101(31) (the "Stalking Horse Bidder"); and notice of the identification of the Stalking Horse Bidder shall be sent to certain parties as provided in the Bidding Procedures.

(5) By not more than four business days after entry of the Bidding Procedures Order, the Debtors shall send a notice of the proposed assumption and assignment, including proposed cure amount, substantially in the form annexed as Exhibit 4 to the Bidding Procedures Order, upon all non-debtor parties to the executory contracts and unexpired leases at issue. A copy of the proposed assumption and assignment procedures in their entirety is annexed as Exhibit 3 to the proposed Bidding Procedures Order.

(6) By not more than twenty-one (21) days after entry of the Bidding Procedures Order, any non-debtor party to an executory contract or unexpired lease must file and serve any objection to any proposed cure amount under the contract or lease.

(7) By not later than 5:00 p.m. (Eastern Standard Time) on April 7, 2023, any prospective purchaser must submit a bid to purchase the Sale Assets (the "<u>Bid Deadline</u>").

(8) By not later than 5:00 p.m. (Eastern Standard Time) on April 12, 2023, any non-debtor party to an executory contract or unexpired lease must file and serve any objection to the proposed assumption and assignment of an executory contract or unexpired lease on any basis other than "cure amount," including on the basis that adequate assurance of future performance has not been provided, if the non-debtor party objects to assumption and assignment to the Stalking Horse Bidder; a non-debtor party may raise any objection to assumption and assignment on such grounds at the hearing to approve the sale if any successful bidder is a bidder other than the Stalking Horse Bidder.

(9) On April 14, 2023, at 11:00 a.m. (Eastern Standard Time), provided at least one Qualified Bid (as defined below) is received prior to the Bid Deadline, the Debtors shall conduct an auction of the Sale Assets (the "<u>Auction</u>"), <u>provided</u>, that CIBC will not have any obligation to provide its consent to any transaction or to the designation of any successful bid (or successful bidder) or any back up bid (or backup bidder). As set forth in the Bidding Procedures, only parties that submit a Qualified Bid (as defined below) to the Debtors, CIBC, the Committee, EB, the United States Trustee, and such entities' respective advisors and counsel may attend; other interested parties may attend if they provide written notice no later than five (5) days before the Auction to the Debtors' counsel. On the same date, notice of the auction results shall be sent to certain parties as provided in the Bidding Procedures.

(10) By not later than 5:00 p.m. (Eastern Standard Time) on April 19, 2023, any objections to final approval of the sale must be filed and served; by not later than April 25, 2023, any replies to any objections must be filed and served.

(11) On April 27, 2023 at 11:00 a.m, this Court shall conduct a hearing to approve the sale of the Sale Assets to any Stalking Horse Bidder, or alternatively, to any highest and best offer as determined at the Auction in accordance with the Bidding Procedures, including with the written consent of CIBC, and in consultation with the Committee and EB (the "<u>Sale Hearing</u>"), provided that CIBC will not have any obligation to consent to the designation of any successful bid (or successful bidder) in connection with the Auction or otherwise.

(12) By a date not more than two (2) days after the conclusion of the Sale Hearing, this Court shall enter an order approving the sale of the Sale Assets (the "<u>Sale Order</u>").

(13) By a date not later than 14 days after the entry of the Sale Order, the Debtors must close on the sale of the Sale Assets.

(e)    <u>Break-Up Fee</u>.    Subject to approval of an asset purchase agreement with another bidder at the Sale Hearing, the Stalking Horse Bidder shall receive a "break-up fee" amounting to 2.5% (the "<u>Break-Up Fee</u>") of the proposed purchase price, which proposed purchase price shall equal (x) the purchase price proposed by the Stalking Horse Bidder, <u>plus</u> (y) the assumption or payoff of interest-bearing indebtedness, <u>but excluding</u> (z) the assumption or payoff of any deferred revenue, trade payables, operating expenses, or deposits of the Debtors (the "<u>Proposed Purchase Price</u>"), plus reimbursement of actual, reasonable, and necessary expenses in the amount of up to $100,000.00.  <u>See</u> Proposed Order ¶ 7, Exh. 1 at "Qualified Bid" § (ii).

(f)    <u>Expense Reimbursement Fee</u>.    Alternatively, subject to approval of an asset purchase agreement at the Sale Hearing, if the Debtors are unable to timely identify a Stalking Horse Bidder, the following prospective purchasers shall, with the written consent of the Debtors and CIBC, and in consultation with the Committee and EB, each receive an expense reimbursement fee on account of actual, reasonable, and necessary out-of-pocket due diligence fees and expenses, including attorneys' fees in the amount of up to $100,000.00: (i) any prospective purchaser, other than any prospective purchaser deemed a Stalking Horse Bidder prior to the Auction, that is a qualified bidder in accordance with the Bidding Procedures (a "<u>Qualified Bidder</u>") and that submits

a Qualified Bid (as defined below), that fully participates in the Auction, and that is deemed by the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, to be a "Successful Bidder" (which submits the "Successful Bid") (as such terms are defined in the Bidding Procedures), if any, at such Auction; and (ii) any prospective purchaser, other than any prospective purchaser deemed a Stalking Horse Bidder prior to the Auction, that is a Qualified Bidder and that submits a Qualified Bid (as defined below), that fully participates in the Auction, and that is deemed by the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, to be the "Backup Bidder" (which submits the "Backup Bid") (as such terms are defined in the Bidding Procedures), if any, at such Auction in accordance with Section 27(n) of this Motion. For the avoidance of doubt, without the written consent of the Debtors and CIBC, such expense reimbursement will not be made available to any Qualified Bidder if a Stalking Horse Bidder has been timely designated. See Proposed Order ¶ 8.

(g) <u>Qualifying Competing Bids</u>. Any offer to purchase the Sale Assets, subsequent to the offer made by the Stalking Horse Bidder, must (i) be "higher and better" than the Stalking Horse Bidder's bid, as determined in good faith by the Debtors, with CIBC's written consent and in consultation with the Committee and EB; and (ii) exceed the sum of (a) the original Proposed Purchase Price that has been proposed by the Stalking Horse Bidder; (b) an "overbid" in the amount of at least $250,000.00 (the "<u>Overbid</u>"); (c) reimbursement of actual, reasonable, and necessary expenses of the Stalking Horse Bidder up to the amount of $100,000.00; and (d) the Break-Up Fee (a "<u>Qualified Bid</u>"). See Proposed Order Exh. 1 at "Participation Requirements" and "Qualified Bid."

(h) <u>Deposit</u>. A good-faith cash deposit in the amount of ten percent (10%) of the Stalking Horse Bidder's bid must accompany the submission of any bid. If the Debtors are unable to identify a Stalking Horse Bidder, any other bidder must submit a deposit in the amount of ten percent (10%) of its initial Qualified Bid.

(i) <u>Management and Key Employees</u>. Each bidder must describe the material, nonconfidential terms of any agreement with management or key employees regarding compensation or future employment; provide a statement as to whether the terms comply with Bankruptcy Code section

503(c); and describe the measures taken to ensure the fairness of the sale and the agreement. <u>See</u> Proposed Order Exh. 1 at "Qualified Bid" § (ix).

(j)    <u>Retention of or Access to Documents</u>. Each bidder must identify the entity that or person who will retain or have access to the Debtors' books and records.

(k)    <u>Bidding Increments</u>. Bids must be made in minimum increments in the amount of at least $100,000.00 (subject to modification in accordance with the terms of the Bidding Procedures).

(l)    <u>Credit Bids</u>. Any secured creditor may "credit bid" under Bankruptcy Code section 363(k).

(m)    <u>Pendency of Bid</u>. A bidder's offer will be irrevocable until the conclusion of the Sale Hearing; except that the Successful Bid and the Backup Bid, if any, will be irrevocable until 28 days after entry of the Sale Order, or such adjourned date to which the Debtors, CIBC, and the Committee agree.

(n)    <u>Backup Bidder</u>. If a Successful Bidder at the Auction fails to consummate an approved sale, the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, shall deem the bidder that submitted the next highest and best bid as the new Successful Bidder (and any backup bid as the new Successful Bid) in accordance with the Bidding Procedures, provided that CIBC will not have any obligation to consent to the designation of any Backup Bid (or Backup Bidder) in connection with the Auction or otherwise. <u>See</u> Proposed Order Exh. 1 at "Backup Bidder."

(o)    <u>Waiver of Stay</u>. The Debtors shall seek a waiver of the stay periods imposed by Bankruptcy Rules 6004(h) and 6006(d).

(p)    <u>Amendment of Bidding Procedures</u>. The Debtors, with the written consent of CIBC and in consultation with the Committee and EB, may amend, supplement, or otherwise modify the Bidding Procedures under certain circumstances. <u>See</u> Proposed Order Exh. 1 at "Amendment."

27.    The Debtors believe that this sale process may produce the highest and best price for the Sale Assets for the benefit of all interested parties.

28. The sale process is subject to the terms and provision of the Debtors' post-petition loan documents, including, without limitation, the alternative reorganization milestones set forth therein; the documents have not yet been approved by this Court.

## RELIEF REQUESTED

**THIS COURT SHOULD AUTHORIZE THE SALE OF THE DEBTORS' ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND APPROVE THE PROPOSED BIDDING PROCEDURES.**

29. The Debtors respectfully request that for the reasons set forth below this Court (i) authorize the sale of the Sale Assets free and clear of all liens, claims, encumbrances, and interests, pursuant to Bankruptcy Code sections 363(b), (f), and (m); (ii) authorize the assumption and assignment of executory contracts and unexpired leases pursuant to section 365; (iii) approve the proposed Bidding Procedures and assumption and assignment procedures; and (iv) grant other related relief as set forth below.

**A.      This Court Should Authorize the Debtors to
          Sell Their Assets Pursuant to Section 363(b)(1).**

30. A debtor-in-possession may, after notice and a hearing, sell property of the estate outside the ordinary of business.  11 U.S.C. § 363(b).  Sales outside of the ordinary course of business can be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

31. Although the Bankruptcy Code does not articulate a standard for approving a sale of assets, the United States Court of Appeals for the Third Circuit has interpreted section 363(b) to require a finding that the buyer of a debtor's assets be a good faith purchaser, meaning one who purchases "in good faith" and for "value."  In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986).

32. "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings."  Ibid.  "Typically, the misconduct that would

destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Ibid. (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

33. Here, the proposed sale of the Sale Assets satisfies the Abbotts Dairies standard. In short, the proposed Bidding Procedures, requiring comprehensive notice to all interested parties and culminating in a public auction, in combination with the marketing efforts already undertaken before the petition filing, will ensure that the Debtors reach a negotiated, arms-length transaction in which the ultimate purchaser acts in good faith, without collusion or fraud of any kind, and that the Debtors receive not only more than what they could receive in a piecemeal liquidation, but also reasonably equivalent value and fair consideration for the Sale Assets.

34. In addition to applying the Abbotts Dairies requirements, courts typically require a sound business purpose to sell assets outside of a plan of reorganization. See, e.g., In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). In determining whether a movant shows sound business purpose, courts consider the following non-exhaustive list of factors: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. Ibid.

35. Applying this standard, this Court has approved the sale of substantially all of a debtor's assets where the debtor has established a valid business purpose for the sale. See, e.g., In re EPV Solar, Inc., 2010 Bankr. LEXIS 6082, at *6-7 (Bankr. D.N.J. Aug. 20, 2010).

36.     Here, the following factors among others confirm that sound business reasons support the proposed sale: (a) debtors-in-possession have a fiduciary duty to protect and maximize estate's assets, see, e.g., Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004); in the present case, the Debtors, in consultation with CIBC and the Committee, have determined that they have a duty to consider whether, depending on the results of the auction, a sale of their assets as a going concern is the best possible course of action for all parties in interest; (b) the Bidding Procedures will require that accurate and reasonable notice will be provided to all prospective purchasers; (c) the auction will generate a fair and reasonable price, surely more than any recovery from a piecemeal liquidation; and (d) given the Debtors' declining revenues in the years preceding the petition filing, the assets may be declining in value.

37.     Therefore, the Debtors satisfy the requirements for sale of property of the estate under section 363(b).

**B.      This Court Should Authorize the Debtors to Sell Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Section 363(f).**

38.     Section 363(f) authorizes a debtor-in-possession to sell property of the estate free and clear of any interest or lien in such property if one of the following five criteria is met:

> 1.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> 2.     such entity consents;
>
> 3.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> 4.     such interest is in bona fide dispute; or
>
> 5.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.     Here, the Debtors can invoke more than one of these criteria. For starters, failure to object to a notice of a sale of property of the estate free and clear of constitutes consent to the sale for purposes of section 363(f)(2). <u>See</u>, <u>e.g.</u>, <u>Prime Healthcare Servs., Inc. v. Hudson Hosp. Propco, Inc. (In re Christ Hosp.)</u>, 2014 U.S. Dist. LEXIS 128409, at *36-39 (D.N.J. Sept. 12, 2014) ("The bankruptcy court also correctly held that the 'net effect of notice to, knowledge of, and nonobjection by [claimant] to the fully public bankruptcy sale process' resulted in consent for purposes of section 363(f)(2)." (quoting <u>In re Christ Hosp.</u>, 502 B.R. 158, 174 (Bankr. D.N.J. 2013))); <u>Hargrave v. Township of Pemberton (In re Tabone, Inc.)</u>, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) ("As the [secured creditor] did not offer any objection, it may be deemed to have consented to the sale for purposes of section 363(f)(2).").

40.     Here, the Debtors expect that, with the exception of any lien, claim, encumbrance, or interest that may be specifically assumed by the purchaser, each of the parties holding a lien, claim, encumbrance, or interest in or on any of the Sale Assets will either expressly consent or, absent opposition to this Motion, will be deemed to have consented to the sale under section 363(f)(2).

41.     Second, for purposes of section 363(f)(3), a sale price need only exceed the value of the liens on the property sold, as determined by an open market sale, such as an auction, and based on the definition of a secured claim in section 506(a), which equates a secured claim to the value of the collateral securing the claim. <u>See</u>, <u>e.g.</u>, <u>In re Boston Generating, LLC</u>, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010) ("As this Court previously held, the best evidence of the value of the Debtors' assets is the $1.1 billion [bid]. Based on [debtors' chief financial officer's] testimony, the proceeds of the Sale Transaction may be insufficient to pay the First Lien Debt in full; if that is the case, then the Second Lien Lenders' claims are not secured. Under <u>Beker</u> and the many

decisions of other Bankruptcy Courts following its reasoning, I find that section 363(f)(3) is satisfied." (citing In re Beker Indus. Corp., 63 B.R. 474 (Bankr. S.D.N.Y. 1986))); In re Electroglas, Inc., 2009 Bankr. LEXIS 4994, at *13 (Bankr. D. Del. Oct. 20, 2009) ("[T]he Sale satisfies the provisions of 363(f)(3) because the aggregate value of all liens was the actual economic value as determined by the Auction and the Claims and Encumbrances will attach to the proceeds of the Sale that will be received by the Debtors' estates.").

42.     Here, the Debtors propose to sell the Sale Assets on the open market, and depending on the offers received, at a public auction.  The price generated through the sale will reflect the market value of, and thus, the value of the liens attached to, the Sale Assets.  Because the sale price will be at least equal to the value of the liens as determined by the Auction, the sale will satisfy section 363(f)(3).

43.     Finally, a "cramdown" proceeding under section 1129(b)(2)(A), under which a secured creditor's claim can be "crammed down" to the value of the creditor's interest in property, qualifies as "a legal or equitable proceeding" pursuant to which a lien holder can be forced to accept less than full money satisfaction for its interest under section 363(f)(5).  See, e.g., In re WK Lang Holding, LLC, 2013 Bankr. LEXIS 5224, at *28-29 (Bankr. D. Kan. Dec. 11, 2013) ("Several courts have held that '[b]y its express terms, Section 363(f)(5) permits lien extinguishment if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt. Section 1129(b)(2) cram down is such a provision.' [Secured creditor] could be crammed down and, therefore, compelled to accept a money satisfaction of its lien.  Therefore, the proposed Sale No. 1 satisfies § 363(f)(5) and may be approved as a sale free and clear of liens." (footnotes omitted) (quoting Scherer v. Fed. Nat'l Mortgage Assoc. (In re Terrace Chalet Apartments, Ltd.), 159 B.R. 821, 829 (N.D. Ill. 1993))); In

re Ricco, Inc., 2014 Bankr. LEXIS 1265, at *16-17 (Bankr. N.D. W. Va. Apr. 1, 2014) (approving sale of estate's interest in real property free and clear of liens under section 363(f)(5) based on trustee's argument that "'cramdown' under § 1129(b)(2)(A) is a 'legal or equitable proceeding' by which he can force the [State] to accept a money satisfaction of its lien for less than the full amount owed thereon").

44.      Here, the secured creditors' liens (other than CIBC's liens) can be crammed down under section 1129(b)(2)(A).   Thus, the secured creditors (other than CIBC) can likewise be compelled to accept such a money satisfaction under section 363(f)(5).

45.      Therefore, the Debtors satisfy at least one of the criteria under section 363(f).   It follows that this Court should authorize the sale free and clear of any liens, claims, encumbrances, or interests.

**C.      This Court Should Approve the Break-Up Fee and Expense Reimbursement.**

46.       In considering a request for a "break-up fee," a court applies the general standard used for all administrative expenses, that is, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010) (quoting Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999)).   "[It is] permissible to offer  a break-up fee and reimbursement for expenses to induce an initial bid, provided the allowance of the fee does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition."  Ibid.

47.      A break-up fee can benefit an estate in several ways.  First, "such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been

limited." O'Brien, 181 F.3d at 537. Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may . . . provide[] a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Ibid. Third, a fee could assure that a bidder "adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for [the] sale" of the relevant asset. Reliant, 594 F.3d at 207.

48.    Here, subject to approval of an asset purchase agreement with another bidder at the Sale Hearing, the Debtors propose to pay to the Stalking Horse Bidder a break-up fee in the amount of 2.5% of the Proposed Purchase Price, plus reimbursement of actual, reasonable, and necessary expenses in an amount of up to $100,000.00. Alternatively, if the Debtors are unable to timely identify a Stalking Horse Bidder, and subject to approval of an asset purchase agreement at the Sale Hearing, the Debtors propose to pay, with the written consent of CIBC, and in consultation with the Committee and EB, each of the following prospective purchasers an expense reimbursement fee in an amount of up to $100,000.00 on account of actual, reasonable, and necessary out-of-pocket due diligence fees and expenses, including attorneys' fees: (i) any prospective purchaser, other than any prospective purchaser deemed a Stalking Horse Bidder prior to the Auction, that submits a Qualified Bid, that fully participates in the Auction, and that is deemed by the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, a Successful Bidder at such Auction; and (ii) any prospective purchaser, other than any prospective purchaser deemed a Stalking Horse Bidder prior to the Auction, that submits a Qualified Bid, that fully participates in the Auction, and that is deemed a Backup Bidder at such Auction in accordance with paragraph 26(n) of this Motion.

49. The Debtors submit that these protections, which are customary for the marketplace, will reasonably compensate prospective purchasers for performing necessary due diligence with respect to the Sale Assets and ultimately negotiating an agreement for sale; and that as a result, the protections will not chill bidding, but instead, will incentivize prospective purchasers to submit bids on which other bidders may rely and thereby increase the likelihood that the Debtors will receive the best possible price for the Sale Assets; and that as a result, the protections will benefit the estate. Therefore, the Break-Up Fee and other bid protections are reasonable and appropriate.

**D.     This Court Should Authorize the Debtors to Assume
          and Assign Executory Contracts and Unexpired Leases.**

50. As noted above, section 363(b) authorizes a debtor-in-possession to sell property of the estate outside the ordinary course of business after notice and a hearing. The Bankruptcy Code broadly defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Executory contracts and leases fall under this definition. Cinicola v. Scharffenberger, 248 F.3d 110, 121 (3d Cir. 2001) (citing L.R.S.C. Co. v. Rickel Home Centers (In re Rickel Home Centers, Inc.), 209 F.3d 291, 303 (3d Cir. 2000)).

51. Section 365(a) authorizes a debtor-in-possession to assume or reject executory contracts, and thereby enable "the trustee [or debtor-in-possession] to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not." Id. at 119 (quoting Rickel, 209 F.3d at 298). Before it may assume a contract or lease, the debtor-in-possession must cure, or must provide adequate assurance that it will promptly cure, certain defaults, if any, and provide adequate assurance of future performance. Ibid. (citing 11 U.S.C. § 365(b)(1)(A), (B)). "Adequate assurance of future performance" must be given a

"practical, pragmatic construction" in "light of the proposed assumption." In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola, 248 F.3d at 120 n.10).

52.     Section 365(f) in turn authorizes a debtor-in-possession to assign an executory contract or unexpired lease regardless of applicable laws or contractual provisions restricting assignment.  Cinicola, 248 F.3d at 120 (citing 11 U.S.C. § 365(f); Rickel, 209 F.3d at 298-99).  Before it may assign a contract or lease, the debtor-in-possession must first assume the contract or lease and provide adequate assurance of future performance by the assignee.  Ibid. (citing 11 U.S.C. § 365(f)(2)(A), (B)).

53.     Also, section 365(c) places constraints on the assignment rights created under § 365(f) and prohibits the assumption or assignment of an executory contract if applicable nonbankruptcy law would excuse the other party "from accepting performance from or rendering performance to" someone other than the debtor.  Id. at 121 (citing 11 U.S.C. § 365(c)(1)(A)).  In other words, if a contract could not be assigned under applicable law, it may not be assumed or assigned by the trustee.  Ibid. (citing 3 Collier on Bankruptcy P 365.06[1]).  But if the other party consents, the trustee may assume and assign the contract.  Ibid. (citing 11 U.S.C. § 365(c)(1)(B)).

54.     This Court has previously approved the assumption and assignment of executory contracts and unexpired leases in connection with the sale of substantially all of a debtor's assets.  See, e.g., EPV Solar, 2010 Bankr. LEXIS 6082, at *7-8 (Bankr. D.N.J. Aug. 20, 2010).

55.     Here, the Debtors intend to assume and assign as part of the sale certain executory contracts and unexpired leases, including (i) oil and gas customer contracts; (ii) military customer contracts, to the extent such contracts can be assumed and assigned under 11 U.S.C. § 365 with the consent of the applicable contract counterparty, as and to the extent required under 11 U.S.C. § 365; (iii) service contracts; (iv) equipment leases; and (v) real property leases.  In connection

with this process, the Debtors will cure any and defaults under these contracts and leases and provide adequate assurance of future performance by the assignee, and obtain the consent of any applicable counterparty, in each case as and to the extent required under the Bankruptcy Code.

56.     Therefore, the Debtors satisfy the requirements for assumption and assignment under section 365.

**E.      This Court Should Approve the Bidding
and Assumption and Assignment Procedures.**

57.     Notice of a proposed sale of property not in the ordinary course of business must be provided to all creditors pursuant to Bankruptcy Rule 6004(a), which incorporates Bankruptcy Rule 2002(a)(2), (c)(1), (i), and (k).   Under Bankruptcy Rule 2002(c)(1), a notice of a sale of property must include the time and place of any public sale and the time fixed for filing objections. The notice of a proposed sale of property is sufficient if it generally describes the property.

58.     Likewise, notice of a motion to assume and assign an executory contract or unexpired lease must be provided to the non-debtor party to the contract or lease and to the United States Trustee pursuant to Bankruptcy Rule 6006(c).

59.     Here, the Debtors propose to send notice of the Bidding Procedures, substantially in the form annexed as Exhibit 2 to the proposed Bidding Procedures Order, not more than three business days after entry of the Bidding Procedures Order.   Also, the Debtors propose to send notice of the assumption and assignment procedures, including proposed cure amount, substantially in the form annexed as Exhibit 4 to the Bidding Procedures Order.   The Debtors submit that such notice, reasonably calculated to provide timely and adequate notice of the proposed sale and assumption and assignment of executory contracts and unexpired leases, would comply with the rules noted above.

60. Moreover, the Debtors submit that the proposed sale procedures, which are briefly summarized above, and which appear in their entirety in Exhibit 1 to the proposed Bidding Procedures Order, and which include the scheduling of the Auction and the Sale Hearing, will facilitate a competitive bidding process in which all potential bidders will be encouraged to participate and submit competing bids for the Sale Assets, and will enable the Debtors to review, analyze, and compare and determine the highest and best offer or offers for the Sale Assets in the best interests of the estates and creditors. Similarly, the Debtors submit that the proposed assumption and assignment procedures, which are briefly summarized above, and which appear in their entirety in Exhibit 3 to the proposed Bidding Procedures Order, are reasonable and appropriate. Therefore, this Court should approve the proposed Bidding Procedures and assumption and assignment procedures.

**F.      This Court Should Waive the Stay Periods
          Under Bankruptcy Rules 6004(h) and 6006(d).**

61. Under Bankruptcy Rule 6004(h), unless the court orders otherwise, an order authorizing the sale of assets pursuant to section 363 is automatically stayed for a period of 14 days after entry of the order. Similarly, under Rule 6006(d), unless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is automatically stayed for a period of 14 days after entry of the order.

62. The purpose of Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Fed. R. Bankr. P. 6004 Advisory Committee Note (1999 Amendments); Fed. R. Bankr. P. 6006 Advisory Committee Note (1999 Amendments).

63. The court may in its discretion order that Rule 6004(h) and Rule 6006(d) are not applicable so that property may be sold and that a contract or lease can be assigned immediately.

Ibid.  See also 10 Collier on Bankruptcy ¶ 6004.11 at 6004-6004-24 (Richard Levin & Henry J. Sommer eds., 16th ed) (noting that the stay period can be eliminated to allow a sale or other transaction to close immediately in the absence of an objection).

64.    This Court has allowed a waiver of the stay periods under Rules 6004(h) and 6006(d) in other cases.  See, e.g., EPV Solar, 2010 Bankr. LEXIS 6082, at *21.

65.    Here, this Court should waive the stay periods under Rules 6004(h) and 6006(d) in order to allow the Debtors to consummate the sale as soon as possible and thereby minimize any accruing liabilities.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court grant (i) their Motion; and (ii) such other and further relief as may be just and proper.

**RABINOWITZ, LUBETKIN & TULLY, LLC**
Attorneys for Debtors/Debtors-In-Possession

By:    /s/ Jonathan I. Rabinowitz
       JONATHAN I. RABINOWITZ

Dated: February 17, 2023