**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, N.J. 07039
(973) 597-9100
Jonathan I. Rabinowitz
Henry M. Karwowski
jrabinowitz@rltlawfirm.com
Attorneys for Debtors/Debtors-In-Possession

Order Filed on May 26, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In re: | Case Nos. 22-18143, 22-18144 (MBK) |
| CUSTOM ALLOY CORPORATION, *et al.*, | Jointly Administered |
| Debtor. | Chapter 11 |

**ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (III) APPROVING CURE AMOUNTS,
AND (IV) GRANTING OTHER AND FURTHER RELATED RELIEF**

The relief set forth on pages numbered (2) through (____) is hereby **ORDERED**.

DATED: May 26, 2023

Honorable Michael B. Kaplan
United States Bankruptcy Judge

On February 17, 2023, Custom Alloy Corporation and CAC Michigan, LLC, the debtors in possession in the above-captioned cases (the "Debtors"), filed the *Motion of Chapter 11 Debtor-In-Possession Custom Alloy Corporation for Order Pursuant to 11 U.S.C. §§ 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; (5) Authorizing Debtors to Sell Substantially All of Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (6) Granting Related Relief* (Dkt. No. 301) (the "Sale Motion").  As used in this Sale Order (the "Sale Order"), "Asset Purchase Agreement" means the Asset Purchase Agreement dated as of May 20, 2023, by and among the Debtors, the other Sellers named therein, and CAC Acquisitions, LLC (together with its successors, "Buyer"), a copy of which, including exhibits but excluding disclosure schedules, which remain confidential, is attached hereto as Exhibit A.  Capitalized terms used but not defined in this Sale Order shall have the meanings ascribed to them in the Asset Purchase Agreement or, if not defined in the Asset Purchase Agreement, in the Bidding Procedures Order (as defined herein) and all exhibits thereto.

By the Sale Motion, the Debtors seek, among other things, approval of the sale (the "Sale") of substantially all of the Debtors' assets (the "Acquired Assets," as defined in the Asset Purchase Agreement), and the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts," as defined in the Asset Purchase Agreement) to a proposed buyer, subject to auction and overbids.  On February 27, 2023, the Court entered its *Order Pursuant to 11 U.S.C. §§ 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) An Auction*

*Sale and (B) A Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (4) Approving Form, Manner and Sufficiency of Notice; and (5) Granting Related Relief* (Dkt. No. 319) (the "Bidding Procedures Order").

In accordance with the Bidding Procedures Order, by notices dated April 5, 2023 (Dkt. No. 377), April 14, 2023 (Dkt. No. 387), and April 21, 2023 (Dkt. No. 402), certain deadlines and certain dates set forth in the Bidding Procedures Order were extended.  By notice dated April 27, 2023 (Dkt. No. 415), the Debtors identified Buyer as the Stalking Horse Bidder under the Bidding Procedures Order.

On May 5, 2023, the Debtors filed a *Notice of Auction Results Pursuant to Bidding Procedures Order* (Dkt. No. 441), stating, among other things, that an Auction had been held on May 3, 2023, and that the Debtors, pursuant to the Bidding Procedures Order, designated Buyer as the Successful Bidder and CAA Partners, LLC as the Back-Up Bidder.

On May 9, 2023, this Court held a hearing (the "Sale Hearing") on the Sale Motion and the relief requested therein, including, among other things, the Debtors' request for this Court to approve the sale of the Acquired Assets to Buyer.  Appearances and all responses and objections to the Sale Motion have been duly noted on the record of the Sale Hearing.

The Court has considered the Sale Motion, all pleadings and papers filed in support of or in response to the Sale Motion, the arguments of counsel at the Sale Hearing, the testimony given, the proffers made at the Sale Hearing, and the entire record of these bankruptcy cases, and it finds that the relief granted in this Sale Order is in the best interests of the Debtors, the Debtors' estates, creditors, and all parties in interest.  Accordingly, after due deliberation and for good and sufficient cause shown,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

## Jurisdiction, Final Order and Statutory Predicates

A.    This Court has jurisdiction to hear and determine the Sale Motion and over the property

of the Debtors' estates, including the Acquired Assets to be sold, transferred or conveyed pursuant to

the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334(b).  The Sale Motion is a core

proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (N).  Venue of these cases and the Sale Motion in

this district is proper under 28 U.S.C. § 1408.

B.    The statutory predicates for the relief requested herein are (i) sections 105, 363, 365

and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"),

(ii) Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and (iii) Rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the United

States Bankruptcy Court for the District of New Jersey (the "Local Rules").

C.    The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this matter pursuant to

Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of

law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings

of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and

conclusions of law made by the Court during or at the conclusion of the Sale Hearing.  This Sale

Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**Notice of Sale and Sale Process**

D.    As evidenced by the certificates of service filed with the Court (Dkt. Nos. 308, 324,

326, 341, 380, 381, 392, 393, 406, 407, 414, 426, 428, 436, 437, and 451), proper, timely, adequate,

and sufficient notice (the "Sale Notice") of the Sale Motion, the Bidding Procedures, the Assumption

and Assignment Procedures (as defined in the Bidding Procedures Order), the Sale Hearing, and the relief

provided in this Sale Order has been provided in accordance with the Bidding Procedures Order,

applicable Bankruptcy Rules, and the Local Rules.  The Sale Notice was reasonably calculated to

provide interested parties with timely and proper notice of the Sale, the Bidding Procedures, the Assumption and Assignment Procedures, and the Sale Hearing. Parties interested in bidding on the Acquired Assets were provided sufficient information to make an informed judgment on whether to bid on the Acquired Assets. No other or further notice of the Sale Motion, the Bidding Procedures, the Sale Hearing, the Sale, the relief provided in this Sale Order, or the entry of this Sale Order is required.

E.       The Debtors and Buyer, together with their affiliates and their professionals, have complied, in good faith, with the Bidding Procedures Order in all respects. As demonstrated by the testimony and evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, (i) afforded potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Debtors' assets; and (ii) considered all indications of interest from potential purchasers, whether or not conforming to the requirements of the Bidding Procedures Order.

F.       The Bidding Procedures and the Assumption and Assignment Procedures, set forth in the Bidding Procedures Order, were created and followed in good faith by the Debtors and Buyer and are substantively and procedurally fair to all parties.

## **Highest and Best Offer**

G.       Buyer's offer to purchase the Acquired Assets under the terms and conditions set forth in the Asset Purchase Agreement: (i) was made in good faith and complied in all respects with the Bidding Procedures Order; (ii) is the highest and best offer obtained for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other alternative; (iii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for

the Acquired Assets being conveyed to Buyer; (iv) is fair and reasonable; (v) is in the best interests of the Debtors' estates, the Debtors' creditors, and other parties in interest; and (vi) would not have been made by Buyer absent the protections afforded to Buyer by the Bidding Procedures Order, the Asset Purchase Agreement, the Bankruptcy Code, and this Sale Order.

H.      The Debtors' determination that the Sale to Buyer, pursuant to the Asset Purchase Agreement, provides the highest or otherwise best offer for the Acquired Assets, and their related decision to sell the Acquired Assets to Buyer, each constitutes a reasonable exercise of the Debtors' business judgment and each is in the best interests of the Debtors, their estates, and their creditors. The facts and circumstances stated in the Sale Motion demonstrate the exigent nature of the Debtors' business situation, and the Debtors have articulated sound business reasons for consummating the Asset Purchase Agreement and for selling the Acquired Assets outside of a chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver, and consummate the Asset Purchase Agreement and consummate the transactions contemplated by the Asset Purchase Agreement, subject to this Sale Order.

I.      The Debtors exercised reasonable business judgment in agreeing to pay the Break-Up Fee and Reimbursable Expenses.  The opportunity to obtain the Break-Up Fee and Reimbursable Expenses constituted a material inducement to Buyer in making its initial bid.

**Validity of Transfer**

J.      The Debtors have full corporate power and authority to execute, deliver, and perform under the Asset Purchase Agreement and to consummate all transactions contemplated thereby, without any further consent or approval required.  No other consents or approvals, other than as may be expressly provided for in the Asset Purchase Agreement and this Sale Order, are required to consummate the Sale.

K.      Except as otherwise expressly set forth herein, the Debtors have good, valid, and marketable title to all of the Acquired Assets, including, without limitation, all intellectual property, and no other person or entity has any ownership right, title, or interests therein except for holders of Interests, as such term is hereafter defined.  The Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The transfers of the Acquired Assets to Buyer and the assignments of the Assigned Contracts to Buyer pursuant to this Sale Order and the Asset Purchase Agreement shall constitute legal, valid, binding, and effective transfers of the Acquired Assets and assignments of the Assigned Contracts, and shall vest Buyer with good and valid title to the Acquired Assets and Buyer with all rights under the Assigned Contracts pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, obligations, liabilities, demands, judgments, guarantees, options, debts, indebtedness, rights, restrictions, contractual commitments, real or shadow equity rights or interests, rights of first refusal, rights of setoff (except as otherwise set forth herein), rights to object to consent, and interests of any kind or nature, whether known or unknown, legal or equitable, direct or indirect, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, monetary or non-monetary, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity,  or otherwise  (collectively, the "Interests"),  except as

otherwise provided in this Sale Order or in the Asset Purchase Agreement (inclusive of the disclosure schedules annexed thereto), with such Interests to attach to the proceeds of Sale, in the order of their priority, with the same priority, validity, force, and effect as such Interests had immediately prior to the consummation of such Sale. All proceeds of the Sale shall be remitted to the Debtors, subject to the terms of any order authorizing debtor-in-possession financing or use of cash collateral approved by the Court in these bankruptcy cases and any other applicable order of the Court. All Interests with respect to the Excluded Assets (as defined in the Asset Purchase Agreement) will continue in, under, and against the Excluded Assets with the same priority, validity, force, and effect as such Interests now have.

L.      Holders of Interests in or with respect to the Acquired Assets (including without limitation, all secured creditors) that did not object, or that withdrew their objections, to the sale of the Acquired Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Otherwise, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply to those holders of Interests in or with respect to the Acquired Assets that did object and such holders are adequately protected by having their Interests, if any, attach to the proceeds of the Sale of the Acquired Assets ultimately attributable to the property against or in which they claim or may claim any Interests, in the order of their priority with the same priority, validity, force, and effect as such Interests had immediately prior to the consummation of such Sale.

M.      If the Sale of the Acquired Assets to Buyer and the assignment of the Assigned Contracts to Buyer were not free and clear of all Interests, Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, the Debtors' estates, creditors, and other parties in interest.

N.      Notwithstanding anything else in this Order to the contrary, all Acquired Assets that the Debtors purchased using funds obtained through the Supplier Development Fund program,

whether acquired pursuant to the *Final Order Authorizing the Debtors to Obtain Post-Petition Purchase Money Financing Pursuant to 11 U.S.C. § 364* entered on December 2, 2022 (Dkt. No. 178), the *Final Order Authorizing the Debtors to Obtain Post-Petition Purchase Money Financing Pursuant to 11 U.S.C. § 364 For the Purchase of Certain Equipment* entered on December 29, 2022 (Dkt. No. 228), or the *Final Order Granting Debtor's Omnibus Motion For Authorization to Obtain Post-Petition Purchase Money Financing Pursuant to 11 U.S.C. § 364 For Purchase Of Certain Equipment and Granting Other Relief* entered on May 19, 2023 (Dkt. No. 488) or acquired prior to the commencement of these cases  (collectively, the "SDF Equipment") pursuant to certain Assigned Contracts (the "SDF Agreements") with Electric Boat Corporation ("EB"), shall be transferred to Buyer subject to EB's Interests in such SDF Equipment and subject to all of the terms of the SDF Agreements.

**<u>Good Faith Purchaser</u>**

O.      Buyer is a purchaser in "good faith," as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Acquired Assets.  The Asset Purchase Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind. Neither the Debtors nor Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Asset Purchase Agreement or to the consummation of the Sale and transfer of the Acquired Assets and Assigned Contracts to Buyer.  Specifically, Buyer has not acted in a collusive manner with any person or entity and was not controlled by any agreement among potential or actual bidders.  Also, Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

P.     The Debtors dealt with not only Buyer but also several other parties interested in acquiring the Acquired Assets (as more fully disclosed on the record), and Buyer fully complied with the Bidding Procedures and the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.  Other than the claims arising under the Asset Purchase Agreement, the Debtors and their estates agree and acknowledge that they have no claims against Buyer, and Buyer agrees and acknowledges that it has no claims against the Debtors.

### No Fraudulent Transfer

Q.     The transfers of the Acquired Assets, assignments of the Assigned Contracts, and other transfers contemplated by the Asset Purchase Agreement pursuant to the terms of this Sale Order and the Asset Purchase Agreement constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and similar laws of any state, territory, possession, or the District of Columbia.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than Buyer. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor Buyer is entering into the transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and similar claims.

### Cure/Adequate Protection

R.     The Assigned Contracts are executory contracts or unexpired leases within the applicable meanings contemplated by the Bankruptcy Code.  The inclusion of the rights to assume and assign the Assigned Contracts, as among the Acquired Assets under the terms of this Sale Order and the Asset Purchase Agreement, is an integral component of the overall transaction reflected in the

Asset Purchase Agreement. The inclusion within the Acquired Assets of the Assigned Contracts reflects the Debtors' exercise of reasonable business judgment and is fair to all parties. The Court's approval of such treatment of the Assigned Contracts is in the best interests of the Debtors, the Debtors' estates, creditors, and all parties in interest.

S.    The notice described in this Sale Order and on the record to parties to the Assigned Contracts regarding the treatment of such Assigned Contracts constituted, under the Assumption and Assignment Procedures and otherwise, adequate notice and opportunity to be heard with respect to the assumption by the Debtors and the assignment to Buyer of the Assigned Contracts and all relevant matters. Except as otherwise set forth herein, any objections to the assumption and assignment of any of the Assigned Contracts to Buyer are hereby overruled. Any objections to the Cure Amounts are resolved or adjourned as set forth herein. The parties to the Assigned Contracts that did not timely object to assumption and assignment of the Assigned Contracts have waived any objections, and are hereby deemed to have consented, to the assumption by the Debtors and assignment to Buyer of the Assigned Contracts and to the amount of the applicable Cure Amounts. Accordingly, except as otherwise expressly provided in this Sale Order, each of the Assigned Contracts including, without limitation, each intellectual property agreement and each intellectual property license related to the Debtors' business or the Acquired Assets, is assumable by the Debtors and assignable to Buyer under the terms of this Sale Order and the Asset Purchase Agreement, subject only to payment of the applicable Cure Amounts under the terms of this Sale Order and the Asset Purchase Agreement.

T.    Payment of the applicable Cure Amounts, as set forth in Exhibit B hereto, under the terms of this Sale Order and the Asset Purchase Agreement shall effect a cure of all defaults existing under the applicable Assigned Contract as of the effective date of assignment and compensate for any actual pecuniary loss to each non-Debtor party to the Assigned Contract resulting from any such default, thereby satisfying the requirements of sections 365(b)(1)(A) and 365(b)(1)(B) of the

Bankruptcy Code. Buyer has demonstrated adequate assurance of its future performance under the

Assigned Contracts within the meanings of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy

Code, including, without limitation, by its promises to perform obligations under the Assigned

Contracts. All requirements applicable to the assumption by the Debtors and/or the assignment to

Buyer of each of the Assigned Contracts, under section 365 of the Bankruptcy Code or otherwise,

have been satisfied.

### Compelling Circumstances for an Immediate Sale

U. The Debtors have demonstrated a sufficient basis and compelling circumstances

requiring the Debtors to enter into the Asset Purchase Agreement, sell the Acquired Assets and assume

and assign the Assigned Contracts under Bankruptcy Code sections 363 and 365 prior to proposing a

plan of reorganization or liquidation under Bankruptcy Code section 1129, and such actions are

appropriate exercises of its reasonable business judgment and in the best interests of, and entirely

fair to, the Debtors, their estate and their creditors. Such business reasons include, but are not limited

to, the facts that (i) there appears to be inadequate liquidity, or opportunity to obtain liquidity, to allow

the Debtors' business to continue through 2023, (ii) it is unclear whether the Debtors will be able to

pay their administrative expenses and therefore be able to confirm any plan absent the support of

secured creditors, (iii) the Asset Purchase Agreement constitutes the highest or best bid for the

Acquired Assets received by the Debtors; (iv) the Asset Purchase Agreement and Closing will present

the best opportunity to realize the value of the Debtors on a going-concern basis and avoid decline in

the Debtors' business; and (v) unless the Sale is concluded expeditiously as provided for in the Sale

Motion and pursuant to the Asset Purchase Agreement, stakeholders' recoveries may be diminished.

V. The sale approved by this Sale Order does not constitute a *de facto* or *sub rosa*

reorganization or liquidation plan or an element of such a plan for the Debtors, and does not propose

to (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent

voting rights with respect to any future plan; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; (iv) classify claims or equity interests, compromise controversies, or extend debt maturities; or (v) propose to pay any of the proceeds of the Sale in a manner that would violate the priority scheme of the Bankruptcy Code.

### General Findings

W.      Time is of the essence in consummating the transactions contemplated by the Asset Purchase Agreement.  The Debtors and Buyer intend to close the sale under the Asset Purchase Agreement as soon as practicable.

X.      Pursuant to the terms of the Asset Purchase Agreement, Buyer is not merging or consolidating with the Debtors or their estates.  Buyer is not a mere continuation of the Debtors or their estates and there is no continuity of enterprise between Buyer and the Debtors.  Buyer is not holding itself out to the public as a continuation of the Debtors.  Buyer is not a successor to the Debtors or their estates and the sale under the Asset Purchase Agreement does not amount to a consolidation, merger or de facto merger of Buyer and the Debtors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

### General Provisions

1.      The Sale Motion is GRANTED as set forth herein.

2.      Except as otherwise set forth herein, any and all objections or responses to the Sale Motion, the relief requested therein, or the relief provided in this Sale Order that have not been withdrawn, resolved, or addressed in this Sale Order, are overruled in all respects on the merits.

### Approval of the Asset Purchase Agreement

3.      The Asset Purchase Agreement is hereby approved.

4.      Each of the terms of, and each of the transactions contemplated by, the Asset Purchase Agreement is hereby approved and may be consummated.  The failure to include specifically any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.  To the extent of any conflict or inconsistency between the provisions of this Sale Order and the terms and conditions of the Asset Purchase Agreement, as applicable, this Sale Order shall govern and control.  Notwithstanding anything contained in the Bidding Procedures Order, a Closing shall be held if and as set forth pursuant to the Asset Purchase Agreement, and no later than May 24, 2023 or such later date on which all conditions set forth in Article VII of the Asset Purchase Agreement are satisfied or waived.

5.      The Debtors and Buyer and their officers, employees, and agents are authorized to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement, and close fully the Asset Purchase Agreement, and each of the transactions contemplated thereby, including, without limitation, assignment of the Assigned Contracts, under the terms of this Sale Order and the Asset Purchase Agreement.

## Transfer of the Acquired Assets

6.      The transfers of the Acquired Assets to Buyer and the assignments of the Assigned Contracts to Buyer pursuant to this Sale Order and the Asset Purchase Agreement shall constitute legal, valid, binding, and effective transfers of the Acquired Assets and assignments of the Assigned Contracts, and shall vest Buyer with good and valid title to the Acquired Assets and with all rights under the Assigned Contracts, to the extent permitted under sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, free and clear of all Interests other than Assumed Liabilities, Permitted Liens, and Interests of EB in the SDF Equipment, and except as otherwise expressly set forth herein.  At the Closing, with respect to the Acquired Assets and at the applicable effective dates with respect to the

Assigned Contracts, all Interests shall be unconditionally released, terminated, and discharged solely as to and from the Acquired Assets, the Assigned Contracts, and Buyer, and shall attach to the Sale proceeds with the same priority, validity, force, and effect that they had against the Acquired Assets immediately before the consummation of the Sale of the Acquired Assets and assignments of the Assigned Contracts. Except as specifically provided otherwise in the Asset Purchase Agreement or this Sale Order, the sole and exclusive right and remedy available to any person or entity that asserts any Interest (a) in any way related to (i) the Acquired Assets that is incurred or otherwise arises prior to the date of the Closing, or (ii) the Assigned Contracts that is incurred or otherwise arises prior to the applicable effective date of assignment, or (b) by reason of the sale of the Acquired Assets to Buyer or the assignments of the Assigned Contracts to Buyer, shall be a right to assert such Interest against the Debtors' estates and the proceeds of the Sale of the Acquired Assets, and no such right or remedy against Buyer, the Acquired Assets or the Assigned Contracts shall survive the Closing. Notwithstanding the foregoing, the Interests of EB in the SDF Equipment shall continue to attach to the SDF Equipment pursuant to the terms of the SDF Agreements.

7.      For the avoidance of doubt, nothing in this Sale Order shall be determinative of the priority or validity of any Interest that any party has to the Sale proceeds or any portion thereof. All proceeds of the Sale shall be remitted to the Debtors except as otherwise expressly provided in the Asset Purchase Agreement, subject to the terms of any order authorizing debtor-in-possession financing or use of cash collateral approved by the Court in these bankruptcy cases and any other applicable order of the Court. All Interests with respect to the Excluded Assets will continue in, under, and against the Excluded Assets with the same priority, validity, force, and effect as such Interests now have. With respect to non-Debtor parties BMO Harris Bank NA, Huntington National Bank, Leaf Capital Funding, LLC, Midland States Bank, Mitsubishi HC Capital America, Inc. ("Mitsubishi"), and U.S. Bank, N.A. d/b/a U.S. Bank Equipment Finance (together with their

respective successors and assigns, collectively the "Objecting Interest Holders"), a portion of the Sale

proceeds, equal to the amount set forth in each Objecting Interest Holder's Proof of Claim, or in the

case of Mitsubishi, Mitsubishi's Objection to Sale of Certain Equipment Free and Clear of Liens (Dkt.

No. 446) and pleadings referenced therein including the Affidavit of Brian Kerrins (Dkt. 313-1), shall

be held by the Debtors in escrow (such escrow, the "Specified Escrow") until the date that is forty-

five (45) days after the Closing Date of the Sale (the "Escrow Deadline").  If no objection to an

Objecting Interest Holder's claim is filed on or before 11:59 p.m. (Eastern Time) on the date of the

Escrow Deadline, an amount equal to the Objecting Interest Holder's allowed secured claim, or such

amount to which the Objecting Interest Holder, CIBC, and the Debtors may otherwise agree to in

writing, shall be promptly disbursed from the Specified Escrow to the applicable Objecting Interest

Holder.  If an objection to an Objecting Interest Holder's claim is filed on or before 11:59 p.m.

(Eastern Time) on the date of the Escrow Deadline, the Objecting Interest Holder shall not receive

payment from the Specified Escrow unless and until either (a) the Objecting Interest Holder, CIBC,

and the Debtors reach an agreement in writing regarding the Objecting Interest Holder's allowed

secured claim, if any; or (b) the Court makes a final, nonappealable determination with respect to the

Objecting Interest Holder's allowed secured claim, if any; provided, however, that the inclusion of a

counterparty as an Objecting Interest Holder does not constitute an agreement, admission, or finding

that any Objecting Interest Holder is a party to an executory contract or "true lease" with the Debtors

or that any Objecting Interest Holder holds a valid, perfected, or priority Interest in any asset or

property of any Debtor, including any Acquired Asset or Excluded Asset, or any proceeds thereof.

        8.      At the Closing, or as soon as practicable thereafter, and except with respect to the SDF

Equipment, (a) the Debtors are hereby authorized and directed to execute and file such termination

statements, instruments of satisfaction, releases, or other documents to reflect the unconditional

release, termination, and discharge of such Interests on behalf of such person or entity with respect to

the Acquired Assets and the Assigned Contracts (provided that, with respect to the Interests of CIBC, any such documents, instruments, or agreements will be in form and substance acceptable to CIBC), and (b) Buyer is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Acquired Assets or the Assigned Contracts.

9.      On the Closing Date, except as otherwise expressly set forth herein this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sellers' interests in the Acquired Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

10.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to cancel any liens and other encumbrances of record except those assumed as Assumed Liabilities, Permitted Liens or Interests of EB in the SDF Equipment.  All persons and entities (including, without limitation, all filing, registration, or recording officers or agents, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all others that may be required by operation of law, the duties of their offices, or contract, to accept, file, register, or record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any of the Acquired Assets or Assigned Contracts) are hereby (a) authorized to (i) accept this Sale Order as sole and sufficient evidence of the transfers of all right, title, and interest in, to, and under the Acquired Assets and the Assigned Contracts, and may rely on this Sale Order in consummating, or facilitating the consummation of, the transactions contemplated

by the Asset Purchase Agreement, and (ii) accept, file, register, and/or record all documents and

instruments of transfer including, without limitation, deeds, leases, and assignments, modifications,

and terminations of leases (if any), that may be filed, registered, and/or recorded under the terms of

this Sale Order or the Asset Purchase Agreement; and (b) prohibited and enjoined from taking any

action that would adversely affect or interfere with the ability of the Debtors to transfer the Acquired

Assets to Buyer, or assign the Assigned Contracts to Buyer, in each case in accordance with the terms

of this Sale Order and the Asset Purchase Agreement, free and clear of all Interests, and from

otherwise interfering with Buyer's enjoyment of the Acquired Assets or the Assigned Contracts;

provided that nothing contained herein shall constitute a waiver of the payment of any transfer taxes that

are otherwise payable.

## Section 363(f) Is Satisfied

11.    The sale of the Acquired Assets and assignment of the Assigned Contracts shall be and

is free and clear of all Interests, except for Assumed Liabilities, Permitted Liens and the Interests of EB

in the SDF Equipment, for the reasons set forth in this paragraph, and except as otherwise expressly

set forth herein.  Holders of Interests that did not object, or that withdrew their objections, to the Sale

Motion are hereby deemed to have consented to the sale of the Acquired Assets and assignments of

the Assigned Contracts free and clear of their Interests, which satisfies section 363(f)(2) of the

Bankruptcy Code.  Also, to the extent that the consideration to be received under the Asset Purchase

Agreement exceeds the value of all Interests in the Acquired Assets and the Assigned Contracts, section

363(f)(3) is satisfied.  In addition, section 363(f)(5) is satisfied because, among other reasons, under

Bankruptcy Code section 1129(b)(2)(A), the holders of Interests (other than CIBC, as defined in the

Bidding Procedures Order) could be forced to accept money satisfaction for their interests in a "cramdown"

proceeding; and under applicable state law, the holders of Interests (other than CIBC, as defined in the

Bidding Procedures Order) could be compelled in foreclosure or receivership proceedings to accept

money satisfactions of their Interests in amounts less than the actual amounts of the Interests. All
Interests shall attach to Sale proceeds with the same priority, validity, force, and effect that they had
immediately before the consummation of the Sale of the Acquired Assets and assignments of the
Assigned Contracts.

12.     All persons and entities that are presently, or at the Closing may be, in possession of
some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets
to Buyer at the Closing, or as otherwise directed by Buyer.

### Prohibition of Actions Against Buyer

13.     To the greatest extent available under applicable law, and except as otherwise provided
in this Sale Order, Buyer shall be authorized, as of the Closing Date and upon the occurrence of the
Closing, to operate under any transferred license, permit, registration and governmental authorization
or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits,
registrations and governmental authorizations and approvals are deemed to have been, and hereby are,
directed to be transferred to Buyer as of the Closing Date.

14.     The provisions of this Sale Order authorizing the sale of the Acquired Assets free and
clear of Liens, Claims, encumbrances, Liabilities, or other Interests, other than Assumed Liabilities,
Permitted Liens and the Interests of EB in the SDF Equipment and except as otherwise expressly set
forth herein (with such Interests to attach to the proceeds of Sale in the order of their priority, with the
same priority, validity, force, and effect as such Interests had immediately before the consummation
of the Sale), shall be self-executing, and neither the Debtors nor Buyer shall be required to execute
or file releases, termination statements, assignments, consents, or other instruments in order to
effectuate, consummate and implement the provisions of this Sale Order. Moreover, effective as of
the Closing, Buyer, its successors and assigns, shall be designated and appointed the Debtors' true
and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on

behalf and for the benefit of Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

15.     Except with respect to Permitted Liens, Assumed Liabilities and the Interests of EB in the SDF Equipment, and except as otherwise expressly set forth herein, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims, encumbrances, Liabilities, or other Interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' Business prior to the Closing Date or the transfer of the Acquired Assets to Buyer, hereby are estopped and enjoined from asserting against Buyer, its Affiliates, its successors or assigns, their property or the Acquired Assets, such persons' or entities' Liens, Claims, encumbrances, Liabilities, or other Interests in and to the Acquired Assets that arose prior to the Closing Date. The foregoing prohibition and injunction includes, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against Buyer, its Affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, its Affiliates, its successors, assets

or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against Buyer, its

Affiliates, its successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or

recoupment of any kind against any obligation due Buyer, its Affiliates or its successors; (v)

commencing or continuing any action, in any manner or place, that does not comply or is inconsistent

with the provisions of this Sale Order or other orders of the Court, or the agreements or actions

contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer

or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of

the businesses operated with the Acquired Assets.  On the Closing Date, each creditor is authorized

to execute such documents and take all other actions as may be necessary to release Liens, Claims,

encumbrances, Liabilities, and other Interests in or on the Acquired Assets (except Permitted Liens,

Assumed Liabilities and the Interests of EB in the SDF Equipment), if any, as provided for herein, as

such Liens may have been recorded or may otherwise exist.

16.    Buyer shall not be deemed a "successor," alter-ego, or mere continuation of the

Debtors or their estates by reason of any theory of law or equity, and Buyer shall not assume, nor be

deemed to assume, or in any way be responsible for, any liability or obligation of the Debtors and/or

their estates arising under or related to the Acquired Assets or otherwise, including, but not limited to,

any bulk sales law, successor liability, liability or responsibility for any Claim against the Debtors or

against an insider of the Debtors, or similar liability, except as otherwise expressly provided in the

Asset Purchase Agreement.  Except to the extent Buyer assumed the Assumed Liabilities pursuant to

the Asset Purchase Agreement, in accordance with section 363(f) of the Bankruptcy Code, neither

the purchase of the Acquired Assets by Buyer, nor the fact that Buyer is using any of the Acquired

Assets previously operated by the Debtors, will cause Buyer to have any successor, alter ego, or

vicarious liabilities of any kind or character, including, but not limited to, under any theory of

antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere

continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of or under (i) any foreign, federal, state or local revenue, pension, labor, employment, or wage laws, including but not limited to any withdrawal liability, tax, antitrust, environmental laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), including, without limitation, (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (ii) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine; (iii) any employment or labor agreements, collective bargaining agreements, consulting agreements, severance arrangement, change-in-control agreements or other similar agreements to which the Debtors are parties; (iv) any pension, health, welfare, compensation or other employees or retiree benefit plans, agreement, practices and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements, collective bargaining agreements, or pension, health, welfare, compensation or other employee or retiree benefit plans, agreements, practices and programs, and any

obligation that might otherwise arise from any such cessation, dismissal or termination pursuant to any law of the United States, any State therein, or any other jurisdiction in the world, whether such obligations arise under any contract, agreement, statute, regulation, ordinance, common law, public policy, constitution or any other source, including with limitation, the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act; (vi) environmental liabilities, debts, claims or obligations arising from the condition first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including without limitation under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq.; (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes relating to the operation of the Acquired Assets prior to the Closing; and (ix) any litigation. For the avoidance of any doubt, the terms of this paragraph shall not apply to claims against Buyer that arise by virtue of the post-Closing conduct of Buyer rather than the successor liability and related claims described in this paragraph.

17.    As of the Closing, Buyer shall have any and all rights, claims, defenses, and offsets held by the Debtors and/or the Debtors' estates with respect to the Assumed Liabilities. All persons and entities are prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to Buyer in accordance with the terms of the Asset Purchase Agreement and this Sale Order.

## Assumption and Assignment of Contracts

18.    The record establishes that there are good, valid, and sound business reasons for the assumption and assignment of the Assigned Contracts; that the decision to assume and assign the Assigned Contracts is an appropriate exercise of the Debtor's business judgment; and that all requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption and assignment to Buyer of Assigned Contracts have been satisfied.

19.    Subject to the procedures set forth in this Sale Order and the terms of the Asset Purchase Agreement, the Debtors are authorized to assume and assign to Buyer the Assigned Contracts, pursuant to sections 105 and 365 of the Bankruptcy Code. Such assignments shall be free and clear of all Liens, Claims, encumbrances, Liabilities, or other Interests, except for the Assumed Liabilities, Permitted Liens and the Interests of EB in the SDF Equipment, with all such Liens, Claims, encumbrances, Liabilities, or other Interests deemed unconditionally released, terminated, and discharged as to the Assigned Contracts and Buyer and, following assignment, Buyer shall be fully and irrevocable vested with all of the Assigned Contracts. Such assignments of the Assigned Contracts shall be entitled to all of the benefits and protections afforded by this Sale Order in connection with the Acquired Assets and the transfers thereof as if the Assigned Contracts were among the Acquired Assets.

20.    Except as otherwise provided in this Sale Order, (a) each Assigned Contract is an executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assigned Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such

Assigned Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of each Assigned Contract have been satisfied; (e) the Assigned Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, Buyer, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer; (f) pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by Buyer; and (g) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract.

21.      Any provision in any Assigned Contract that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtors is unenforceable, and all such Assigned Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amount, if any, by either the Debtors or Buyer (pursuant to the terms of the Asset Purchase Agreement).  No sections or provisions of any Assigned Contract that purport to provide for additional payments, rent accelerations, assignment fees, increases, payments, charges or any other fees charged to Buyer or the Debtors as a result of the assumption and the assignment of the Assigned Contracts shall have any force and effect with respect to the transactions contemplated by the Asset Purchase Agreement and assignments authorized by this Sale Order, and such provisions constitute unenforceable anti-assignment provisions under Section 363(f) of the Bankruptcy Code.  Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or

otherwise, to provide any additional deposit or security with respect to any Assigned Contract to the extent not previously provided by the Debtors.

22.    The Cure Amounts are hereby fixed at the amounts set forth in Exhibit B hereto, and the counterparties to the Assigned Contracts are bound by such Cure Amounts and are hereby precluded from objecting to the Cure Amounts (if any) related to such Assigned Contracts and the assumption and assignment of any Assigned Contract and enjoined from taking any action against Buyer or the Acquired Assets with respect to any claim for cure, alleged default, or any other claim that purports to have accrued or arisen prior to assignment, under any Assigned Contract, or against the Debtors for any amounts other than the Cure Amounts.  Payment of the Cure Amounts shall discharge the Debtors' obligation to cure or provide adequate assurance that the Debtors will promptly cure any defaults or to compensate, or provide adequate assurance that the Debtor will promptly compensate, any counterparty to the Assigned Contracts, for any actual pecuniary loss resulting from any default under the Assigned Contracts.

23.    Upon the Debtors' assumption and assignment of the Assigned Contracts to Buyer under the provisions of this Sale Order and any additional orders of this Court, and the Debtors' or Buyer's (pursuant to the terms of the Asset Purchase Agreement) payment of Cure Amounts pursuant to paragraph 22 hereof, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted (a) to declare a default by Buyer under such Assigned Contract for alleged defaults existing prior to Closing or (b) otherwise take action against Buyer or the Debtors as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Contract.  Each party to an Assigned Contract hereby is also estopped and enjoined from (i) asserting against Buyer, or its property, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, or, against Buyer, any counterclaim, defense, setoff or any other Claim asserted or

assertable against the Debtors; and (ii) imposing or charging against Buyer or its Affiliates any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignments to Buyer of the Assigned Contracts. The validity of such assumption and assignments of the Assigned Contracts shall not be affected by any dispute between the Debtors and any non-Debtor party to an Assigned Contract relating to such Assigned Contract's respective Cure Amount.

24.     Buyer has satisfied all requirements under Bankruptcy Code sections 365(b)(1) and 365(f)(2) to provide adequate assurance of future performance under the Assigned Contracts.

25.     The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assigned Contracts.

26.     To the greatest extent available under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any licenses, permits, registrations, certificates, approvals, authorizations, Assigned Contracts, and other commitments relating to the Acquired Assets, and all such licenses, permits, registrations, certificates, approvals, authorizations, Assigned Contracts, and other commitments relating to the Acquired Assets are deemed to have been, and are hereby directed to be, transferred to Buyer or any assignee of Buyer as of the Closing. To the extent provided by Bankruptcy Code section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases.

27.     Notwithstanding anything to the contrary in the *Second Amended Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale of Substantially all of the Debtors' Assets* filed on May 2, 2023 (Dkt. No. 427), or this Sale Order, the Contracts between any of the Debtors and the following counterparties: Cigna (as defined below); Constellation NewEnergy, Inc. and Constellation NewEnergy – Gas Division, LLC; Leaf

Capital Funding, LLC; Signature Vacuum; U.S. Bank, N.A. d/b/a U.S. Bank Equipment Finance (such non-Debtor counterparties, collectively the "Objection Counterparties," and such Contracts, collectively, the "Objection Counterparty Contracts") shall be Held Contracts under the Asset Purchase Agreement, and no Objection Counterparty Contract shall be assumed and assigned until either (a) the respective Objection Counterparty, Buyer, and the Debtors reach an agreement in writing resolving the Objection Counterparty's objections to assumption and assignment of the applicable Objection Counterparty Contract, including objections with respect to the applicable Cure Amount, if any, or (b) the Court makes a final, nonappealable determination with respect to the Objection Counterparty's objections to assumption and assignment of the applicable Objection Counterparty Contract, including objections with respect to the applicable Cure Amount, if any; provided, however, that the inclusion of a counterparty as an Objection Counterparty does not constitute an agreement, admission, or finding that any Objection Counterparty Contract is an executory contract or "true lease."

28.    The Software License Agreement with Infor (US), LLC cannot be assumed and assigned to Buyer unless Infor (US), LLC consents in writing to such assumption and assignment.

29.    All of the rights of the Debtors, Buyer, and Curtiss-Wright Corporation and its affiliates (together, "Curtiss-Wright") and their customers are preserved under this Sale Order with respect to each of such party's rights, title and interest, if any, in property of any kind or nature (including, without limitation, any materials, goods, inventory, work in process, tooling, equipment, vehicles, cash or other assets) that is an Acquired Asset that was furnished, sold or otherwise provided to the Debtors by or on behalf of Curtiss-Wright, or that was acquired or manufactured by the Debtor for Curtiss-Wright.  For the avoidance of doubt, such rights of the Debtors to such property shall be transferred to Buyer pursuant to the Sale as an Acquired Asset.

30.    Notwithstanding anything to the contrary in the Second Assumption/Assignment Notice, or this Sale Order, Purchase Order No. 515400, issued by Curtiss-Wright Corporation or its affiliates, shall be a Held Contract under the Asset Purchase Agreement.  Buyer, the Debtors, and Curtiss-Wright reserve all rights as to whether Purchase Order No. 515400 may or should be assumed and assigned to Buyer.  Curtiss-Wright and Buyer shall have until 5:00 P.M. EST on May 22, 2023, or such additional time as may be agreed upon in writing by the parties (the "Curtiss-Wright Consideration Period"), in which to address the potential assumption and assignment of Purchase Order No. 515400.  If the parties do not reach agreement by the conclusion of the Curtiss-Wright Consideration Period, then Purchase Order No. 515400 shall be deemed assumed with a $0 cure amount.  Moreover, notwithstanding anything to the contrary in this Sale Order or the Asset Purchase Agreement, Buyer, Curtiss-Wright and the Debtors reserve all rights with respect to Buyer's obligation to honor the Debtors' warranty obligations with respect to any closed purchase order where the respective goods have been delivered to Curtiss-Wright, and for which goods Curtiss-Wright has paid.

31.    Notwithstanding anything to the contrary contained herein, in the Asset Purchase Agreement, or otherwise, the Acquired Assets shall not include any alloys or other metal products delivered to the Debtors' facilities by IBC Advanced Alloys, Inc. ("IBC") and held by the Debtors for processing pursuant to purchase orders issued by IBC.  Nothing contained herein shall be construed to convey title of such alloys and metal products to the Debtors or to Buyer.

32.    Notwithstanding anything to the contrary contained in the *Second Amended Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale of Substantially all of the Debtors' Assets* (Dkt. No. 427); the Asset Purchase Agreement, the Bidding Procedures Order, the Sale Order or otherwise,   Equipment Depot Pennsylvania, Inc. ("Equipment Depot") and Buyer shall have until 5:00 P.M. EST on May 22, 2023,

or such additional time as may be agreed upon in writing by the parties (the "Equipment Depot Consideration Period"), in which to address the potential assumption and assignment of that certain Planned Maintenance Program by and between Equipment Depot and the Debtor (the "Equipment Depot Maintenance Program").  If the parties do not reach agreement by the conclusion of the Equipment Depot Consideration Period, then the Equipment Depot Maintenance Program shall be deemed rejected and terminated effective as of the expiration of the Equipment Depot Consideration Period, and Equipment Depot shall be entitled to file an administrative claim for services rendered from the Petition Date through the later of May 22, 2023 or the termination of the Equipment Depot Consideration Period with regard to the Equipment Depot Maintenance Program.  Nothing in this paragraph shall be deemed an agreement, admission, or finding that the Equipment Depot Maintenance Program is an executory contract and the parties' rights and arguments with respect to executoriness or any other issues, claims or defenses arising under or in connection with the Equipment Depot Maintenance Program are expressly reserved.  The Debtors and Buyer confirm that no other agreement or contract with Equipment Depot is being assumed or assigned pursuant to or in connection with this Sale Order.

33.    Notwithstanding anything to the contrary in this Sale Order, or any notice related thereto, unless Cigna (as defined in the *Objection of Cigna to Amended Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With Sale of Substantially All of the Debtors' Assets* (Dkt. No. 394) ("Cigna Objection"), the Debtors, and Buyer agree otherwise, not later than 4:00 pm ET, five (5) business days prior to the closing of the Sale, the Debtors shall provide to Cigna, through its counsel of record, written notice of the Debtors' irrevocable (subject to closing of the Sale) decision as to whether or not the Employee Benefits Agreements (as defined in the Cigna Objection) will be Assigned Contracts on the Closing Date pursuant to the Asset Purchase Agreement.  To the extent that the Employee Benefits Agreements are

30

designated as Assigned Contracts, in lieu of cure, and notwithstanding <u>Exhibit B</u> hereto: (a) all obligations due and unpaid under the Employee Benefits Agreements accruing before the Closing Date shall pass through to Buyer and survive assumption and assignment so that nothing in this Sale Order or 11 U.S.C. §365 shall affect such obligations; and (b) upon Closing, unless Cigna and Buyer agree otherwise, the Debtors shall transfer to Buyer, the Debtors' segregated bank account at Citibank, N.A., Account No. XXXX5173, held in the name of Debtor Custom Alloy Corporation, through which self-insured benefits claims of the Debtors' employees and their dependents are funded under the Employee Benefits Agreements. This fully resolves the Cigna Objection.

34.     The Assigned Contracts with EB set forth in <u>Exhibit C</u> hereto shall be assumed and assigned to Buyer effective as of the Closing pursuant to Section 365 of the Bankruptcy Code.  Title to any finished goods for which EB has paid the final amount due to the Debtors but which finished goods are still in the Debtors' possession shall not be transferred to Buyer and EB retains title to such finished goods.  Buyer assumes all of the Debtors' obligations to deliver such finished goods to EB.

### <u>Other Provisions</u>

35.     To the extent due and payable under the Asset Purchase Agreement, the Debtors are authorized to pay Buyer the Break-Up Fee of $687,500 and Reimbursable Expenses not to exceed $100,000 under and in accordance with the terms of the Asset Purchase Agreement.  The Break-Up Fee shall be payable to Buyer from the sale proceeds received in connection with an Alternate Transaction if the Asset Purchase Agreement is terminated for any reason, other than by the Debtors in the circumstances set forth in Sections 8.1(c), 8.1(d) or 8.1(f) thereof, *provided* that Buyer is not in material breach of any of its material obligations under the Asset Purchase Agreement at the time of such termination.  The Reimbursable Expenses shall be payable immediately to Buyer if the Asset Purchase Agreement is terminated for any reason, other than by the Debtors in the circumstances set

forth in Sections 8.1(c), 8.1(d) or 8.1(f) thereof, *provided* that Buyer is not in material breach of any of its material obligations under the Asset Purchase Agreement at the time of such termination.

36.    Any obligation to pay the Break-Up Fee and/or Reimbursable Expenses under the Asset Purchase Agreement shall be absolute and unconditional; such payment shall constitute an administrative expense of the Debtors' estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable, if at all, in accordance with and as specified in the Asset Purchase Agreement, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.  To the extent due and payable, the Break-Up Fee shall be payable in accordance with and as specified in the Asset Purchase Agreement and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.  To the extent due and payable under the Asset Purchase Agreement, upon the filing of a motion, on notice and following a hearing, the Court shall consider granting to Buyer an award of Reimbursable Expenses of up to the amount of $100,000.00 in accordance with the Asset Purchase Agreement, to be paid from the Sale proceeds, on account of reasonable and documented out-of-pocket due diligence fee and expenses, including attorneys' fees.

37.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with their terms without further order of the Court, provided that any such modification, amendment, or supplement (a) does not modify or amend the Purchase Price or any terms relating to the form or payment thereof; (b) is not material; and (c) does not materially change the economic substance of the transactions contemplated in the Asset Purchase Agreement or hereby.  For purposes of this Sale Order, whether a change described in the preceding sentence is "material" or "materially changes" the transactions authorized herein shall be determined by the Debtors, with the written consent of CIBC (as defined in the Bidding Procedures Order) and in consultation with the Committee (as

defined in the Bidding Procedures Order), provided that a change that affects the cash component of the Purchase Price shall constitute a material change; provided, however, that the Debtors may seek a further order from this Court on five (5) business days' notice for approval of any requested change to the Asset Purchase Agreement (whether or not the Debtors deem such change or changes material), subject to the rights of parties in interest to object.

38.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, any amendments, modifications, or supplements thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, including but not limited to the Assigned Contracts, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to Buyer; (b) interpret, implement and enforce the provisions of this Sale Order; (c) protect Buyer against any Interests in or against the Debtors or the Acquired Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts; and (e) determine the priority or validity of any Interest that any party has to the Sale proceeds or any portion thereto.

39.     Buyer is a holder of a claim and, by virtue of the Asset Purchase Agreement, is and shall be a party in interest with standing to object to claims (including, without limitation, the amount or priority of any claim) asserted against the Debtors.

40.     Notwithstanding anything in this Sale Order or that portion of the Purchase Price that includes a credit bid of the secured claim originally filed by Barings BDC, Inc., and subsequently transferred/assigned to Buyer, designated as claim number 68 in Case No. 22-18143 and as claim number 6 in Case No. 22-18144 (together, the "Barings Claim"), the right to challenge and/or object

to the Barings Claim, including, but not limited to the validity and/or priority of the Barings Claim under chapter 5 of the Bankruptcy Code or otherwise is expressly preserved for the Debtors, the Debtors' estate, the Committee, and any successors or assigns of the Debtors, the Debtors' estate, or the Committee. If the Closing occurs, the foregoing reservation does not, and will not, affect or otherwise modify the Sale or terms of the Asset Purchase Agreement, including, without limitation, the Purchase Price or its adequacy, or any payment or other remittance from time to time by Buyer to CIBC under or in connection with any subordination agreement, intercreditor agreement, or similar agreement between CIBC and Buyer, as successor-in-interest to Barings BDC, Inc. and transferee/assignee of the Barings Claim.

41.     Buyer agrees to waive any and all rights it has as a secured creditor to object to the payment of allowed claims with administrative expense status from the Purchase Price, notwithstanding the existence of the secured claim(s) asserted by Buyer.

42.     Unless otherwise expressly agreed by Buyer in writing, nothing contained in any subsequent order of this Court or in any plan of reorganization or liquidation confirmed in the Debtors' cases shall alter, conflict with, or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

43.     Buyer and the Debtors shall have no obligation to proceed with the Closing until all conditions precedent in the Asset Purchase Agreement to their obligation to do so have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

44.     The terms of this Sale Order and the Asset Purchase Agreement shall in all respects be binding upon and enforceable against all persons and entities, including, without limitation, Buyer and its successors, the Debtors, the Debtors' estates, any chapter 7 trustee of the Debtors' estates, any committees appointed in the Debtors' bankruptcy cases, creditors, and other parties in interest.

45.    Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order.

46.    The stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby waived, and this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person obtaining a stay pending appeal, the Debtors and Buyer are free to close under the Asset Purchase Agreement at any time, subject to the terms of the Asset Purchase Agreement.

47.    No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to Taxes) shall apply in any way to the transactions contemplated by the Asset Purchase Agreement or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to Taxes incurred by the Debtors prior to the consummation of the Sale, whether arising under any law, by the Asset Purchase Agreement, or otherwise shall be the obligation of and fulfilled and paid by the Debtors.

48.    The provisions of this Sale Order are mutually dependent and any material provisions are non-severable without the express written consent of Buyer.

49.    All parties' rights herein are preserved with respect to any sale of the Acquired Assets to the Back-Up Bidder; provided, however, that no rights that have been waived, estopped, or otherwise relinquished by any party or that are otherwise barred shall be reinstated hereby.

**EXECUTION VERSION**

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**CUSTOM ALLOY CORPORATION,**

**THE OTHER SELLERS NAMED HEREIN**

**and**

**CAC ACQUISITIONS, LLC**

**May 20, 2023**

## Table of Contents

Page

ARTICLE I Definitions ...................................................................................1
ARTICLE II Purchase and Sale ......................................................................15
    Section 2.1    Purchase and Sale of Acquired Assets.......................................15
    Section 2.2    Excluded Assets. ........................................................................17
    Section 2.3    Assumption of Assumed Liabilities............................................19
    Section 2.4    Excluded Liabilities. ..................................................................20
    Section 2.5    Purchase Price. ..........................................................................21
    Section 2.6    Assumption and Assignment of Contracts..................................25
    Section 2.7    Closing. .....................................................................................27
    Section 2.8    Deliveries at Closing.................................................................27
    Section 2.9    Allocation..................................................................................28

ARTICLE III Sellers' Representations and Warranties....................................29
    Section 3.1    Organization of Sellers; Good Standing. ....................................29
    Section 3.2    Authorization of Transaction. ....................................................29
    Section 3.3    Noncontravention.......................................................................30
    Section 3.4    Title to Acquired Assets.............................................................30
    Section 3.5    Contracts. ..................................................................................30
    Section 3.6    Government Contracts. ...............................................................31
    Section 3.7    International Trade......................................................................33
    Section 3.8    Illegal Payments........................................................................34
    Section 3.9    Real Property. ............................................................................34
    Section 3.10    Intellectual Property...................................................................34
    Section 3.11    Information Technology. .............................................................35
    Section 3.12    Permits. .....................................................................................35
    Section 3.13    Employee Benefit Plans; Employees. .........................................35
    Section 3.14    Labor Relations. ........................................................................35
    Section 3.15    Environmental Matters...............................................................36
    Section 3.16    Insurance. ..................................................................................36
    Section 3.17    Related Party Transactions. ........................................................36
    Section 3.18    No Brokers or Finders................................................................37
    Section 3.19    Litigation; Proceeding................................................................37
    Section 3.20    Compliance with Laws. .............................................................37
    Section 3.21    Taxes. .......................................................................................37
    Section 3.22    Bank Accounts; Powers of Attorney...........................................39
    Section 3.23    Financial Statements. .................................................................39
    Section 3.24    No Other Representations or Warranties. ....................................39

-i-

ARTICLE IV Buyer's Representations and Warranties .................................................40

    Section 4.1    Organization of Buyer.................................................................40
    Section 4.2    Authorization of Transaction ......................................................40
    Section 4.3    Noncontravention.......................................................................41
    Section 4.4    Adequate Assurances Regarding Executory Contracts..............41
    Section 4.5    Good Faith Purchaser.................................................................42
    Section 4.6    Brokers' Fees. ............................................................................42
    Section 4.7    Financial Capacity. ....................................................................42
    Section 4.8    Condition of Business. ...............................................................42

ARTICLE V Pre-Closing Covenants .........................................................................42

    Section 5.1    Certain Efforts; Cooperation......................................................42
    Section 5.2    Notices and Consents.................................................................43
    Section 5.3    Bankruptcy Actions. ..................................................................44
    Section 5.4    Conduct of Business. .................................................................45
    Section 5.5    Notice of Developments And Disclosure Schedule Supplements. ...........47
    Section 5.6    Access. .......................................................................................47
    Section 5.7    Press Releases and Public Announcements. ..............................48
    Section 5.8    Bulk Transfer Laws....................................................................48

ARTICLE VI Other Covenants. .................................................................................48

    Section 6.1    Cooperation................................................................................48
    Section 6.2    Further Assurances.....................................................................48
    Section 6.3    Availability of Business Records................................................49
    Section 6.4    Employee Matters. .....................................................................49
    Section 6.5    Taxes. ........................................................................................50
    Section 6.6    Casualty.....................................................................................51
    Section 6.7    Collection on Acquired Assets....................................................51
    Section 6.8    Use of Names. ...........................................................................52
    Section 6.9    Environmental Matters................................................................52
    Section 6.10    Novation Matters. ......................................................................53
    Section 6.11    Workers' Compensation Policy. .................................................53
    Section 6.12    Transfer of Export Licenses. ......................................................53
    Section 6.13    No Successor Liability.................................................................54

ARTICLE VII Conditions to Closing .........................................................................54

    Section 7.1    Conditions to Buyer's Obligations..............................................54
    Section 7.2    Conditions to Sellers' Obligations. .............................................55
    Section 7.3    No Frustration of Closing Conditions..........................................55

ARTICLE VIII Termination. .......................................................................................56

    Section 8.1    Termination of Agreement..........................................................56

53429/0003-45396379v2

| | | |
|---|---|---|
| Section 8.2 | Procedure Upon Termination. | 57 |
| Section 8.3 | Effect of Termination. | 57 |

ARTICLE IX Miscellaneous. ...................................................................................59

| | | |
|---|---|---|
| Section 9.1 | Expenses. | 59 |
| Section 9.2 | Entire Agreement. | 59 |
| Section 9.3 | Incorporation of Schedules, Exhibits and Disclosure Schedule. | 59 |
| Section 9.4 | Amendments and Waivers. | 59 |
| Section 9.5 | Succession and Assignment. | 59 |
| Section 9.6 | Notices. | 60 |
| Section 9.7 | Governing Law; Jurisdiction. | 61 |
| Section 9.8 | Specific Performance. | 62 |
| Section 9.9 | Consent to Service of Process. | 62 |
| Section 9.10 | WAIVERS OF JURY TRIAL. | 62 |
| Section 9.11 | Severability. | 62 |
| Section 9.12 | No Third Party Beneficiaries. | 62 |
| Section 9.13 | No Survival of Representations, Warranties and Agreements. | 63 |
| Section 9.14 | Construction. | 63 |
| Section 9.15 | Mutual Drafting. | 63 |
| Section 9.16 | Disclosure Schedule. | 64 |
| Section 9.17 | Headings; Table of Contents. | 64 |
| Section 9.18 | Counterparts; Facsimile and Email Signatures. | 64 |
| Section 9.19 | Solicitation of Competitive Bids. | 64 |

| | | |
|---|---|---|
| Exhibit A | - | Bid Procedures Order |
| Exhibit B | - | Form of Sale Order |
| Exhibit C | - | Form of Bill of Sale |
| Exhibit D | - | Form of Assignment and Assumption Agreement |
| Exhibit E | - | Form of Trademark Assignment Agreement; Form of Assignment of Patent Rights |
| Exhibit F | - | Form of Domain Name Assignment Agreement |
| Exhibit G | - | Form of Escrow Agreement |
| Exhibit H | - | Form of Leases |
| Exhibit I | - | Form of Transition Services Agreement |
| Exhibit J | - | Form of Subcontract Pending Novation |

| | | |
|---|---|---|
| Schedule 2.5(a) | - | CAC Waterfall Estimates |
| Schedule 2.9 | - | Allocation |

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of May 20, 2023, and effective as of April 27, 2023 (the "Effective Date"), by and among Custom Alloy Corporation, a Delaware corporation ("CAC"), CAC Michigan, LLC, a Michigan limited liability company (collectively with CAC, "Sellers" and each individually, a "Seller"), CAC Acquisitions, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer") and, solely for the purposes of Section 2.5(d) (and the associated definitions) hereof, CIBC Bank USA ("CIBC"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in ARTICLE I.

WHEREAS, Sellers are debtors and debtors-in-possession under title 11 of the United States Code, 11 U.S.C.  § 101 et seq.  (the "Bankruptcy Code") in jointly administered bankruptcy cases under Chapter 11 of the Bankruptcy Code captioned *In re Custom Alloy Corporation, et. al., Case No.  22-18143, 22-18144* (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, Sellers are engaged in the business of manufacturing specialty metals for seamless and welded pipe fittings and forgings (the "Business");

WHEREAS, Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as of the Closing;

WHEREAS, CAC, Sellers and Buyer are parties to that certain Asset Purchase Agreement, dated April 27, 2023 (the "Original APA") by and among CAC, Sellers and Buyer, and the Parties desire to amend and restate the Original APA in its entirety, on the terms and subject to the conditions set forth herein; and

WHEREAS, Sellers filed the Sale Motion with the Bankruptcy Court to implement the transactions contemplated hereby, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

-1-

"Acquired Assets" has the meaning set forth in Section 2.1.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, such Person's parent and subsidiary entities, and any other Person directly or indirectly controlling, controlled by, or under common control with, said Person.  For purposes of this definition, control of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers (a) accept a Qualified Bid, as defined in the Bid Procedures, other than that of Buyer, as the highest or best offer, or (b) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets in a transaction or series of transactions to a party or parties other than Buyer.

"Assigned Causes of Action" means any Claims of any Seller arising out of or related to the Acquired Assets against any Continuing Vendors, including, but not limited to, Claims related to Contracts, Leases and other agreements related to the Acquired Assets and Avoidance Actions, but shall specifically exclude any Avoidance Actions and any other Claims and causes of action against the officers, directors, shareholders, members, managers, Affiliates and Insiders of the Sellers.

"Assigned Contract" has the meaning set forth in Section 2.6(b)(iii).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii)).

"Assumed Contracts" has the meaning set forth in Section 2.6(a)(ii).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits, but excluding all Permits to the extent solely related to any Excluded Asset.

"Auction" means the auction for the sale of Sellers' assets conducted by Sellers pursuant to the Bid Procedures Order.

"Avoidance Actions" mean, collectively and individually, preference actions, fraudulent conveyance actions and any other claims or causes of action, including but not limited to under

-2-

sections 510, 542, 544, 545, 547, 548, 549, 550, 551, 553, and other applicable provisions of the Bankruptcy Code and other similar state law claims and causes of action.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order, as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"Bid Procedures Order" has the meaning set forth in Section 5.3(a).

"Bidding Incentives" means, collectively, the Break-Up Fee and the Reimbursable Expenses.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i)).

"Break-Up Fee" means $687,500.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday and any day that is a legal holiday or a day on which banks located in New York, New York shall be authorized or required by Law or other government action to close.

"Buyer" has the meaning set forth in the preamble.

"CAC Waterfall Estimates" means the spreadsheet set forth in Schedule 2.5(a).

"CAC Waterfall Seller Adjustable Amounts" means those line items labeled on the CAC Waterfall Estimates as "DIP Balance", "Payroll and Payroll Taxes", "Post-Petition Accounts Payable" and "Contingency".

"CAC Waterfall Seller Non-Adjustable Amounts" means those line items labeled on the CAC Waterfall Estimates as "CIBC Debt Prior to Professional Fee Accruals", "CIBC Professional Fees", "Total of Restructuring Disbursements (week of 6/3)", SSG Advisors, LLC (Investment Banker) – Sale Fee and Unpaid Balances" and "Winddown".

"CAC Waterfall Variable Amounts" means those line items labeled on the CAC Waterfall Estimates as "Real Estate Taxes," "Cure Costs (excl. Real Estate Taxes)," and "Amounts Allocated to PMSI (Financing Agreements)".

"Carveout" means the carveout for professional fees pursuant to the DIP Order and DIP Loan Agreement.

"Cash Payment" has the meaning set forth in Section 2.5(a).

-3-

"Cash Payment Cap" has the meaning set forth in Section 2.5(a).

"Cash Payment Adjustable Cap" has the meaning set forth in Section 2.5(a).

"Chapter 11 Cases" has the meaning set forth in the recitals.

"CIBC" means CIBC Bank USA, together with its predecessors, successors, and assigns.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Closing Date Cure Amount" has the meaning set forth in Section 2.5(c)(ii).

"Confidentiality Agreement" means any applicable agreement governing confidentiality of Sellers' information which has been executed by and between Buyer (or its Affiliates) and Sellers.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Acquired Assets, including the assumption, assignment and sale by Sellers to Buyer, and the acceptance by Buyer, of the Assumed Contracts and Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Related Agreements.

"Continuing Vendors" means lessors, vendors, suppliers, service providers, contractors, and employees that will provide support to Buyer post-Closing, either pursuant to Assigned Contracts or otherwise, provided, however, that, after the Closing Date, if the Official Committee of Unsecured Creditors, the Sellers, or a liquidating trustee for the Debtors' estates approved by the Bankruptcy Court submits a written inquiry to Buyer as to whether a party is a Continuing Vendor, and Buyer does not identify such party as a Continuing Vendor within 30 days of receipt of such written request, such party shall be deemed not to be a Continuing Vendor.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding, and any amendments, modifications or supplements thereto that is an executory contract pursuant to Section 365 of the Bankruptcy Code.

-4-

"Contracts Schedule" has the meaning set forth in Section 2.6(a)(i).

"Credit Bid" has the meaning set forth in Section 2.5(a).

"Cure Amounts" means all amounts, costs and expenses (including real estate taxes) required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Decree" means any legally binding judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Deposit" means $2,750,000, however to the extent that the purchase price set forth in this Agreement is modified at or prior to the potential Auction (as defined in the Bid Procedures Order), or to the extent Buyer is the Successful Bidder (as defined in the Bid Procedures Order) or the Backup Bidder (as defined in the Bid Procedures Order), Buyer shall pay an additional amount into the Escrow Fund, within two (2) business days of the Auction, such that the total Deposit equals $3,642,400.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by any Seller or for which any Seller may have liability as being an ERISA Affiliate, or in which any Seller participates or participated and that provides benefits to any Current Employee or Former Employee.

"Environmental Law" means all federal, state, and local statutes, regulations, orders, rules, permits, licenses and ordinances (including common laws) concerning employee health and safety,  pollution, and protection of human health or the environment, including, without limitation, the Clean Air Act; the Clean Water Act; the Resource Conservation Recovery Act; the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to Know Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Endangered Species Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the National Environmental Policy Act; and  the Occupational Safety and Health Act, and the Hazardous Materials Transportation Act, and all similar state statutes and local ordinances, and all regulations promulgated under any of those statutes, and all administrative and judicial actions respecting such legislation, all as amended from time to time.

"Environmental Claim" means any action, order from a Governmental Entity, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of

-5-

enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification, and injunctive relief) arising out of, based on, or resulting from: (a) the presence, release of, or exposure to an Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Liabilities and Costs" means any Liabilities determined as a result of an order from a Governmental Entity and pursuant to an Environmental Law, in each case, (a) arising from or relating to any claim pursuant to an Environmental Law for death or personal injury, property damage, damage to the environment, or a release of Hazardous Material (whether based on negligent acts or omissions, statutory liability without fault or otherwise), in connection with the Business or the Acquired Assets or the activities or operations conducted on the Acquired Assets; (b) arising from or related to any remediation occurring pursuant to applicable Environmental Law; or (c) incurred by reason of the failure of the Business or the Seller or the activities or operations conducted on the Acquired Assets pursuant to Environmental Law, including (i) any fines and penalties assessed, levied or asserted against the Business or the Seller, or (ii) any Liabilities or other losses related to the installation of or repairs to equipment or facilities used by the Business or the Seller.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equity Securities" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests or partnership interests.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Seller within the meaning of Section 414(b) or (c) of the IRC (and Sections 414(m) and (o) of the IRC for purposes of provisions relating to Section 412 of the IRC).

"Escrow Agent" means Wilmington Trust in its capacity as Escrow Agent under the Escrow Agreement.

"Escrow Agreement" means the Escrow Agreement dated as of the Effective Date, by and among Sellers, the Buyer and the Escrow Agent in substantially the form of Exhibit G hereto, as amended.

"Escrow Fund" means the Deposit, together with any and all interest or income actually earned thereon pursuant to the Escrow Agreement.

-6-

"Excess Cash" means all cash and cash equivalents of Sellers to the extent in excess of amounts required to indefeasibly pay in full in cash (i) all Administrative Claims in the Chapter 11 Cases, (ii) all obligations owing to CIBC, and (iii) all other amounts required to satisfy obligations in each category or line item set forth in the CAC Waterfall Estimates (whether or not the amount required to indefeasibly pay each such amount in full in cash exceeds the applicable amount set forth in the CAC Waterfall Estimates), provided, that if Buyer, Sellers or CIBC dispute any items or amounts arising from the foregoing categories, any such disputes will be submitted to the Bankruptcy Court for resolution.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means the Claims described in Section 2.2(j), Section 2.2(m), Section 2.2(n) and Section 2.2(p), but expressly excluding the Assigned Causes of Action.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Taxes" means any and all (i) Taxes of any Sellers or their Affiliates;  (ii) Taxes imposed on or arising in connection with the Business, the Acquired Assets, the employees of any Seller or their Affiliates, and any withholding Taxes, in each case for any Pre-Closing Tax Period or allocable or apportioned to the portion of a Straddle Period ending on the Closing Date as provided herein; (iii) Taxes arising from a breach of covenant of, agreement, representation or warranty of any Seller in this Agreement; (iv) all deferred payroll Taxes and credits associated with wages paid or incurred of employees of Sellers and Affiliates for any Pre-Closing Tax Period; (v) Taxes of another Person as a result of Treasury Regulation Section 1.1502-6 (or any similar state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise; (vi) Taxes described in Section 6.5(d), and the Sellers' share of Transfer Taxes determined in accordance with Section 6.5(a); and (vii) all Taxes arising from any bulk sale provisions, or failure of any Seller to obtain, comply with, and deliver to Buyer any tax clearance or certificate of no tax due or similar document.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, enjoined, set aside, annulled, suspended or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"GAAP" means United States generally accepted accounting principles.

"Government Bid" means any active proposal or offer, solicited or unsolicited, made by a Seller prior to the Closing Date which, if accepted, would result in a Government Contract.   A Government Bid: (i) includes any proposal or offer made by a Seller that has been accepted by the offeree but has not resulted in a Government Contract prior to the Closing Date; and (ii) does

not include any proposal or offer made by a Seller that has been accepted and has resulted in award of a Government Contract prior to the Closing Date.

"Government Contract" means any Contract between a Seller, on the one hand, and (i) any Governmental Entity, (ii) any prime contractor of a Governmental Entity in its capacity as a prime contractor, or (iii) any subcontractor at any tier with respect to any Contract of a type described in clauses (i) or (ii) above, on the other hand.   For the avoidance of doubt, a task, purchase or delivery order under a Government Contract shall not constitute a separate Government Contract, for purposes of this definition, but shall be part of the Government Contract to which it relates.

"Governmental Entity" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"Hazardous Material" means (i) those substances included within the statutory and/or regulatory definitions of "hazardous substance," "hazardous waste," "extremely hazardous substance," "regulated substance," "contaminant," "hazardous materials" or "toxic substances," under any Environmental Law, (ii) those substances listed in 49 C.F.R.  172.101 and in 40 C.F.R. Part 302; (iii) any material, waste or substance which is designated as a "hazardous substance" pursuant to 33 U.S.C.  § 1321 or listed pursuant to 33 U.S.C.  § 1317; (iv) any material, waste or substance designated, classified or regulated as a "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "pollution" under any Environmental Laws; and (v) such other substances, materials, or wastes that are or become classified or regulated under Environmental Laws including, but not limited to,  petroleum (including crude oil, gasoline, and diesel oil), asbestos, asbestos containing material, toxic mold, radon, urea formaldehyde, polychlorinated biphenyls, and per- and polyfluoroalkyl substances (PFAS).

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Held Contract" has the meaning set forth in Section 2.6(a)(ii).

"Indebtedness" of any Person means, without duplication, (a) the principal of, interest on, and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course of Business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type

-8-

referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Information Technology" means any computer hardware, Software, microprocessors, networks, handheld devices, electronic devices, hardware, middleware, servers, workstations, routers, hubs, switches, data communications lines, outsourced information technology arrangements and resources and all other information technology and communications assets and equipment used by the Business, and all associated documentation.

"Insider" shall have the meaning set forth in the Bankruptcy Code.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing, (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property, and (j) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iii)).

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property used in the operation of the Business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Junior Debt Claims" means all Claims assigned by Barings BDC, Inc. to Buyer on May 2, 2023, arising under that certain Amended and Restated Loan Agreement, dated as of April 30, 2019, by and among CAC, as Borrower, the lenders party thereto, and Barings BDC, Inc. (as

amended, restated, amended and restated, supplemented or otherwise modified from time to time), subject to the terms and conditions of that certain Third Amended and Restated Subordination Agreement dated as of April 30, 2019, by and among CIBC, Buyer (as assignee and transferee of, and successor-in-interest to, Barings BDC, Inc.), and CAC (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Knowledge," with respect to Sellers, means the actual knowledge of any of the following individuals: Adam Ambielli, Jr., Don Burns and Jeff Burns.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation, order or Decree of any Governmental Entity.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of Sellers which is used in the Business or related to the Acquired Assets.

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liabilities" means any Indebtedness, liabilities, demands, deferred revenue, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto.

"Lien" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type, and the meaning ascribed to the term "lien" in the Bankruptcy Code.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any state of facts, change, event, effect, development, condition, circumstance or occurrence (individually or when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the condition (financial or otherwise) or results of operations of the

Acquired Assets (taken as a whole) or the Business or prospects of the Business; <u>provided</u>, <u>however</u>, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, which do not disproportionately affect Sellers relative to other industry participants; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (iii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes directly attributable to the announcement of this Agreement or any Related Agreement; (v) resulting from any act of God, any pandemic or other force majeure event (including natural disasters); or (vi) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Chapter 11 Cases or Sellers' and their respective Affiliates' financial condition or Sellers' and certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA and that is subject to Title IV of ERISA, to which any Seller or ERISA Affiliate makes or is obligated to make contributions, or during the preceding six plan years, has made or been obligated to make contributions.

"<u>Offeree</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

"<u>Ordinary Course of Business</u>" means the conduct by Sellers in the Business consistent with past custom and practice.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Patents</u>" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"<u>Pension Plan</u>" means any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by a Seller or ERISA Affiliate or to which any Seller or ERISA Affiliate

-11-

contributes or has an obligation to contribute, or has made contributions at any time during the preceding six plan years.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, concession, authorization, grant, easement,  Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Liens" means (a) Liens for Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business; (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; and (e) Liens in respect of any obligations as lessee under capitalized leases.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" means October 13, 2022.

"Pre-Closing Tax Period" means a taxable period of a Seller or an Acquired Asset that begins before and ends on or before the Closing Date.

"Product" means any product, system, module, equipment, service, offering, process, method, procedure, material, technique, or Technology owned by any Seller and offered to Sellers' customers.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

-12-

"<u>Reimbursable Expenses</u>" means the reasonable, documented out-of-pocket fees and expenses incurred by Buyer and its Affiliates prior to termination of this Agreement in connection with this Agreement, the Related Agreements, the Sale Order, and the transactions contemplated hereby and thereby, including the reasonable fees and expenses of legal counsel, financial advisors, consultants and any other advisors that Buyer engages in its reasonable discretion.  Reimbursable Expenses shall not exceed $100,000 and shall be payable pursuant to <u>Section 8.3</u>, to the extent applicable and subject to approval of the Bankruptcy Court.

"<u>Rejected Contract</u>" has the meaning set forth in <u>Section 2.6(a)(ii)</u>.

"<u>Related Agreements</u>" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Acquired Assets to Buyer.

"<u>Related Person</u>" means, with respect to any Person, all past, present and future directors, officers, members, managers, partners, limited partners, stockholders, insiders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"<u>Representative</u>" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"<u>Restricted Cash</u>" means any amount, other than the Carveout, which is not freely usable by Sellers because it is subject to restriction or limitations on use or distribution pursuant to the Supplier Development Fund Agreements.

"<u>Sale Motion</u>" has the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Sale Order</u>" means an order of the Bankruptcy Court entered in the Chapter 11 Cases.

"<u>Seller</u>" or "<u>Sellers</u>" has the meaning set forth in the preamble.

"<u>Software</u>" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating  system, application, system, firmware or software.

-13-

"Straddle Period" means a taxable period that commences on or before the Closing Date and ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation).   The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Supplier Development Fund Agreements" means all agreements entered into between Electric Boat Corporation and Sellers in connection with the funding appropriated and allocated by the FY2019 and FY2020 National Defense Authorization Act for the expansion of the submarine industrial base.

"Tax" or "Taxes" means (a) any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, escheat, unclaimed property, ad valorem, escheat, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed; and (b) any Liability for the payment of any amount of a type described in clause (a) arising as a result of Treasury Regulation Section 1.1502-6 (or similar provision of state, local, or foreign Law), or as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax Return related thereto; and (c) any Liability of another Person for the payment of any amount of a type described in clause (a) or clause (b) as a result of being a transferee, successor, by Contract, or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

-14-

"Technology" shall mean any or all of the following (A) works of authorship including computer programs (whether source code or executable code, and whether embodied in software, firmware or otherwise), compilers, middleware, development tools, firmware, operating systems and specifications, platforms, interfaces, APIs, test specifications and scripts, architecture, documentation, designs, files and records, (B) inventions (whether or not patentable or reduced to practice), discoveries and improvements, (C) proprietary and confidential information, trade secrets and know how, (D) database rights, databases, data compilations and collections, and technical data, whether or not machine readable, (E) internet domain names, applications and reservations therefor, and uniform resource locators and the corresponding internet websites (including any content and other materials accessible and/or displayed thereon, (F) tools, methods and processes, (G) all versions, updates, releases, patches, corrections, enhancements and modifications thereto and all documentation, developer notes, instructions, comments and annotations relating to any of the foregoing and (H) any and all embodiments of the foregoing in any form and embodied in any media.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transfer Tax" has the meaning set forth in Section 6.5(a).

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"Treasury Regulation" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Acquired Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' direct or indirect, right, title and interest in, to and under all of Sellers' tangible and intangible assets, properties and rights as of the Closing Date of whatever kind or nature and wherever situated or located, free and clear of all Liens (other than Permitted Liens), for the consideration specified in Section 2.5, in each case, expressly excluding all Excluded Assets (as defined below).  All of such assets, properties and rights (other than the Excluded Assets) of Sellers are collectively referred to in this Agreement as the "Acquired Assets." Without limitation of the foregoing, the Acquired Assets shall include all of Sellers' right, title and interest in, to and under the following assets as of the Closing Date:

-15-

(a)    all Excess Cash and Sellers' interest in the Restricted Cash, which for the avoidance of doubt excludes the Carveout;

(b)    all Accounts Receivable of Sellers as of the Closing;

(c)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(d)    all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities, Health Plans or otherwise) and other prepaid charges and expenses of Sellers;

(e)    all Assigned Contracts;

(f)    to the extent that such lease (and any such agreement related thereto, if any) is an Assigned Contract, all rights under a lease (and any agreement related thereto) for a Leased Real Property, in each case together with all interests in and to all leasehold improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(g)    all items of machinery, equipment, supplies, furniture and furnishings owned by Sellers as of the Closing;

(h)    all motor vehicles owned by Sellers;

(i)    all Intellectual Property owned by Sellers and all of Sellers' rights to use other Intellectual Property;

(j)    all information technology systems;

(k)    all Records related to the Acquired Assets and Assumed Liabilities, other than Records related to income Taxes of Sellers, copies of which, however, shall be provided to Buyer;

(l)    all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any Confidentiality Agreements to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(m)    all rights of Sellers under non-disclosure or confidentiality, noncompete, or non-solicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers or with any third parties (including, without limitation, any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

-16-

(n)    all of the Assumed Permits or all of the rights and benefits accruing under any Permits;

(o)    the amount of, and all rights to any, insurance proceeds received by any of Sellers after the Effective Date in respect of (i) the loss, destruction or condemnation of any Acquired Assets or (ii) any Assumed Liabilities;

(p)    except for the Excluded Claims, all causes of action, lawsuits, settlements, awards, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related to the Acquired Assets, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law, including, without limitation, all Assigned Causes of Action;

(q)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products or services purchased by, or provided to, Sellers or to the extent related to the Acquired Assets;

(r)    the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(s)    all prepaid assets;

(t)    all notes receivable of Sellers;

(u)    all (or the benefit of all) Tax refunds, rebates, credits and similar items of Sellers, including but not limited to any employee retention tax credits; and

(v)    all telephone numbers, fax numbers, e-mail addresses, websites, URLs, social media accounts and internet domain names (and usernames and passwords associated with the foregoing).

(w)    Notwithstanding anything herein to the contrary, Buyer may, from time to time, remove any Acquired Asset from this Section 2.1 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

Section 2.2    **Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Buyer; Buyer hereby disclaims all liability or responsibility with respect to any of the Excluded Assets; and Sellers shall retain all right, title and interest to, in and under, and all

-17-

obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of the following items and assets:

(a)     all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b)     all Equity Securities of any Seller and any of their Subsidiaries;

(c)     all Rejected Contracts;

(d)     any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege;

(e)     all Permits other than the Assumed Permits;

(f)     all directors' and officers' liability insurance policies;

(g)     the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(h)     all cash and cash equivalents of Sellers (other than cash that is Restricted Cash);

(i)     all Tax records related to income Taxes of Sellers, subject to Buyer's rights under Section 2.1(k) and Section 6.5(b);

(j)     any Claims of any Seller against CIBC, in any capacity (including as a pre-petition lender and contemplated post-petition lender), or any of its affiliates, agents, or related parties;

(k)     any unused retainers paid by Sellers to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same;

(l)     all rights to escrow deposits or to amounts held as a "holdback" in connection with the purchase or sale of any business, division or assets;

(m)     any Avoidance Action of any Seller, other than the Assigned Causes of Action;

-18-

(n)   any Claims and causes of action of any Seller against any of its directors, shareholders, officers, members, managers, Insiders, or Affiliates;

(o)   the Carveout; and

(p)   any Claims of any Seller solely to the extent arising in respect of any of the Excluded Assets listed in (a)-(o) listed above, and excluding the Assigned Causes of Action or any Acquired Assets.

Section 2.3   **Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), Buyer shall assume and become responsible only for the liabilities and obligations of Sellers which are enumerated in this Section 2.3 (the "Assumed Liabilities"), and no other Liabilities of Sellers or any of their Affiliates:

(a)   all Liabilities of Sellers relating to or arising under the Assigned Contracts, but excluding all Liabilities of Sellers relating to or arising from any breaches or defaults under the Assigned Contracts that are required to be cured pursuant to sections 363 and 365(b) of the Bankruptcy Code so that the Assigned Contracts may be assumed and assigned to Buyer;

(b)   all Liabilities of Sellers relating to or arising under the Assigned Contracts for (i) goods and services ordered by Sellers before the Closing Date but delivered after the Closing Date, or (ii) customer warranty and service obligations, but in all cases excluding all Liabilities of Sellers relating to or arising from any breaches or defaults under the Assigned Contracts that are required to be cured pursuant to sections 363 and 365(b) of the Bankruptcy Code so that the Assigned Contracts may be sold and assigned to Buyer;

(c)   all Liabilities of Sellers with respect to the SDF Equipment (as defined in the Supplier Development Fund Agreements);

(d)   all Liabilities of Sellers (other than in respect of Taxes) relating to, or arising in respect of, the Acquired Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing after the Closing Date or the operation of the Business or the Acquired Assets after the Closing Date;

(e)   all Liabilities for Taxes arising solely from and attributable to the ownership of any portion of the Acquired Assets after the Closing Date;

(f)   to the extent lawfully transferable, all Liabilities relating to or arising under Permits assigned to Buyer hereunder accruing after the Closing Date;

(g)   all Liabilities of Sellers relating to Transferred Employees accruing after the Closing Date, to the extent arising out of or relating to their employment by Buyer or any of its Affiliates;

-19-

(h)    all Liabilities of Sellers relating to accrued and unpaid vacation or paid time off obligations of Transferred Employees; and

(i)    any Liabilities of Sellers that Buyer expressly agrees with the holder of such Liabilities to assume.

Section 2.4    **Excluded Liabilities.**  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of any Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").  For the avoidance of doubt and without limiting the generality of the foregoing, all of the following shall be Excluded Liabilities:

(a)    Excluded Taxes;

(b)    all Liabilities of Sellers relating to the negotiation, execution and consummation of the transactions contemplated by this Agreement, including legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;

(c)    all Liabilities of Sellers relating to or arising from any breaches or defaults under the Assigned Contracts that are required to be cured pursuant to Sections 363 and 365(b) of the Bankruptcy Code so that the Assigned Contracts may be sold and assigned to Buyer;

(d)    all Liabilities of any Seller relating to or arising from any collective bargaining agreement (including any related multi-employer pension plan);

(e)    all Liabilities of a Seller in respect of Indebtedness (except with respect to the SDF Equipment (as defined in the Supplier Development Fund Agreements));

(f)    all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing by a Seller;

(g)    all Liabilities of Sellers under this Agreement and the Related Agreements and the transactions contemplated hereby or thereby (excluding all the Assumed Liabilities);

(h)    all Liabilities of Sellers incurred in connection with, or related to, the administration of the Chapter 11 Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Case;

-20-

(i)    any Environmental Liabilities and Costs or any Liability arising from or related to any Environmental Claim which relates to operations conducted under prior ownership, or the period prior to the Closing;

(j)    without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of Sellers or arising out of or related to the Acquired Assets or the Business that are not expressly assumed by Buyer pursuant to the provisions of <u>Section 2.3</u>.

**Section 2.5    <u>Purchase Price</u>.**

(a)    <u>Consideration</u>.  In consideration of the sale of the Business and the Acquired Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer of the Acquired Assets shall be composed of the following:  (i) the payment of an amount sufficient to indefeasibly satisfy in full in cash all of the categories and related line items set forth in the CAC Waterfall Estimates with respect to CIBC's obligations and administrative fees and expenses (other than the Break-Up Fee and Expense Reimbursement), subject to the right of reallocation set forth below, for each category or line item in an amount that is the lesser of (x) the amount set forth for each such category or line item in the CAC Waterfall Estimates or (y) the actual amount incurred or owing for each such category or line item, which aggregate amount is estimated in the CAC Waterfall Estimates to total $36,424,000, *minus* the Closing Date Cure Amount (such difference, the "<u>Cash Payment</u>"), plus (ii) a credit bid of $30 million of the Junior Debt Claims (the "<u>Credit Bid</u>"); and (iii) the assumption by Buyer of the Assumed Liabilities.  The "<u>Purchase Price</u>" shall mean the sum of the Cash Payment, the Closing Date Cure Amount, and the Credit Bid.  For the avoidance of doubt, in no event shall the sum of the Closing Date Cure Amount and the Cash Payment exceed $36,424,000 (the "<u>Cash Payment Cap</u>"), and Buyer shall not be required to assume any Contract that is set forth in the CAC Waterfall Estimates or to pay any Cure Amount relating to any Contract that it does not agree to assume and assign. For the further avoidance of doubt, to the extent the CAC Waterfall Estimates and the Cash Payment include any amount also considered a "Closing Date Cure Amount," such amount shall only be counted once and included in either the Cash Payment or the Closing Date Cure Amount.  Notwithstanding anything contained herein to the contrary, but subject to the Cash Payment Cap, to the extent the actual amount incurred or owing for any category or line item that is a CAC Waterfall Seller Adjustable Amount is less than the amount set forth in the CAC Waterfall Estimate, each such excess amount shall be reallocated and applied to satisfy other CAC Waterfall Seller Adjustable Amount obligations set forth on the CAC Waterfall Estimate in the following order and priority:  <u>first</u>, to indefeasibly satisfy in full in cash any deficiency in satisfying all obligations owing to CIBC; and <u>second</u>, to indefeasibly satisfy in full in cash all other amounts that are CAC Waterfall Seller Adjustable Amounts (whether or not the amount required to indefeasibly pay each such amount in full in cash exceeds the applicable amount set forth in the CAC Waterfall Estimates), <u>provided</u>, <u>however</u>, that in no event shall the total CAC Waterfall Seller Adjustable Amount paid by Buyer exceed $2,697,000 (the "<u>Cash Payment Adjustable Cap</u>").

-21-

(b)　Purchase Price Deposit.  On or before the execution of this Agreement, the Buyer shall immediately deposit with the Escrow Agent under the Escrow Agreement cash in an amount equal to the Deposit by wire transfer of immediately available funds.  Upon the terms and subject to the conditions of the Escrow Agreement, the Escrow Fund shall be distributed as follows:

(i)　In connection with the Closing, the Escrow Fund shall be paid in accordance with Section 2.5(c)(iv);

(ii)　If this Agreement is terminated by Sellers pursuant to Section 8.1(c)(i) or Section 8.1(d), the Escrow Fund shall be delivered to Sellers; and

(iii)　If this Agreement is terminated for any reason, other than by Sellers pursuant to Section 8.1(c)(i) or Section 8.1(d), the Escrow Fund shall be delivered to the Buyer.

(c)　Purchase Price Payment.

(i)　By 5:00 p.m. Eastern Time on the date that is three (3) Business Days prior to the Closing Date, Sellers shall deliver in writing to Buyer a statement (the "Estimated Closing Statement") attaching an updated version of the CAC Waterfall Estimates as set forth in Schedule 2.5(a) (and each category or line item set forth therein) based upon the most recent reasonably ascertainable financial information of Sellers, identifying (1) each category or line item that is included in the CAC Waterfall Seller Adjustable Amount and the CAC Waterfall Seller Non-Adjustable Amount and is due and payable as of Closing, and the applicable wire information for each payee (the "Fixed Cash Payment") (which categories and line items to be included in the Fixed Cash Payment are identified on the CAC Waterfall Estimates and in any event shall include all obligations owing to CIBC), and (2) a good faith estimate of any amounts included in the CAC Waterfall Seller Adjustable Amount and the CAC Waterfall Seller Non-Adjustable Amount that are not due and payable as of Closing, and the amounts due to third-parties that are included in the CAC Waterfall Variable Amount (the "Estimated Cash Payment"), provided, however, that in no event shall the amount set forth in any category or line item in the CAC Waterfall Seller Non-Adjustable Amount and the CAC Waterfall Variable Amount as included in the Estimated Closing Statement exceed the amount set forth in such category or line item in the CAC Waterfall Estimates attached hereto; provided, further, however, that the amount set forth in any category or line item of the CAC Waterfall Seller Adjustable Amount may exceed the amount for such category or line item in the CAC Waterfall Estimates attached hereto and be reallocated to another category or line item which is included in the CAC Waterfall Seller Adjustable Amount so long as (i) any such increase is made in accordance with that certain (1) *Final Order Authorizing Debtors to: (A) Use Cash Collateral on a Final Basis; (B) Incur Postpetition Debt on a Final Basis, and (C) Grant Adequate Protection and Provide Security and other Relief to CIBC Bank USA, as Prepetition Lender, and the Other Secured Parties* (the "DIP Order"), and (2) Debtor in Possession Loan and Security Agreement by and between CAC and CIBC (the "DIP Loan Agreement"), and (ii) the total of the Fixed Cash Payment and the Estimated Cash Payment

-22-

do not exceed the Cash Payment Cap, and the total CAC Waterfall Seller Adjustable Amount paid by Buyer does not exceed the Cash Payment Adjustable Cap. Sellers shall consider in good faith, but shall not be obligated to accept or implement, Buyer's reasonable comments to such Fixed Cash Payment and Estimated Cash Payment calculations, except that Buyer shall not be required to pay any Cure Amount relating to any Contract that it does not agree to assume and assign, and Sellers shall provide Buyer with supporting documentation for all such amounts. In the event that the Parties are unable to resolve any disputes arising from the Estimated Closing Statement, Buyer and Sellers, or either of them, shall submit such dispute to the Bankruptcy Court for resolution prior to Closing.

(ii) At the Closing, the Buyer shall use a portion of the Purchase Price to pay Cure Amounts, by wire transfer of immediately available funds to the applicable counterparties to the Assumed Contracts that the Buyer has designated as Assumed Contracts and that have become Assigned Contracts as of the Closing (such total Cure Amounts, the "Closing Date Cure Amount").

(iii) At the Closing, the Buyer shall deliver to the Escrow Agent an amount in cash equal to the Estimated Cash Payment (the "Adjustment Escrow Amount") as security for amounts payable by Buyer pursuant to Section 2.5(d).

(iv) At the Closing, the Buyer shall deliver by wire transfer of immediately available funds the Fixed Cash Payment to the payees identified in the Estimated Closing Statement, provided that the Fixed Cash Payment will be reduced by the amount of the Deposit, and Buyer and Sellers will jointly instruct the Escrow Agent to deliver the Deposit to Buyer who will then promptly deliver such amount to payees mutually determined by Buyer and Sellers and identified in the Estimated Closing Statement, in full satisfaction of the Fixed Cash Payment amounts.

(d) Aggregate Purchase Price Adjustment.

(i) Following the Closing, Buyer and Sellers agree to promptly (and no later than one (1) Business Day from Buyer's request) execute a joint written instruction to the Escrow Agent providing for a release to Buyer from the Adjustment Escrow Amount in the Escrow Account of the amounts necessary to satisfy the payments comprising the Estimated Cash Payment as and when such payments become fixed and due, to the payees identified in the Estimated Closing Statement. Buyer will promptly deliver such amounts to the applicable payee.

(ii) After Buyer and Sellers have mutually agreed that all categories and line items in the Estimated Closing Statement have become fixed and due or otherwise resolved, Buyer shall cause to be prepared and delivered to Seller a statement (the "Closing Statement," and the date on which the Closing Statement is delivered to Seller, the "Delivery Date") setting forth, in reasonable detail and with reasonable supporting documentation, an updated version of the CAC Waterfall Estimates as set forth in Schedule 2.5(a) (and each category or line item set forth therein) identifying all Fixed Cash Payments and Estimated Cash Payments made through such date, and the amounts and payees for any remaining

-23-

Estimated Cash Payments (which calculation shall be subject in all respects to the Cash Payment Cap).  To the extent any remaining Estimated Cash Payments need to be made at such time, Buyer and Sellers agree to promptly (and no later than one (1) Business Day after the date of mutual agreement of Buyer and Sellers) execute a joint written instruction to the Escrow Agent providing for a release to Buyer of the amount necessary to satisfy any remaining unpaid Estimated Cash Payment from the Adjustment Escrow Amount in the Escrow Account.  Buyer will promptly deliver such amounts to the payees identified in the Estimated Closing Statement.  Buyer shall provide Sellers and, to the extent CIBC's obligations have not been previously indefeasibly paid in full in cash, CIBC (and CIBC's respective representatives) with reasonable access during normal business hours to the books, records, supporting data, facilities and personnel necessary for Sellers' and, if applicable, CIBC's review of the Closing Statement and reasonably cooperate with Sellers, if applicable, CIBC (and their respective representatives) in connection with such review.

(iii)  Each of Sellers and, to the extent CIBC's obligations have not been previously indefeasibly paid in full in cash, CIBC shall have thirty (30) days following the Delivery Date (the "Dispute Period") to review the Closing Statement.  If either Sellers or, if applicable, CIBC have any objections to the amount of the Estimated Cash Payments set forth on the Closing Statement, Sellers or, if applicable, CIBC shall deliver to Buyer a statement setting forth their objections thereto (a "Dispute Notice"), which shall identify in reasonable detail those items and amounts to which Sellers or, if applicable, CIBC object (the "Disputed Items").  If Sellers or, if applicable, CIBC deliver a Dispute Notice to Buyer, Buyer and Sellers or, if applicable, CIBC shall attempt to resolve the Disputed Items within thirty (30) days after delivery of the Dispute Notice.  If Buyer and Sellers or, if applicable, CIBC are unable to resolve any Disputed Items within such thirty (30) day period, Buyer and Sellers or, if applicable, CIBC, or either of them, shall submit such dispute to the Bankruptcy Court.  Each party shall bear its own costs and expenses in connection with the resolution of such Disputed Items by the Bankruptcy Court.  If a Dispute Notice is not delivered to Buyer during the Dispute Period, the Closing Statement as prepared by Buyer shall be deemed accepted and agreed to by Sellers and shall be final, binding, and non-appealable by the parties hereto.

(iv)  Within three (3) Business Days after the final determination of the Cash Payment in accordance with Section 2.5(d)(iii) and, solely to the extent all obligations owing to CIBC and all other amounts required to satisfy the obligations in each category or line item set forth in the CAC Waterfall Estimates, in each case, have been indefeasibly paid in full in cash, Buyer and Sellers shall jointly instruct the Escrow Agent to pay the balance of the Adjustment Escrow Amount to Buyer from the Escrow Account pursuant to instructions furnished by Buyer.

(e)    Withholding.  Buyer will be entitled to deduct and withhold from any amount payable pursuant to this Agreement (including payments of the Purchase Price) such amounts as Buyer (or any Affiliate thereof) shall determine it is required to deduct and withhold with respect to the making of such payment under the IRC or any other provision of applicable Law.   To the extent that amounts are so withheld by Buyer, such withheld amounts

-24-

will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding were made.

Section 2.6    **Assumption and Assignment of Contracts**.

(a)    Assignment and Assumption at Closing.

(i)    Section 2.6(a) of the Disclosure Schedule (the "Contracts Schedule") sets forth a list of all Contracts to which a Seller is a party, together with estimated Cure Amounts for each Contract.

(ii)    Buyer, by delivering written notice to Seller, will designate each Contract on the Contracts Schedule as "Assumed," "Rejected" or "Held" within five (5) Business Days of the date hereof.  Each Contract so designated as "Assumed" is referred to herein as an "Assumed Contract"; each Contract so designated as "Rejected" is referred to herein as a "Rejected Contract"; and each Contract so designated as "Held" is referred to herein as a "Held Contract." Buyer shall have the right (in its sole and absolute discretion) to change any designation of a Rejected or Held Contract to an Assumed Contract and to notify Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted) in writing of any such change until two (2) Business Days prior to Closing, in which case such Contract shall become an Assumed Contract as indicated by such changed designation.  For the avoidance of doubt, there shall be no change to the Purchase Price with respect to any net increase or decrease in the sum of Cure Amounts and non-debtor counterparties' Administrative Claims resulting directly from such designation of additional Assumed Contracts.

(iii)    At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Buyer, assume (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assign to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts so designated by Buyer as of the Closing, and (y) Buyer shall pay the Closing Date Cure Amount in connection with such assumption and assignment out of the Purchase Price, and such Assumed Contracts shall be "Assigned Contracts" for all purposes under this Agreement.

(b)    Assumed Contracts.

(i)    At the Closing, Sellers shall promptly cause all Rejected Contracts and all Held Contracts not designated as "Assumed" by Buyer during the Designation Period, or subject to treatment as Nonassignable Assets pursuant to Section 2.6(c) hereof, to be rejected pursuant to Section 365 of the Bankruptcy Code at or as soon after Closing as practicable.  Notwithstanding the foregoing, with respect to any Held Contracts treated as Nonassignable Assets pursuant to Section 2.6(c) hereof, Sellers shall not reject such Held Contracts until Buyer provides Sellers with written notice that it no longer seeks the benefit of such Held Contract or Held Contracts under Section 2.6(c)(ii) hereof, after which time Sellers

-25-

shall cause such Held Contract or Held Contracts to be rejected as soon as reasonably practicable.

(ii)    Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Sellers, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the earlier of the date that the Chapter 11 Cases are closed, dismissed or the Sellers are dissolved.

(iii)    On each date that an Assumed Contract is assumed and assigned to Buyer pursuant to this Section 2.6 (including, without limitation, the approval of the assumption and assignment thereof by the Bankruptcy Court), such Assumed Contract shall constitute an "Assigned Contract" and shall be an Assigned Contract for all purposes under this Agreement, provided that no Assumed Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has previously approved the assumption and assignment thereof to Buyer.

(iv)    In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.6, the allowed Cure Amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts (as agreed to among Buyer, Seller, and the counterparty to a respective Assumed Contract or as determined by the Bankruptcy Court), shall be paid by Buyer at the Closing in the amount of the Closing Date Cure Amount out of the Purchase Price with respect to any Assumed Contracts that are assumed and assigned to Buyer at the Closing, or, if designated as an Assumed Contract after the Closing pursuant to this Section 2.6, by Sellers upon the date such designated Assumed Contract is assumed and assigned to Buyer and becomes an Assigned Contract.

(c)    Non-Assignment of Contracts and Permits.

(i)    Notwithstanding anything contained in this Agreement to the contrary, Sellers shall not be required to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof, require the payment of any cure amount that exceeds Buyer's cost to find an alternative to such Contract or Permit, or in any way adversely affect any of the rights of Buyer (unless the restrictions on assignment or transfer thereunder would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended) as the assignee or transferee of such Contract or Permit (as the case may be) thereunder (such Contract or Permit being a "Nonassignable Asset").  If, notwithstanding the provisions of Sections 363 and 365 of the

-26-

Bankruptcy Code and the efforts of Sellers in accordance with the covenant set forth in Section 2.6(b)(ii), such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted.  For a period of one-hundred and twenty (120) days following the Closing, each Seller agrees not to file a certificate of dissolution (or its equivalent) with its state of incorporation or formation, as applicable, or otherwise dissolve. Until Sellers have dissolved, Sellers shall reasonably cooperate with Buyer, at no cost or expense to Sellers, in obtaining all consents or approvals that are required with respect to Assumed Contracts and Permits, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Sellers to assume and assign to Buyer such Contracts and Permits. For the avoidance of doubt, nothing in this Section 2.6(c) shall be deemed to alter or limit any rights of Buyer under Section 2.8(a)(ix) of this Agreement.

(ii)   To the extent permitted by Law, if consents to the assignment of any Nonassignable Asset cannot be obtained or cure amounts cannot be negotiated prior to the Closing, and upon delivery of an indemnity in substantially similar form as set forth in the Form of Transition Services Agreement attached as Exhibit I hereto from Buyer protecting the Sellers from liability therefor, Sellers shall use commercially reasonable efforts to provide Buyer with the benefits under any such Nonassignable Asset by entering into subcontracts, subleases, sale and leasebacks, use and service agreements or other contractual arrangements that will provide such benefits to Buyer; provided that the foregoing indemnity is entered into, Sellers shall promptly pay over to Buyer, in respect of each Nonassignable Asset, all money or other consideration received by Sellers under the terms of such Nonassignable Asset.

Section 2.7      Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing at 11:00 a.m.  local time on the date (the "Closing Date") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions at the Closing) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.   The Closing shall be deemed to have occurred at 11:59 p.m.  (prevailing Eastern time) on the Business Day prior to the Closing Date.

Section 2.8      Deliveries at Closing.

(a)   At the Closing, Sellers shall deliver or cause to be delivered to Buyer the following documents and other items, duly executed by Sellers, as applicable:

(i)   one or more Bills of Sale substantially in the form of Exhibit C attached hereto ("Bill of Sale");

(ii)   one or more Assignment and Assumption Agreements substantially in the form of Exhibit D attached hereto ("Assignment and Assumption Agreement");

-27-

(iii) instruments of assignment substantially in the forms of <u>Exhibit E</u> and <u>Exhibit F</u> attached hereto for each registered trademark, registered copyright, domain name and patent, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "<u>Intellectual Property Assignments</u>");

(iv) a duly executed non-foreign affidavit from each Seller, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such Seller is not a "foreign person" as defined in Section 1445 of the IRC;

(v) an Internal Revenue Service Form W-8BEN-E with respect to and duly executed by Custom Alloy Singapore PTE Ltd., dated as of the Closing Date;

(vi) the officer's certificate required by <u>Section 7.1(e)</u>;

(vii) a certified copy of the Bid Procedures Order and the Sale Order;

(viii)    new lease agreements for the real property located at (1) 3 Washington Avenue, High Bridge, New Jersey and (2) 412 Trimmer Road, Califon, New Jersey, in substantially the form attached as <u>Exhibit H</u> and duly executed by the applicable landlord, and evidence reasonably satisfactory to Buyer of the termination of the prior leases; and

(ix) evidence reasonably satisfactory to Buyer that all consents, approvals or novations, as applicable, listed on <u>Section 2.8(a)(ix) of the Disclosure Schedule</u> have been received, including that executed counterparts of any such consents, approvals or novations have been delivered to Buyer.

(b)    At the Closing, Buyer shall deliver to Sellers, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)    the Assignment and Assumption Agreement(s);

(ii)    the Cash Payment by wire transfer of immediately available funds to one or more bank accounts designated by Sellers in writing to Buyer; and

(iii) the officer's certificate required by <u>Section 7.2(e)</u>.

**Section 2.9**    **Allocation.**  The Parties agree and intend that the transactions contemplated herein are intended to constitute a taxable asset acquisition for federal and state income Tax purposes and not as any "reorganization" within the meaning of Section 368 of the IRC.  Within thirty (30) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all Assumed Liabilities, capitalized costs and other relevant items) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) and the methodology set forth on <u>Schedule 2.9</u> (the "<u>Allocation</u>").

-28-

Sellers shall have thirty (30) days following receipt of Buyer's proposed Allocation to review and comment on such proposed Allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final Allocation.   Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Forms 8594) in all respects and for all purposes consistent with such Allocation and this Section 2.9.   Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with this Section 2.9 unless required to do so by a "determination" within the meaning of Section 1313 of the IRC to the contrary.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES.

Each Seller, jointly and severally, represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"):

**Section 3.1**      **Organization of Sellers; Good Standing.**

(a)      Each Seller is duly organized, validly existing and, to the extent applicable, in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted.  Each Seller has all requisite corporate or similar power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)      Each Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2**      **Authorization of Transaction.**  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)      Each Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other corporate action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)      This Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable.  Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid

-29-

and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3    **Noncontravention.**

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Assignments and Assumptions Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, by-laws or other organizational documents of any Seller, or (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, in the case of clause (ii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.4    **Title to Acquired Assets.**  Sellers, as of the Closing, shall have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order.  At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, to the fullest extent permissible under section 363(b) of the Bankruptcy Code and applicable non-bankruptcy law, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

Section 3.5    **Contracts.**  Section 2.6(a) of the Disclosure Schedule includes a complete list, as of the Effective Date, of all material Contracts to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets.  Sellers have delivered or made available to Buyer a representative sample of such Contracts, and to the knowledge of Sellers, no such Contract (i) deviates in any material respect from the samples provided to Buyer, (ii) includes a "most favored customer" or similar restriction or (iii) includes a liquidated damages provision. Sellers have delivered or made available to Buyer any and all material amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the Effective Date in connection with such exemplary contracts.  Sellers have identified to Buyer the Cure Amounts (listing separately both pre-petition and post-petition amounts) with respect to such Contracts.  Sellers have provided timely and proper written notice

-30-

of the Sale Motion, which includes the procedures for the assumption and assignment of Contracts, to all parties to Assumed Contracts and all other parties in interest.

### Section 3.6 Government Contracts.

(a)   Section 3.6(a) of the Disclosure Schedule sets forth each Government Contract having a maximum value in excess of $150,000 entered into by a Seller that is currently active.  Sellers have delivered or made available to Buyer a representative sample of such Government Contracts, and no such Government Contract (i) deviates in any material respect from the samples provided to Buyer, (ii) includes a "most favored customer" or similar restriction or (iii) includes a liquidated damages provision.

(b)   Except as set forth in Section 3.6(b) of the Disclosure Schedule, since January 1, 2022 (i) no Governmental Entity, prime contractor, or higher-tier subcontractor under a Government Contract or any other Person acting on behalf of the foregoing, has notified Sellers, in writing, or to the Knowledge of Sellers, orally, of any actual or alleged violation or breach of any statute, regulation, representation, certification, disclosure obligation, contract term, condition, clause, provision or specification; (ii) to the Knowledge of Sellers there are no Government Contracts pursuant to which a Seller expects to experience cost, schedule, technical, or quality problems that could reasonably be expected to result in claims against such Seller (or successors in interest), by a Governmental Entity, a prime contractor or a higher-tier subcontractor from and after the Effective Date; (iii) the Sellers have not received any written, or to the Knowledge of Sellers, oral, notification of cost, schedule, technical, or quality problems that are expected to result in claims against the Sellers (or successors in interest), by a Governmental Entity, a prime contractor, or a higher-tier subcontractor or any other Person acting on behalf of the foregoing; (iv) there are no outstanding claims or requests for equitable adjustment by a Seller; (v) to the Knowledge of Sellers, no Government Contract has incurred and Sellers do not currently project any Government Contract to incur actual costs in excess of the contract price or material cost overruns; (vi) no money due to Sellers pertaining to any Government Contract has been withheld or set off nor has there by any attempt to withhold or set off any money due under any Government Contract; (vii) no termination for default, notice of potential termination for default, cure notice, show cause notice or other similar notice, either written or oral, has been issued and/or remains unresolved with respect to any Government Contract and no termination for default has been threatened with respect to any Government Contract; (viii) all of the Government Contracts were legally awarded and are in full force and effect; and (ix) no Seller has been notified that any Government Contracts are currently the subject of bid or award protest proceedings and no Government Contracts are reasonably likely to become the subject of bid or award protest proceedings.

(c)   Sellers have delivered or made available to Buyer a true and correct copy (as amended to date) of all outstanding written Government Bids made by Sellers that, if accepted, would lead to a Government Contract, with a maximum value in excess of $100,000, all of which are listed in Section 3.6(c) of the Disclosure Schedule.

(d)     Except as set forth in <u>Section 3.6(d) of the Disclosure Schedule</u> (i) to the Knowledge of Sellers, all representations, warranties, and certifications made by Sellers with respect to a Government Bid were accurate, in all material respects, as of their effective date, and to the extent required Sellers have updated any representations, warranties, and certifications with respect to any Government Bid to reflect any material changes that have occurred since their effective date; (ii) Sellers have not been notified that any Government Bid is currently the subject of bid or award protest proceedings, and no Government Bids are reasonably likely to become the subject of bid or award protest proceedings; and (iii) to the Knowledge of Sellers, no Government Bid, if accepted, is expected to result in a Government Contract with actual costs in excess of the contract price or cost overruns.

(e)     Except as set forth in <u>Section 3.6(e) of the Disclosure Schedule</u>, since January 1, 2022, except for audits in the Ordinary Course of Business, (i)  no Seller has undergone and is not undergoing any audit, inspection, or investigation of records by any Governmental Entity relating to any Government Contract or Government Bid; (ii) no Seller has received written, or to the Knowledge of Sellers, oral, notice of any investigation, inspection, or audit relating to any Government Contract or Government Bid, and (iii) no such audit, inspection, or investigation, of records is or has been threatened in writing.  No Seller has been advised in writing, by any source, that an audit, inspection or investigation pertaining to any of its Government Contracts will take place or is under consideration.

(f)     Except as set forth on <u>Section 3.6(f) of the Disclosure Schedule</u>, Sellers have not assigned or otherwise conveyed or transferred, or agreed to assign, to any Person, any Government Contract or Government Bid, or any amounts receivable, including accounts receivable related thereto and for completed but unbilled work, relating thereto, whether as a Lien or otherwise.

(g)     Each Seller maintains systems of internal controls (including as applicable cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems) that are in material compliance with all applicable requirements of all of the Government Contracts and all applicable federal, state and local Laws.  There has been no finding of, and to the Knowledge of Sellers, no conduct that would constitute, fraud, defective pricing, mischarging, or improper payments on the part of any Seller with respect to any Government Contract, and no Seller has taken any action nor is a party to any litigation that could reasonably be expected to give rise to (i) Liability under the False Claims Act, or (ii) a claim for price adjustment under the Truthful Cost or Pricing Data Statute (formerly the Truth in Negotiations Act).

(h)     No Seller has made any mandatory disclosure under Federal Acquisition Regulation ("<u>FAR</u>") 52.203-13(b)(3)(i) or FAR Part 3, or any voluntary disclosure to any Governmental Entity with respect to any alleged unlawful, unethical, or otherwise improper conduct, misstatement or omission arising under or relating to any Government Contract.

(i)     To the Knowledge of Sellers, since January 1, 2017, no Seller nor any of its respective officers, managers, agents or employees has violated (i) any administrative

-32-

agreement or consent agreement with any Governmental Entity relating to compliance with Government Contracts, or (ii) any legal, administrative, or contractual restriction concerning either any subcontractor or any kickbacks or the employment of (or discussions concerning possible employment with) current or former officials or employees of a state, local or federal government (regardless of the branch of government), including the so-called "revolving door" restrictions set forth at 18 U.S.C. § 207.

(j)      No Seller nor, to the Knowledge of Sellers, any of its respective directors, managers, members, officers or employees, is currently debarred or suspended, or proposed for suspension or debarment, by any Governmental Entity (or otherwise ineligible to obtain Government Contracts).   There are no open inquiries, investigations, disputes, controversies or facts with respect to any Government Contract or Government Bid, or any violations of any federal, state or local order, statute, rule, or regulation relating to any Government Contract or Government Bid, nor any other facts which would reasonably be expected to give rise to such suspension or debarment, or proposed suspension or debarment.

(k)      Section 3.6(k) of the Disclosure Schedule sets forth a true, correct and complete list of all facility security clearances currently held by Sellers and, to the Knowledge of Sellers, the number of personnel security clearances currently held by any Employee of Sellers, or any agent or representative of Sellers, by number and type.   The clearances set forth in Section 3.6(k) of the Disclosure Schedule are all of the facility and personnel security clearances necessary for Sellers to conduct the Business as currently being conducted thereby. Each Seller holds (and at all relevant times held) at least a "satisfactory" rating from the United States Defense Counterintelligence and Security Agency with respect to such facility security clearances.

(l)      Except as set forth on Section 3.6(l) of the Disclosure Schedule, to the knowledge of Sellers, no Governmental Entity, prime contractor, or higher-tier subcontractor has title to or any security interest in any tangible or intangible property (i) used by the Business in the performance of a Government Contract or (ii) received by a Seller in connection with any Supplier Development Fund agreement with any other party.

(m)      Section 3.6(m) of the Disclosure Schedule sets forth a complete list of (i) every Government Contract under which Sellers have provided notice of a bankruptcy filing, whether pursuant to Federal Acquisition Regulation 52.242-13 (Bankruptcy) or otherwise, and the date and form of such notice, and (ii) any written direction received from a Governmental Entity, prime contractor, or higher-tier subcontractor relating to a bankruptcy filing, and the date and form of such direction.

### Section 3.7      __International Trade.__

(a)      (i) Each Seller has obtained all export licenses, registrations, and other approvals required for the manufacture and exports of products, software, services and technologies under the Export Administration Regulations, the International Traffic in Arms Regulations, or the sanctions regulations administered by the Office of Foreign Assets Control (collectively, "Trade Control Laws"), and all such approvals and licenses are in full force and

-33-

effect, (ii) Section 3.7(ii) of the Disclosure Schedule sets forth a true and correct list of all currently active export licenses, registrations, and approvals identified in clause (i), (iii) Section 3.7(iii) of the Disclosure Schedule sets forth a true and correct list of the Export Control Classification Numbers or U.S. Munitions List Categories applicable to each the Company's products, (iv) each Seller is in compliance in all material respects with the terms of such applicable export licenses or other approvals, (v) there is no Litigation threatened in writing against any Seller with respect to such export licenses or other approvals, and (vi) to the Knowledge of Sellers, there do not exist any conditions or circumstances that would reasonably be expected to cause any Governmental Entity to rescind or invalidate such export licenses, registrations, or other approvals.

(b)     Since January 1, 2022, to the Knowledge of Seller, no Seller has engaged in any material violation of Trade Control Laws that reasonably would be expected to adversely impact Buyer's use of the Acquired Assets. Each Seller maintains in effect policies and procedures designed to prevent, deter, and detect violations of Trade Control Laws, including with respect to preventing the unauthorized release of export-controlled technical data, technology, and source code to foreign persons.

Section 3.8     **Illegal Payments.**  None of Sellers or their respective Affiliates have made any payment in violation of Law to, or provided any illegal or improper benefit or inducement, including for or to any official of any Governmental Entity, supplier, customer, or other Person, in an attempt to influence any such Person to take or to refrain from taking any action relating to the operations of the Business, or to engage in any action by or on behalf of a Seller its Affiliates in any way, or paid any bribe, payoff, influence payment, kickback, or other unlawful payment.

Section 3.9     **Real Property.**  None of Sellers owns any real property.  Section 3.9 of the Disclosure Schedule sets forth the street addresses of all real property used or held for use in the Business which any of Sellers or their Affiliates leases, operates, occupies or subleases in connection with the Business or upon which any tangible Acquired Assets are located and all instruments, easements, leases, subleases, options and other material agreements (including all amendments thereto) creating any interest or right in any of Sellers or any other party in any of the real property specifying the name of the lessor or sublessor (as applicable).  Sellers have provided to Buyer true and complete copies of the leases, ground leases, subleases and licenses and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the Effective Date relating to the Leased Real Property.   Sellers have provided to Buyer true and complete copies of all default notices and any other correspondence of a material nature to or from any party to any lease, ground lease, sublease or license relating to the Leased Real Property.

Section 3.10     **Intellectual Property**.  Except as set forth on Section 3.10(i) of the Disclosure Schedule, (i) with respect to any Intellectual Property owned by Sellers (as opposed to Intellectual Property of which such Seller is a licensee), to the Knowledge of Sellers, Sellers have all right, title and interest to all such Intellectual Property, (ii) to the Knowledge of Sellers, no Person other than Sellers have the right to use the Intellectual Property owned by Sellers and (iii)

-34-

Sellers have the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Sellers' Business that is owned by a party other than Sellers. Section 3.10(ii) of the Disclosure Schedule sets forth a complete list, as of the Effective Date, of all registered and applied for Intellectual Property owned by Sellers (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).

**Section 3.11    Information Technology**. Except as set forth on Section 3.11 of the Disclosure Schedule: (a) no notice of any material defect has been sent or received by Sellers in respect of any Permits or lease under which Sellers receive Information Technology, (b) all of the Information Technology owned by each Seller is held by such Seller as sole, legal and beneficial owner and is held free of all Liens or any other similar third party rights or interests, other than Permitted Liens and CIBC's Liens, (c) the records, systems, controls and/or data used by the each Seller are recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by third parties with whom such Seller has contracted for such services (including holding through electronic, mechanical or photographic process whether computerized or not), (d) to the Knowledge of Sellers, Sellers have taken commercially reasonable precautions to protect the integrity and security (both logical and physical), as applicable, of the Information Technology and Technology from any unauthorized use, access, interruption or modification by any other Person.  To the Knowledge of Sellers, the Information Technology, including the Technology, shall (i) operate and run in a commercially reasonable business manner, and (ii) conform in all material respects to the Business or customer specifications thereof.  The Products and the other Information Technology, including any Information Technology involved in the hosting of the Products, have not materially malfunctioned or failed in any manner that materially and adversely impacted customer-facing capabilities within the past three (3) years.

**Section 3.12    Permits.**  Section 3.12(i) of the Disclosure Schedule sets forth a complete list, as of the Effective Date, of all material Permits issued to Sellers for the operation of the Business.  Section 3.12(ii) of the Disclosure Schedule sets forth a complete list, as of the Effective Date, of all material Permits applied for by Sellers or the issuance of which to Sellers is pending. Each Seller represents and warrants that such approvals are in full force and effect and have not been limited, revoked or modified in any manner.  Section 3.12(iii) of the Disclosure Schedule sets forth a complete list, as of the Effective Date, of all material Permits required for the operation of the Business which have not been issued to Sellers or applied for by Sellers or the issuance of which to Sellers is not pending.

**Section 3.13    Employee Benefit Plans; Employees.**  Section 3.13(i) of the Disclosure Schedule sets forth a list as of the Effective Date of each Employee Benefit Plan.  Section 3.13(ii) of the Disclosure Schedule sets forth a list as of the Effective Date of all Current Employees and their respective (a) titles or responsibilities; (b) dates of hire; (c) current base salary or wages; (d) all bonuses paid during 2022; and (3) accrued vacation and sick leave.

**Section 3.14    Labor Relations**.  Except as set forth on Section 3.14 of the Disclosure Schedule, no Seller is a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization.  Sellers have not received written notice of any outstanding representation petitions

-35-

involving any Seller before the National Labor Relations Board or any state labor board, and, to the Knowledge of Sellers, no such petition has been threatened, and, to the Knowledge of Sellers, no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing.  Sellers are not subject to any material unfair labor practice charge.

**Section 3.15     Environmental Matters.**  Except as set forth on Section 3.15 of the Disclosure Schedule, to the Knowledge of Sellers the Acquired Assets are in material compliance with all applicable Environmental Laws.  Except as set forth on Section 3.15 of the Disclosure Schedule, since January 1, 2022 each Seller has conducted the Business and the respective operations in accordance with all Environmental Laws applicable to such Seller and the Business.  Since January 1, 2022, no Seller has received written notice of any violation, investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to the Knowledge of Sellers, are any of the same being threatened in writing against any Seller.  The Sellers hold, and to the Knowledge of Sellers, are in compliance in all material respects with, all Permits required under applicable Environmental Laws (each of which is listed in Section 3.15 of the Disclosure Schedule) to operate at the Acquired Assets and to carry on their respective businesses as now conducted and, to the Knowledge of Sellers, there are no material capital expenditures required to maintain or achieve such compliance in all material respects.  No Seller has received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, indemnity, or decree involving outstanding requirements relating to or arising under Environmental Laws, nor are Sellers a party to any settlement agreement pertaining to matters arising under Environmental Laws.  Sellers have provided to Buyer any and all material environmental reports, surveys, studies, audits and other similar documents in any Sellers possession with respect to the Business and the Acquired Assets.

**Section 3.16     Insurance**.  Sellers maintain the insurance policies set forth on Section 3.16(i) of the Disclosure Schedule, which sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect.  Sellers have paid all premiums on such policies due and payable prior to the Effective Date.  To the Knowledge of Sellers, Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

**Section 3.17     Related Party Transactions**.  Except as set forth on Section 3.17 of the Disclosure Schedule, no current or former equity holder, officer, director, employee, member, manager, managing member or Affiliate of Sellers, or any individual related by blood, marriage or adoption to any such individual or any entity in which any such Person or individual owns or has any interest in, has any ownership or right, title or other interest in any tangible (real or personal) or intangible property or assets of or used by, is a party to any Contract with, or performs any services for, or on behalf of, or provides any group purchasing benefits to or with respect to, Sellers.  In addition, Section 3.17 of the Disclosure Schedule lists all of the material business relationships or Contracts between Sellers, on the one hand, and its current or former Affiliates, including any guaranty, indemnity or other obligation of one such party in favor of the other.

-36-

Section 3.18    **No Brokers or Finders**.  Except for amounts due to SSG Advisors, LLC, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Sellers in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions for which Buyer could become liable or obligated to pay.

Section 3.19    **Litigation; Proceeding**.  Except as set forth in Section 3.19 of the Disclosure Schedule, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Knowledge of Sellers, threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Entity, nor are there any investigations relating to the Business, pending or, to Knowledge of Sellers, threatened by or before any arbitrator or any Governmental Entity.  None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Entity or any arbitration award or settlement agreement with any Person.

Section 3.20    **Compliance with Laws**.  Except as set forth on Section 3.20(i) of the Disclosure Schedule, since January 1, 2022, to the Knowledge of Sellers, each Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits (exclusive of Tax law compliance to the extent disclosed in Section 3.21 of the Disclosure Schedule) in all material respects, and (ii) holds all Permits necessary for the lawful conduct of the Business by such Seller.  Except as set forth on Section 3.20(ii) of the Disclosure Schedule, no Seller has received any written notice or other written communication from any Governmental Entity or other Person (x) asserting any violation of, or failure to comply with, any requirement of any Law or Permit or (y) notifying such Seller of the non-renewal, revocation or withdrawal of any Permit.  Each Seller is in material compliance with the terms of the Permits.

Section 3.21    **Taxes.**

(a)    Except as set forth on Section 3.21(a) of the Disclosure Schedule, all Tax Returns with respect to the Business or the Acquired Assets required to be filed for any Tax period ending on or before the Closing Date have been timely filed.  Such Tax Returns are true, complete, and correct in all material respects.  All Taxes due and owing by the Sellers or with respect to the Acquired Assets or the Business (whether or not shown on any Tax Return) have been timely paid;

(b)    The Sellers have withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, member, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law;

(c)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Sellers or relating to the Acquired Assets or the Business;

-37-

(d)     Except as set forth on <u>Section 3.21(d) of the Disclosure Schedule</u>, all deficiencies asserted, or assessments made, against the Sellers or relating to the Acquired Assets or the Business as a result of any examinations by any Taxing authority have been fully paid;

(e)     None of the Sellers is a party to any Litigation by any Taxing authority. There is no pending or, to the Knowledge of Seller, threatened Litigation by any Taxing authority;

(f)     The Financial Statements fully accrue all actual and contingent liabilities for Taxes relating to the Acquired Assets or the Business with respect to all periods through the dates thereof in accordance with GAAP.  Since March 31, 2023, no liabilities for Taxes relating to the Acquired Assets or the Business have been incurred outside ordinary course of business consistent with past practices;

(g)     Except as set forth on <u>Section 3.21(g) of the Disclosure Schedule</u>, no claim has been made by any Taxing authority in a jurisdiction in which the Sellers do not file Tax Returns that a Seller is or may be subject to taxation by that jurisdiction;

(h)     None of the Sellers is a party to any Tax allocation or sharing agreement applicable to the Business or the Acquired Assets other than such agreements entered into by the Sellers in the ordinary course of business, the primary purpose of which does not relate to Taxes;

(i)     None of the Sellers has been a member of an affiliated, combined, consolidated or unitary Tax group filing a consolidated, unitary or combined Tax Return.  The Sellers have no Liability for Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local or foreign Law), as transferee or successor, by Contract or otherwise;

(j)     None of the Sellers is subject to any private ruling of the Internal Revenue Service or comparable ruling of other Taxing authorities with respect to the Acquired Assets or the Business;

(k)     To the Knowledge of Sellers, the Sellers do not have any Liability for Taxes pursuant to any Assigned Contract;

(l)     The Acquired Assets do not include any stock or other equity interests in any Person, including for these purposes any interest in a "disregarded entity" described in Treasury Regulation Section 301.7701-3

(m)     none of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the IRC;

(n)     Except as set forth on <u>Section 3.21(n) of the Disclosure Schedule</u>, there are no Liens for any Tax on the Acquired Assets, except for Taxes not yet due and payable nor,

-38-

to the Knowledge of Seller, is any Taxing authority in the process of imposing any Liens for Taxes on any of the Acquired Assets (other than for current Taxes not yet due and payable);

(o)    None of the Sellers is a foreign person as defined in Section 897 of the IRC.

(p)    None of the Acquired Assets is a "United States real property interest" within the meaning of Section 897 of the IRC.

Section 3.22    **Bank Accounts; Powers of Attorney**.  Section 3.22 of the Disclosure Schedule sets forth (i) the name of each bank in which each Seller has an account or safe deposit box and the names of all Persons authorized to draw thereon or to have access thereto, and (ii) the names of all Persons, if any, holding powers of attorney from Sellers with respect to such accounts or safe deposit boxes and a summary statement of the terms thereof.

Section 3.23    **Financial Statements**.

(a)    Sellers have provided to Buyer (i) the unaudited consolidated balance sheet of Sellers and the related consolidated statements of income, stockholders' equity and cash flow for the fiscal year ended December 31, 2022, and (ii) the monthly unaudited consolidated balance sheets of Sellers for the months beginning January 2023 through February 2023 and the related consolidated statements of income, stockholders' equity and cash flow for each such month (collectively the "Financial Statements").  The Financial Statements have been prepared from the books and records of Sellers, have been prepared in accordance with generally accepted accounting principles (except as may be stated in the notes thereto) and fairly present the financial position and the results of operations and cash flows of Sellers as of the times and for the periods referenced to therein.

(b)    Section 3.23(b) of the Disclosure Schedule contains an aged list of the Accounts Receivable of Sellers as of March 31, 2023, (which Sellers will update and deliver to Buyer three (3) Business Days prior to the Closing Date).  All such Accounts Receivable arose from, and all Accounts Receivables of Sellers existing as of the Closing Date will have arisen from, bona fide arm's length transactions arising from the delivery of products or services in its Ordinary Course of Business.

(c)    Section 3.23(c) of the Disclosure Schedule contains a list of the trade accounts payable (the "Trade Accounts Payable") of Sellers as of March 31, 2023 (which Sellers will update and deliver to Buyer three (3) Business Days prior to the Closing Date).  All such Trade Accounts Payable arose from, and all Trade Accounts Payable of Sellers existing as of the Closing Date will have arisen from, bona fide arm's length transactions in the Ordinary Course of Business, and Sellers have been paying such Trade Accounts Payable as and when due.

Section 3.24    **No Other Representations or Warranties**.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE

-39-

SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE ACQUIRED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY ACQUIRED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS Article III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE ACQUIRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE ACQUIRED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES).   THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1    Organization of Buyer**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company or corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company or corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

-40-

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have have been duly authorized by Buyer, and no other limited liability company or corporate action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer.    Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.    Assuming, to the extent they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3**    **Noncontravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Article II) will (i) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

**Section 4.4**    **Adequate Assurances Regarding Executory Contracts**.  Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and, subject to section 365(c), 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.5    **Good Faith Purchaser**.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

Section 4.6    **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.7    **Financial Capacity**.  Buyer (a) has, and at all time through the Closing will have, the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the transactions contemplated by this Agreement) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities.

Section 4.8    **Condition of Business**.  Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article III of this Agreement, Sellers (including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Business. Except for the representations and warranties contained in Article III (as qualified, amended, supplemented and modified by the Disclosure Schedule), Buyer will accept the Acquired Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    **Certain Efforts; Cooperation**.

(a)    Each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2.  Without limiting the generality of the foregoing, each of the Parties shall use commercially reasonable efforts not to take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any other Party to consummate, or materially delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

-42-

(b)    On and after the Effective Date, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Acquired Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order) and to ensure continuous uninterrupted operation of the Business after the Closing in the Ordinary Course of Business consistent with its operation immediately prior to the Closing.  For the avoidance of doubt, prior to the Closing, at no material cost to Sellers, Sellers shall use commercially reasonable efforts to support Buyer's efforts to facilitate the transition of the Business and associated operations to Buyer on and after the Effective Date, including but not limited to: (i) payroll, (ii) health, welfare, and retirement plans, (iii) insurance coverage, (iv) information technology systems and services, and (v) finance and treasury.  Such support shall include, but is not limited to, Sellers providing information and data reasonably requested by Buyer and participating in teleconference calls with third party providers that may be required to transition the Business and operations in the foregoing areas.

**Section 5.2    <u>Notices and Consents</u>**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, including notices of Buyer's assumption and assignment of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code consistent with this Agreement.

(b)    Sellers and Buyer shall cooperate with one another (a) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (b) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)    Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and incorporate the other Party's reasonable comments, (C) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the transactions contemplated by this Agreement unless it consults with the other Party in advance, and, to the

-43-

extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement, provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) to remove details concerning financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues.  Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

Section 5.3    **Bankruptcy Actions**.

(a)    Sellers filed the Chapter 11 Cases with the Bankruptcy Court on the Petition Date.   Sellers filed and served a motion (the "Sale Motion") in the Chapter 11 Cases requesting that the Bankruptcy Court (x) schedule the hearing for approving the Bid Procedures, (y) enter the Bid Procedures Order and (z) enter the Sale Order after a  hearing to approve a sale to a stalking horse bidder or the prevailing bidder at the Sale auction.  The Court entered an Order approving Sellers' proposed bid procedures and scheduling a sale hearing for May 1, 2023 at 10:00 a.m.  (the "Bid Procedures Order") which is attached as Exhibit A hereto. Buyer and Sellers shall take all actions as may be reasonably necessary to cause each of such orders to be issued, entered and become a Final Order.

(b)    Sellers have provided timely and proper written notice of the Sale Motion, which includes the procedures for the assumption and assignment of Contracts, to all parties to Assumed Contracts and all other parties in interest and will take all other actions necessary to cause all Assumed Contracts to be assumed by Sellers (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assigned to Buyer, and all Rejected Contracts to be rejected by Sellers, pursuant to Section 365 of the Bankruptcy Code, provided that the only Contracts to be actually assumed and assigned to Buyer at or after Closing will be the Assumed Contracts pursuant to this Agreement.

(c)    In the event that the Reimbursable Expenses become payable under this Agreement pursuant to Section 8.3, Sellers shall promptly file a motion seeking Bankruptcy Court approval of the payment of the Reimbursable Expenses and shall use commercially

-44-

reasonable efforts to obtain entry by the Bankruptcy Court of approval of the Reimbursable Expenses as soon as practicable, after notice and a hearing.

(d)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

Section 5.4     **Conduct of Business**.  Except as may have been required by the Bankruptcy Court, as set forth on Schedule 5.4 hereto or as agreed to in writing by Buyer (which agreement shall not be unreasonably withheld, conditioned or delayed) (the "Consent"), from the Effective Date until the Closing:

(a)     Sellers shall: (i) operate the Business in substantially the same manner as conducted as of the Effective Date and only in the Ordinary Course of Business; (ii) preserve in all material respects the Acquired Assets; (iii) use commercially reasonable efforts to keep available the services of the Current Employees, to the extent reasonably feasible, (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, distributors, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, and (v) refrain from changing in any material respect any of its product or service prices or pricing policies (*e.g.*, discount policies) for any of its products or services;

(b)     Sellers shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets other than the sale of Inventory in the Ordinary Course of Business;

(c)     Sellers shall not, directly or indirectly, knowingly permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Exceptions and Permitted Liens;

(d)     Sellers shall not, directly or indirectly, enter into any transaction or take any other action which, if taken, or omit to take any act which, if omitted to be taken, could be reasonably expected to cause, result in or constitute a material breach of any representation or warranty (as if then made) or covenant made by Sellers in this Agreement;

(e)     Sellers shall notify Buyer promptly in writing of the occurrence of any Material Adverse Effect;

(f)     Sellers shall not, directly or indirectly, make any promise or representation, oral or written, or otherwise, to (x) increase the annual level of compensation

-45-

payable or to become payable by Sellers to any of its directors, officers or Current Employees, (y) grant, establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, officer or Employee of Sellers, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) enter into any employment, deferred compensation, severance, consulting, non-competition, non-solicitation or similar agreement (or amend any such current agreement) to which a Seller is a party or involving a director, officer or Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Effective Date and disclosed on Section 3.13(i) of the Disclosure Schedule;

(g)     Sellers shall comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Acquired Asset;

(h)     Sellers shall not, directly or indirectly, (x) enter into any Contract with a value greater than or equal to $200,000, or (y) assume, materially amend, materially modify, materially supplement or terminate, or waive any material rights under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets (including any Assigned Contract), provided, that Buyer shall provide Sellers with a dedicated Person to whom a request for Consent under this Section 5.4(h) shall be submitted and Buyer shall be deemed to have waived its right under this Section 5.4 to give its Consent only if Buyer does not respond in any way to the request within 24 hours;

(i)     Sellers shall not, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of Sellers that constitutes an Acquired Asset;

(j)     Sellers shall not, directly or indirectly, enter into any commitment for any capital expenditure, except pursuant to any budget approved by the lender under the Final Order Authorizing Debtors To: (A) Use Cash Collateral On A Final Basis; (B) Incur Postpetition Debt On A Final Basis; And (C) Grant Adequate Protection And Provide Security And Other Relief to CIBC Bank USA, As Prepetition Lender, And The Other Secured Parties or the existing Supplier Development Fund Agreements;

(k)     Sellers shall not, directly or indirectly, terminate, amend or modify in any manner any Contract for Leased Real Property;

(l)     Sellers shall use commercially reasonable efforts to assist Buyer in obtaining all consents or approvals prior to the Closing that are required, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Sellers to assume and assign to Buyer any Assumed Contract or Permit;

(m)     Sellers shall use commercially reasonable efforts to assist Buyer in obtaining all Permits required to own or operate the Acquired Assets under applicable Laws, including making filings with the Governmental Authorities;

-46-

(n)    Sellers shall maintain in full force and effect each Permit held by Sellers as of the Effective Date or otherwise obtained by Sellers prior to the Closing, Sellers shall comply with, in all material respects, the terms of each such Permit and Sellers shall not permit any such Permit to terminate, expire or lapse; and

(o)    Sellers shall maintain in full force and effect without modification any insurance policy with respect to Acquired Assets, Sellers shall comply with, in all material respects, the terms of such insurance policy and Sellers shall not permit any such policy to terminate, expire or lapse.

### Section 5.5    Notice of Developments And Disclosure Schedule Supplements.

(a)    From the Effective Date until the Closing Date, each of Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

(b)    From time to time prior to the Closing Date, Sellers, on the one hand, with respect to Disclosure Schedule and representations and warranties relating to Sellers, shall notify Buyer of, and Buyer on the other hand, with respect to representations and warranties relating to Buyer, shall notify Sellers of, and shall supplement or amend the Disclosure Schedule, if applicable, with respect to, any matter that arises after the Effective Date and that, (i) if existing or occurring at or prior to such delivery of the Disclosure Schedule, would have been required to be set forth or described in the Disclosure Schedule to this Agreement or (ii) makes it necessary to correct any information in the Disclosure Schedule or in any representation or warranty of Sellers or Buyer, as applicable, that has been rendered inaccurate thereby.  Each such notification and supplement, to the extent known, shall be made by Sellers to the Disclosure Schedule prepared by Sellers no later than two (2) Business Days after discovery thereof by Sellers or Buyer, as applicable, or if such matter arises less than two (2) Business Days before the date set for the Closing by the parties hereto, then promptly after discovery thereof by Sellers or Buyer, as applicable, and in any event prior to the Closing Notwithstanding the foregoing, (i) nothing contained herein shall detract from or diminish the rights of Buyer under Section 7.1(a) and Section 8.1(b)(i) as if the Schedules were not supplemented or amended pursuant to this Section 5.5(b) and (ii) no such supplement or amendment to the Disclosure Schedule shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

### Section 5.6    Access.

(a)    Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, and in a

-47-

manner so as not to interfere unreasonably with the normal business operations of Sellers, to all facilities, offices, premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law. In furtherance of the foregoing, Sellers shall (i) provide Buyer and its Representatives with reasonable access to perform field examinations and inspections of the Business, the Acquired Assets, inventories, facilities and equipment; (ii) furnish Buyer with such financial and operating data and other information with respect to the condition (financial or otherwise) of the Business and the Acquired Assets as Buyer shall reasonably request; and (iii) permit Buyer to make such reasonable inspections and copies thereof as Buyer may require.

(b)    All information obtained pursuant to this Section 5.6 shall be subject to the terms and conditions of any Confidentiality Agreement, if applicable.

**Section 5.7    Press Releases and Public Announcements.**  Prior to the Closing, neither of Buyer or Sellers shall issue any press release or make any public announcement relating to the sale of the Business by Sellers to Buyer without the prior written approval of each of Buyer and Sellers; provided, however, that each of Buyer and Sellers may make any public disclosure that it believes in good faith is required by applicable Law or court process (in which case the disclosing Party shall use its reasonable best efforts to advise the other prior to making the disclosure).

**Section 5.8    Bulk Transfer Laws.**  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

## ARTICLE VI
## OTHER COVENANTS.

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1    Cooperation.**  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances.**  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of

-48-

sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities.

**Section 6.3    Availability of Business Records.**  For a period of twelve months after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Acquired Assets for periods prior to the Closing to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up or Tax reporting and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) twelve months after the Closing Date, (ii) the required retention period for all government contact information, records or documents (solely for such information which such requirement applies), or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases.  Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing during the twelve month period described herein, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim at Sellers' expense and (upon comfort that Buyer's expenses will be appropriately paid or reimbursed to it) shall make available to Sellers such personnel as are most knowledgeable about the matter in question.

**Section 6.4    Employee Matters**.

(a)    Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer) to employ all Current Employees, with employment commencing on the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree."  Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee."  Each offer to an Offeree shall be for base salary and wages that are equal to, or more favorable to the Current Employee than, such employment terms Sellers offered to the Current Employee on the Closing Date.

(b)    Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the Effective Date, Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d)    Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Buyer,

-49-

(i)    Subject to <u>Section 2.3(h)</u> of this Agreement, Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are earned on or prior to the Closing Date with respect to all employees of Sellers.  Each Seller shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date.

(ii)    Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that are earned after the Closing Date with respect to all Transferred Employees.  Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees.

(e)    Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person.   Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.5    <u>Taxes.</u>**

(a)    To the extent not exempt under section 1146 of the Bankruptcy Code, any stamp, documentary, registration, transfer or similar Tax (each, a "<u>Transfer Tax</u>") imposed under any applicable Law on the transfer of the Acquired Assets contemplated by this Agreement shall be borne one-half by Sellers, on the one hand, and one-half by Buyer, on the other hand.  Sellers and Buyer shall cooperate to timely prepare and timely file any Tax Returns required to be filed with respect such Transfer Taxes, and shall provide such other assistance including exemption or resale certificates as allowable to reduce any such Transfer Taxes.

(b)    Sellers and the Buyer shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with any Tax proceeding relating to: (a) the Acquired Assets; (b) the Business; or (c) the transactions contemplated by this Agreement.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any Tax audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Parties agree that all books and records with respect to Tax matters pertinent to the Acquired Assets or the Business relating to any taxable period beginning before the Closing Date shall be retained at 3 Washington Avenue, High Bridge, New Jersey and that each of the Sellers, the Buyer and the Creditors' Committee shall have reasonable access to same upon request.  In the event Sellers intend on destroying any such books and records, Sellers shall provide Buyer with written

-50-

notice of same and Buyer shall have thirty (30) days thereafter to remove the books and records that are the subject of destruction from the premises.  This Section 6.5(b) is intended to, and shall, supplement and not limit the generality of the provisions contained in Section 6.3.

(c)    In the case of any property, ad valorem, or similar Tax with respect to the Acquired Assets or the Business ("Asset Taxes") that is assessed with respect to a Straddle Period, the amount of such Asset Taxes allocated to the portion of such Straddle Period ending on the Closing Date shall be equal to the amount of such Tax for the entire Straddle Period, multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the total number of days in such Straddle Period.  Information available after the Closing Date that alters the amount of Asset Taxes due with respect to the Straddle Period in respect of which such Tax was paid shall be taken into account and any change in the amount of such property or ad valorem Tax shall be prorated between Sellers and Buyer.

(d)    Notwithstanding anything to the contrary in this Agreement, Sellers shall not file any Tax Return or amended Tax Return relating to Asset Taxes (or otherwise change such Tax Returns) or make or change an election relating to Asset Taxes, in each case, with respect to a Pre-Closing Tax Period, without a written consent of Buyer (not to be unreasonably withheld, conditioned, or delayed), unless required to do so by applicable Law.

(e)    For the avoidance of doubt, Sellers shall remain responsible for, and Buyer shall have no liability for, all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Acquired Assets or the Business or attributable to Tax periods (or portions thereof) commencing on or after the Petition Date and ending on or before the Closing Date.  Sellers shall remain responsible for all sales Taxes, use Taxes, payroll Taxes, real property taxes (including such amounts included in the Cure Amounts), personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or are attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date.

Section 6.6    **Casualty**.  If, between the Effective Date and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by hurricane, fire, earthquake, flood, other casualty or any other cause (each a "**Casualty**"), then Buyer shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the applicable Casualty or (b) in the event that the applicable Casualty would have a Material Adverse Effect, the Buyer may terminate this Agreement and the transactions contemplated hereby.

Section 6.7    **Collection on Acquired Assets**.  If, after the Closing Date, any Seller receives any cash, checks, payments or other property with respect to any Acquired Assets (including misdirected customer payments under the Assigned Contracts), such Seller shall immediately (and within three (3) business days) remit or deliver such cash, checks, payments or other property to Buyer and take all steps necessary to vest title to such cash, checks, payments or other property in Buyer.  The Sellers hereby designate Buyer and its officers as the true and

-51-

lawful attorney in-fact of the Sellers, with full power of substitution, to execute and endorse for the benefit of Buyer all checks, notes or other documents received by the Sellers in payment of or in substitution or exchange for any of the Acquired Assets.  The Sellers hereby acknowledge and agree that the power of attorney set forth in the preceding sentence in favor of Buyer is coupled with an interest, and further agree to execute and deliver to Buyer from time to time any documents or other instruments requested by Buyer to evidence such power of attorney.  If, following the Closing, any right, property or asset forming part of the Acquired Assets is found not have been transferred to Buyer, Sellers shall transfer such rights, property or asset forming part of the Acquired Assets as soon as practicable to Buyer.

Section 6.8     Use of Names.  Within three (3) Business Days following Buyer's request, each Seller shall deliver to Buyer those documents reasonably requested by Buyer to effect the name change of each Seller to names mutually determined by the Parties not to be confusingly similar to, or a colorable imitation or dilutive of, the current names of Sellers.  Each Seller shall diligently pursue such filings until completion.

Section 6.9     Environmental Matters.

(a)     Sellers and Buyer acknowledge that the transaction contemplated by this Agreement is subject to the requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. ("ISRA"), as amended by the Site Remediation Reform Act, N.J.S.A. 58:10C-1 et seq. ("SRRA"), and the regulations issued thereunder.  Sellers, at no cost or expense to Buyer, hereby covenant and agree, and agree to cause 1742 Square Associates, Ltd. ("Landlord"), the landlord of the Leased Real Property located at 3 Washington Avenue, High Bridge, New Jersey, to comply with ISRA and SRRA, to the fullest extent required, and Sellers shall or shall cause Landlord to undertake the steps necessary to obtain a Response Action Outcome ("RAO"), as defined in the SRRA, applicable to the Leased Real Property confirming complete performance of its obligations pursuant to ISRA, including, but not limited to, filing any deed notices required for the issuance of an RAO. The Sellers or Landlord shall be solely responsible for all costs and expenses and requirements associated with compliance with ISRA and the SRRA, and shall submit to New Jersey Department of Environmental Protection ("NJDEP") a General Information Notice within five (5) days of the entry of the Sale Order identifying Landlord as the Person Responsible for Conducting the Remediation Information and Certification, and shall obtain or otherwise complete and duly file on or before Closing (i) a Remediation Certification in accordance with N.J.A.C. 7:26B-4.3, or (ii) such other authorization which authorizes Seller to complete this transaction.  The foregoing shall be incorporated into the Sale Order entered by the Bankruptcy Court.

(b)     Sellers and Buyer acknowledge that the transaction contemplated by this Agreement is subject to Part 201 of Michigan's Natural Resources and Environmental Protection Act ("NREPA"), found at MCL 324.20101, et seq. ("Part 201"), and/or that the Leased Real Property is a "Site" as defined by Part 213 of NREPA, MCL 324.21301. et seq. ("Part 213").  If eligible, Buyer shall conduct and submit to the appropriate department of the state of Michigan one or more Baseline Environmental Assessments for each parcel of the Purchased Real Property to qualify for exemptions or defenses to liability allowed under Part

201 or Part 213 of NREPA.  Sellers shall provide or shall cause Landlord to provide to Buyer and its Representatives the right to access the Leased Real Property for the purpose of conducting any assessments, sampling, or analysis necessary to complete the Baseline Environmental Assessment.

      **Section 6.10**    <u>**Novation Matters**</u>.  If required by the responsible contracting officer at any point (see FAR 42.1202 detailing identification of the responsible contracting officer), following the Closing, Buyer will promptly submit in writing a request of the relevant Governmental Entity to (i) recognize Buyer as the successor in interest to the Government Contracts set forth on <u>Section 6.10 of the Disclosure Schedules</u> (the "<u>Prime Contracts</u>") in accordance with Federal Acquisition Regulation Part 42, Subpart 42.12 (the "<u>Novation Submission</u>"), and (ii) if required, enter into a novation agreement (the "<u>Novation Agreement</u>") in substantially similar to the version in Federal Acquisition Regulation 42.1204.  If a Novation Submission is required by the responsible contracting officer, for a period of ninety (90) days from Closing, Seller will cooperate with Buyer, at no cost or expense to Seller, to obtain all consents, approvals and waivers required for the purpose of processing, entering into, and completing the Novation Agreement with regard to the Prime Contracts.  If the Novation Submission is required by the responsible contracting officer, for a period of ninety (90) days from Closing, Seller will cooperate with Buyer, at no cost or expense to Seller, to provide all reasonable information and take all other actions reasonably necessary to execute and consummate such Novation Agreement.  In the event that the responsible contracting officer declines to enter into a Novation Agreement or until such time as the responsible contracting officer recognizes such transfer by entering into a Novation Agreement, nothing in this Agreement will constitute a transfer, assignment, attempted transfer or an attempted assignment of the outstanding Prime Contracts.  If the Novation Submission is required by the responsible contracting officer, until such time as Buyer is recognized as the successor in interest of the Prime Contracts, Seller hereby subcontracts (pursuant to the Subcontract Pending Novation in substantially the form attached as <u>Exhibit J</u> hereto) with Buyer to perform for and in the place of Seller any and all operations and provide any and all goods equipment, services and other performance obligations under the Prime Contracts as of the Closing Date, pursuant to each of their respective terms and conditions, including any and all amendments, options, modifications, purchase orders issued thereunder and such other terms and conditions as may have been duly incorporated in the Prime Contracts; provided that Seller does not subcontract to Buyer any Prime Contract for which a Novation Agreement is not required by the responsible contracting officer.

      **Section 6.11**    <u>**Workers' Compensation Policy**</u>.  On and after the Closing Date, Sellers shall maintain in full force and effect without modification a workers' compensation policy for Claims arising before the Closing Date.

      **Section 6.12**    <u>**Transfer of Export Licenses.**</u>  Within five (5) business days of the entry of the Sale Order, at no cost to Sellers, Sellers will submit to the U.S. Department of Commerce, Bureau of Industry and Security ("<u>BIS</u>") a request under the Export Administration Regulations ("<u>EAR</u>") to transfer to Buyer EAR export licenses D1233278, D1246106, and D1255669 that Seller holds, and any other EAR export license that Sellers hold, in accordance with the procedures set out at 15 C.F.R. § 750.10.  Buyer will furnish to Sellers the supporting materials

-53-

described in 15 C.F.R. § 750.10(b).  Sellers will keep Buyer apprised of any communications with BIS regarding the transfer request, and upon BIS's approval of the transfer request, will transfer to Buyer the materials described in 15 C.F.R. § 750.10(c).  In the event that BIS returns the request for additional information, the Parties will cooperate in gathering the requested information, and Sellers will resubmit the request as described in 15 C.F.R. § 750.10(c).

Section 6.13    **No Successor Liability**.  The parties hereto intend that, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under COBRA and the applicable regulations thereunder) to Sellers, including with respect to any collective bargaining agreement and any Employee's Benefit Plans, (b) have *de facto* or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) be liable for any acts or omissions of Sellers in the conduct of the Business, other than with respect to the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Agreement, the parties hereto intend that Buyer shall not be liable for any Liens against any Seller or any of its Affiliates, and that Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Acquired Assets or any Liabilities of any Seller arising on or prior to the Closing Date.  The parties hereto agree that a provision substantially in the form of, and with comparable effect (to the extent permitted by law), to this Section 6.13 shall be reflected in the Sale Order.


# ARTICLE VII
# CONDITIONS TO CLOSING

Section 7.1    **Conditions to Buyer's Obligations**.  Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    each of the representations or warranties set forth in ARTICLE III that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) when made and shall be true and correct in all respects (inclusive of such materiality standard or Material Adverse Effect) as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), and each of the representations or warranties set forth in ARTICLE III that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date);

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and at the Closing Sellers shall have caused the documents and instruments required

-54-

by Section 2.8(a) (Deliveries at Closing) to be delivered to Buyer (or tendered subject only to Closing);

    (c)   no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

    (d)   the Sale Order shall have become a Final Order (unless this condition has been waived in writing by Buyer); and

    (e)   Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) has been satisfied.

    **Section 7.2**    **Conditions to Sellers' Obligations**.  Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

    (a)   each of the representations or warranties set forth in Article IV that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all respects when made and shall be true and correct in all respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), and each of the representations or warranties set forth in Article IV that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date);

    (b)   Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

    (c)   no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

    (d)   the Sale Order shall have become a Final Order (unless waived by Buyer);

    (e)   Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

    **Section 7.3**    **No Frustration of Closing Conditions.**  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated

-55-

Transactions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII
## TERMINATION.

      **Section 8.1**    <u>**Termination of Agreement.**</u>  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

      (a)   by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

      (b)   by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any material covenant, or misstated any representation or warranty (such that it would cause a failure of the closing condition set forth in <u>Section 7.1(a)</u>), contained in this Agreement in any material respect, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of fifteen (15) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in <u>Section 7.1</u> shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

      (c)   by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant, or misstated any representation or warranty (such that it would cause a failure of the closing condition set forth in <u>Section 7.2(a)</u>), contained in this Agreement in any material respect, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of fifteen (15) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in <u>Section 7.2</u> shall become incapable of being satisfied by the Closing, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by them prior to the Closing, and such condition is not waived by Sellers;

      (d)   by Buyer, on the one hand, or Sellers, on the other hand, if the Closing shall not have occurred by June 14, 2023; <u>provided</u>, <u>however</u>, that (i) Buyer shall not have the right to terminate this Agreement under this <u>Section 8.1(d)</u> or <u>Section 8.1(b)</u> if, at the time of such termination, Sellers would then be entitled to terminate this agreement pursuant to <u>Section 8.1(c)</u> (subject only to delivery of notice and the opportunity to cure, if curable, required by <u>Section 8.1(c)</u>), and (ii) Sellers shall not have the right to terminate this Agreement under this <u>Section 8.1(d)</u> or <u>Section 8.1(c)</u> if, at the time of such termination, Buyer would then be entitled to terminate this agreement pursuant to <u>Section 8.1(b)</u> (subject only to delivery of notice and the opportunity to cure, if curable, required by <u>Section 8.1(b)</u>);

      (e)   by Buyer:

-56-

(i) if the Auction has not concluded on or prior to May 8, 2023;

(ii) if the Sale Order shall not have become a Final Order by May 31, 2023 (other than as a result of any action or inaction by Buyer);

(iii) if the Bidding Incentives or the Sale Order are modified in any material respect without the consent of Buyer;

(iv) if, prior to the Closing, (x) if, prior to the Closing, Sellers seek to have the Bankruptcy Court enter an order dismissing, or converting the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Chapter 11 Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason, or (y) the Bankruptcy Case shall be converted into a case under chapter 7 of the Bankruptcy Code or dismissed;

(v) if Buyer so elects in writing pursuant to Section 6.6;

(vi) if any Claim regarding this Agreement or the transactions contemplated here in is brought by any Person against any of Buyer, any Buyer Related Person or any of their affiliated or related Persons prior to the expiration of the applicable period in which such Claim could be brought;

(vii) subject to the terms of the Bid Procedures Order, upon the approval by the Bankruptcy Court of an Alternate Transaction; or

(viii) if Sellers propose, sponsor, or support a stand-alone plan of reorganization, liquidation, or refinancing that contemplates an Alternate Transaction; or

(f) automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon the issuance of a final and non-appealable Order, decree, or ruling by a Governmental Entity to permanently restrain, enjoin or otherwise prohibit the Closing.

**Section 8.2**    **Procedure Upon Termination**.  In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3**    **Effect of Termination**.

(a) If any Party terminates this Agreement pursuant to Section 8.1, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I (Definitions), Article IX (Miscellaneous), and this

Article VIII (Termination) shall survive any such termination) and no Party shall have any Liability to any other Party with respect to the transactions contemplated by this Agreement, as applicable, except as otherwise expressly set forth in this Agreement including as set forth in Section 2.5(b) with respect to the Escrow Fund.

(b)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(c)    Any Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 8.3(c) shall relieve Buyer or Sellers of their respective obligations under a Confidentiality Agreement.

(d)    The Break-Up Fee shall be payable to Buyer from the sale proceeds received in connection with an Alternate Transaction if this Agreement is terminated for any reason, other than by Sellers in the circumstances set forth in Section 8.1(c), Section 8.1(d), or Section 8.1(f), *provided* that Buyer is not in material breach of any of its material obligations under this Agreement at the time of such termination.   Subject to Bankruptcy Court approval, the Reimbursable Expenses shall be payable immediately to Buyer if this Agreement is terminated for any reason, other than by Sellers in the circumstances set forth in Section 8.1(c), Section 8.1(d), or Section 8.1(f) *provided* that Buyer is not in material breach of any of its material obligations under this Agreement at the time of such termination.

Any obligation to pay the Break-Up Fee and/or Reimbursable Expenses hereunder shall be absolute and unconditional; such payment shall constitute an administrative expense of Sellers' estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.   Sellers and Buyer agree that the Bidding Incentives were a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

(e)    In the event Sellers terminate this Agreement pursuant to (i) Section 8.1(c) or (ii) Section 8.1(d), and either Buyer agrees, or a Final Order is entered determining, that Sellers had the right to so terminate the Agreement, then the Escrow Fund shall be payable to Sellers.   Sellers agree (i) that Buyer's aggregate Liability for money damages in such circumstances shall be limited to the Escrow Fund and (ii) the Escrow Fund constitutes the sole and exclusive remedy of Sellers, whether at Law or in equity, in the event that this Agreement is terminated under such circumstances, except in the event of Buyer's fraud or willful breach. Sellers and Buyer agree that the Deposit was a material inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

-58-

(f)     Except as set forth above in this Section 8.3, all fees and expenses incurred in connection with this Agreement and the other Transaction Documents shall be paid by the party incurring such expenses, whether or not the Sale is consummated.

(g)     This Section 8.3 and the rights and obligations created hereunder, shall survive termination of this Agreement.

## ARTICLE IX
## MISCELLANEOUS.

**Section 9.1     Expenses**.  Except as otherwise provided in this Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.2     Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements.

**Section 9.3     Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4     Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein; provided, however, that any amendment that affects or otherwise modifies any right or interest granted in favor of CIBC hereunder shall not be valid unless the same shall be in writing and signed by each Party and CIBC.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.4 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.5     Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.   None of

53429/0003-45396379v2

the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment.

Section 9.6    **Notices**.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.   Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

> Custom Alloy Corporation
> 3 Washington Ave
> High Bridge, New Jersey 08829
> Attention: Adam Ambielli
> Email:  amambielli@customalloy.us

with a copy to:

> Cole Schotz P.C.
> 25 Main Street
> Hackensack, NJ 07601
> Attention:  Roger Iorio, Esq.
> Email:  riorio@coleschotz.com
>
> and
>
> Rabinowitz, Lubetkin & Tully, LLC
> 293 Eisenhower Parkway, Suite 100
> Livingston, New Jersey 07039
> Attn: Jonathan I.  Rabinowitz, Esq.
> Email: jrabinowitz@rltlawfirm.com

If to Buyer, then to:

> CAC Acquisitions, LLC
> c/o Trident Maritime Systems, LLC
> 2011 Crystal Drive, Suite 1102, Arlington, VA 22202
> Attention:  Tom Eccles, Joe Mullen and Mike Bornak

-60-

Email:  tom.eccles@tridentllc.com, joe.mullen@tridentllc.com, mike.bornak@tridentllc.com

with copies (which shall not constitute notice) to:

J.F. Lehman & Company
110 East 59th Street, 27th Floor
New York, New York 10022
Attention: C. Alexander Harman, David L. Rattner, David F. Thomas and R. Benjamin Hatcher
Email: cah@jflpartners.com, dlr@jflpartners.com, dft@jflpartners.com and rbh@jflpartners.com

and

Keller Benvenutti Kim LLP
650 California Street, Suite 1900
San Francisco, CA 94108
Attention:  Tobias S.  Keller, Esq.; Jane Kim
Email: tkeller@kbkllp.com; jkim@kbkllp.com

and

Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:  Peter Schnur; Thomas Cournoyer
Email:  peter.schnur@blankrome.com; thomas.cournoyer@blankrome.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.6.

Section 9.7    **Governing Law; Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New Jersey, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.   The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of New Jersey, sitting in Hunterdon

-61-

County, Jersey, and the federal courts of the United States of America sitting in in Essex County, New Jersey, shall have exclusive jurisdiction over such Litigation.

Section 9.8    **Specific Performance.**  Sellers and Buyer agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  It is accordingly agreed that (i) Sellers or Buyer will be entitled to seek an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the parties' respective covenants and agreements under this Agreement that survive the Closing, without the requirement of posting a bond or other security, and without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Buyer would have entered into this Agreement.  The remedies available to Sellers pursuant to this Section 9.8 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages, except as otherwise limited by this Agreement.   In no event will this Section 9.8 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

Section 9.9    **Consent to Service of Process.**  Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.6.

Section 9.10    **WAIVERS OF JURY TRIAL.**  EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

Section 9.11    **Severability.**  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.   If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12    **No Third Party Beneficiaries.**

-62-

This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns; provided, however, that CIBC is and will remain a third-party beneficiary of, to, and under this Agreement to the extent of any Liens or other rights or interests of CIBC arising in or under, or otherwise relating to, this Agreement.  Notwithstanding anything in this Agreement to the contrary, the undersigned each acknowledges, confirms, and agrees that all of Sellers' rights and interests in, under, and to this Agreement, including all of Sellers' rights and interests in, under, and to the Deposit, are subject to any Liens and other rights or interests therein from time to time granted or otherwise provided to CIBC, including under or in connection with any cash collateral order, debtor-in-possession financing order, or related documentation from time to time approved by the Bankruptcy Court, and including any Liens granted or provided to CIBC from time to time under any of Sections 361 or 364 of the Bankruptcy Code.

        **Section 9.13    No Survival of Representations, Warranties and Agreements.**  None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this Article IX, and (iii) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

        **Section 9.14    Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.   The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."  The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.   Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the Effective Date."  Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement.   Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.   Any reference herein to "dollars" or "$" means United States dollars.

        **Section 9.15    Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no

53429/0003-45396379v2

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.16** **Disclosure Schedule**. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.   The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the applicable disclosures and exceptions set forth in the Disclosure Schedule.   The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is readily apparent on the face of the disclosure contained in the Disclosure Schedule.   The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.   No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.   All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly referenced.

**Section 9.17** **Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.18** **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.   This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.19** **Solicitation of Competitive Bids**. Upon designation of the Buyer as the stalking horse bidder, Sellers are authorized to solicit competitive bids subject to Buyer's right to terminate pursuant to Section 8.1(e) of this Agreement.

**[SIGNATURE PAGES FOLLOW]**

-64-

**SIGNATURE PAGE TO**
**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

SELLERS:

CUSTOM ALLOY CORPORATION

By _____
Name:    Adam M. Ambielli
Title:     CEO/President

CAC MICHIGAN, LLC

By _____
Name:    Adam F. Ambielli
Title:     Manager

BUYER:

CAC ACQUISITIONS, LLC


By _____
Name:
Title:

**SIGNATURE PAGE TO
AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

SELLERS:

CUSTOM ALLOY CORPORATION

By _____
       Name:
       Title:

CAC MICHIGAN, LLC

By _____
       Name:
       Title:

BUYER:

CAC ACQUISITIONS, LLC

By _____
       Name: David F. Thomas
       Title:  Assistant Secretary

**SIGNATURE PAGE TO**
**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

Solely for purposes of Section 2.5(d) (and the associated definitions) hereof:

CIBC BANK USA

By     _____
        Name:   Robert Corsentino
        Title:  Managing Director

Exhibit A      -      Bid Procedures Order

<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, N.J. 07039
(973) 597-9100
Jonathan I. Rabinowitz
Henry M. Karwowski
jrabinowitz@rltlawfirm.com
Attorneys for Debtors/Debtors-In-Possession

</td><td>

Order Filed on February 27, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

</td></tr>
</table>

|  |  |
|---|---|
| In re: | Case Nos. 22-18143, 22-18144 (MBK) |
| CUSTOM ALLOY CORPORATION, *et al.*, | Jointly Administered |
| Debtor. | Chapter 11 |

**ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND BANKRUPTCY RULES 2002, 6004, AND 6006 (1) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS; (2) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVAL OF HIGHEST AND BEST OFFER; (3) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (4) APPROVING FORM, MANNER, AND <u>SUFFICIENCY OF NOTICES; AND (5) GRANTING RELATED RELIEF</u>**

    The relief set forth on the pages, numbered (2) through (\_\_\_\_), is hereby **ORDERED**.

DATED: February 27, 2023

                                              Honorable Michael B. Kaplan
                                              United States Bankruptcy Judge

**THIS MATTER** having been opened to this Court by Custom Alloy Corporation, Chapter 11 Debtor-in-Possession in the above-captioned case (the "Debtor"), and CAC Michigan, LLC (collectively with the Debtor, the "Debtors"), by and through their counsel, upon their Motion for entry of an order pursuant to Bankruptcy Code sections 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) approving bidding procedures for the sale of substantially all of the Debtors' assets; (2) scheduling (A) an auction sale and (B) a hearing to consider approval of the highest and best offer for the assets; (3) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (4) approving the form, manner, and sufficiency of notices relating to the sale and to the assumption and assignment of certain executory contracts and unexpired leases; (5) authorizing the Debtors to sell substantially all of their assets free and clear of liens, claims, encumbrances, and interests and to assume certain executory contracts and unexpired leases; and (6) granting related relief (the "Motion"); and it appearing that good and sufficient notice of the Motion having been provided, as evidenced by the Certification of Service filed with this Court; and this Court having considered the Motion and any opposition filed thereto, and the arguments of counsel; and this Court, after due deliberation and consideration, having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors;

**IT IS HEREBY ORDERED** as follows:

1.      The Debtors are hereby authorized to solicit bids for the sale of substantially all of their assets (the "Sale Assets") and to initiate the process of assumption and assignment of certain executory contracts and unexpired leases consistent with the procedures set forth below.

2.      In connection with the Debtors' solicitation of offers, the Debtors are hereby authorized, subject to further approval at a hearing to approve the sale of the Sale Assets, and with

(Page 3)

| | |
|---|---|
| Debtor: | Custom Alloy Corporation |
| Case No.: | 22-18143 (MBK) |
| Caption of Order: | Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief |

---

the written consent of CIBC Bank USA, in its capacity as pre-petition lender and contemplated post-petition lender to the Debtors (together with its successors and assigns, "CIBC"), to enter into an asset purchase agreement with a potential interested purchaser in form and substance acceptable to the Debtors and CIBC; and provided the Debtors receive at least one other qualifying bid, the Debtors are authorized to conduct an auction of the Sale Assets (the "Auction"); provided, that CIBC will not have any obligation to provide its consent to any transaction or to the designation of any "Successful Bid" (or "Successful Bidder") or any "Back Up Bid" (or "Backup Bidder") (as such terms are defined in the below-defined Bidding Procedures).

3.    The procedures governing the solicitation of bids for the sale of the Sale Assets and the Auction sale of the Sale Assets, attached hereto as **Exhibit 1** (the "Bidding Procedures"), are hereby authorized, approved, and made part of this Order as if fully set forth herein.

4.    Within three (3) business days after entry of this Order, a copy of the Notice of Bid Deadline, Auction, and Sale Hearing in Connection With Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, substantially in the form attached hereto as **Exhibit 2**, which is approved in all respects, together with copies of this Order and each of the other Exhibits attached hereto, shall be served by electronic mail, overnight mail, or first class mail upon the following parties:  (a) all potential purchasers as identified by the Debtors; (b) counsel to all parties that are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Sale Assets, including but not limited to CIBC and Barings BDC,

(Page 4)

| | |
|---|---|
| Debtor: | Custom Alloy Corporation |
| Case No.: | 22-18143 (MBK) |
| Caption of Order: | Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief |

---

Inc.; (c) counsel to the Official Committee of Unsecured Creditors (the "Committee"); (d) counsel to the United States Trustee; and (e) counsel to all parties-in-interest that have requested notice in this case pursuant to Bankruptcy Rule 2002. On the same date, the Debtors shall serve by first class mail this Notice upon all known creditors, to the extent not otherwise already served by electronic mail or overnight mail.

5.    Any objections to final approval of the sale must be filed and served not later than April 19, 2023 at 5:00 p.m. (Eastern Standard Time). Any replies to any objections must be filed and served by April 25, 2023.

6.    A hearing to confirm the results of the Auction, if such Auction is conducted, to approve the sale of the Sale Assets, and to authorize the Debtors to sell the Sale Assets and otherwise consummate the transactions contemplated by any asset purchase agreement for the sale of the Sale Assets (subject to the consent rights of CIBC and any consultation rights of the Committee and Electric Boat Corporation ("EB")), including the assumption and assignment of the executory contracts or unexpired leases (the "Sale Hearing"), will be held before this Court on May 1, 2023 at 10:00 a.m., which may be adjourned by further Order of this Court or otherwise on agreement of counsel for the Debtors, CIBC, and the Committee.

7.    Subject to approval of an asset purchase agreement with another bidder designated in accordance with the terms of the Bidding Procedures (subject to the consent rights of CIBC and any consultation rights of the Committee and EB) at the Sale Hearing, a "break-up fee" amounting

(Page 5)

| | |
|---|---|
| Debtor: | Custom Alloy Corporation |
| Case No.: | 22-18143 (MBK) |
| Caption of Order: | Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief |

to 2.5% of the proposed purchase price (which proposed purchase price shall equal (x) the purchase price proposed by the Stalking Horse Bidder (as defined in the Bidding Procedures), plus (y) the assumption or payoff of interest-bearing indebtedness, but excluding (z) the assumption or payoff of any deferred revenue, trade payables, operating expenses, or deposits of the Debtors) and to be paid from the sale proceeds, is hereby approved and awarded to the Stalking Horse Bidder.  In addition, upon the filing of a motion, on notice and following a hearing, and subject to approval of an asset purchase agreement designated in accordance with the terms of the Bidding Procedures (subject to the consent rights of CIBC and any consultation rights of the Committee and EB) at the Sale Hearing, this Court shall consider granting to the Stalking Horse Bidder an award of reimbursement of up to the amount of $100,000.00, to be paid from the sale proceeds, on account of reasonable and documented out-of-pocket due diligence fee and expenses, including attorneys' fees.

8.    Alternatively, if the Debtors are unable to timely identify a Stalking Horse Bidder, upon the filing of a motion, on notice and following a hearing, and subject to approval of an asset purchase agreement designated in accordance with the terms of the Bidding Procedures at the Sale Hearing and to the written consent of the Debtors and CIBC, and in consultation with the Committee and EB, the following prospective purchasers shall each receive an expense reimbursement fee in an amount of up to $100,000.00 on account of actual, reasonable, and necessary out-of-pocket due diligence fees and expenses, including attorneys' fees: (i) any

(Page 6)

| | |
|---|---|
| Debtor: | Custom Alloy Corporation |
| Case No.: | 22-18143 (MBK) |
| Caption of Order: | Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief |

---

prospective purchaser that is a "Qualified Bidder" and that submits a "Qualified Bid" (as such terms are defined in the Bidding Procedures), that fully participates in the Auction, and that is deemed by the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, to be the "Successful Bidder" (which submits the "Successful Bid") (as such terms are defined in the Bidding Procedures), if any, at such Auction; and (ii) any prospective purchaser that is a "Qualified Bidder" and that submits a "Qualified Bid" (as such terms are defined in the Bidding Procedures), that fully participates in the Auction, and that is deemed by the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, to be the "Backup Bidder" (which submits the "Backup Bid") (as such terms are defined in the Bidding Procedures), if any, at such Auction.  For the avoidance of doubt, without the written consent of the Debtors and CIBC, such expense reimbursement will not be made available to any Qualified Bidder if a Stalking Horse Bidder has been timely designated.

9.      The procedures governing the assumption and assignment of executory contracts and unexpired leases, attached hereto as **Exhibit 3** (the "Assumption and Assignment Procedures"), are hereby authorized, approved, and made part of this Order as if fully set forth herein.

10.      Within four (4) business days after entry of this Order,, or such adjourned date to which the Debtors, CIBC, and the Committee agree, the Debtors must file and serve by electronic mail, overnight mail, or first class mail a copy of the Notice of Possible Assumption and

(Page 7)

| | |
|---|---|
| Debtor: | Custom Alloy Corporation |
| Case No.: | 22-18143 (MBK) |
| Caption of Order: | Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief |

---

Assignment of Certain Executory Contracts and Unexpired Leases in Connection With Sale of Substantially All of the Debtors' Assets, substantially in the form attached hereto as **Exhibit 4**, which is approved in all respects, together with copies of this Order and each of the other Exhibits attached hereto, upon all non-debtor parties to the executory contracts and unexpired leases at issue (the "Non-Debtor Parties").  The Notice shall identify the executory contracts and unexpired leases that may be assumed and assigned and identify the amounts required to cure any and all defaults under such contracts and leases as of the projected date of closing of the sale of the Sale Assets.

11.    Any objection by a Non-Debtor Party to a scheduled cure amount must be filed and served not later than twenty-one (21) days after entry of the Bidding Procedures Order.

12.    Any objection by a Non-Debtor Party to the proposed assumption and assignment of an executory contract or unexpired lease on any other basis, including on the basis that adequate assurance of future performance has not been provided, must be filed and served by not later than 5:00 p.m. (Eastern Standard Time) on April 12, 2023, if the Non-Debtor Party objects to assumption and assignment to the Stalking Horse Bidder; or (ii) at the Sale Hearing, if the Non-Debtor Party objects to assumption and assignment to the Successful Bidder (as defined in the Bidding Procedures), if the Successful Bidder is a bidder other than the Stalking Horse Bidder.

13.    All liens, claims, encumbrances, and interests attached to the Sale Assets immediately prior to the consummation of the sale of the Sale Assets will attach to the net proceeds

(Page 8)

| | |
|---|---|
| Debtor: | Custom Alloy Corporation |
| Case No.: | 22-18143 (MBK) |
| Caption of Order: | Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief |

---

of the sale of the Sale Assets with the same validity and priority as existed immediately prior to the consummation of such sale.

14.    The Debtors are hereby authorized to take all actions reasonably necessary as contemplated by or consistent with this Order, the Bidding Procedures, and the Assumption and Assignment Procedures, subject to the consent and consultation rights, as applicable, of CIBC and the Committee as set forth herein and therein.

15.    The term "consultation," as it appears in this Order or in any of the Exhibits attached hereto, shall include and allow for interaction with representatives or advisors of the party to be consulted.  In all events, any consultation, including the method and timing of interaction with the party to be consulted and the party's response, shall be that which is appropriate under the circumstances.   In those instances in which consultation with a party to be consulted, other than the Committee, may pose a conflict of interest for the party, the Debtors shall have the right to modify the party's consultation rights in those instances as appropriate and shall notify such party that it has invoked such right.

16.    This Court shall retain jurisdiction to interpret, implement, and enforce the terms of this Order; to enter orders in aid and furtherance of this Order; and adjudicate any and all remaining issues concerning the sale of the Sale Assets.

# EXHIBIT 1

# Exhibit 1

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed with respect to the proposed sale of substantially all of the assets of Custom Alloy Corporation and CAC Michigan, LLC (collectively, the "<u>Debtors</u>"), debtors and debtors-in-possession in their Chapter 11 cases pending in the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>").  The sale will be subject to competitive bidding as set forth herein and Bankruptcy Court approval pursuant to sections 363 and 365 of the United States Bankruptcy Code.

On February ____, 2023, the Debtors filed a Motion for an order pursuant to Bankruptcy Code sections 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) approving bidding procedures for the sale of substantially all of the Debtors' assets; (2) scheduling (A) an auction sale and (B) a hearing to consider approval of the highest and best offer for the assets; (3) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (4) approving the form, manner, and sufficiency of notices relating to the sale and to the assumption and assignment of certain executory contracts and unexpired leases; (5) authorizing the Debtors to sell substantially all of its assets free and clear of liens, claims, encumbrances, and interests and to assume certain executory contracts and unexpired leases; and (6) granting related relief (the "<u>Motion</u>").

On February ____, 2023, the Bankruptcy Court entered an Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief (the "<u>Bidding Procedures Order</u>").

## Assets to Be Sold; Excluded Assets

The assets to be sold include substantially all of the assets of the Debtors, including, without limitation, their right, title, and interest in: (i) name; (ii) accounts receivable; (iii) inventory; (iv) equipment and machinery; (v) intellectual property; (vi) contracts and leases; (vii) books and records; and (viii) any tax credits and refunds, including any employee retention tax credits, provided, that either CIBC Bank USA (together with its successors and assigns, "<u>CIBC</u>") or the Debtors, in consultation with CIBC or the Debtors (as applicable), may require that any such tax credit or refund be withheld in the event that the prospective purchaser intends to ascribe less than face value to such tax credit or refund (in all events excluding the below-defined Excluded Assets, collectively, the "<u>Sale Assets</u>"); <u>provided that</u>, on information and belief (but without any representation or warranty of any kind by the Debtors as to the accuracy of the following), Debtors may currently possess equipment or other personal property in which they do not have an ownership interest or operate pursuant to one or more non-residential leases of commercial property, machinery and equipment leases, and other agreements, customer contracts, documents, leases, and instruments, and which may include operating licenses and permits (collectively,

"Designated Agreements"). No rights under any Designated Agreement are or will be included in the Sale Assets, except and solely to the extent that any such rights are assignable under applicable law, including with the consent of the non-Debtor party as may be required. Additionally, the Debtors currently possess certain items of equipment acquired pursuant to certain Supplier Development Funding Agreements (the "SDF Agreements") with EB, and such SDF Agreements are subject to limitations on the transferability of, or title to, such equipment. The Sale Assets will not include, and will in all events expressly exclude (collectively, the "Excluded Assets"): (a) any claims and causes of action of any Debtor against CIBC, in its capacity as a pre-petition lender and contemplated post-petition lender, or any of its affiliates, agents, or related parties; (b) any claims and causes of action of any Debtor arising under chapter 5 of the Bankruptcy Code; (c) any claims and causes of action of any Debtor against any of its directors, officers, insiders, or affiliates; (d) unless CIBC consents otherwise in writing, any equity interests owned by the Debtors and issued by any Debtor or non-Debtor affiliates; and (e) certain other assets to be identified by the Debtors with the written consent of CIBC, and in consultation with the Official Committee of Unsecured Creditors (the "Committee") and EB. The Sale Assets may be sold in a single lot to a single bidder or in multiple lots to multiple bidders; and the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, may exclude any portion of the Sale Assets from the sale.

### Investment Banker

On January 19, 2023, the Debtors filed a motion to retain SSG Advisors, LLC as their investment banker (the "Investment Banker"). On February 2, 2023, the Bankruptcy Court entered an Order approving the retention of the Investment Banker.

### Data Room

On February 8, 2023, a data room for potential purchasers was established; CIBC and the Committee and their respective professionals shall have unrestricted access to the data room at all times prior to the closing of the sale.

### Stalking Horse Bidder

By not later than March 13, 2023, or such adjourned date to which the Debtors, CIBC, and the Committee agree, the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, shall identify a "stalking horse bidder" that makes a qualified bid in form and substance acceptable to the Debtors and CIBC, and in consultation with the Committee and EB, that offers to purchase, in cash or cash equivalents, the Sale Assets in their entirety or in lots pursuant to terms in form and substance acceptable to the Debtors and CIBC, and that is not an "insider" within the meaning of Bankruptcy Code section 101(31) (the "Stalking Horse Bidder"). Notice of the identification of the Stalking Horse Bidder shall be provided to the following parties: (a) all potential purchasers as identified by the Debtors; (b) counsel to all parties that are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Sale Assets, including but not limited to CIBC and Barings BDC, Inc.; (c) counsel to the Committee; (d) counsel to the United States Trustee; (e) counsel to EB; and (f) counsel to all parties-in-interest that have

requested notice in this case pursuant to Bankruptcy Rule 2002. The Stalking Horse Bidder's bid will be subject to higher and better offers as set forth below.

**"As Is, Where Is"**

The sale of the Sale Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates or otherwise except as set forth in any asset purchase agreement to be executed by the Debtors with respect to the Sale Assets (with the written consent of CIBC) in accordance with the terms herein. By submitting a bid, each Qualified Bidder (as defined herein) shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Sale Assets prior to making its offer, that in making its bid it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale Assets, and that it has not relied upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Sale Assets, or the completeness of any information provided in connection therewith or at the Auction, except as set forth in any asset purchase agreement to be executed by the Debtors with respect to the Sale Assets (with the written consent of CIBC).

**Sale Free of Any and All Liens, Claims, Encumbrances, and Interests**

Except as otherwise provided in any asset purchase agreement to be executed by the Debtors with respect to the Sale Assets (with the written consent of CIBC), all of the Debtors' right, title, and interest in and to the Sale Assets shall be sold free and clear of all liens, claims, encumbrances, and interests to the maximum extent permitted by Bankruptcy Code section 363, with such liens, claims, encumbrances, and interests to attach to the net proceeds of the sale of the Sale Assets with the same validity and priority as existed immediately prior to the consummation of such sale.

**Participation Requirements**

Any person or entity that wishes to participate in the bidding process (a "Potential Bidder") must become an "Eligible Bidder." As a prerequisite to becoming an Eligible Bidder, a Potential Bidder must promptly deliver to respective counsel for the Debtors (Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.) (jrabinowitz@rltlawfirm.com)), CIBC (Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes, Esq.) (dimitri.karcazes@goldbergkohn.com) and Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, New Jersey 08540 (Attn: Derek Baker, Esq.) (dbaker@reedsmith.com)), the Committee (Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, Pennsylvania 19103-3222 (Attn: Martha B. Chovanes) (mchovanes@foxrothschild.com)), and EB (Jenner & Block LLP, 353 N. Clark Street, Chicago, Illinois 60654 (Attn: Catherine Steege) (csteege@jenner.com)), the following documents:

(i)    An executed confidentiality agreement in form and substance acceptable to the Debtors and CIBC, in consultation with the Committee; and

(ii)      Sufficient information showing that the Potential Bidder has or will have, without any conditions or contingencies, the financial wherewithal and any required organizational authorizations to consummate the sale and associated transactions, including but not limited to current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB) of the Potential Bidder and of those entities that or individuals who have an ownership interest in the Potential Bidder and that or who will guarantee or back the obligations of the Potential Bidder.

An Eligible Bidder is a Potential Bidder that (a) delivers the documents described in subparagraphs (i) and (ii) above, and that (b) the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, and based on financial information submitted by the Potential Bidder and other considerations deemed relevant by the Debtors, in consultation with the Committee, EB, and CIBC, determine is reasonably likely to submit a bona fide offer and to be able to consummate a sale if selected as a Successful Bidder (as defined herein).

After a Potential Bidder delivers all of the materials required by subparagraphs (i) and (ii) above, the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, shall notify the Potential Bidder that it qualifies as an Eligible Bidder.

## Due Diligence

The Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, may allow any Eligible Bidder the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Auction. The Debtors, in consultation with the Committee and CIBC, must designate an employee or other representative to coordinate all reasonable requests for additional information from and due diligence access to any such Eligible Bidder. Neither the Debtors nor any of their representatives are obligated to furnish any information to any person other than an Eligible Bidder, CIBC, the Committee, and EB.

If any Eligible Bidder or Qualified Bidder asks the Debtors or the Investment Banker to speak with EB regarding a potential transaction in connection with the sale process, then, in each case with the prior written consent of the Debtors and CIBC and prior consultation with the Committee, EB will be authorized and it agrees to speak with such Eligible Bidder or Qualified Bidder, as applicable, regarding a potential sale transaction in connection with the sale process, in each case subject to the Investment Banker's participation in any such meeting or discussion (any such meeting or discussion, a "Qualified Discussion") provided that EB shall have no liability to the Debtors, the Debtors' estates, any party-in-interest making a claim through the Debtors' estates, CIBC, the Committee, or any Eligible Bidder as a result of any such Qualified Discussions and the "As Is, Where Is" and "Qualified Bid" provisions of these Bidding Procedures shall apply to any such Qualified Discussion. All information arising out of, or otherwise disclosed in connection with, any such Qualified Discussion will constitute "Confidential Information" for all

purposes under each such Eligible Bidder's or Qualified Bidder's confidentiality agreement with the Debtors.

### Bid Deadline

An Eligible Bidder that desires to make a bid for the Sale Assets must deliver written copies of its bid by electronic mail and overnight mail to the following parties: (i) counsel to the Debtors (Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.) (jrabinowitz@rltlawfirm.com)); (ii) counsel to CIBC (Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes, Esq.) (dimitri.karcazes@goldbergkohn.com) and Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, New Jersey 08540 (Attn: Derek Baker, Esq.) (dbaker@reedsmith.com)); (iii) counsel to the Committee (Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, Pennsylvania 19103-3222 (Attn: Martha B. Chovanes) (mchovanes@foxrothschild.com)); (iv) counsel to the EB (Jenner & Block LLP, 353 N. Clark Street, Chicago, Illinois 60654 (Attn: Catherine Steege) (csteege@jenner.com));  and (v) counsel to the United States Trustee (United States Department of Justice, Office of the United States Trustee, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Maggie McGee, Esq.) (maggie.mcgee@usdoj.gov)), so as to be received not later than 5:00 p.m. (Eastern Standard Time) on April 7, 2023 (the "Bid Deadline"), or such adjourned date to which the Debtors, CIBC, and the Committee agree.

### Qualified Bid

All bids must include the following documents or items, as applicable:

(i)     The identity of the bidder, the name(s) of the officer(s) or authorized agent(s) who will appear on behalf of such bidder, and the name(s) of each direct and indirect owner of the bidder, and the existence, if any, of any relationship between any such entity or person with the Debtors or any of the other bidders;

(ii)     If a Stalking Horse Bidder has been timely designated in accordance with these Bidding Procedures, a purchase price in an amount not less than the purchase price to be paid by the Stalking Horse Bidder, plus (a) a break-up fee in the amount of 2.5% of the proposed purchase price in favor of the Stalking Horse Bidder, which proposed purchase price shall equal (x) the purchase price proposed by the Stalking Horse Bidder, plus (y) the assumption or payoff of interest-bearing indebtedness, but excluding (z) the assumption or payoff of any deferred revenue, trade payables, operating expenses, or deposits of the Debtors, (b) reimbursement of actual, reasonable, and necessary expenses of the Stalking Horse Bidder up to the amount of $100,000.00, and (c) an overbid in the amount of at least $250,000.00;

(iii)     A written statement confirming that the bidder's offer will be irrevocable until the conclusion of the Sale Hearing (as defined herein), subject to the terms herein pertaining to the irrevocability of any Successful Bid and Backup Bid, that the bidder has not engaged and that it will not engage in any collusion or bad faith with

respect to the bidding or sale process, and that the bidder consents to the jurisdiction of the Bankruptcy Court;

(iv)    The bidder's redline draft of a proposed asset purchase agreement, based on the asset purchase agreement executed by the Stalking Horse Bidder; or alternatively, a new draft of a proposed asset purchase agreement, if one has not been previously executed by any Stalking Horse Bidder, together with all exhibits and schedules thereto; the agreement shall include (A) a commitment to close by not later than 14 days after the entry of a Bankruptcy Court order approving the sale (the "Sale Order"), and (B) a representation that the Eligible Bidder is able to and that it will make all necessary government, regulatory, or other filings and pay the fees associated with such filings and any such taxes that might be due on the sale or transfer of the Sale Assets;

(v)     The bidder's redline draft of a proposed form of Sale Order, based on the form of order drafted in connection with the asset purchase agreement executed by the Stalking Horse Bidder; or alternatively, a new draft of a proposed form of Sale Order, if one has not been previously drafted;

(vi)    A good-faith cash deposit in the amount of ten percent (10%) of the Stalking Horse Bidder's bid must be delivered to the Debtors' counsel, Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz), upon the submission of a bid, and which will be held in a non-interest bearing account; if the Debtors, with the written consent of CIBC, are unable to identify a Stalking Horse Bidder, any other bidder must submit a deposit in the amount of ten percent (10%) of its initial Qualified Bid (as defined herein);

(vii)   Written evidence, satisfactory to the Debtors, in consultation with CIBC, the Committee, and EB, of the Eligible Bidder's ability and willingness to immediately consummate the sale, without any conditions or contingencies, and with appropriate contact information for the financing sources;

(viii)  A written statement listing the executory contracts and unexpired leases to be assumed by the bidder and indicating that the bidder will cure all costs and provide adequate assurance of future performance with respect to any executory contracts or unexpired leases to be assumed and assigned in connection with the sale;

(ix)    A written statement describing the material, nonconfidential terms of any agreement with management or key employees regarding compensation or future employment; indicating whether the terms comply with Bankruptcy Code section 503(c); and describing the measures taken to ensure the fairness of the sale and the agreement; and

(x)     A written statement identifying the entity that or person who will retain or have access to the Debtors' books and records.

A bid received from an Eligible Bidder that includes all of these documents and meets all of the above requirements shall be a "Qualified Bid" and such Eligible Bidder shall become a "Qualified Bidder," except that the Debtors, in the exercise of their business judgment and with the written consent of CIBC, and in consultation with the Committee and EB, shall have the right to reject any bid that they deem inadequate or insufficient, not in conformity with these Bidding Procedures, or contrary to the best interests of the Debtors and their estates. The Stalking Horse Bidder shall be a "Qualified Bidder"; and any asset purchase agreement executed by the Stalking Horse Bidder shall be a "Qualified Bid."

The Debtors reserve the right to waive any of these terms or conditions or to impose additional terms and conditions on any Qualified Bid, in each case, with the written consent of CIBC, and in consultation with the Committee and EB.

Each Qualified Bidder, by submitting a Qualified Bid, will be deemed to acknowledge and agree that it is not relying on any written or oral statements, representations, promises, warranties or guarantees of any kind or nature, whether express or implied, by operation of law or otherwise, made by any person or party whomsoever, including the Debtors or their agents and representatives (other than as may be set forth in a definitive agreement executed by the Debtors) or by EB (if the Qualified Bidder consults with EB), regarding the Debtors, any Sale Assets, the Auction, these Bidding Procedures or any information provided in connection therewith from time to time.

Without the written consent of the Debtors and CIBC, in consultation with the Committee and EB, a Qualified Bidder may not amend, modify, or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid remains irrevocable and binding.

Notwithstanding anything herein to the contrary, without any further action of any kind: (a) CIBC, in its capacity as pre-petition lender and contemplated post-petition lender (and any designee of any CIBC, including, without limitation, any entity that may be formed by or on behalf of CIBC), is, and will be deemed to be, a Qualified Bidder for all purposes under and in connection with these Bidding Procedures and may credit bid all or any portion of the pre-petition debt or any post-petition debt, as applicable, of CIBC in accordance with 11 U.S.C. § 363(k); (b) any credit bid made by CIBC (or any such designee) is, and will be deemed to be, a Qualified Bid in each instance for all purposes under and in connection with the Bidding Procedures and will be deemed to be, and will be evaluated by the Debtors as, a cash Qualified Bid; and (c) CIBC (or any designee) will not be subject to any of the terms or conditions of the following provisions under: (x) Sections (iv)(B), (vi), or (vii) of the "Qualified Bid" section of these Bidding Procedures or (y) Sections (i) or (ii) of the "Participation Requirements" Section of these Bidding Procedures, provided, however, that the Debtors shall not be required to consult with or obtain the consent of CIBC during the Auction process (to the extent that CIBC may otherwise have consultation or consent rights under these Bidding Procedures) if CIBC has submitted a Qualified Bid, for so long as such Qualified Bid remains irrevocable.

These Bidding Procedures are subject to the terms and provisions of any post-petition debtor-in-possession financing order and cash collateral order entered in the Debtors' cases from time to time.

**Effect of No Qualified Bids**

If no "higher and better bids" are timely submitted, the Auction will not be held, the Stalking Horse Bidder will be the Successful Bidder (as defined herein), the asset purchase agreement with the Stalking Horse Bidder will be the Successful Bid (as defined herein), and the Debtors shall seek approval and authority to consummate the sale contemplated by such agreement on the terms and conditions described therein.

**The Auction**

If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Debtors, the Debtors shall conduct an auction (the "Auction") of the Sale Assets. The Auction shall commence on April 14, 2023 at 11:00 a.m. (Eastern Standard Time), or such adjourned date to which the Debtors, CIBC, and the Committee agree, at the offices of Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039.

Before the commencement of the Auction, the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, shall select the "highest and best" bid to serve as the starting point for the auction sale (the "Starting Bid"). The Stalking Horse Bidder shall be provided with a copy of the Starting Bid prior to the Auction. Also, each Qualified Bidder will be required to represent that it has not engaged and that it will not engage in any collusion or bad faith with respect to the bidding or sale process.

Only Qualified Bidders, the Debtors, CIBC Bank USA, the Official Committee of Unsecured Creditors, EB, the United States Trustee, and such entities' respective advisors and counsel may attend the Auction. Any other interested party may attend only if no later than five (5) days before the Auction it provides notice to respective counsel for the Debtors, CIBC, and the Committee of its intention to attend the Auction.

During the Auction, bidding shall begin initially with the Starting Bid, and then continue in minimum increments in the amount of at least $100,000.00 (subject to modification in accordance with the terms of these Bidding Procedures). The Debtors, in consultation with CIBC, the Committee, and EB, may conduct the Auction and adopt rules for the bidding process in the manner that they, in their reasonable judgment, determine will result in the highest and best offer for the Sale Assets and that are not materially inconsistent with any of the provisions of these Bidding Procedures, the Bidding Procedures Order, any other Bankruptcy Court order, or any asset purchase agreement with the Stalking Horse Bidder. At a minimum, the following rules will apply: (i) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other participating Qualified Bidder; (ii) all bids must be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding, with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; (iii) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction; and (iv) the bidding must be documented.

Any secured creditor may "credit bid" under Bankruptcy Code section 363(k).

Bidding at the Auction shall continue until such time as the highest and best offer is determined by the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, in accordance with these Bidding Procedures.

The Debtors, in the exercise of their business judgment and with the written consent of CIBC, and in consultation with the Committee and EB, shall have the right to reject any bid that they deem inadequate or insufficient, not in conformity with these Bidding Procedures, or contrary to the best interests of the Debtors and their estates.

At the conclusion of the Auction, the Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, shall announce any highest and best bid designated as the successful bid (the "Successful Bid," submitted by the "Successful Bidder") and any next highest and best bid designated as a backup bid (the "Backup Bid," submitted by the "Backup Bidder"); provided, that CIBC will not have any obligation to consent to the designation of any Successful Bid (or Successful Bidder) or any Backup Bid (or Backup Bidder) in connection with the Auction or otherwise. If the Debtor identifies any Qualified Bid as a Successful Bid or as a Backup Bid to which CIBC does not consent in writing, then all rights of CIBC are and will be preserved, including, without limitation, the rights of CIBC to (i) object to the identification of such Qualified Bid as a Successful Bid (and such Qualified Bidder as a Successful Bidder) or as a Backup Bid (and such Qualified Bidder as a Backup Bidder), as applicable, (ii) object to the approval of any sale or other disposition of all or any portion of the Sale Assets or the Excluded Assets, and/or (iii) credit bid all or any portion of the pre-petition debt or any post-petition debt under Bankruptcy Code 363(k) at any time during any Auction. The Successful Bid and the Backup Bid, if any, will be irrevocable until 28 days after entry of the Sale Order, or such adjourned date to which the Debtors, CIBC, and the Committee agree.

Notice of the auction results shall be promptly provided to the following parties: (a) all potential purchasers as identified by the Debtors; (b) counsel to all parties that are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Sale Assets, including but not limited to CIBC and Barings BDC, Inc.; (c) counsel to the Committee; (d) counsel to the United States Trustee; (e) counsel to EB; and (f) counsel to all parties-in-interest that have requested notice in this case pursuant to Bankruptcy Rule 2002.

## Sale Hearing

Upon submission of an acceptable asset purchase agreement by any Successful Bidder in form and substance acceptable to the Debtors and CIBC, in consultation with the Committee (a "Purchase Agreement"), the Debtors shall execute such Purchase Agreement and shall seek Bankruptcy Court approval of the agreement at the Sale Hearing (as defined herein). The Debtors shall be deemed to have accepted the Successful Bid only when it has been approved by the Bankruptcy Court at the Sale Hearing.

Any objections to final approval of the sale must be filed and served not later than April 19, 2023 at 5:00 p.m. (Eastern Standard Time).

The Bidding Procedures Order sets May 1, 2023 at 10:00 a.m. (Eastern Standard Time) as the date on which the Bankruptcy Court shall conduct a hearing to approve the sale of and to authorize the Debtors to sell the Sale Assets (the "Sale Hearing").  The Sale Hearing may be adjourned by further order of the Bankruptcy Court or otherwise on agreement of counsel for the Debtors, CIBC, and the Committee.

By a date not more than two (2) days after the conclusion of the Sale Hearing, this Court shall enter an order approving the sale of the Sale Assets.

**Effect of No Objection**

Failure to timely object to the sale of the Sale Assets shall be deemed consent to the sale of the Sale Assets and other relief requested in the Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Auction, the sale of the Sale Assets, the assumption and assignment of executory contracts and unexpired leases, or the Debtors' consummation and performance of the terms of the asset purchase agreement entered into with the ultimate purchaser.

**Closing**

The consummation of the sale to the Successful Bidder pursuant to the terms of the Purchase Agreement shall take place not later than 14 days after the entry of the Sale Order, or as extended on request of a party in interest or on agreement of counsel for the Debtors, CIBC, the Committee, and the Successful Bidder.

The deposit of any Successful Bidder shall be applied to the purchase price at closing.  If the sale of the Sale Assets to any Successful Bidder pursuant to the terms of the Purchase Agreement does not close as a result of the Successful Bidder's default, breach or failure to perform, the Debtors shall be entitled to retain the deposit as liquidated damages.  Otherwise, any other bidders' deposits shall be promptly returned to such bidders after the closing of the sale to any Successful Bidder.

**Backup Bidder**

If the Successful Bidder fails to consummate an approved sale pursuant to the terms of the Purchase Agreement, the Debtors, in consultation with CIBC, the Committee, and EB, shall deem any Backup Bidder as the new Successful Bidder (and any Backup Bid as the new Successful Bid); and the Debtors shall have authority, without further order of this Court, to consummate the sale with the Backup Bidder at the price of the Backup Bid pursuant to the terms of such Backup Bidder's Purchase Agreement; and the Debtors shall have the right to seek all available damages, including specific performance, from any defaulting Successful Bidder.

**Amendment**

The Debtors, with the written consent of CIBC, and in consultation with the Committee and EB, may amend, supplement, or otherwise modify these Bidding Procedures if an amendment will further the goals and objective of the bidding process, provided that any amendment will not be inconsistent with the Bidding Procedures Order or any other Order of the Bankruptcy Court.

# EXHIBIT 2

**Exhibit 2**

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, N.J. 07039
(973) 597-9100
Jonathan I. Rabinowitz
Henry M. Karwowski
jrabinowitz@rltlawfirm.com
Attorneys for Debtors/Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CUSTOM ALLOY CORPORATION, *et al.*,<br><br>Debtors. | Case Nos. 22-18143, 22-18144 (MBK)<br><br>Jointly Administered<br><br>Chapter 11 |

**NOTICE OF BID DEADLINE, AUCTION, AND SALE HEARING IN CONNECTION
WITH SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      Custom Alloy Corporation, Chapter 11 Debtor-in-Possession in the above-captioned case, and CAC Michigan, LLC (collectively, the "Debtors"), its wholly owned subsidiary, seek to sell substantially all of their assets (the "Sale Assets") free and clear of any and all liens, claims, encumbrances, and interests.

2.      On February ____, 2023, the Debtors filed with the United States Bankruptcy Court for the District of New Jersey a Motion for entry of an order pursuant to Bankruptcy Code sections 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) approving bidding procedures for the sale of substantially all of the Debtors' assets (the "Bidding Procedures"); (2) scheduling (A) an auction sale and (B) a hearing to consider approval of the highest and best offer for the assets; (3) approving procedures for the assumption and assignment of certain executory contracts and

unexpired leases; (4) approving the form, manner, and sufficiency of notices relating to the sale

and to the assumption and assignment of certain executory contracts and unexpired leases; (5)

authorizing the Debtors to sell substantially all of its assets free and clear of liens, claims,

encumbrances, and interests and to assume certain executory contracts and unexpired leases; and

(6) granting related relief.

3.    On February ____, 2023, the Bankruptcy Court entered an Order granting the

Motion (the "Bidding Procedures Order").

4.    All interested parties are invited to make offers to purchase the Sale Assets in

accordance with the Bidding Procedures and the Bidding Procedures Order.  Copies of the Bidding

Procedures and Bidding Procedures Order may be obtained by (a) written request to the Debtors'

counsel, Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston,

New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.) (jrabinowitz@rltlawfirm.com); (b)

accessing the Bankruptcy Court's website at https://ecf.njb.uscourts.gov/ (please note that a

PACER password is needed to access documents on the Court's website); or (c) viewing the docket

of these bankruptcy cases at the Clerk of the Court, United States Bankruptcy Court, 402 East State

Street, Trenton, New Jersey 08608.  All interested parties should carefully read the Bidding

Procedures.

5.    The deadline to submit an offer to purchase the Sale Assets, in accordance with the

Bidding Procedures, is 5:00 p.m. (Eastern Standard Time) on April 7, 2023 (the "Bid Deadline").

6.     Pursuant to the Bidding Procedures and the Bidding Procedures Order, if any

Qualified Bid (as defined in the Bidding Procedures) is received on or before the Bid Deadline,

the Debtors shall conduct an auction (the "Auction") commencing at 11:00 a.m. (Eastern Standard

Time) on April 14, 2023, or such adjourned date to which the Debtors, CIBC Bank USA (together

with its successors and assigns, "CIBC"), and the Official Committee of Unsecured Creditors (the "Committee") agree, at the offices of Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039, to determine, in accordance with the Bidding Procedures (including the consent rights of CIBC and any consultation rights of the Committee), the person or entity that has submitted the highest and best bid for the Sale Assets (the "Successful Bidder").  As set forth in the Bidding Procedures, only certain parties may attend the Auction; any other interested party may attend only if no later than five (5) days before the Auction it provides written notice to the Debtors' counsel of its intention to attend the Auction.  The Auction may be adjourned on request of a party in interest or on agreement of the Debtors, CIBC, and the Committee.

7.      Any objections to approval of the sale of the Sale Assets must be filed with the Clerk of the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, New Jersey 08608, and served on the following parties by April 19, 2023 at 5:00 p.m. (Eastern Standard Time) (the "Objection Deadline"): (i) counsel for the Debtors (Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.) (jrabinowitz@rltlawfirm.com)); (ii) counsel to CIBC (Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes, Esq.) (dimitri.karcazes@goldbergkohn.com) and Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, New Jersey 08540 (Attn: Derek Baker, Esq.) (dbaker@reedsmith.com)); (iii) counsel to the Committee (Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, Pennsylvania 19103-3222 (Attn: Martha B. Chovanes) (mchovanes@foxrothschild.com)); (iv) counsel to Electric Boat Corporation (Jenner & Block LLP, 353 N. Clark Street, Chicago, Illinois 60654 (Attn: Catherine Steege)

(csteege@jenner.com)); (v) counsel to the United States Trustee (United States Department of Justice, Office of the United States Trustee, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Maggie McGee, Esq.) (maggie.mcgee@usdoj.gov)); and (vi) any persons or entities that have filed a request for notice in the above-captioned chapter 11 cases on or before the Objection Deadline.  Any replies to any objections must be filed and served by April 25, 2023.

8.      Failure to file an objection on or before the Objection Deadline shall be deemed consent to the sale of the Sale Assets to the Successful Bidder and other relief requested in the Motion, and be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Auction, the sale of the Sale Assets, the assumption and assignment of executory contracts and unexpired leases to the Successful Bidder, or the Debtors' consummation and performance of the terms of the asset purchase agreement entered into with the Successful Bidder.

9.      The sale of the Sale Assets to the Successful Bidder shall be presented for authorization and approval at a hearing at 10:00 a.m. (Eastern Standard Time) on May 1, 2023 (the "Sale Hearing") at the Bankruptcy Court, 402 East State Street, Courtroom #8, Trenton, New Jersey 08608.  The Sale Hearing may be adjourned by further order of the Bankruptcy Court or otherwise on agreement of counsel for the Debtors, CIBC, and the Committee.

10.     The closing on the sale to the Successful Bidder shall take place not later than 14 days after the entry of the Sale Order, or as extended on request of a party in interest or on agreement of counsel for the Debtors, CIBC, the Committee, and the Successful Bidder.

11.     This Notice is subject to the full terms and conditions of the Bidding Procedures and the Bidding Procedures Order, and the Debtors encourage any interested parties to review such documents in their entirety.  To the extent that this Notice is inconsistent with the Motion, the Bidding Procedures Order, or the Bidding Procedures, the terms of those documents shall govern.

**RABINOWITZ, LUBETKIN & TULLY, LLC**
Attorneys for Debtors/Debtors-In-Possession

By: _____/s/ Jonathan I. Rabinowitz_____
JONATHAN I. RABINOWITZ

Dated: February ___, 2023

# EXHIBIT 3

**Exhibit 3**

**ASSUMPTION AND ASSIGNMENT PROCEDURES**

Set forth below are the procedures that shall apply to the proposed assumption and assignment (the "Assumption and Assignment Procedures") of executory contracts and unexpired leases in connection with the proposed sale of substantially all of the assets of Custom Alloy Corporation and CAC Michigan, LLC (collectively, the "Debtors"), debtors and debtors-in-possession in their Chapter 11 cases pending in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

On February _____, 2023, the Debtors filed a Motion for an order pursuant to Bankruptcy Code sections 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) approving bidding procedures for the sale of substantially all of the Debtors' assets; (2) scheduling (A) an auction sale and (B) a hearing to consider approval of the highest and best offer for the assets; (3) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases; (4) approving the form, manner, and sufficiency of notices relating to the sale and to the assumption and assignment of certain executory contracts and unexpired leases; (5) authorizing the Debtors to sell substantially all of its assets free and clear of liens, claims, encumbrances, and interests and to assume certain executory contracts and unexpired leases; and (6) granting related relief.

On February _____, 2023, the Bankruptcy Court entered an Order Pursuant to 11 U.S.C. §§363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; and (5) Granting Related Relief (the "Bidding Procedures Order").  A copy of the "Bidding Procedures" is attached as **Exhibit 1** to the Bidding Procedures Order.

**Filing and Service of Assumption Notice**

By not more than four business days after entry of the Bidding Procedures Order, or such adjourned date to which the Debtors, CIBC Bank USA (together with its successors and assigns, "CIBC"), and the Official Committee of Unsecured Creditors (the "Committee") agree, the Debtors must file and serve by electronic mail, overnight mail, or first class mail a notice of the possible assumption and assignment of executory contracts and unexpired leases pursuant to Bankruptcy Code section 365 (the "Notice of Possible Assumption and Assignment") upon the following parties  (i) the applicable counterparties to all such executory contracts and unexpired leases (the "Non-Debtor Parties"), and their counsel, if known; (ii) CIBC; (iii) the Committee; (iv) the United States Trustee; and (v) any other parties in interest who have requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002.

**Content of Assumption Notice**

The Notice shall be substantially in the form of **Exhibit 4** attached to the Bidding Procedures Order and shall set forth the following information, to the best of the Debtors' knowledge, as applicable:  (i) all of the Debtors' executory contracts and unexpired leases that potentially could be assumed and assigned; (ii) the names and addresses of the Non-Debtor Parties to each contract or lease; (iii) the proposed amount, if any, that must be paid to cure all defaults pursuant to Bankruptcy Code section 365(b)(1)(A) for each listed executory contract or unexpired lease (the "Cure Amount"); (iv) the procedures for Non-Debtor Parties to receive information regarding assurance of future performance of the contract or lease pursuant to Bankruptcy Code section 365(f); and (v) the deadlines and procedures for filing an objection to the potential assumption and assignment of any executory contract or unexpired lease listed in the Notice of Possible Assumption and Assignment.

**Adequate Assurance Information**

Upon written request by a Non-Debtor Party, the Debtors must promptly provide to the Non-Debtor Party any available information relating to the ability of a potential assignee to fulfill the Debtors' obligations under any assumed executory contract or unexpired lease and thereby demonstrate adequate assurance of future performance ("Adequate Assurance Information"), provided that the Non-Debtor Party confirms in writing to the Debtors' counsel its agreement to keep such information strictly confidential and use it only for the purpose of evaluating whether the potential assignee has provided adequate assurance of future performance under the applicable contract or lease.

**Cure Objections**

Any objections to a proposed Cure Amount (a "Cure Objection") must be filed with the Clerk of the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, New Jersey 08608 and served on (i) counsel to the Debtors (Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.) (jrabinowitz@rltlawfirm.com)); (ii) counsel to CIBC (Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes, Esq.) (dimitri.karcazes@goldbergkohn.com) and Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, New Jersey 08540 (Attn: Derek Baker, Esq.) (dbaker@reedsmith.com)); (iii) counsel to the Committee (Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, Pennsylvania 19103-3222 (Attn: Martha B. Chovanes) (mchovanes@foxrothschild.com)), and (iv) the United States Trustee (United States Department of Justice, Office of the United States Trustee, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Maggie McGee, Esq.) (maggie.mcgee@usdoj.gov)), not later than at 5:00 p.m. (Eastern Standard Time) by not later than twenty-one (21) days after entry of the Bidding Procedures Order.

A Cure Objection must set forth with specificity each alleged default in the executory contract or unexpired lease at issue and the alleged cure amount asserted by such Non-Debtor Party to the extent it differs from the Cure Amount specified by the Debtors in the Notice of Possible Assumption and Assignment.

A Cure Objection may not prevent or delay assumption and assignment of the executory contract or unexpired lease to which the Cure Objection relates.  If a Non-Debtor Party files a Cure Objection, the Debtors may hold the Cure Amount in reserve pending further Order of the Court or mutual agreement of the parties.  So long as the Cure Amount is held in reserve, and the Non-Debtor Party has not otherwise objected to the applicable executory contract or unexpired lease, the Debtors may assume and assign such contract or lease.

**Other Objections**

Any objections to the proposed assumption and assignment of an executory contract or unexpired lease on any other basis, including on the basis that adequate assurance of future performance has not been provided (a "Non-Cure Objection"), must be filed with the Clerk of the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, New Jersey 08608 and served on respective counsel for the Debtors, CIBC, the Committee, and the United States Trustee (i) by 5:00 p.m. (Eastern Standard Time) on April 12, 2023, if the Non-Debtor Party objects to assumption and assignment to the Stalking Horse Bidder (as defined in the Bidding Procedures); or (ii) at the Sale Hearing (as defined in the Bidding Procedures), if the Non-Debtor Party objects to assumption and assignment to the Successful Bidder (as defined in the Bidding Procedures), if the Successful Bidder is a bidder other than the Stalking Horse Bidder.

**Effect of No Objection**

If any Non-Debtor Party fails to timely file a Cure Objection or a Non-Cure Objection, then: (i) the Debtors' proposed Cure Amount shall be binding upon the Non-Debtor Party with respect to the Debtors' liability and obligations, if any, to the Non-Debtor Party under the applicable executory contract or unexpired lease; and (ii) the Sale Order (as defined in the Bidding Procedures) will constitute a final determination that the Debtors have satisfied its burden of proof under Bankruptcy Code sections 365(b) and 365(f).

**Effect of Assumption and Assignment**

Pursuant to Bankruptcy Code section 365(k), upon assumption and assignment of an executory contract or unexpired lease, the Debtors and their estates shall be relieved of any liability for any breach of such contract or lease that occurs after the assignment.

**Amendment**

The Debtors, in consultation with CIBC, the Committee, and Electric Boat Corporation may amend these Assumption and Assignment Procedures if an amendment will further the objective of the assumption and assignment process, provided that any amendment will not be inconsistent with the Bidding Procedures Order or any other Order of the Bankruptcy Court.

**Reservation of Rights**

The Debtors reserve all rights, remedies, claims, and defenses with respect to any executory contract or unexpired lease.  The issuance of a Notice of Possible Assumption and Assignment to

a Non-Debtor Party shall not constitute an admission that the executory contract or unexpired leases to which the Non-Debtor Party is a party is an executory contract or unexpired lease, or that the contract or lease will in fact be assumed and assigned in connection with the sale of the Sale Assets (as defined in the Bidding Procedures), and shall not obligate the Successful Bidder (as defined in the Bidding Procedures) to take assignment of the executory contract or unexpired lease to which the Non-Debtor Party is a party.

# EXHIBIT 4

**Exhibit 4**

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, N.J. 07039
(973) 597-9100
Jonathan I. Rabinowitz
Henry M. Karwowski
jrabinowitz@rltlawfirm.com
Attorneys for Debtors/Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CUSTOM ALLOY CORPORATION, *et al.*,<br><br>Debtors. | Case Nos. 22-18143, 22-18144 (MBK)<br><br>Jointly Administered<br><br>Chapter 11 |

**NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
WITH SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     Custom Alloy Corporation, Chapter 11 Debtor-in-Possession in the above-captioned case, and CAC Michigan, LLC (collectively, the "Debtors"), its wholly owned subsidiary, seek to sell substantially all of their assets (the "Sale Assets") free and clear of any and all liens, claims, encumbrances, and interests.

2.     On February ____, 2023, the Debtors filed with the United States Bankruptcy Court for the District of New Jersey a Motion for entry of an order pursuant to Bankruptcy Code sections 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) approving bidding procedures for the sale of substantially all of the Debtors' assets (the "Bidding Procedures"); (2) scheduling (A) an auction sale and (B) a hearing (the "Sale Hearing") to consider approval of the highest and best offer for the assets; (3) approving procedures for the assumption and assignment of certain

executory contracts and unexpired leases (the "Assumption and Assignment Procedures"); (4)

approving the form, manner, and sufficiency of notices relating to the sale and to the assumption

and assignment of certain executory contracts and unexpired leases; (5) authorizing the Debtors to

sell substantially all of its assets free and clear of liens, claims, encumbrances, and interests and to

assume certain executory contracts and unexpired leases; and (6) granting related relief.

3.    On February ____, 2023, the Bankruptcy Court entered an Order granting the

Motion (the "Bidding Procedures Order").

4.    Pursuant to the Bidding Procedures Order, the Debtors may seek to assume and

assign the executory contracts and unexpired leases identified on **Exhibit 1** attached hereto (the

"Assignment Schedule") in connection with the sale of the Sale Assets.

5.    Any written request for Adequate Assurance Information (as defined in the

Assumption and Assignment Procedures attached as **Exhibit 3** to the Bidding Procedures Order)

must be promptly made to Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway,

Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.)

(jrabinowitz@rltlawfirm.com), counsel for the Debtors, and it must (i) include an email address or

mail address to which a response to such request can be sent, and (ii) confirm that the recipient

will enter into a confidentiality agreement.  Upon receiving such a request, the Debtors shall

promptly provide such party with the Adequate Assurance Information.

6.    Any objections to the assumption and assignment of any executory contract or

unexpired lease identified on the Assignment Schedule, including, without limitation, any

objection to the amount, if any, determined by the Debtors to be necessary to be paid to cure any

default under such contract or lease (the "Cure Amount"), must be filed with the Clerk of the

United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton,

New Jersey 08608 and served on (i) counsel to the Debtors (Rabinowitz, Lubetkin & Tully, LLC, 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jonathan I. Rabinowitz, Esq.) (jrabinowitz@rltlawfirm.com)); (ii) counsel to CIBC (Goldberg Kohn, Ltd., 55 East Monroe, Suite 3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes, Esq.) (dimitri.karcazes@goldbergkohn.com) and Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, New Jersey 08540 (Attn: Derek Baker, Esq.) (dbaker@reedsmith.com)); (iii) counsel to the Committee (Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, Pennsylvania 19103-3222 (Attn: Martha B. Chovanes) (mchovanes@foxrothschild.com)); and (iv) counsel to the United States Trustee (United States Department of Justice, Office of the United States Trustee, One Newark Center, Suite 2100, Newark, New Jersey 07102 (Attn: Maggie McGee, Esq.) (maggie.mcgee@usdoj.gov)).

7.      Any objections to the Cure Amount must be filed and served by not later than twenty-one (21) days after entry of the Bidding Procedures Order.

8.      Any other objections to the proposed assumption and assignment of an executory contract or unexpired lease, including any objection relating to adequate assurance of future performance, must be (i) filed and served by not later than 5:00 p.m. (Eastern Standard Time) on April 12, 2023 if the Non-Debtor Party objects to assumption and assignment to the Stalking Horse Bidder (as defined in the Bidding Procedures, a copy of which is attached as **Exhibit 1** to the Bidding Procedures Order); or (ii) made not later than at the Sale Hearing (the date, time, and location of which is addressed in the Bidding Procedures), if the Non-Debtor Party objects to assumption and assignment to the Successful Bidder (as defined in the Bidding Procedures), if the Successful Bidder is a bidder other than the Stalking Horse Bidder.

9.     Unless a Non-Debtor Party (as defined in the Assumption and Assignment Procedures) timely objects, whether to a Cure Amount or on any other basis, the Non-Debtor Party shall be (i) deemed to have consented to the assumption and assignment of the applicable contract or lease and stipulated that the applicable Cure Amount as determined by the Debtors is correct and that the assurance of future performance is adequate; (ii) forever barred, estopped, and enjoined from objecting to the assumption and assignment of the assumed contract or lease, to the applicable Cure Amount, or to the assurance of future performance; (iii) forever barred, estopped, and enjoined from asserting or claiming against the Debtors or the assignee that any additional amounts are due, that any defaults under the contract or lease exist, that conditions to assignment must be satisfied under such assumed contract or lease, that there is any objection or defense to the assumption and assignment of such assumed contract or lease, or that any required consent to the assignment has not been given; (iv) deemed to have agreed that from and after the date of assignment of the applicable contract or lease, the contract or lease will remain in effect; and (v) barred from asserting any other basis on which to object to the assumption and assignment.

10.     If any Non-Debtor Party (as defined in the Assumption and Assignment Procedures) agrees with the Cure Amount identified on the Assignment Schedule and such party has no other objection to the sale or the potential assumption and assignment of its executory contract or unexpired lease, the Non-Debtor Party need not take any further action.

11.     The Debtors reserve the right to supplement and modify the Assignment Schedule up to the close of the Auction; provided that if the Debtors add an executory contract or unexpired lease to the Assignment Schedule or modify the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

**RABINOWITZ, LUBETKIN & TULLY, LLC**
Attorneys for Debtors/Debtors-In-Possession

By:_____/s/ Jonathan I. Rabinowitz_____
JONATHAN I. RABINOWITZ

Dated: February ___, 2023

Exhibit B      -      Form of Sale Order

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**RABINOWITZ, LUBETKIN & TULLY, LLC**
293 Eisenhower Parkway, Suite 100
Livingston, N.J. 07039
(973) 597-9100
Jonathan I. Rabinowitz
Henry M. Karwowski
jrabinowitz@rltlawfirm.com
Attorneys for Debtors/Debtors-In-Possession

| | |
|---|---|
| In re: | Case Nos. 22-18143, 22-18144 (MBK) |
| CUSTOM ALLOY CORPORATION, *et al.*, | Jointly Administered |
| Debtor. | Chapter 11 |

[**PROPOSED FORM OF**]

**ORDER (I)  APPROVING THE SALE OF THE DEBTORS' ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(II)  AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (III) APPROVING CURE AMOUNTS,
AND (IV) GRANTING OTHER AND FURTHER RELATED RELIEF**

The relief set forth on pages numbered (2) through (____) is hereby **ORDERED**.

Dated: _____          _____
                                Honorable Michael B. Kaplan
                                United States Bankruptcy Judge

On February 17, 2023, Custom Alloy Corporation and CAC Michigan, LLC, the debtors in possession in the above-captioned cases (the "Debtors"), filed the *Motion of Chapter 11 Debtor-In-Possession Custom Alloy Corporation for Order Pursuant to 11 U.S.C. §§ 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (4) Approving Form, Manner, and Sufficiency of Notices; (5) Authorizing Debtors to Sell Substantially All of Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (6) Granting Related Relief* (Dkt. No. 301) (the "Sale Motion").  As used in this Sale Order (the "Sale Order"), "Asset Purchase Agreement" means the Asset Purchase Agreement dated as of ____, 2023, by and among the Debtors, the other Sellers named therein, and CAC Acquisitions, LLC ("Buyer") attached hereto as Exhibit A.  Capitalized terms used but not defined in this Sale Order shall have the meanings ascribed to them in the Asset Purchase Agreement or, if not defined in the Asset Purchase Agreement, in the Bidding Procedures Order (as defined herein) and all exhibits thereto.

By the Sale Motion, the Debtors seek, among other things, approval of the sale (the "Sale") of substantially all of the Debtors' assets (the "Acquired Assets," as defined in the Asset Purchase Agreement), and the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts," as defined in the Asset Purchase Agreement) to a proposed buyer, subject to auction and overbids.  On February 27, 2023, the Court entered its *Order Pursuant to 11 U.S.C. §§ 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006 (1) Approving Bidding Procedures for Sale of Substantially All of Debtors' Assets; (2) Scheduling (A) An Auction*

*Sale and (B) A Hearing to Consider Approval of Highest and Best Offer; (3) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (4) Approving Form, Manner and Sufficiency of Notice; and (5) Granting Related Relief* (Dkt. No. 319) (the "Bidding Procedures Order").

In accordance with the Bidding Procedures Order, by notices dated April 5, 2023 (Dkt. No. 377), April 14, 2023 (Dkt. No. 387), and April 21, 2023 (Dkt. No. 402), certain deadlines and certain dates set forth in the Bidding Procedures Order were extended. By notice dated April [26], 2023, the Debtors identified Buyer as the Stalking Horse Bidder under the Bidding Procedures Order.

[Include disclosures regarding Auction if held.]

On [May 9], 2023, this Court held a hearing (the "Sale Hearing") on the Sale Motion and the relief requested therein, including, among other things, the Debtors' request for this Court to approve the sale of the Acquired Assets to Buyer. Appearances and all responses and objections to the Sale Motion have been duly noted on the record of the Sale Hearing.

The Court has considered the Sale Motion, all pleadings and papers filed in support of or in response to the Sale Motion, the arguments of counsel at the Sale Hearing, the testimony given, the proffers made at the Sale Hearing, and the entire record of these bankruptcy cases, and it finds that the relief granted in this Sale Order is in the best interests of the Debtors, the Debtors' estates, creditors, and all parties in interest. Accordingly, after due deliberation and for good and sufficient cause shown,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

## Jurisdiction, Final Order and Statutory Predicates

A.    This Court has jurisdiction to hear and determine the Sale Motion and over the property of the Debtors' estates, including the Acquired Assets to be sold, transferred or conveyed pursuant to the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334(b). The Sale Motion is a core

proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (N). Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. § 1408.

B.      The statutory predicates for the relief requested herein are (i) sections 105, 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), (ii) Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (iii) Rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this matter pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

### Notice of Sale and Sale Process

D.      As evidenced by the certificates of service filed with the Court (Dkt. Nos. 308, 324, 326, 341, 380, 381, 392, 393, 406, 407, and ___ [Supplemental Notice of the Sale Motion re successor liability and avoidance actions]), proper, timely, adequate, and sufficient notice (the "Sale Notice") of the Sale Motion, the Bidding Procedures, the Assumption and Assignment Procedures (as defined in the Bidding Procedures Order), the Sale Hearing, and the relief provided in this Sale Order has been provided in accordance with the Bidding Procedures Order, applicable Bankruptcy Rules, and the Local Rules. The Sale Notice was reasonably calculated to provide interested parties with timely and proper notice of the Sale, the Bidding Procedures, the Assumption and Assignment Procedures, and the Sale Hearing. Parties interested in bidding on the Acquired Assets were provided sufficient

information to make an informed judgment on whether to bid on the Acquired Assets.  No other or further notice of the Sale Motion, the Bidding Procedures, the Sale Hearing, the Sale, the relief provided in this Sale Order, or the entry of this Sale Order is required.

E.      The Debtors and Buyer, together with their affiliates and their professionals, have complied, in good faith, with the Bidding Procedures Order in all respects.  As demonstrated by the testimony and evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, (i) afforded potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Debtors' assets; and (ii) considered all indications of interest from potential purchasers, whether or not conforming to the requirements of the Bidding Procedures Order.

F.      The Bidding Procedures and the Assumption and Assignment Procedures, set forth in the Bidding Procedures Order, were created and followed in good faith by the Debtors and Buyer and are substantively and procedurally fair to all parties.

## Highest and Best Offer

G.      Buyer's offer to purchase the Acquired Assets under the terms and conditions set forth in the Asset Purchase Agreement: (i) was made in good faith and complied in all respects with the Bidding Procedures Order; (ii) is the highest and best offer obtained for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other alternative; (iii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Acquired Assets being conveyed to Buyer; (iv) is fair and reasonable; (v) is in the best interests of the Debtors' estates, the Debtors' creditors, and other parties in interest; and (vi) would not have

been made by Buyer absent the protections afforded to Buyer by the Bidding Procedures Order, the Asset Purchase Agreement, the Bankruptcy Code, and this Sale Order.

H.     The Debtors' determination that the Sale to Buyer, pursuant to the Asset Purchase Agreement, provides the highest or otherwise best offer for the Acquired Assets, and their related decision to sell the Acquired Assets to Buyer, each constitutes a reasonable exercise of the Debtors' business judgment and each is in the best interests of the Debtors, their estates, and their creditors. The facts and circumstances stated in the Sale Motion demonstrate the exigent nature of the Debtors' business situation, and the Debtors have articulated sound business reasons for consummating the Asset Purchase Agreement and for selling the Acquired Assets outside of a chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver, and consummate the Asset Purchase Agreement and consummate the transactions contemplated by the Asset Purchase Agreement, subject to this Sale Order.

I.     The Debtors exercised reasonable business judgment in agreeing to pay the Break-Up Fee and Reimbursable Expenses.  The opportunity to obtain the Break-Up Fee and Reimbursable Expenses constituted a material inducement to Buyer in making its initial bid.

**Validity of Transfer**

J.     The Debtors have full corporate power and authority to execute, deliver, and perform under the Asset Purchase Agreement and to consummate all transactions contemplated thereby, without any further consent or approval required.  No other consents or approvals, other than as may be expressly provided for in the Asset Purchase Agreement and this Sale Order, are required to consummate the Sale.

K.     The Debtors have good, valid, and marketable title to all of the Acquired Assets, including, without limitation, all intellectual property, and no other person or entity has any ownership right, title, or interests therein except for holders of Interests, as such term is hereafter defined.  The

6

Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfers of the Acquired Assets to Buyer and the assignments of the Assigned Contracts to Buyer pursuant to this Sale Order and the Asset Purchase Agreement shall constitute legal, valid, binding, and effective transfers of the Acquired Assets and assignments of the Assigned Contracts, and shall vest Buyer with good and valid title to the Acquired Assets and Buyer with all rights under the Assigned Contracts pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, obligations, liabilities, demands, judgments, guarantees, options, debts, indebtedness, rights, restrictions, contractual commitments, real or shadow equity rights or interests, rights of first refusal, rights of setoff (except as otherwise set forth herein), rights to object to consent, and interests of any kind or nature, whether known or unknown, legal or equitable, direct or indirect, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, monetary or non-monetary, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise (collectively, the "Interests"), except as otherwise provided in this Sale Order or in the Asset Purchase Agreement (inclusive of the disclosure schedules annexed thereto), with such Interests to attach to the proceeds of Sale, in the order of their priority, with the same priority, validity, force, and effect as such Interests had immediately prior to the consummation of such Sale. All proceeds of the Sale shall be remitted to the Debtors, subject to the terms of any order authorizing debtor-in-possession financing or use of cash collateral approved by the Court in these bankruptcy cases and any other applicable order of the Court. All Interests with respect to the Excluded Assets (as defined in the Asset Purchase Agreement) will continue in, under, and against the Excluded Assets with the same priority, validity, force, and effect as such Interests now have.

L.        Holders of Interests in or with respect to the Acquired Assets (including without limitation, all secured creditors) that did not object, or that withdrew their objections, to the sale of the Acquired Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Otherwise, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply to those holders of Interests in or with respect to the Acquired Assets that did object and such holders are adequately protected by having their Interests, if any, attach to the proceeds of the Sale of the Acquired Assets ultimately attributable to the property against or in which they claim or may claim any Interests, in the order of their priority with the same priority, validity, force, and effect as such Interests had immediately prior to the consummation of such Sale.

M.        If the Sale of the Acquired Assets to Buyer and the assignment of the Assigned Contracts to Buyer were not free and clear of all Interests, Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, the Debtors' estates, creditors, and other parties in interest.

### Good Faith Purchaser

N.        Buyer is a purchaser in "good faith," as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Acquired Assets.  The Asset Purchase Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind. Neither the Debtors nor Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the Asset Purchase Agreement or to the consummation of the Sale and transfer of the Acquired Assets and Assigned Contracts to Buyer.  Specifically, Buyer has not acted in a collusive manner with any person or entity and was not controlled by any agreement among

potential or actual bidders.  Also, Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

O.     The Debtors dealt with not only Buyer but also several other parties interested in acquiring the Acquired Assets (as more fully disclosed on the record), and Buyer fully complied with the Bidding Procedures and the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.  Other than the claims arising under the Asset Purchase Agreement, the Debtors and their estates agree and acknowledge that they have no claims against Buyer, and Buyer agrees and acknowledges that it has no claims against the Debtors.

**No Fraudulent Transfer**

P.     The transfers of the Acquired Assets, assignments of the Assigned Contracts, and other transfers contemplated by the Asset Purchase Agreement pursuant to the terms of this Sale Order and the Asset Purchase Agreement constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and similar laws of any state, territory, possession, or the District of Columbia.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than Buyer. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor Buyer is entering into the transactions contemplated by the Asset Purchase Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and similar claims.

**Cure/Adequate Protection**

Q.     The Assigned Contracts are executory contracts or unexpired leases within the applicable meanings contemplated by the Bankruptcy Code.  The inclusion of the rights to assume and

assign the Assigned Contracts, as among the Acquired Assets under the terms of this Sale Order and the Asset Purchase Agreement, is an integral component of the overall transaction reflected in the Asset Purchase Agreement. The inclusion within the Acquired Assets of the Assigned Contracts reflects the Debtors' exercise of reasonable business judgment and is fair to all parties. The Court's approval of such treatment of the Assigned Contracts is in the best interests of the Debtors, the Debtors' estates, creditors, and all parties in interest.

R.      The notice described in this Sale Order and on the record to parties to the Assigned Contracts regarding the treatment of such Assigned Contracts constituted, under the Assumption and Assignment Procedures and otherwise, adequate notice and opportunity to be heard with respect to the assumption by the Debtors and the assignment to Buyer of the Assigned Contracts and all relevant matters. Any objections to the assumption and assignment of any of the Assigned Contracts to Buyer are hereby overruled. Any objections to the Cure Amounts are resolved or adjourned as set forth herein. The parties to the Assigned Contracts that did not timely object to assumption and assignment of the Assigned Contracts have waived any objections, and are hereby deemed to have consented, to the assumption by the Debtors and assignment to Buyer of the Assigned Contracts and to the amount of the applicable Cure Amounts. Accordingly, except as otherwise expressly provided in this Sale Order, each of the Assigned Contracts including, without limitation, each intellectual property agreement and each intellectual property license related to the Debtors' business or the Acquired Assets, is assumable by the Debtors and assignable to Buyer under the terms of this Sale Order and the Asset Purchase Agreement, subject only to payment of the applicable Cure Amounts under the terms of this Sale Order and the Asset Purchase Agreement.

S.      Payment of the applicable Cure Amounts, as set forth in Exhibit B hereto, under the terms of this Sale Order and the Asset Purchase Agreement shall effect a cure of all defaults existing under the applicable Assigned Contract as of the effective date of assignment and compensate for any

actual pecuniary loss to each non-Debtor party to the Assigned Contract resulting from any such default, thereby satisfying the requirements of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code. Buyer has demonstrated adequate assurance of its future performance under the Assigned Contracts within the meanings of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code, including, without limitation, by its promises to perform obligations under the Assigned Contracts. All requirements applicable to the assumption by the Debtors and/or the assignment to Buyer of each of the Assigned Contracts, under section 365 of the Bankruptcy Code or otherwise, have been satisfied.

## Compelling Circumstances for an Immediate Sale

T.    The Debtors have demonstrated a sufficient basis and compelling circumstances requiring the Debtors to enter into the Asset Purchase Agreement, sell the Acquired Assets and assume and assign the Assigned Contracts under Bankruptcy Code sections 363 and 365 prior to proposing a plan of reorganization or liquidation under Bankruptcy Code section 1129, and such actions are appropriate exercises of its reasonable business judgment and in the best interests of, and entirely fair to, the Debtors, their estate and their creditors. Such business reasons include, but are not limited to, the facts that (i) there appears to be inadequate liquidity, or opportunity to obtain liquidity, to allow the Debtors' business to continue through 2023, (ii) it is unclear whether the Debtors will be able to pay their administrative expenses and therefore be able to confirm any plan absent the support of secured creditors, (iii) the Asset Purchase Agreement constitutes the highest or best bid for the Acquired Assets received by the Debtors; (iv) the Asset Purchase Agreement and Closing will present the best opportunity to realize the value of the Debtors on a going-concern basis and avoid decline in the Debtors' business; and (v) unless the Sale is concluded expeditiously as provided for in the Sale Motion and pursuant to the Asset Purchase Agreement, stakeholders' recoveries may be diminished.

U.	The sale approved by this Sale Order does not constitute a *de facto* reorganization or liquidation plan or an element of such a plan for the Debtors, and does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; (iv) classify claims or equity interests, compromise controversies, or extend debt maturities; or (v) propose to pay any of the proceeds of the Sale in a manner that would violate the priority scheme of the Bankruptcy Code.

### General Findings

V.	Time is of the essence in consummating the transactions contemplated by the Asset Purchase Agreement.  The Debtors and Buyer intend to close the sale under the Asset Purchase Agreement as soon as practicable.

W.	Pursuant to the terms of the Asset Purchase Agreement, Buyer is not merging or consolidating with the Debtors or their estates.  Buyer is not a mere continuation of the Debtors or their estates and there is no continuity of enterprise between Buyer and the Debtors.  Buyer is not holding itself out to the public as a continuation of the Debtors.  Buyer is not a successor to the Debtors or their estates and the sale under the Asset Purchase Agreement does not amount to a consolidation, merger or de facto merger of Buyer and the Debtors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

### General Provisions

1.	The Sale Motion is GRANTED as set forth herein.

2.	Any and all objections or responses to the Sale Motion, the relief requested therein, or the relief provided in this Sale Order that have not been withdrawn, resolved, or addressed in this Sale Order, are overruled in all respects on the merits.

**Approval of the Asset Purchase Agreement**

3.     The Asset Purchase Agreement is hereby approved.

4.     Each of the terms of, and each of the transactions contemplated by, the Asset Purchase Agreement is hereby approved and may be consummated.  The failure to include specifically any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.  To the extent of any conflict or inconsistency between the provisions of this Sale Order and the terms and conditions of the Asset Purchase Agreement, as applicable, this Sale Order shall govern and control.  Notwithstanding anything contained in the Bidding Procedures Order, a Closing shall be held if and as set forth pursuant to the Asset Purchase Agreement, and no later than May 24, 2023 or such later date on which all conditions set forth in Article VII of the Asset Purchase Agreement are satisfied or waived.

5.     The Debtors and Buyer and their officers, employees, and agents are authorized to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement, and close fully the Asset Purchase Agreement, and each of the transactions contemplated thereby, including, without limitation, assignment of the Assigned Contracts, under the terms of this Sale Order and the Asset Purchase Agreement.

**Transfer of the Acquired Assets**

6.     The transfers of the Acquired Assets to Buyer and the assignments of the Assigned Contracts to Buyer pursuant to this Sale Order and the Asset Purchase Agreement shall constitute legal, valid, binding, and effective transfers of the Acquired Assets and assignments of the Assigned Contracts, and shall vest Buyer with good and valid title to the Acquired Assets and with all rights under the Assigned Contracts, to the extent permitted under sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, free and clear of all Interests other than Assumed Liabilities and Permitted

Liens. At the Closing, with respect to the Acquired Assets and at the applicable effective dates with respect to the Assigned Contracts, all Interests shall be unconditionally released, terminated, and discharged solely as to and from the Acquired Assets, the Assigned Contracts, and Buyer, and shall attach to the Sale proceeds with the same priority, validity, force, and effect that they had against the Acquired Assets immediately before the consummation of the Sale of the Acquired Assets and assignments of the Assigned Contracts. Except as specifically provided otherwise in the Asset Purchase Agreement or this Sale Order, the sole and exclusive right and remedy available to any person or entity that asserts any Interest (a) in any way related to (i) the Acquired Assets that is incurred or otherwise arises prior to the date of the Closing, or (ii) the Assigned Contracts that is incurred or otherwise arises prior to the applicable effective date of assignment, or (b) by reason of the sale of the Acquired Assets to Buyer or the assignments of the Assigned Contracts to Buyer, shall be a right to assert such Interest against the Debtors' estates and the proceeds of the Sale of the Acquired Assets, and no such right or remedy against Buyer, the Acquired Assets or the Assigned Contracts shall survive the Closing. All proceeds of the Sale shall be remitted to the Debtors, subject to the terms of any order authorizing debtor-in-possession financing or use of cash collateral approved by the Court in these bankruptcy cases and any other applicable order of the Court. All Interests with respect to the Excluded Assets will continue in, under, and against the Excluded Assets with the same priority, validity, force, and effect as such Interests now have.

7.     At the Closing, or as soon as practicable thereafter, (a) the Debtors are hereby authorized and directed to execute and file such termination statements, instruments of satisfaction, releases, or other documents to reflect the unconditional release, termination, and discharge of such Interests on behalf of such person or entity with respect to the Acquired Assets and the Assigned Contracts, and (b) Buyer is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order which, once filed, registered, or otherwise

recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Acquired Assets or the Assigned Contracts.

8.      On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sellers' interests in the Acquired Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

9.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to cancel any liens and other encumbrances of record except those assumed as Assumed Liabilities or Permitted Liens.  All persons and entities (including, without limitation, all filing, registration, or recording officers or agents, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all others that may be required by operation of law, the duties of their offices, or contract, to accept, file, register, or record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any of the Acquired Assets or Assigned Contracts) are hereby (a) authorized to (i) accept this Sale Order as sole and sufficient evidence of the transfers of all right, title, and interest in, to, and under the Acquired Assets and the Assigned Contracts, and may rely on this Sale Order in consummating, or facilitating the consummation of, the transactions contemplated by the Asset Purchase Agreement, and (ii) accept, file, register, and/or record all documents and instruments of transfer including, without limitation, deeds, leases, and assignments, modifications, and terminations of leases (if any), that may be filed, registered, and/or recorded under the terms of this Sale Order or the Asset Purchase Agreement; and (b) prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to Buyer,

or assign the Assigned Contracts to Buyer, in each case in accordance with the terms of this Sale Order and the Asset Purchase Agreement, free and clear of all Interests, and from otherwise interfering with Buyer's enjoyment of the Acquired Assets or the Assigned Contracts; provided that nothing contained herein shall constitute a waiver of the payment of any transfer taxes that are otherwise payable.

## Section 363(f) Is Satisfied

10.    The sale of the Acquired Assets and assignment of the Assigned Contracts shall be and is free and clear of all Interests, except for Assumed Liabilities and Permitted Liens, for the reasons set forth in this paragraph.  Holders of Interests that did not object, or that withdrew their objections, to the Sale Motion are hereby deemed to have consented to the sale of the Acquired Assets and assignments of the Assigned Contracts free and clear of their Interests, which satisfies section 363(f)(2) of the Bankruptcy Code.  Also, to the extent that the consideration to be received under the Asset Purchase Agreement exceeds the value of all Interests in the Acquired Assets and the Assigned Contracts, section 363(f)(3) is satisfied.  In addition, section 363(f)(5) is satisfied because, among other reasons, under Bankruptcy Code section 1129(b)(2)(A), the holders of Interests (other than CIBC, as defined in the Bidding Procedures Order) could be forced to accept money satisfaction for their interests in a "cramdown" proceeding; and under applicable state law, the holders of Interests (other than CIBC, as defined the Bidding Procedures Order) could be compelled in foreclosure or receivership proceedings to accept money satisfactions of their Interests in amounts less than the actual amounts of the Interests.  All Interests shall attach to Sale proceeds with the same priority, validity, force, and effect that they had immediately before the consummation of the Sale of the Acquired Assets and assignments of the Assigned Contracts.

11.    All persons and entities that are presently, or at the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to Buyer at the Closing, or as otherwise directed by Buyer.

16

## Prohibition of Actions Against Buyer

12.     To the greatest extent available under applicable law, and except as otherwise provided in this Sale Order, Buyer shall be authorized, as of the Closing Date and upon the occurrence of the Closing, to operate under any transferred license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Buyer as of the Closing Date.

13.     The provisions of this Sale Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, encumbrances, Liabilities, or other Interests, other than Assumed Liabilities and Permitted Liens (with such Interests to attach to the proceeds of Sale in the order of their priority, with the same priority, validity, force, and effect as such Interests had immediately before the consummation of the Sale), shall be self-executing, and neither the Debtors nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.  Moreover, effective as of the Closing, Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which Buyer, its successors and assigns, shall deem desirable.  The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

14.    Except with respect to Permitted Liens and Assumed Liabilities, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims, encumbrances, Liabilities, or other Interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' Business prior to the Closing Date or the transfer of the Acquired Assets to Buyer, hereby are estopped and enjoined from asserting against Buyer, its Affiliates, its successors or assigns, their property or the Acquired Assets, such persons' or entities' Liens, Claims, encumbrances, Liabilities, or other Interests in and to the Acquired Assets that arose prior to the Closing Date.  The foregoing prohibition and injunction includes, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against Buyer, its Affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, its Affiliates, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against Buyer, its Affiliates, its successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Buyer, its Affiliates or its successors; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.  On the Closing Date, each creditor is authorized to execute such documents and take all other actions as may be necessary to release Liens, Claims,

encumbrances, Liabilities, and other Interests in or on the Acquired Assets (except Permitted Liens and Assumed Liabilities), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

15.     Buyer shall not be deemed a "successor," alter-ego, or mere continuation of the Debtors or their estates by reason of any theory of law or equity, and Buyer shall not assume, nor be deemed to assume, or in any way be responsible for, any liability or obligation of the Debtors and/or their estates arising under or related to the Acquired Assets or otherwise, including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any Claim against the Debtors or against an insider of the Debtors, or similar liability, except as otherwise expressly provided in the Asset Purchase Agreement.  Except to the extent Buyer assumed the Assumed Liabilities pursuant to the Asset Purchase Agreement, in accordance with section 363(f) of the Bankruptcy Code, neither the purchase of the Acquired Assets by Buyer, nor the fact that Buyer is using any of the Acquired Assets previously operated by the Debtors, will cause Buyer to have any successor, alter ego, or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of or under (i) any foreign, federal, state or local revenue, pension, labor, employment, or wage laws, including but not limited to any withdrawal liability, tax, antitrust, environmental laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), including, without limitation, (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker

Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and

Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of

1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws,

(k) state unemployment compensation laws or any other similar state laws, or (l) any other state or

federal benefits or claims relating to any employment with any of the Debtors or any of their

respective predecessors; (ii) any products liability law or doctrine with respect to the Debtors' liability

under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine

with respect to the Debtors' liability under such law, rule or regulation or doctrine; (iii) any

employment or labor agreements, collective bargaining agreements, consulting agreements,

severance arrangement, change-in-control agreements or other similar agreements to which the

Debtors are parties; (iv) any pension, health, welfare, compensation or other employees or retiree

benefit plans, agreement, practices and programs, including, without limitation, any pension plan of

the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of

employment or labor agreements, collective bargaining agreements, or pension, health, welfare,

compensation or other employee or retiree benefit plans, agreements, practices and programs, and any

obligation that might otherwise arise from any such cessation, dismissal or termination pursuant to

any law of the United States, any State therein, or any other jurisdiction in the world, whether such

obligations arise under any contract, agreement, statute, regulation, ordinance, common law, public

policy, constitution or any other source, including with limitation, the Employee Retirement Income

Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of

1964, the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal

Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget

Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Restraining Notification Act; (vi)

environmental liabilities, debts, claims or obligations arising from the condition first existing on or

prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including without limitation under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq.; (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes relating to the operation of the Acquired Assets prior to the Closing; and (ix) any litigation. For the avoidance of any doubt, the terms of this paragraph shall not apply to claims against Buyer that arise by virtue of the post-Closing conduct of Buyer rather than the successor liability and related claims described in this paragraph.

16.    As of the Closing, Buyer shall have any and all rights, claims, defenses, and offsets held by the Debtors and/or the Debtors' estates with respect to the Assumed Liabilities.  All persons and entities are prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to Buyer in accordance with the terms of the Asset Purchase Agreement and this Sale Order.

<u>**Assumption and Assignment of Contracts**</u>

17.    The record establishes that there are good, valid, and sound business reasons for the assumption and assignment of the Assigned Contracts; that the decision to assume and assign the Assigned Contracts is an appropriate exercise of the Debtor's business judgment; and that all requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption and assignment to Buyer of Assigned Contracts have been satisfied.

18.    Subject to the procedures set forth in this Sale Order and the terms of the Asset Purchase Agreement, the Debtors are authorized to assume and assign to Buyer the Assigned Contracts, pursuant to sections 105 and 365 of the Bankruptcy Code.  Such assignments shall be free and clear of all Liens, Claims, encumbrances, Liabilities, or other Interests, except for the Assumed Liabilities and Permitted Liens, with all such Liens, Claims, encumbrances, Liabilities, or other

Interests deemed unconditionally released, terminated, and discharged as to the Assigned Contracts and Buyer and, following assignment, Buyer shall be fully and irrevocable vested with all of the Assigned Contracts. Such assignments of the Assigned Contracts shall be entitled to all of the benefits and protections afforded by this Sale Order in connection with the Acquired Assets and the transfers thereof as if the Assigned Contracts were among the Acquired Assets.

19.     Except as otherwise provided in this Sale Order, (a) each Assigned Contract is an executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assigned Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of each Assigned Contract have been satisfied; (e) the Assigned Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, Buyer, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer; (f) pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by Buyer; and (g) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract.

20.    Any provision in any Assigned Contract that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtors is unenforceable, and all such Assigned Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amount, if any, by either Debtors or Buyer (pursuant to the terms of the Asset Purchase Agreement).  No sections or provisions of any Assigned Contract that purport to provide for additional payments, rent accelerations, assignment fees, increases, payments, charges or any other fees charged to Buyer or the Debtors as a result of the assumption and the assignment of the Assigned Contracts shall have any force and effect with respect to the transactions contemplated by the Asset Purchase Agreement and assignments authorized by this Sale Order, and such provisions constitute unenforceable anti-assignment provisions under Section 363(f) of the Bankruptcy Code. Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Contract to the extent not previously provided by the Debtors.

21.    The Cure Amounts are hereby fixed at the amounts set forth in Exhibit B hereto, and the counterparties to the Assigned Contracts are bound by such Cure Amounts and are hereby precluded from objecting to the Cure Amounts (if any) related to such Assigned Contracts and the assumption and assignment of any Assigned Contract and enjoined from taking any action against Buyer or the Acquired Assets with respect to any claim for cure, alleged default, or any other claim that purports to have accrued or arisen prior to assignment, under any Assigned Contract, or against the Debtors for any amounts other than the Cure Amounts.  Payment of the Cure Amounts shall discharge the Debtors' obligation to cure or provide adequate assurance that the Debtors will promptly cure any defaults or to compensate, or provide adequate assurance that the Debtor will promptly compensate, any counterparty to the Assigned Contracts, for any actual pecuniary loss resulting from any default under the Assigned Contracts.

22.     Upon the Debtors' assumption and assignment of the Assigned Contracts to Buyer under the provisions of this Sale Order and any additional orders of this Court, and Debtors' or Buyer's (pursuant to the terms of the Asset Purchase Agreement) payment of Cure Amounts pursuant to paragraph [21] hereof, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract shall be permitted (a) to declare a default by Buyer under such Assigned Contract for alleged defaults existing prior to Closing or (b) otherwise take action against Buyer or the Debtors as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Contract.  Each party to an Assigned Contract hereby is also estopped and enjoined from (i) asserting against Buyer, or its property, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, or, against Buyer, any counterclaim, defense, setoff or any other Claim asserted or assertable against the Debtors; and (ii) imposing or charging against Buyer or its Affiliates any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignments to Buyer of the Assigned Contracts.  The validity of such assumption and assignments of the Assigned Contracts shall not be affected by any dispute between the Debtors and any non-Debtor party to an Assigned Contract relating to such Assigned Contract's respective Cure Amount.

23.     Buyer has satisfied all requirements under Bankruptcy Code sections 365(b)(1) and 365(f)(2) to provide adequate assurance of future performance under the Assigned Contracts.

24.     The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assigned Contracts.

25.     To the greatest extent available under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any licenses, permits, registrations, certificates, approvals, authorizations, Assigned Contracts, and other commitments relating to the Acquired Assets, and all

such licenses, permits, registrations, certificates, approvals, authorizations, Assigned Contracts, and other commitments relating to the Acquired Assets are deemed to have been, and are hereby directed to be, transferred to Buyer or any assignee of Buyer as of the Closing. To the extent provided by Bankruptcy Code section 525, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases.

26.     [Counterparties have consented to assignment of Assigned Contracts as follows: TBA]

**Other Provisions**

27.     To the extent due and payable under the Asset Purchase Agreement, the Debtors are authorized to pay Buyer the Break-Up Fee of $687,500 and Reimbursable Expenses not to exceed $100,000 under and in accordance with the terms of the Asset Purchase Agreement. The Break-Up Fee shall be payable to Buyer from the sale proceeds received in connection with an Alternate Transaction if the Asset Purchase Agreement is terminated for any reason, other than by Debtors in the circumstances set forth in Sections 8.1(c), 8.1(d) or 8.1(f) thereof, *provided* that Buyer is not in material breach of any of its material obligations under the Asset Purchase Agreement at the time of such termination. The Reimbursable Expenses shall be payable immediately to Buyer if the Asset Purchase Agreement is terminated for any reason, other than by Debtors in the circumstances set forth in Sections 8.1(c), 8.1(d) or 8.1(f) thereof, *provided* that Buyer is not in material breach of any of its material obligations under the Asset Purchase Agreement at the time of such termination.

28.     Any obligation to pay the Break-Up Fee and/or Reimbursable Expenses shall be absolute and unconditional; such payment shall constitute an administrative expense of the Debtors' estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified in the Asset Purchase Agreement, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever. The Break-Up Fee shall be payable as

specified in the Asset Purchase Agreement and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever. Upon the filing of a motion, on notice and following a hearing, the Court shall consider granting to Buyer an award of Reimbursable Expenses of up to the amount of $100,000.00, to be paid from the sale proceeds, on account of reasonable and documented out-of-pocket due diligence fee and expenses, including attorneys' fees.

29.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with their terms without further order of the Court, provided that any such modification, amendment, or supplement (a) does not modify or amend the Purchase Price or any terms relating to the form or payment thereof; (b) is not material; and (c) does not materially change the economic substance of the transactions contemplated in the Asset Purchase Agreement or hereby. For purposes of this Sale Order, whether a change described in the preceding sentence is "material" or "materially changes" the transactions authorized herein shall be determined by the Debtors, with the written consent of CIBC (as defined in the Bidding Procedures Order) and in consultation with the Committee (as defined in the Bidding Procedures Order), provided that a change that affects the cash component of the Purchase Price shall constitute a material change; provided, however, that the Debtors may seek a further order from this Court on five (5) business days' notice for approval of any requested change to the Asset Purchase Agreement (whether or not the Debtors deem such change or changes material), subject to the rights of parties in interest to object.

30.    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, any amendments, modifications, or supplements thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, including but not limited to the Assigned

Contracts, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to Buyer; (b) interpret, implement and enforce the provisions of this Sale Order; (c) protect Buyer against any Interests in or against the Debtors or the Acquired Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

31.     Unless otherwise expressly agreed by Buyer in writing, nothing contained in any subsequent order of this Court or in any plan of reorganization or liquidation confirmed in the Debtors' cases shall alter, conflict with, or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

32.     Buyer and Debtors shall have no obligation to proceed with the Closing until all conditions precedent in the Asset Purchase Agreement to their obligation to do so have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

33.     The terms of this Sale Order and the Asset Purchase Agreement shall in all respects be binding upon and enforceable against all persons and entities, including, without limitation, Buyer and its successors, the Debtors, the Debtors' estates, any chapter 7 trustee of the Debtors' estates, any committees appointed in the Debtors' bankruptcy cases, creditors, and other parties in interest.

34.     Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order.

35.     The stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby waived, and this Sale Order shall be effective and enforceable immediately upon entry and its

provisions shall be self-executing.  In the absence of any person obtaining a stay pending appeal, the Debtors and Buyer are free to close under the Asset Purchase Agreement at any time, subject to the terms of the Asset Purchase Agreement.

36.    No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to Taxes) shall apply in any way to the transactions contemplated by the Asset Purchase Agreement or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to Taxes incurred by the Debtors prior to the consummation of the Sale, whether arising under any law, by the Asset Purchase Agreement, or otherwise shall be the obligation of and fulfilled and paid by the Debtors.

37.    The provisions of this Sale Order are mutually dependent and any material provisions are non-severable without the express written consent of Buyer.

Exhibit C      -      Form of Bill of Sale

## FORM OF
## BILL OF SALE

THIS BILL OF SALE, dated as of _____, 2023, is made by CUSTOM ALLOY CORPORATION, a Delaware corporation ("**CAC**") and CAC MICHIGAN, LLC, a Michigan limited liability company (together with CAC, the "**Sellers**" and each individually, a "**Seller**") in favor of CAC ACQUISITIONS, LLC, a Delaware limited liability company (the "**Buyer**").

A.      The Buyer and the Sellers entered into that certain Asset Purchase Agreement (the "**Purchase Agreement**") made as of April ___, 2023, whereby the Buyer agreed to purchase, and the Sellers agreed to sell, the Acquired Assets (as defined in the Purchase Agreement);

B.      The Sellers wish to execute and deliver this Bill of Sale for the purposes of transferring to and vesting in the Buyer all of the Sellers' right, title and interest in and to the Acquired Assets.

In consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Initially capitalized terms not otherwise defined in this Bill of Sale have the meanings assigned to them in the Purchase Agreement.

2.      Pursuant to the terms of the Purchase Agreement, the Sellers hereby convey, transfer, assign, set over to and vest in the Buyer, its successors and assigns, forever, all of the Sellers' right, title and interest, legal or equitable, in and to all of the Acquired Assets.

3.      From time to time after the delivery of this instrument, at the Buyer's request and without further consideration, the Sellers will execute, acknowledge and deliver, or will cause to be executed, acknowledged and delivered, all and every such further acts, deeds, conveyance, transfers, assignments, powers of attorney and assurances as reasonably may be required to more effectively convey, transfer to and vest in the Buyer, and to put the Buyer in possession of any of the Acquired Assets.

4.      Nothing in this Bill of Sale, express or implied, is intended or shall be construed to expand or defeat, impair or limit in any way the representations, warranties, covenants, rights, obligations, claims or remedies of the parties as set forth in the Purchase Agreement.

5.      Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon, or give to, any person, corporation or other entity, other than the parties to the Purchase Agreement, any rights, remedies, obligations or liabilities.

6.      This Bill of Sale inures to the benefit of and is binding upon the Buyer and the Sellers and their respective successors and assigns.

7.      This Bill of Sale may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute but one and the same instrument.

142307.00107/131094041v.1

Facsimile or electronic scan (via email) counterpart signatures to this Bill of Sale shall be acceptable and binding.

**IN WITNESS WHEREOF,** each of the parties has caused this Bill of Sale to be duly executed and delivered as of the day and year first above written.

<b>SELLERS:</b>

CUSTOM ALLOY CORPORATION

By _____
        Name:
        Title:

CAC MICHIGAN, LLC

By _____
        Name:
        Title:

Exhibit D    -    Form of Assignment and Assumption Agreement

**FORM OF**
**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of _____, 2023 by and among CAC ACQUISITIONS, LLC, a Delaware limited liability company (the "**Buyer**"), CUSTOM ALLOY CORPORATION, a Delaware corporation ("**CAC**") and CAC MICHIGAN, LLC, a Michigan limited liability company (together with CAC, the "**Sellers**" and each individually, a "**Seller**"). The Sellers are the "**Assignors.**"

WHEREAS, the Assignors are party to that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated April __, 2023, by and among the Assignors and the Buyer. Pursuant to the Purchase Agreement, the Assignors agreed to sell, and the Buyer agreed to purchase the Acquired Assets (as such term is defined in the Purchase Agreement) and the Buyer agreed to assume all of the Assumed Liabilities (as such term is defined in the Purchase Agreement").

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Capitalized Terms**. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

2.    **Assignment and Assumption**. Effective as of the Closing, the Assignors hereby assign, sell, transfer and set over (collectively, the "**Assignment**") to the Buyer all of their right, title, benefit, privilege and interest in and to the Assumed Liabilities set forth on Schedule A hereto (if any). The Buyer hereby accepts the Assignment and assumes and agrees to observe and perform and to pay and discharge the Assumed Liabilities as applicable to the Buyer.

3.    **Further Actions**. Each of the parties hereto agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assignment and Assumption Agreement.

4.    **Governing Law**.    The validity, interpretation, and performance of this Assignment and Assumption Agreement will be determined in accordance with the laws of the State of New Jersey.

5.    **Counterparts**.  This Assignment and Assumption Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute but one and the same instrument. Facsimile or electronic scan (via email) counterpart signatures to this Assignment and Assumption Agreement shall be acceptable and binding.

6.    **Conflicts**.  Nothing in this Assignment and Assumption Agreement, express or implied, is intended or shall be construed to expand or defeat, impair or limit in any way the representations, warranties, covenants, rights, obligations, claims or remedies of the parties as set

-1-

forth in the Purchase Agreement. Nothing in this Assignment and Assumption Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any person, corporation or other entity, other than the parties to the Purchase Agreement, any rights, remedies, obligations or liabilities.

7.     **Successors and Assigns**.  This Assignment and Assumption Agreement inures to the benefit of and is binding upon the Buyer and the Assignors and their respective successors and assigns.

8.     **Headings**.  The headings, subheadings, and captions in this Assignment and Assumption Agreement and in any exhibit hereto are for reference purposes only and are not intended to affect the meaning or interpretation of this Assignment and Assumption Agreement.

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement as of the date first above written.

**ASSIGNORS:**

CUSTOM ALLOY CORPORATION

By   _____

      Name:

      Title:

CAC MICHIGAN, LLC

By   _____

      Name:

      Title:

**BUYER:**

CAC ACQUISITIONS, LLC

By   _____

      Name:

      Title:

Schedule A

Assumed Liabilities

[Attached]

Exhibit E    -    Form of Trademark Assignment Agreement; Form of Assignment of

Patent Rights

**FORM OF**
**TRADEMARK ASSIGNMENT AGREEMENT**

THIS TRADEMARK ASSIGNMENT AGREEMENT (this "**Assignment**") is made and entered into as of _____, 2023 by and among Custom Alloy Corporation, a Delaware corporation ("**CAC**") and CAC Michigan, LLC, a Michigan limited liability company (together with CAC, the "**Sellers**" and each individually, a "**Seller**"), and CAC Acquisitions, LLC, a Delaware limited liability company ("**Buyer**").

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of April ___, 2023 (the "**Purchase Agreement**"), by and among Buyer and the Sellers, the Sellers have agreed to sell to Buyer and Buyer has agreed to purchase from the Sellers various assets, including without limitation, the trademarks and trademark applications set forth on Exhibit 1 hereto, including and the goodwill of the business associated therewith (the "**Trademarks**");

WHEREAS, the Sellers own the entire right, title and interest in and to the Trademarks, and Buyer desires to acquire the Sellers' entire right, title and interest in and to such Trademarks;

WHEREAS, the parties wish to execute this Assignment for purposes of evidencing the transfer of the Trademarks and to allow Buyer to file this Assignment with the United States Patent and Trademark Office and all applicable foreign intellectual property offices, as may be necessary to effectuate the assignment and transfer of the Trademarks from the Sellers to Buyer; and

WHEREAS, the Sellers hereby acknowledge and agree that from and after the date hereof, Buyer shall be the exclusive owner of all of the Sellers' right, title and interest in and to the Trademarks.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth below and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. The Sellers hereby irrevocably and unconditionally grant, convey, transfer and assign to Buyer all of the Sellers' right, title and interest in and to the Trademarks, and the goodwill and all rights associated therewith, and all other corresponding rights that are or may be secured under the laws of the United States, any jurisdiction thereof, any foreign country or any multinational jurisdiction now or hereafter in effect, the same to be held by Buyer for Buyer's own use and enjoyment, and for the use and enjoyment of Buyer's successors and assigns and other legal representatives, together with all rights to income, royalties and license fees deriving from the Trademarks, all claims for damages by reason of past, present and future infringements or unauthorized uses of the Trademarks and the right to sue for and collect such damages, as permitted under the applicable laws of any jurisdiction or country in which such claims may be asserted for the use and benefit of Buyer and Buyer's successors, assigns and other legal representatives.

2. Assistance. Subject to Section 3 of this Assignment, the Sellers and Buyer shall execute and deliver such instruments and take such other actions as may reasonably be

required in order to carry out the intent of this Assignment and to evidence and effectuate the transactions contemplated herein. Furthermore, the Sellers hereby covenant and agree to and with Buyer, its successors, legal representatives and assigns, that the Sellers will execute such papers and documents, take such lawful oaths and do such acts as may be reasonably required for the procurement, maintenance, enforcement and defense of any of the Trademarks, without charge to Buyer, its successors, legal representatives and assigns.

3.    Relation to Purchase Agreement. This Assignment is intended only to effect the transfer of the Trademarks, including the rights therein as provided in Section 1 of this Assignment, and nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, representations or, in general any of the rights and remedies, and any of the obligations and indemnifications of any party set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.    General.

4.1    Severability; Amendment. Any provision in this Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof. This Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of the Sellers and Buyer on behalf of the Sellers and Buyer.

4.2    Entire Agreement; No Third-Party Beneficiaries. This Assignment, including the Exhibits and other documents attached or referred to herein, which form a part hereof, embodies the entire agreement and understanding of the parties hereof, and supersedes all prior or contemporaneous agreements or understandings (whether written or oral) among the parties, in respect to the subject matter contained herein. If any conflict exists between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control. This Assignment and the obligations hereunder are not intended to confer any rights or remedies to any third party and are not intended to operate, in anyway, as an agreement for the benefit of any third party.

4.3    Successors and Assigns. This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. This Assignment and the rights and obligations hereunder shall not be assignable by the Sellers without the prior written consent of Buyer, and any such purported assignment without such consent shall be void. This Assignment and the rights and obligations hereunder shall be assignable by Buyer without the written consent of the Sellers.

4.4    Governing Law. This Assignment shall be governed by and construed in accordance with the laws of the State of New Jersey without regard to the rules of conflict of laws of the State of New Jersey or any other jurisdiction.

4.5    Defined Terms. All capitalized terms not defined herein shall have the meaning assigned to them in the Purchase Agreement.

4.6     Counterparts. This Assignment may be executed in facsimile or other electronic means and in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

**[*Signature Page Follows*]**

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be executed, as of the date first written above.

**SELLERS:**

CUSTOM ALLOY CORPORATION

By _____
      Name:
      Title:

CAC MICHIGAN, LLC

By _____
      Name:
      Title:

**BUYER:**

CAC ACQUISITIONS, LLC

By _____
      Name:
      Title:

# EXHIBIT 1

TRADEMARKS

[Attached]

## FORM OF
## ASSIGNMENT OF PATENT RIGHTS

THIS ASSIGNMENT OF PATENT RIGHTS (this "**Assignment**") is executed, acknowledged and delivered by Custom Alloy Corporation, a Delaware corporation ("**Assignor**"), to CAC Acquisitions, LLC, a Delaware limited liability company ("**Assignee**").

NOW, THEREFORE:

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor agrees to and does hereby irrevocably sell, assign, transfer and convey unto said Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest (i) in and to (a) U.S. Design Patent No. D852,934 (U.S. Patent Application No. 29/597,248), filed March 15, 2017, entitled "Welded Wye Connector" (the "**Patent**"), (b) patents or patent applications (1) to which the Patent claims priority, (2) for which the Patent forms a basis for priority, (3) that were Assignor co-owned applications that incorporate by reference the Patent (excluding for this purpose mere prior art references that are not incorporated by reference) and/or (4) which are subject to a terminal disclaimer with the Patent; (c) reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in the foregoing categories (a) and (b); (d) foreign patents, patent applications and counterparts claiming priority to any item in any of the foregoing categories (a) through (c), including, without limitation, certificates of invention and utility models; and (e) any other patents or similar rights under any country's laws owned by the Assignor as of the Closing, together with the items listed in subsections (b) through (e), collectively, the "**Assigned Patent**"), the same to be held and enjoyed by Assignee for its own use, and for the use by its successors, assigns, or other legal representatives to the end of the term or terms for which the Assigned Patent may be granted as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made; (ii) in and to causes of action and enforcement rights for the Assigned Patent, including all rights to pursue damages, injunctive relief and other remedies for past and future infringement of the Assigned Patent; and (iii) to apply in any and all countries for patents, certificates of invention or other governmental grants for the Assigned Patent.  Assignor also hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents or certificates of invention which may be granted upon the Assigned Patent in the name of Assignee, as the assignee to the entire interest therein.

Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of that certain Asset Purchase Agreement, dated as of April __, 2023 (the "**Purchase Agreement**"), by and among Assignor, Assignee and the other parties thereto. In the event of any conflict between the terms of this Assignment and those of the Purchase Agreement, the terms of the Purchase Agreement shall be controlling.

This Assignment shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

This Assignment shall be governed by, and construed in accordance with, the laws of the United States in respect to patent issues and in all other respects by the laws of the State of New Jersey, without giving effect to the conflict of laws rules thereof.

*[Signature Page Follows]*

**BLANK ROME LLP DRAFT 4/27/2023**

      **IN WITNESS WHEREOF**, Assignor and Assignee have caused this Assignment to be executed as of this ___ day of _____, 2023.

For Assignor:

By:_____

Name: _____

Title: _____

For Assignee:

By:_____

Name: _____

Title: _____

Exhibit F      -      Form of Domain Name Assignment Agreement

**FORM OF**
**DOMAIN NAME ASSIGNMENT**

THIS DOMAIN NAME ASSIGNMENT (this "Domain Name Assignment") is made as of _____, 2023 by and among CAC ACQUISITIONS, LLC, a Delaware limited liability company ("Assignee"), CUSTOM ALLOY CORPORATION, a Delaware corporation ("CAC") and CAC MICHIGAN, LLC, a Michigan limited liability company (together with CAC, the "Assignors" and each individually, an "Assignor").

WHEREAS, the Assignors and Assignee have entered into that certain Asset Purchase Agreement, dated as of April __, 2023 (the "Purchase Agreement"), pursuant to which, among other things, the Assignors have agreed to sell, transfer, convey, assign and deliver to Assignee all of the Assignors' right, title and interest in and to the Acquired Assets (as defined in the Purchase Agreement), including but not limited to, all of the Assignors' right, title and interest in and to the registration of the domain names listed on Schedule A to this Domain Name Assignment (the "Domain Names").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Sale and Transfer.  The Assignors hereby unconditionally and irrevocably sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Assignee and its successors and assigns forever, all of the Assignors' right, title and interest in and to the Domain Names.

2.      Disclaimer of Warranties. Except as specifically provided in the Purchase Agreement, Assignee acknowledges that the Assignors make no representation or warranty whatsoever with respect to the Domain Names, including, without limitation, any: (i) warranty of merchantability; (ii) warranty of fitness for a particular purpose; (iii) warranty of title; or (iv) warranty against infringement of Intellectual Property rights of a third party; whether arising by law, course of dealing, course of performance, usage of trade or otherwise.

3.      Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall remain in full force and effect to the full extent provided therein, and nothing contained in this Agreement shall supersede the Purchase Agreement or any provision contained therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.      Definitions.  Capitalized terms used but not otherwise defined in this Domain Name Assignment shall have the respective meanings ascribed to them in the Purchase Agreement.

5.      Miscellaneous.

(a)      Further Assurances.  The Assignors agree that, at any time and from time to time after the date hereof, upon the request of Assignee and without further consideration, the Assignors shall duly execute, acknowledge and deliver all such further assignments, transfers, conveyances, powers of attorney and assurances (or will cause to be done all and every such further acts) as may be required to more effectively assign to and vest in Assignee, and to put Assignee in possession of the Domain Names.

(b)     <u>Governing Law</u>.  This Domain Name Assignment shall be governed by and construed, interpreted, and enforced in accordance with the laws of the State of New Jersey without regard to conflicts of laws principles.

(c)     <u>Amendment, Waiver, etc</u>.  No amendment or modification of this Domain Name Assignment, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of such amendment, modification, or waiver is sought.

(d)     <u>Binding Effect</u>.  This Domain Name Assignment shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

(e)     <u>Counterparts; Facsimiles</u>.  This Domain Name Assignment may be executed in counterparts, each of which shall be enforceable against the party actually executing the counterpart, and all of which together shall constitute one instrument.  Facsimile or electronic scan signatures to this Domain Name Assignment shall be sufficient to bind the parties hereto.

(f)     <u>Recitals</u>.  The first paragraph of this Domain Name Assignment, <u>Schedule A</u> and the Recitals are deemed to be integral parts of this Agreement and incorporated by reference herein.

*[Signature page follows]*

- 2 -

IN WITNESS WHEREOF, the undersigned have caused this Domain Name Assignment to be executed by their duly authorized officers as of the date first set forth above.

"<u>Assignors</u>":

CUSTOM ALLOY CORPORATION

By _____
      Name:
      Title:

CAC MICHIGAN, LLC

By _____
      Name:
      Title:

"<u>Assignee</u>":

CAC ACQUISITIONS, LLC

By _____
      Name:
      Title:

[Signature Page to Domain Name Assignment]

## SCHEDULE A

DOMAIN NAMES

| Domain Name | Registrar | Registrant | Expiration Date |
|---|---|---|---|
| | | | |

Exhibit G      -      Form of Escrow Agreement



# ESCROW AGREEMENT

This Escrow Agreement dated this ___ day of April, 2023 (the "**Escrow Agreement**"), is entered into by and among CAC Acquisitions, LLC, a Delaware limited liability company (the "**Purchaser**"), Custom Alloy Corporation, a Delaware corporation and CAC Michigan, LLC, a Michigan limited liability company (collectively, the "**Seller**") and together with the Purchaser, each a "**Party**" and collectively, the "**Parties**"), and Wilmington Trust, National Association, as escrow agent ("**Escrow Agent**").   All capitalized terms not defined herein shall have the meanings prescribed to them in the Purchase Agreement.

## RECITALS

**WHEREAS,** Seller is a debtor in possession in a chapter 11 proceeding before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") which are being jointly administered under the case name *In re Custom Alloy Corporation, et. al., Case No.  22-18143, 22-18144*) (collectively, the "**Bankruptcy Case**");

**WHEREAS**, pursuant to the terms of that certain Asset Purchase Agreement dated as of the date hereof (the "**Purchase Agreement**"), Purchaser is required to make a deposit in the amount of Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000) (the "**Deposit**"); and

**WHEREAS**, pursuant to the Purchase Agreement, the Parties desire that the Escrow Agent hold the Deposit in escrow, and Escrow Agent is willing to do so, on the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the premises, and further consideration of the covenants set forth hereafter, the receipt and sufficiency of which is duly acknowledged, it is hereby agreed mutually as follows:

## ARTICLE 1
## ESCROW DEPOSIT

1.1.   <u>Receipt of Escrow Property</u>.

(a)   Upon execution of this Escrow Agreement by each of the parties hereto, Purchaser shall deposit Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000) into a United States Dollar denominated account (the "**Escrow Account**") established by the Escrow Agent.  The Escrow Account is set forth below:

> Manufacturers & Traders Trust Co.
> ABA# 031100092
> A/C# 163186-000
> A/C Name: Custom Alloy Corp Purchase Price Escrow
> Attn: Global Capital Markets

(b)   The Escrow Agent will hold the Deposit in the Escrow Account, together with all investments thereof and all interest accumulated thereon and proceeds therefrom (the "**Escrow Property**"), in escrow upon the terms and conditions set forth in this Escrow Agreement and shall not disburse funds from the Escrow Account except as provided herein.

1

1.2.    <u>Investments</u>.

(a)      The Escrow Agent shall invest the Escrow Property in accordance with the written instructions provided to the Escrow Agent and signed by the Parties in such investments (i) as shall from time to time be selected by the Parties and (ii) be investments the Escrow Agent is able to hold.  In the absence of written investment instructions from the Parties, the Escrow Agent shall hold the Escrow Property un-invested, without interest thereon.  For the avoidance of doubt, any investment earnings and income on the Escrow Property shall become part of the Escrow Property, and shall be disbursed in accordance with Section 1.3 below. The Escrow Agent shall make no disbursement, investment or other use of funds until and unless it has collected funds. The Escrow Agent shall not be liable for collection items until such proceeds have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

(b)      The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement.  The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

1.3.    <u>Disbursements</u>.

(a)      The Escrow Agent shall deliver the Escrow Property as follows:

(i)  to a Party or its designee(s) pursuant to the joint written direction of the Parties in substantially the form attached hereto as <u>Exhibit A</u> (the "**Written Direction**") upon the termination or closing of the transactions contemplated under the Purchase Agreement; or

(ii) to the person(s) or entity(ies) directed pursuant to a non-appealable order of the Bankruptcy Court.

(b)      In the event that Escrow Agent makes any payment to any other party pursuant to this Escrow Agreement and for any reason such payment (or any portion thereof) is required to be returned to the Escrow Account or another party or is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a receiver, trustee or other party under any bankruptcy or insolvency law, other federal or state law, common law or equitable doctrine, then the recipient shall repay to the Escrow Agent upon written request the amount so paid to it.

(c)      The Escrow Agent shall, in its sole discretion, comply with judgments or orders issued or process entered by any court with respect to the Escrow Property, including without limitation any attachment, levy or garnishment, without any obligation to determine such court's jurisdiction in the matter and in accordance with its normal business practices.  If the Escrow Agent complies with any such judgment, order or process, then Escrow Agent shall not be liable to either Party or any other person by reason of such compliance, regardless of the final disposition of any such judgment, order or process.

(d)      Each Party understands and agrees that the Escrow Agent shall have no obligation or duty to act upon a Written Direction delivered to the Escrow Agent for the disbursement of Escrow Property

2

under this Escrow Agreement if such Written Direction is not (i) in writing, (ii) signed by, in the case of Purchaser, any individual designated by Purchaser on Exhibit B-1 hereto or, in the case of Seller, any individual designated by Seller on Exhibit B-2 hereto (in each case, each such individual an "**Authorized Representative**" of such Party), and (iii) delivered to, and able to be authenticated by, the Escrow Agent in accordance with Section 1.5.

(e)        Upon request, the Escrow Agent will furnish monthly statements to each Party setting forth the activity in the Escrow Account.

(f)        The Parties may specify in a Written Direction whether the Escrow Property shall be disbursed by way of wire transfer or check.  If the written notice for the disbursement of funds does not so specify the disbursement means, the Escrow Agent may disburse the Escrow Property by any means chosen by the Escrow Agent.

1.4.     Written Direction and Other Instruction.

(a)        With respect to any Written Direction or any other notice, direction or other instruction required to be delivered by the Parties to the Escrow Agent under this Escrow Agreement, the Escrow Agent is authorized to follow and rely upon any and all such instructions given to it from time to time if the Escrow Agent believes, in good faith, that such instruction is genuine and to have been signed by an Authorized Representative of each Party.  The Escrow Agent shall have no duty or obligation to verify that the person who sent such instruction is, in fact, a person duly authorized to give instructions on behalf of a Party, other than to verify that the signature of the Authorized Representative on any such instruction appears to be the signature of such person. Each Party acknowledges and agrees that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Escrow Agent, and that there may be more secure methods of transmitting instructions other than the method selected by such Party. The Escrow Agent shall have no responsibility or liability for any loss which may result from:

(i)  any action taken or not taken by the Escrow Agent in good faith reliance on any such signatures or instructions;

(ii) as a result of a Party's reliance upon or use of any particular method of delivering instructions to the Escrow Agent, including the risk of interception of such instruction and misuse by third parties; or

(iii) any officer or Authorized Representative of a Party named in an incumbency certificate, Exhibit B-1 or Exhibit B-2 delivered hereunder prior to actual receipt by the Escrow Agent of a more current incumbency certificate or an updated Exhibit B-1 or Exhibit B-2 and a reasonable time for the Escrow Agent to act upon such updated or more current certificate or Exhibit.

(b)        Purchaser may, at any time, update Exhibit B-1 and Seller may, at any time, update Exhibit B-2 by signing and submitting to the Escrow Agent an updated Exhibit.  Any updated Exhibit shall not be effective unless the Escrow Agent countersigns a copy thereof.  The Escrow Agent shall be entitled to a reasonable time to act to implement any changes on an updated Exhibit.

1.5.     Delivery and Authentication of Written Direction.

(a)        A Written Direction must be delivered to the Escrow Agent by one of the delivery methods set forth in Section 4.3.

(b)    Each Party and the Escrow Agent hereby agree that the following security procedures will be used to verify the authenticity of a Written Direction delivered by any Party to the Escrow Agent under this Escrow Agreement:

(i)    The Written Direction must include the name and signature of the person delivering the disbursement request to the Escrow Agent.  The Escrow Agent will check that the name and signature of the person identified on the Written Direction appears to be the same as the name and signature of an Authorized Representative of such Party;

(ii)    The Escrow Agent will make a telephone call to an Authorized Representative of the Party purporting to deliver the Written Direction (which Authorized Representative may be the same as the Authorized Representative who delivered the Written Direction) at any telephone number for such Authorized Representative as set forth on Exhibit B-1 or Exhibit B-2, as applicable, to obtain oral confirmation of delivery of the Written Direction.  If the Written Direction is a joint written notice of the Parties, the Escrow Agent shall call back an Authorized Representative of both of those Parties;  and

(iii)    If the Written Direction is sent by email to the Escrow Agent, the Escrow Agent also shall review such email address to verify that it appears to have been sent from an email address for an Authorized Representative of such Party as set forth on Exhibit B-1 or Exhibit B-2, as applicable, or from an email address for a person authorized under Exhibit B-1 or Exhibit B-2, as applicable, to email a Written Direction to the Escrow Agent on behalf of the Authorized Representative).

(c)    Each Party acknowledges and agrees that given its particular circumstances, including the nature of its business, the size, type and frequency of its instructions, transactions and files, internal procedures and systems, the alternative security procedures offered by the Escrow Agent and the security procedures in general use by other customers and banks similarly situated, the security procedures set forth in this Section 1.5 are a commercially reasonable method of verifying the authenticity of a payment order in a Written Direction.

(d)    The Escrow Agent is authorized to execute, and each Party expressly agrees to be bound by any payment order in a Written Direction issued in its name (and associated funds transfer) (i) that is accepted by the Escrow Agent in accordance with the security procedures set forth in this Section 1.5, whether or not authorized by such Party and/or (ii) that is authorized by or on behalf of such Party or for which such Party is otherwise bound under the law of agency, whether or not the security procedures set forth in this Section 1.5 were followed, and to debit the Escrow Account for the amount of the payment order.  Notwithstanding anything else, the Escrow Agent shall be deemed to have acted in good faith and without negligence, gross negligence or misconduct if the Escrow Agent is authorized to execute the payment order under this Section 1.5.  Any action taken by the Escrow Agent pursuant to this Section 1.5 prior to the Escrow Agent's actual receipt and acknowledgement of a notice of revocation, cancellation or amendment of a Written Direction shall not be affected by such notice of revocation, cancellation or amendment of a Written Direction.

(e)    The security procedures set forth in this Section 1.5 are intended to verify the authenticity of payment orders provided to the Escrow Agent and are not designed to, and do not, detect errors in the transmission or content of any payment order.  The Escrow Agent is not responsible for detecting an error in the payment order, regardless of whether either Party believes the error was apparent, and the Escrow Agent is not liable for any losses arising from any failure to detect an error.

4

(f)      When instructed to credit or pay a party by both name and a unique numeric or alpha-numeric identifier (e.g. ABA number or account number), the Escrow Agent, and any other banks participating in the funds transfer, may rely solely on the unique identifier, even if it identifies a party different than the party named. Each Party agrees to be bound by the rules of any funds transfer network used in connection with any payment order accepted by the Escrow Agent hereunder.

(g)      The Escrow Agent shall not be obliged to make any payment requested under this Escrow Agreement if it is unable to validate the authenticity of the request by the security procedures set forth in this Section 1.5.  The Escrow Agent's inability to confirm a payment order may result in a delay or failure to act on that payment order. Notwithstanding anything else in this Escrow Agreement, the Escrow Agent shall not be required to treat a payment order as having been received until the Escrow Agent has authenticated it pursuant to the security procedures in this Section 1.5 and shall not be liable or responsible for any losses arising in relation to such delay or failure to act.

1.6.    <u>Income Tax Allocation and Reporting</u>.

(a)      Each Party agrees that, for tax reporting purposes, the Escrow Property shall be deemed to be the property of Purchaser unless otherwise ordered by the Bankruptcy Court and all interest and other income from investment of the Escrow Property shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by such Party, whether or not such income was disbursed during such calendar year.  Notwithstanding anything to the contrary herein, the Escrow Agent shall have no duty to prepare or file any Federal or state tax report or return with respect to the Escrow Property, except for the delivery and filing of tax information reporting forms required to be delivered and filed with the Internal Revenue Service. With respect to the preparation, delivery and filing of such required tax information reporting forms and all matters pertaining to the reporting of earnings on the Escrow Property, the Escrow Agent shall be entitled to request and receive written instructions from Seller, and the Escrow Agent shall be entitled to rely conclusively and without further inquiry on such written instructions.    With respect to any other payments made under this Escrow Agreement, the Escrow Agent shall not be deemed the payer and shall have no responsibility for performing tax reporting.  The Escrow Agent's function of making such payments is solely ministerial and upon express direction of the Parties.

(b)      Prior to the execution of this Escrow Agreement, or within two days thereafter, each Party shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request.  Each Party understands that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(c)      To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property.  The Parties, jointly and severally, hereby indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Escrow Agent.  The indemnification provided by this Section 1.6(c) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

1.7.    <u>Termination</u>.  This Escrow Agreement shall terminate upon the date upon which all of the Escrow Property is disbursed in accordance with Section 1.3(a), at which time this Escrow Agreement shall be of no further force and effect, except that the provisions of Sections 1.6 (Tax Allocation and Reporting), 3.1(Indemnification) and 3.2 (Limitation of Liability) hereof shall survive termination.

# ARTICLE 2
# DUTIES OF THE ESCROW AGENT

2.1.    <u>Scope of Responsibility</u>.  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties expressly and specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will the Escrow Agent be deemed to be a fiduciary to either Party or any other person under this Escrow Agreement or otherwise.  The Escrow Agent will not be responsible or liable for the failure of either Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the parties and the Escrow Agent has no duties or obligations with respect thereto. The Escrow Agent acts hereunder as escrow agent only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof. The Escrow Agent shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of the Escrow Property, written instructions, or any other documents in connection therewith, and will not be regarded as making nor be required to make, any representations thereto. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement, any other agreement or otherwise.

2.2.    <u>Rights of the Escrow Agent</u>. No provision of this Escrow Agreement shall require the Escrow Agent to expend or risk its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings. The Escrow Agent shall be protected in acting upon any written instruction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and what it purports, to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement.

2.3.    <u>Attorneys and Agents</u>.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent with respect to any matters arising under this Escrow Agreement or the Escrow Agent's status as Escrow Agent under this Escrow Agreement. The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all documented compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.   The Escrow Agent may perform any and all of its duties through its agents,

6

representatives, attorneys, custodians, and/or nominees and shall not be responsible for the acts or omissions of such agents, representatives, attorneys, custodians or nominees appointed with due care.

2.4.    <u>Right Not Duty Undertaken</u>.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

# ARTICLE 3
## PROVISIONS CONCERNING THE ESCROW AGENT

3.1.    <u>Indemnification</u>.  The Parties, jointly and severally, hereby indemnify and defend the Escrow Agent and its directors, officers, employees and agents (collectively, the "**Indemnified Parties**"), and hold the Indemnified Parties harmless from any and against all liabilities, losses, actions, suits or proceedings at law or in equity, and any other expenses, fees or charges of any character or nature, (including, without limitation, reasonable attorney's fees and expenses and the costs of enforcement of this Escrow Agreement or any provision thereof), which an Indemnified Party may incur or with which it may be threatened by reason of acting as or on behalf of the Escrow Agent under this Escrow Agreement or arising out of the existence of the Escrow Account, except to the extent the same shall be have been finally adjudicated to have been directly caused by the Escrow Agent's gross negligence or willful misconduct.  The terms of this paragraph shall survive termination of this Escrow Agreement.

3.2.    <u>Limitation of Liability</u>.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH THIS ESCROW AGREEMENT, THE ESCROW ACCOUNT, THE ESCROW PROPERTY, OR THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, OR (III) ANY AMOUNT IN EXCESS OF THE VALUE OF THE ESCROW PROPERTY.

3.3.    <u>Resignation or Removal</u>.  The Escrow Agent may, at any time, resign as escrow agent hereunder by furnishing written notice of its resignation to each Party. At such time, all fees and expenses to which the Escrow Agent is entitled shall be immediately due and payable to Escrow Agent. The Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent shall be entitled, at its sole discretion and at the expense of Purchaser, to petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

3.4.    <u>Compensation</u>.  (a) The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as <u>Exhibit C</u>, which compensation shall be paid by Purchaser.  Such

7

compensation is intended for the Escrow Agent's services as contemplated by this Escrow Agreement. In addition to such compensation, in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent is required to render any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated in a commercially reasonable manner for such extraordinary services and any services or work performed by Escrow Agent in connection with any delay, controversy, litigation or event, and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event.  If any amount due to the Escrow Agent hereunder is not paid within thirty (30) days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.

The terms of this Section 3.4 shall survive termination of this Escrow Agreement.

3.5.    <u>Disagreements</u>.  If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, refuse to act until the Escrow Agent (a) receives a final non-appealable order of a court of competent jurisdiction directing delivery of the Escrow Property or (b) receives a written instruction, executed by each of the parties involved in such disagreement or dispute, in a form reasonably acceptable to the Escrow Agent, directing delivery of the Escrow Property. The Escrow Agent will be entitled to act on any such written instruction or final, non-appealable order of a court of competent jurisdiction without further question, inquiry or consent.  The Escrow Agent may file an interpleader action in a state or federal court, and upon the filing thereof, the Escrow Agent will be relieved of all liability as to the Escrow Property and will be entitled to recover reasonable and documented out-of-pocket attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action.    In the event the Escrow Agent receives conflicting instructions hereunder, the Escrow Agent shall be fully protected in refraining from acting until such conflict is resolved in accordance with this Section 3.5.

3.6.    <u>Merger or Consolidation</u>.  Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

3.7.    <u>Attachment of Escrow Property; Compliance with Legal Orders</u>.  In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any Party or to any other person, firm or corporation, should, by reason of

8

such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

3.8.    <u>Force Majeure</u>.  The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions; loss or malfunctions of utilities including but not limited to, computer (hardware or software), payment systems, or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

3.9.    <u>Compliance with Legal Orders</u>.  The Escrow Agent shall be entitled to consult with legal counsel in the event that a question or dispute arises with regard to the construction of any of the provisions hereof, and shall incur no liability and shall be fully protected in acting in accordance with the advice or opinion of such counsel.

3.10.    <u>No Financial Obligation</u>. The Escrow Agent shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Escrow Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security and indemnity which it deems, in its sole and absolute discretion, to be satisfactory.

# ARTICLE 4
# MISCELLANEOUS

4.1.    <u>Successors and Assigns</u>.  This Escrow Agreement shall be binding on and inure to the benefit of each Party and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of any of the Parties and the Escrow Agent shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld).

4.2.    <u>Escheat</u>.  Each Party is aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  The Escrow Agent shall have no liability to either Party or any other party, should any or all of the Escrow Property escheat by operation of law.

4.3.    <u>Notices</u>.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by overnight delivery with a reputable national overnight delivery service, (iv) by mail or by certified mail, return receipt requested, and postage prepaid, or (v) by electronic transmission; including by way of e-mail (as long as such email is accompanied by a PDF or similar version of the relevant document bearing the signature of an Authorized Representative for the Party sending the notice) with email confirmation of receipt.  If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States mail, and any other notices shall be deemed to have been given on the date received by the Seller, Purchaser or the Escrow Agent, as applicable.  If notice is given to a party, it shall be given at the

9

address for such party set forth below.  It shall be the responsibility of each Party to notify the Escrow Agent in writing of any name or address changes.

If to Purchaser:

CAC Acquisitions, LLC
c/o Trident Maritime Systems, LLC
2011 Crystal Drive, Suite 1102, Arlington, VA 22202
Attention:  Tom Eccles, Joe Mullen and Mike Bornak
Email:  tom.eccles@tridentllc.com, joe.mullen@tridentllc.com, mike.bornak@tridentllc.com

with copies (which shall not constitute notice) to:

J.F. Lehman & Company
110 East 59th Street, 27th Floor
New York, New York 10022
Attention: C. Alexander Harman, David L. Rattner, David F. Thomas and R. Benjamin Hatcher
Email: cah@jflpartners.com, dlr@jflpartners.com, dft@jflpartners.com and rbh@jflpartners.com

and

Keller Benvenutti Kim LLP
650 California Street, Suite 1900
San Francisco, CA 94108
Attention:  Tobias S.  Keller, Esq.; Jane Kim
Email: tkeller@kbkllp.com; jkim@kbkllp.com

and

Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:  Peter Schnur; Thomas Cournoyer
Email:  peter.schnur@blankrome.com; thomas.cournoyer@blankrome.com

If to Seller:

Custom Alloy Corporation
3 Washington Ave
High Bridge, New Jersey 08829
Attention: Adam Ambielli
Email:  amambielli@customalloy.us

with a copy to:

Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601
Attention:  Roger Iorio, Esq.
Email:  riorio@coleschotz.com

10

and

Rabinowitz, Lubetkin & Tully, LLC
293 Eisenhower Parkway, Suite 100
Livingston, New Jersey 07039
Attn: Jonathan I. Rabinowitz, Esq.
Email: jrabinowitz@rltlawfirm.com

If to the Escrow Agent:

Wilmington Trust, N.A.
Global Capital Markets | Agency, Corporate & Restructuring Services
277 Park Avenue, 25th Floor
New York, NY 10172
Attn: Joseph Clark, Vice President
Telephone: 212 941 4439
Email address: jhclark@wilmingtontrust.com

4.4.    <u>Governing Law</u>.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to any laws relating to choice of laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

4.5.    <u>Venue</u>.  Each Party and the Escrow Agent hereby consent to the exclusive personal jurisdiction of the courts located in New Castle County in the State of Delaware in the event of a dispute arising out of or under this Escrow Agreement.  Each Party and the Escrow Agent hereby irrevocably waives any objection to the laying of the venue of any suit, action or proceeding and irrevocably submits to the exclusive jurisdiction of such court in such suit, action or proceeding.

4.6.    <u>Entire Agreement.</u>  This Escrow Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties related to the Escrow Property and supersedes all prior agreements and understandings, oral or written.  If a court of competent jurisdiction declares a provision invalid, it will be ineffective only to the extent of the invalidity, so that the remainder of the provision and Escrow Agreement will continue in full force and effect.  In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Purchase Agreement, the terms of the Escrow Agreement shall control and prevail; provided, in no event shall the Escrow Agent be bound by the terms of the Purchase Agreement.  This Escrow Agreement is not intended to confer upon any person other than the parties hereto any rights or remedies.

4.7.    <u>Amendment</u>.  This Escrow Agreement may be amended, modified, supplemented, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent; provided that <u>Exhibit B-1</u> or <u>Exhibit B-2</u>, as applicable, may be amended at any time in accordance with Section 1.4.

4.8.    <u>Waivers</u>.  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant,

representation, or warranty contained in this Escrow Agreement.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.

4.9.    <u>Interpretation</u>.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement. Unless otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Any references to an Exhibit is a reference to an Exhibit of this Escrow Agreement.

4.10.    <u>Counterparts</u>.  This Escrow Agreement may be executed in one or more counterparts, including by electronic transmission as a "PDF" or facsimile, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

4.11.    <u>Waiver of Jury Trial.</u> **EACH OF THE PARTIES HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN RESOLVING ANY CLAIM OR COUNTERCLAIM RELATING TO OR ARISING OUT OF THIS ESCROW AGREEMENT.**

[The remainder of this page left intentionally blank.]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

PURCHASER

CAC ACQUISITIONS, LLC


By: _____
Name:
Title:
Date:

SELLER

CUSTOM ALLOY CORPORATION


By: _____
Name:
Title:
Date:

CAC MICHIGAN, LLC


By: _____
Name:
Title:
Date:


WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Escrow Agent

By: _____
Name:
Title:
Date:

53429/0003-45118969v3



**EXHIBIT A**

**Form of Written Direction**

*[Form to be provided by Purchaser/Seller, provided that any alternative form contain substantially all information in the table below]*

*Example for reference purposes only:*

[date]
Wilmington Trust, National Association
[Corporate Client Services
1100 N. Market Street
Wilmington, DE  19890]
Attention: [name]

**Re:  Escrow Account No.:  [##],  [escrow account name]**

Ladies and Gentlemen:

        Reference is made to the Escrow Agreement, dated as of _____, 20__ entered into by and among  [_____]  ("[**Purchaser**]"),  [_____]  ("[**Seller**]")  and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, as escrow agent (the "**Escrow Agent**").  Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein. This letter is a [__] Written Direction referred to in Section [___] of the Escrow Agreement.

        [_____] and [_____] hereby jointly instruct the Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), as follows:

| | |
|---|---|
| Amount: | |
| Beneficiary Bank Name: | |
| Beneficiary Bank Address Line 1: | |
| Beneficiary Bank Address Line 2: | |
| Beneficiary Bank Address Line 3: | |
| ABA#: | |
| SWIFT#: | |
| Beneficiary Account Title: | |
| Beneficiary Account No./IBAN: | |
| Beneficiary Address Line 1: | |



| Beneficiary Address Line 2: | |
|---|---|
| Beneficiary Address Line 3: | |
| Additional Information: | |

**[PURCHASER]**

By: _____
Name:
Title:
Date:

**[SELLER]**

By: _____
Name:
Title:
Date:

15



**EXHIBIT B**

**EXHIBIT B-1**

**CERTIFICATE AS TO AUTHORIZED SIGNATURES**
**OF PURCHASER**

Purchaser hereby designates each of the following persons as its Authorized Representative for purposes of this Escrow Agreement, and confirms that the title, contact information and specimen signature of each such person as set forth below is true and correct.  Each such Authorized Representative is authorized to initiate and approve transactions of all types for the Escrow Accountestablished under this Escrow Agreement to which this Exhibit B-1 is attached, on behalf of Purchaser.

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required): *If more than one, list all* | Office: Cell: Home: Other: |
| **E-mail** (required): *If more than one, list all* | Email 1: Email 2: |
| **Facsimile:** | |

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required): *If more than one, list all* | Office: Cell: Home: Other: |
| **E-mail** (required): *If more than one, list all* | Email 1: Email 2: |
| **Facsimile:** | |

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required): | Office: Cell: |

16



| *If more than one, list all* | Home: |
| | Other: |
| **E-mail** (required): | Email 1: |
| *If more than one, list all* | Email 2: |
| **Facsimile:** | |

**COMPLETE BELOW TO UPDATE <u>EXHIBIT B-1</u>**

If Purchaser wishes to change the names or details of any of its Authorized Representatives, Purchaser must complete, sign and send to Escrow Agent an updated copy of this <u>Exhibit B-1</u> with such changes. Any updated <u>Exhibit B-1</u> shall be effective once signed by Purchaser and Escrow Agent and shall entirely supersede and replace any prior <u>Exhibit B-1</u> attached to this Escrow Agreement or submitted to Escrow Agent.

**PURCHASER**

By:_____

Name:

Title:

Date:


**WILMINGTON TRUST, NATIONAL ASSOCIATION**


By:_____

Name:

Title:

Date:

*Internal Use Only:*

☐   Updated details of Authorized Representatives completed in full

☐   Signed by a representative of Purchaser per relevant board resolutions/certificate of incumbency on file (if relevant).

☐   Call-back performed to Purchaser to confirm authenticity of updated <u>Exhibit B-1</u>:

Person Called:_____   Date of Call:_____   Time of Call:_____am/pm

Reviewed by (name):_____Signature:_____Date:_____

17



**EXHIBIT B-2**

**CERTIFICATE AS TO AUTHORIZED SIGNATURES**
**OF SELLER**

Seller hereby designates each of the following persons as its Authorized Representative for purposes of this Escrow Agreement, and confirms that the title, contact information and specimen signature of each such person as set forth below is true and correct.  Each such Authorized Representative is authorized to initiate and approve transactions of all types for the Escrow Account[s] established under this Escrow Agreement to which this Exhibit B-2 is attached, on behalf of Seller.

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):  *If more than one, list all* | Office:  Cell:  Home:  Other: |
| **E-mail** (required):  *If more than one, list all* | Email 1:  Email 2: |
| **Facsimile:** | |

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):  *If more than one, list all* | Office:  Cell:  Home:  Other: |
| **E-mail** (required):  *If more than one, list all* | Email 1:  Email 2: |
| **Facsimile:** | |

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):  *If more than one, list all* | Office:  Cell:  Home:  Other: |

18



| **E-mail** (required): | Email 1: |
|---|---|
| *If more than one, list all* | Email 2: |
| **Facsimile:** | |

---

## COMPLETE BELOW TO UPDATE <u>EXHIBIT B-2</u>

If Seller wishes to change the names or details of any of its Authorized Representatives, Seller must complete, sign and send to Escrow Agent an updated copy of this <u>Exhibit B-2</u> with such changes.  Any updated <u>Exhibit B-2</u> shall be effective once signed by Seller and Escrow Agent and shall entirely supersede and replace any prior <u>Exhibit B-2</u> attached to this Escrow Agreement or submitted to Escrow Agent.

**SELLER**

By: _____

Name:

Title:

Date:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By: _____

Name:

Title:

Date:

---

*Internal Use Only:*

☐   Updated details of Authorized Representatives completed in full

☐   Signed by a representative of Seller per relevant board resolutions/certificate of incumbency on file (if relevant).

☐   Call-back performed to Seller to confirm authenticity of updated <u>Exhibit B-2</u>:

Person Called:_____   Date of Call: _____   Time of Call: ____am/pm

Reviewed by (name):_____Signature: _____Date: _____

19



## EXHIBIT C

### Fees of Escrow Agent

**Acceptance Fee:**                                                                                    **Waived**

Initial Fees as they relate to Wilmington Trust, N.A. acting in the capacity of Escrow Agent – includes review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s).

**Escrow Agent Administration Fee:**                                                      **$4,500.00_**

This is an annual fee payable at the time of closing, and annually thereafter for ordinary administrative services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check processing); monitoring claim notices pursuant to the agreement; disbursement of funds in accordance with the agreement; and mailing of monthly trust account statements to all applicable parties.

*Wilmington Trust, N.A.'s fees are based on the following assumptions:*

- Number of Escrow Accounts to be established: One (1)
- Estimated Term of Escrow Agreement: TBD
- Investment of Escrow Property in: TBD

**Out-of-Pocket Expenses:**                                                              **Billed At Cost**

20

Exhibit H      -      Form of Lease

# LEASE AGREEMENT

**[1742 Square Associates, Ltd. / Trimmer Road Company, L.L.C.]**
**Landlord**

**AND**

**CAC ACQUISITIONS, LLC**
**Tenant**

**AT**

**[3 Washington Avenue**
**High Bridge, NJ**
**/**
**412 Trimmer Road**
**Califon, NJ]**

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** is made by and between [**1742 SQUARE ASSOCIATES, LTD.**, a New Jersey limited partnership / **TRIMMER ROAD COMPANY, L.L.C.**, a New Jersey limited liability company] ("Landlord") and **CAC ACQUISITIONS, LLC**, a Delaware limited liability company ("Tenant"), and is dated as of the date on which this Lease has been fully executed by Landlord and Tenant (the "Effective Date").

1. **Basic Lease Terms and Definitions**.

   (a)    **Land**: The lot or plot of land on which the Buildings are situated, with an address of [3 Washington Avenue, High Bridge, NJ 08829 / 412 Trimmer Road, Califon, NJ 07830].

   (b)    **Premises**: [The Land, each Building, all driveways, sidewalks, parking, loading and landscaped areas located on the Land, and all appurtenances pertaining thereto / The Building(s), together with the driveways, sidewalks, parking, loading and landscaped areas exclusively serving the Building(s), as shown on **Exhibit "A"** attached hereto.]

   (c)    **Building(s)**: The building (or buildings) located on the Land, as shown on **Exhibit "A"** attached hereto, consisting of an aggregate rentable square footage of [296,720 / 53,700][1].

   (d)    **Term**: [Sixty (60) months / thirty-six (36) months](plus any partial month from the Commencement Date until the first day of the next full calendar month during the Term). In the event that Tenant validly exercises any of the Renewal Options pursuant to Section 30 hereof, then all references herein to the "Term" shall be deemed to include the Renewal Terms (as applicable).

   (e)    **Commencement Date**: The Effective Date.

   (f)    **Expiration Date**: 11:59 p.m. on the last day of the Term.

   (g)    **Minimum Annual Rent**: Payable in monthly installments as follows:

| Period (in months) | Annual | Monthly |
|---|---|---|
| 1 – 12 | $651,487.04 | $54,290.59 |
| 13 – 24 | $684,061.39 | $57,005.12 |
| 25 – 36 | $718,264.46 | $59,855.37 |
| 37 – 48 | $754,177.68 | $62,848.14 |
| 49 – 60 | $791,886.57 | $65,990.55 |

| Period (in months) | Annual | Monthly |
|---|---|---|
| 1 – 12 | $396,562.12 | $33,046.84 |
| 13 – 24 | $416,390.23 | $34,699.19 |

---

[1]    Seller to provide.

| 25 – 36 | $437,209.74 | $36,434.14 |
|---------|-------------|------------|

(h)    Intentionally omitted.

(i)    **Tenant's Share**: [100% / ---%]² (also see Additional Definitions).

(j)    **Use**: Manufacturing, warehouse and distribution with appurtenant offices and any other lawful use.

(k)    Security Deposit: N/A

(l)    Guarantor: N/A

(m)    Addresses for Notices:

Landlord:                                    Tenant:

_____        c/o Trident Maritime Systems, LLC
_____        2011 Crystal Drive, Suite 1102
_____        Arlington, VA 22202
Attn: _____        Attn: Tom Eccles, Joe Mullen & Mike Bornak
Email:                                        Email: tom.eccles@tridentllc.com;
                                                        joe.mullen@tridentllc.com;
                                                        mike.bornak@tridentllc.com

(n)    **Additional Definitions**: See Rider for the definitions of other capitalized terms.

(o)    **Contents**: The following are attached to and made a part of this Lease:

| **Rider** | Additional Definitions |
|-----------|------------------------|
| **Exhibit "A"** | Premises Plan |
| **Exhibit "B"** | Rules and Regulations |
| **Exhibit "C"** | Permitted Hazardous Materials |
| **Exhibit "D"** | Form of SNDA |

**2.    Premises**. Landlord leases to Tenant and Tenant leases from Landlord the Premises. Tenant accepts the Premises "AS IS", without relying on any representation, covenant or warranty by Landlord other than as expressly set forth in this Lease. Notwithstanding the foregoing, upon the Commencement Date, Landlord, at Landlord's sole cost and expense, shall deliver all Building Systems in good working order; provided, however, that Landlord's obligations under this Section 2 shall exclude damages or defects to such items caused by Tenant and Tenant's Agents. Landlord and Tenant stipulate and agree

---

2    Seller to provide.

to the rentable square footage set forth in <u>Section 1</u> above without regard to actual measurement.

**3.  <u>Use</u>**. Tenant shall occupy and use the Premises only for the Use specified in <u>Section 1</u> above. Tenant may use all driveways, sidewalks, parking, loading and landscaped areas only for their intended purposes. Tenant shall have access to the Premises twenty-four (24) hours per day, three hundred sixty-five (365) days per year during the Term.

**4.  <u>Term; Possession</u>**. The Term of this Lease shall commence on the Commencement Date and shall end on the Expiration Date, unless sooner terminated in accordance with this Lease.

**5.  <u>Rent; Taxes</u>**. Tenant agrees to pay to Landlord, without demand, deduction or offset (except as expressly provided in this Lease), Minimum Annual Rent and all other amounts payable by Tenant to Landlord under this Lease during the Term. Tenant shall pay the Monthly Rent, in advance, on the first day of each calendar month during the Term, at Landlord's address designated in <u>Section 1</u> above or via ACH wire transfer to an account designated in writing by Landlord; provided that Monthly Rent for the first full month shall be paid at the signing of this Lease. If the Commencement Date is not the first day of the month, the Monthly Rent for that partial month shall be apportioned on a per diem basis and shall be paid on or before the Commencement Date. Tenant shall pay Landlord a service and handling charge equal to five percent (5%) of any Rent not paid within five (5) days after written notice from Landlord; provided, however, that Landlord shall not be required to provide such notice more than two (2) times in any twelve (12)-month period (and thereafter, such service and handling charge may be assessed by Landlord on any Rent not paid by Tenant within five (5) days after the date due). In addition, any Rent, including such charge, not paid within five (5) days after the due date will bear interest at the Interest Rate from the date due to the date paid. Tenant shall pay before delinquent all taxes levied or assessed upon, measured by, or arising from: (a) the conduct of Tenant's business; (b) Tenant's leasehold estate; or (c) Tenant's property and trade fixtures. Additionally, Tenant shall pay to Landlord all sales, use, transaction privilege, or other excise tax that may at any time be levied or imposed upon, or measured by, any amount payable by Tenant under this Lease.

**6.**  Intentionally omitted

**7.  <u>Utilities</u>**. Tenant shall pay for water, sewer, gas, electricity, heat, power, telephone and other communication services and any other utilities supplied to the Premises. Tenant shall obtain such utilities and services directly and in its own name and timely pay all charges directly to the provider. In the event that any meter serving the Premises is not functioning properly or during the period that such meter is being repaired, Tenant shall be responsible for its utility usage based upon Landlord's reasonable estimate. Notwithstanding anything to the contrary in this Lease, in the event that an interruption in utilities or services that Landlord is required to provide (an "Interruption") occurs, such that it renders the whole or any material portion of the Premises untenantable for the purposes intended hereunder and Tenant actually vacates such untenantable portion then after a period of five (5) consecutive days after receipt by Landlord of written notice of such untenantability from Tenant, the Monthly Rent shall abate (as to the proportion

that the square footage of the Premises actually vacated by Tenant as a result of an Interruption bears to the total square footage of the Premises) starting on the fourth (4th) day until the earlier to occur of the date that Tenant re-enters the Premises or the date that such Interruption is remedied. Notwithstanding anything to the contrary, Tenant shall waive and release Landlord from and against, all claims of rental abatement as provided above to the extent covered by Tenant's business interruption insurance.

8. **Insurance; Waivers; Indemnification**.

(a)    Landlord shall maintain insurance against loss or damage to each Building and other improvements at the Premises with coverage for perils as set forth under the "Causes of Loss-Special Form" or equivalent property insurance policy in an amount equal to the full insurable replacement cost of such Building and improvements (excluding coverage of Tenant's personal property and any Alterations by Tenant), and such other insurance, including rent loss coverage, as Landlord may reasonably deem appropriate or as any Mortgagee may require.

(b)    Tenant, at its expense, shall keep in effect (i) property insurance covering the replacement cost of all fixtures, furniture and equipment and other personal property installed in the Premises and (ii) commercial general liability insurance, including blanket contractual liability insurance, covering Tenant's use of the Premises, with such coverages and limits of liability as Landlord may reasonably require, but not less than a $1,000,000 combined single limit with a $3,000,000 general aggregate limit (which general aggregate limit may be satisfied by an umbrella liability policy) for bodily injury or property damage; however, such limits shall not limit Tenant's liability hereunder. The policy shall name Landlord and any other associated or affiliated entity as their interests may appear and at Landlord's request, any Mortgagee(s), as additional insureds, shall be written on an "occurrence" basis and not on a "claims made" basis and shall be endorsed to provide that it is primary to and not contributory to any policies carried by Landlord and to provide that notice of cancellation will be given in accordance with insurance policy terms and conditions. The insurer shall be authorized to issue such insurance, licensed to do business and admitted in the state in which the Premises is located and rated at least A VII in the most current edition of *Best's Insurance Reports*. Tenant shall deliver to Landlord on or before the Commencement Date or any earlier date on which Tenant accesses the Premises, and at least thirty (30) days prior to the date of each policy renewal, a certificate of insurance evidencing such coverage.

(c)    Landlord and Tenant each waive, and release each other from and against, all claims for recovery against the other for any loss or damage to the property of such party arising out of fire or other casualty coverable by a standard "Causes of Loss-Special Form" property insurance policy with, in the case of Tenant, such endorsements and additional coverages as are considered good business practice in Tenant's business, even if such loss or damage shall be brought about by the fault or negligence of the other party or its Agents; provided, however, such waiver by Landlord shall not be effective with respect to Tenant's liability described in Sections 9(b) and 10(d) below. This waiver and release is effective regardless of whether the releasing party actually maintains the insurance described above in this subsection and is not limited to the amount of insurance actually carried, or to the actual proceeds received after a loss. Each party shall have its

insurance company that issues its property coverage waive any rights of subrogation, and shall have the insurance company include an endorsement acknowledging this waiver, if necessary. Tenant assumes all risk of damage of Tenant's property within the Premises, including any loss or damage caused by water leakage, fire, windstorm, explosion, theft, act of any other tenant, or other cause.

(d)    Subject to subsection (c) above, and except to the extent caused by the gross negligence or willful misconduct of Landlord or its Agents, Tenant will indemnify, defend, and hold harmless Landlord and its Agents from and against any and all claims, actions, damages, liabilities and expenses (including fees of attorneys, investigators and experts) which may be asserted against, imposed upon, or incurred by Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether during or after the Term. Tenant's obligations pursuant to this subsection shall survive the expiration or termination of this Lease.

(e)    Subject to subsection (c) above, and except to the extent caused by the gross negligence or willful misconduct of Tenant or its Agents, Landlord will indemnify, defend, and hold harmless Tenant and its Agents from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) which may be asserted against, imposed upon, or incurred by Tenant or its Agents and arising out of or in connection with loss of life, personal injury or damage to property on or about the driveways, sidewalks, parking, loading and landscaped areas located on the Land, whether prior to, during or after the Term. Landlord's obligations pursuant to this subsection shall survive the expiration or termination of this Lease.

9.  **Maintenance and Repairs**.

(a)    Landlord, at Landlord's sole cost and expense, shall Maintain and, as necessary, replace: (i) each Building's footings, foundations, structural steel columns and girders at Landlord's sole expense; and (ii) each Building's roof and exterior walls. [Furthermore, Landlord shall Maintain and, as necessary, replace all driveways, sidewalks, parking, loading and landscaped areas and other common areas located on the Land which do not exclusively serve the Building(s) ("Common Area Charges"), and Tenant shall pay to Landlord, as additional Rent hereunder, Tenant's Share of such Common Area Charges within thirty (30) days after delivery of an invoice evidencing such charges to Tenant]. If Tenant becomes aware of any condition that is Landlord's responsibility to repair, Tenant shall promptly notify Landlord of the condition. Notwithstanding anything to the contrary herein, if it is necessary to replace the heating, ventilation and air conditioning system(s) exclusively serving the Premises (the "HVAC System"), and the need for such replacement is not due to the negligent acts or omissions of Tenant or Tenant's Agents (including but not limited to Tenant's failure to properly Maintain such HVAC System), Landlord shall replace such HVAC System and the cost thereof shall be amortized over such HVAC System's estimated useful life (consistent with GAAP) and Tenant shall, during the Term (and any extensions thereof), reimburse Landlord for such amounts monthly as additional Rent.

(b)      Except as provided in subsection (a) above, Tenant, at Tenant's sole cost and expense, shall Maintain the Premises, including, but not limited to, Building Systems, driveways, sidewalks, parking, loading and landscaped areas exclusively servicing the Premises, all lighting, plumbing fixtures, floors, walls, partitions, dock doors, loading areas, doors, windows, fixtures and equipment in or about the Premises. All repairs and replacements by Tenant shall utilize materials and equipment which are comparable to those originally used in constructing the Buildings and Premises. Alterations, repairs and replacements to the Premises made necessary because of Tenant's Alterations or installations, any use or circumstances special or particular to Tenant, or any act or omission of Tenant or its Agents shall be made by Landlord or Tenant as set forth above, but at the sole expense of Tenant to the extent not covered by any applicable insurance proceeds paid to Landlord.

**10. <u>Compliance</u>**.

(a)      As of the Commencement Date, the Premises shall be in compliance with all applicable Laws. Tenant will, at its expense, promptly comply with all Laws subsequently pertaining to the Premises or Tenant's use or occupancy and obtain all Permits necessary for Tenant's use, occupancy and/or business conducted at the Premises. Neither Tenant nor its Agents shall use the Premises in any manner that under any Law would require Landlord to make any Alteration to or in a Building or driveways, sidewalks, parking, loading and landscaped areas (without limiting the foregoing, Tenant shall not use the Premises in any manner that would cause the Premises to be deemed a "place of public accommodation" under the ADA if such use would require any such Alteration). Tenant shall be responsible for compliance with the ADA, and any other Laws regarding accessibility, with respect to Tenant's specific use and/or Alteration of the Premises. Except for Tenant's obligations set forth in this <u>Section 10(a)</u>, Landlord shall be responsible, at Landlord's sole cost and expense, for compliance with the ADA and any other Laws regarding accessibility to the Premises. Landlord represents and warrants to Tenant that, as of the Effective Date, it has not received any written notice from any governmental authority with respect to violations of the ADA.

(b)      Tenant will comply, and will cause its Agents to comply, with the Rules and Regulations attached to this Lease as **Exhibit "B"** as they may be amended from time to time.

(c)      Tenant agrees not to purposely do anything or fail to do anything which will increase the cost of Landlord's insurance or which will prevent Landlord from procuring policies (including public liability) from companies. If any breach of the preceding sentence by Tenant causes the rate of fire or other insurance to materially increase, Tenant shall pay the amount of such increase as additional Rent within thirty (30) days after being billed.

(d)      Landlord has disclosed that the Premises is the subject of an on-going remediation in compliance with ISRA (the "On-going Remediation") being conducted by Custom Alloy Corporation, a Delaware corporation and an affiliate of Landlord ("CAC"). As of the effective date of this Lease, Landlord shall be solely responsible for completing the remediation of the Premises in accordance with ISRA and for obtaining a Response

Action Outcome ("RAO") subject to the provisions in <u>Section 10(e)</u> below for (I) any area of concern being addressed in the On-going Remediation, and (II) for any additional areas of concern identified by Landlord that are not Tenant's Discharge Remediation Obligation (as defined below). Tenant agrees that (i) no activity will be conducted on the Premises that will use or produce any Hazardous Materials, except for activities which are part of the ordinary course of Tenant's business and are conducted in accordance with all Environmental Laws ("Permitted Activities"); (ii) the Premises will not be used for storage of any Hazardous Materials, except for materials used in the Permitted Activities which are properly stored in a manner and location complying with all Environmental Laws; (iii) no portion of the Premises will be used by Tenant or Tenant's Agents for disposal of Hazardous Materials in violation of any Environmental Laws; (iv) Tenant will deliver to Landlord copies of all Material Safety Data Sheets prepared by manufacturers, importers or suppliers of any chemical used by Tenant at the Premises; and (v) Tenant will promptly notify Landlord of any material violation by Tenant or Tenant's Agents of any Environmental Laws or the release or suspected release of Hazardous Materials in, under or about the Premises caused by Tenant, and Tenant shall promptly deliver to Landlord a copy of any written notice, filing or permit sent or received by Tenant with respect to the foregoing. For the avoidance of doubt, the use and storage of the substances listed on **Exhibit "C"** attached hereto (the "Permitted Hazardous Materials")[3], in the quantities set forth thereon, is permitted in accordance with this subsection (d) provided that (A) such use and storage is required as part of Tenant's business, (B) Tenant at all times complies with all Occupational Safety and Health Administration standards for flammable liquids (the "OSHA Standards") with respect to the storage and use thereof, including, but not limited to, storing all such Permitted Hazardous Materials in a non-flammable cabinet in the temperature controlled portion of the Premises (or as otherwise required pursuant to the OSHA Standards), and (C) the use and storage of the Permitted Hazardous Materials is otherwise conducted in accordance with all Environmental Laws.

(e)     Tenant hereby represents that its NAICS number is [---][4], which does subject the Premises and Tenant's operations at the Premises to ISRA. Landlord and Tenant expressly acknowledge and agree that Landlord shall be, and is hereby designated, the party responsible to comply with the requirements of ISRA that apply to the Premises prior to the Effective Date and any remedial obligations arising under applicable Environmental Laws prior to the Effective Date in order for a Licensed Site Remediation Professional ("LSRP") to issue a RAO pursuant to ISRA. Tenant shall, at its own cost and expense, at least sixty (60) days prior to "closing, terminating or transferring operations, or change in ownership" (as defined in ISRA) at or from the Premises or termination of this Lease, make all submissions to, provide all information to, and comply with all requirements of ISRA and the NJDEP in order for Tenant's LSRP to issue a RAO pursuant to ISRA. In the event investigation/remediation is required, Tenant shall be responsible for all investigation and remediation necessitated by Tenant's occupancy of the Premises, including pre-Effective Date environmental conditions which were exacerbated or dispersed by Tenant or Tenant's Agents ("<u>Tenant's Discharge Remediation Obligation</u>"). Landlord shall have the burden of proof to demonstrate that

---

3     Need a list covering all substances that might be used by Tenant at the Premises.

4     To be provided.

Tenant is responsible for a Tenant Discharge Remediation Obligation. Landlord shall be responsible for any pre-Effective Date environmental conditions and all investigation and remediation necessitated by such pre-Effective Date environmental conditions, except to the extent of Tenant's Discharge Remediation Obligation. For the avoidance of doubt, after the Effective Date Landlord shall, at its own cost and expense, file all necessary forms and comply with the requirements of ISRA: (i) as a result of Lease termination by Landlord; or (ii) by a proposed or actual sale or transfer of Landlord's interest in the Premises, even if it involves Tenant or a termination of this Lease in connection with a contract of sale. Landlord and Tenant agree to cooperate fully and in good faith to ensure ISRA compliance and to obtain all NJDEP approvals and LSRP approval, as the case may be, for the issuance of the RAO pursuant to ISRA. Such cooperation shall include the completion and execution of forms, affidavits and the like as required by NJDEP or by the LSRP, and any other assistance reasonably requested or necessary for the receipt of ISRA approval. Such designation and foregoing ISRA obligations shall remain in effect irrespective of any assignment of this Lease or sublease of any or all of the Premises. Tenant shall ensure that any sublease or assignment document makes such subtenant or assignee responsible for ISRA compliance with respect to such subtenant's or assignee's operations. In addition to the foregoing, after the Effective Date, Tenant shall, at Tenant's sole cost and expense, fully comply with ISRA with respect to Tenant's use and operations, including, but not limited to, any soil and/or groundwater remedial action permit application (as the party primarily responsible for compliance with the permit and establishment of all financial assurance required with respect to such permit) for ISRA compliance and shall indemnify, defend and hold Landlord harmless from and against any and all fines, suits, losses, damages, claims, costs and expenses (including reasonable attorneys' fees) or liabilities resulting from such violation and failure to comply with ISRA as a result of its operations. Notwithstanding the foregoing, Landlord shall, at Landlord's sole cost and expense, indemnify, defend and hold Tenant harmless from and against any and all fines, suits, losses, damages, claims, costs and expenses (including reasonable attorneys' fees) or liabilities resulting from any pre-Effective Date violation of ISRA at the Premises or the use of, or operations by, CAC at the Premises failing to comply with ISRA or applicable Environmental Laws prior to the Effective Date.

(f)     If at any time during or after the Term, any portion of the Premises is found to be contaminated as a result of Tenant's operations or Tenant's Agents' operations, or subject to conditions prohibited in this Lease caused by Tenant or Tenant's Agents, Tenant will indemnify, defend and hold Landlord harmless from all losses, claims, demands, actions, liabilities, costs and expenses (including reasonable attorneys' fees), damages and obligations of any nature solely to the extent arising from or as a result thereof. Landlord will indemnify, defend and hold Tenant harmless from all losses, claims, demands, actions, liabilities, costs and expenses (including reasonable attorneys' fees), damages and obligations of any nature incurred by Tenant (i) as a result of any Hazardous Materials that have been released or emitted within the Premises or violations of Environmental Laws either (1) prior to the Effective Date, or (2) by Landlord or Landlord's Agents at any time before, during or after the Lease Term. In the event of any enforcement, clean-up or other regulatory action mandated by any governmental authority with respect to any violation of Environmental Laws prior to the Effective Date, or the presence of Hazardous Materials in, upon, or about the Premises and the violation

of Environmental Laws or the presence of such Hazardous Materials was not caused or exacerbated by Tenant or Tenant's Agents, then Landlord shall be responsible for such compliance to the extent required by applicable Environmental Laws, at Landlord's sole cost and expense.

(g)    From and after the Effective Date, the Tenant agrees that the Landlord and its Agents may access and enter the Premises as reasonably necessary for the Landlord and/or CAC to complete its ISRA obligations hereunder. Notwithstanding the foregoing, Landlord will provide Tenant with not less than forty-eight (48) hours' prior written notice of such requested access (including expected duration of access), except that notice shall not be required for consecutive days relating to the same phase of work. Tenant shall use commercially reasonable efforts to accommodate any such requested access. Landlord shall not to inconvenience Tenant or interfere with Tenant's business operations or activities at the Premises in exercising such rights, and shall use best efforts not to disrupt Tenant's business operations or activities at the Premises in connection with such access. Landlord shall, at Landlord's sole cost and expense, repair any resulting damage from any remedial work made in connection with its access and entry hereunder, and will promptly restore the Premises to the condition existing prior to the commencement of such remedial work. The parties' obligations pursuant to Sections 10(d)-(g) hereof shall survive the expiration or termination of this Lease.

11. **Signs**. Tenant shall not place any signs on the Premises without the prior consent of Landlord, such consent not to be unreasonably withheld, conditioned or delayed, other than signs that are located wholly within the interior of a Building and not visible from the exterior of a Building. Tenant shall maintain all signs installed by Tenant in good condition. Tenant shall remove its signs at the termination of this Lease, shall repair any resulting damage, and shall restore the Premises to its condition existing prior to the installation of Tenant's signs, reasonable wear and tear accepted.

12. **Alterations**. Except for non-structural Alterations that (i) do not exceed Two Hundred Fifty Thousand Dollars ($250,000) in any one instance, (ii) are not visible from the exterior of any Building, (iii) do not affect any Building System or the structural strength of any Building, (iv) do not require penetrations into the floor, roof, ceiling or walls, and (v) do not require work on the roof or within the walls, below the floor or above the ceiling, Tenant shall not make or permit any Alterations in or to the Premises without first obtaining Landlord's consent, which consent shall not be unreasonably withheld. With respect to any Alterations that do not require Landlord's consent, Tenant shall nonetheless provide written notice thereof to Landlord, describing in reasonable detail the nature of the Alteration. With respect to any Alterations made by or on behalf of Tenant (whether or not the Alteration requires Landlord's consent): (i) not less than ten (10) days prior to commencing any Alteration, Tenant shall deliver to Landlord the plans, specifications and necessary permits for the Alteration, together with certificates evidencing that Tenant's contractors and subcontractors have adequate insurance coverage naming Landlord and any other associated or affiliated entity as their interests may appear as additional insureds, (ii) Tenant shall obtain Landlord's prior written approval of any contractor or subcontractor, such approval not to be unreasonably withheld, conditioned or delayed, and (iii) the Alteration shall be constructed with new materials, in a good and workmanlike manner, and in compliance with all Laws and the plans and specifications delivered to,

and, if required above, approved by Landlord (such approval to be provided within five (5) business days of Tenant's request thereof, and Landlord's failure to timely respond to such request shall be deemed Landlord's approval of such plans and specifications). Any Alteration by Tenant shall be the property of Tenant until the expiration or termination of this Lease; at that time without payment by Landlord the Alteration shall remain in the Building and become the property of Landlord unless Landlord gives notice to Tenant to remove it, in which event Tenant will remove it, will repair any resulting damage and will restore the Premises to the condition existing prior to Tenant's Alteration, reasonable wear and tear excepted. At Tenant's request prior to Tenant making any Alterations, Landlord will notify Tenant whether Tenant is required to remove the Alterations at the expiration or termination of this Lease. Tenant may install its trade fixtures, furniture and equipment in any Building, provided that the installation and removal of them will not affect any structural portion of such Building, any Building System or any other equipment or facilities serving such Building.

**13. Mechanics' Liens**. Tenant shall pay promptly for any labor, services, materials, supplies or equipment furnished to Tenant in or about the Premises. Tenant shall keep the Premises free from any liens arising out of any labor, services, materials, supplies or equipment furnished or alleged to have been furnished to Tenant. Tenant shall take all steps permitted by law in order to avoid the imposition of any such lien. Should any such lien or notice of such lien be filed against the Premises, Tenant shall discharge the same by bonding or otherwise within forty-five (45) days after Tenant has notice that the lien or claim is filed regardless of the validity of such lien or claim.

**14. Landlord's Right of Entry**. Tenant shall permit Landlord and its Agents to enter the Premises at all reasonable times following reasonable prior written notice of at least forty-eight (48) hours (except in an emergency or during the existence of an Event of Default, in which case Landlord and its Agents may enter at any time and notice shall not be required) to Maintain or make Alterations to the Premises, to perform its remediation obligations pursuant to Section 10 hereof, to exhibit the Premises for the purpose of sale or financing, and, during the last six (6) months of the Term, to exhibit the Premises to any prospective tenant. Landlord shall not to inconvenience Tenant or interfere with Tenant's business operations or activities at the Premises in exercising such rights, and shall use best efforts not to disrupt Tenant's business operations or activities at the Premises in connection therewith. Tenant may, from time to time, designate certain areas of the Premises as a secured area (the "Secured Area"), which may include technology rooms and primary computer equipment rooms, data rooms, so called "war rooms," vaults and safety deposit box rooms or the like. Tenant may protect access to any Secured Area, and any Secured Area shall be unavailable to Landlord except if accompanied by Tenant's representative.

**15. Damage by Fire or Other Casualty**. If the Premises shall be damaged or destroyed by fire or other casualty, Tenant shall promptly notify Landlord, and Landlord, subject to the conditions set forth in this Section, shall repair such damage and restore the Premises to substantially the same condition in which they were immediately prior to such damage or destruction, but not including the repair, restoration or replacement of the fixtures, equipment, or Alterations installed by or on behalf of Tenant. Landlord shall notify Tenant, within thirty (30) days after the date of the casualty, if Landlord anticipates that the

restoration will take more than one hundred eighty (180) days from the date of the casualty to complete; in such event, either Landlord or Tenant (unless the damage was caused by Tenant or Tenant's Agents) may terminate this Lease effective as of the date of casualty by giving notice to the other within ten (10) days after Landlord's notice. If a casualty occurs during the last twelve (12) months of the Term, Landlord may terminate this Lease unless Tenant has the right to extend the Term for at least three (3) more years and does so within thirty (30) days after the date of the casualty. If the Premises shall be damaged or destroyed as a result, in whole or in part, of the negligence of Tenant or Tenant's Agents, Tenant shall repair and restore the Premises within one hundred eighty (180) days from the date of the casualty. In the event the repair or restoration is not substantially completed (such that Tenant may use and occupy the Premises in substantially the same manner as existed prior to the casualty or becomes, in the Landlord's reasonable opinion, tenantable) by the date which is one hundred eighty (180) days from the date of the casualty, Landlord may thereafter terminate this Lease upon written notice to Tenant prior to substantial completion of such repair or restoration, in which event this Lease shall terminate on the date which is thirty (30) days after Tenant's receipt of such termination notice. Tenant will receive an abatement of Minimum Annual Rent to the extent the Premises are rendered untenantable as a result of the casualty, except if caused by the negligence of Tenant or Tenant's Agents and not covered by Landlord's insurance proceeds. In the event the repair or restoration is not substantially completed (such that Tenant may use and occupy the Premises in substantially the same manner as existed prior to the casualty) by the date which is one hundred eighty (180) days from the date of the casualty, Tenant may thereafter terminate this Lease upon written notice to Landlord prior to substantial completion of such repair or restoration, in which event this Lease shall terminate on the date which is thirty (30) days after Landlord's receipt of such termination notice (the "Casualty Termination Date"), unless the repair or restoration is substantially completed prior to the Casualty Termination Date.

**16. <u>Condemnation</u>**. If (a) all of the Premises are Taken, (b) any part of the Premises is Taken and the remainder is insufficient in Tenant's reasonable opinion for the operation of Tenant's business, or (c) any of the Premises is Taken, and, in Landlord's opinion, it would be impractical or the condemnation proceeds are insufficient to restore the remainder, then this Lease shall terminate as of the date the condemning authority takes possession. If this Lease is not terminated, Landlord shall restore the Premises to a condition as near as reasonably possible to the condition prior to the Taking, the Minimum Annual Rent shall be abated for the period of time all or a part of the Premises is untenantable in proportion that such rentable square foot area that is untenantable bears to the rentable square footage of the Premises, and this Lease shall be amended appropriately. The compensation awarded for a Taking shall belong to Landlord, except that Tenant shall be entitled to independently pursue a separate award against the condemning authority relating to the loss of, or damage to, Tenant's personal property and trade fixtures and Tenant's relocation costs directly associated with the Taking, and the loss of goodwill. Except as set forth in the preceding sentence, Tenant hereby assigns all claims against the condemning authority to Landlord, including, but not limited to, any claim relating to Tenant's leasehold estate. Notwithstanding the foregoing, Landlord shall not be obligated to pursue those assigned claims.

**17. Quiet Enjoyment**. Landlord covenants that Tenant, upon performing all of its covenants, agreements and conditions of this Lease, shall have quiet and peaceful possession of the Premises as against anyone claiming by or through Landlord, subject, however, to the terms of this Lease.

**18. Assignment and Subletting**.

(a)    Except as provided in subsection (b) below, Tenant shall not enter into nor permit any Transfer voluntarily or by operation of law, without the prior consent of Landlord, which consent shall not be unreasonably withheld. Without limitation, Tenant agrees that Landlord's consent shall not be considered unreasonably withheld if (i) the business, business reputation or creditworthiness of the proposed transferee is unacceptable to Landlord, (ii) Landlord has comparable space available for lease by the proposed transferee and Landlord has communicated with such proposed transferee with respect to leasing space within the Property within the previous twelve (12) months, or (iii) there is an Event of Default has occurred and is continuing. Consent to one Transfer shall not be deemed to be consent to any subsequent Transfer. In no event shall any Transfer relieve Tenant from any obligation under this Lease. Landlord's acceptance of Rent from any person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any Transfer. Any Transfer not in conformity with this Section 18 shall be void at the option of Landlord.

(b)    Landlord's consent shall not be required in the event of any Transfer by Tenant to an Affiliate provided that (i) the Affiliate has a tangible net worth at least equal to that of Tenant as of the date of this Lease, (ii) Tenant provides Landlord notice of the Transfer, and (iii) in the case of an assignment or sublease, Tenant delivers to Landlord an assumption agreement or sublease reasonably acceptable to Landlord executed by Tenant and the Affiliate, together with a certificate of insurance evidencing the Affiliate's compliance with the insurance requirements of Tenant under this Lease.

(c)    The provisions of subsection (a) above notwithstanding, if Tenant proposes to Transfer all of the Premises (other than to an Affiliate) for the balance of the Term, Landlord may terminate this Lease, either conditioned on execution of a new lease between Landlord and the proposed transferee or without that condition. If Tenant proposes to enter into a Transfer of less than all of the Premises (other than to an Affiliate), Landlord may amend this Lease to remove the portion of the Premises to be transferred, either conditioned on execution of a new lease between Landlord and the proposed transferee or without that condition.

(d)    If Tenant requests Landlord's consent to a Transfer, Tenant shall provide Landlord, at least fifteen (15) days prior to the proposed Transfer, current financial statements of the transferee certified by an executive officer of the transferee, a complete copy of the proposed Transfer documents, and any other information Landlord reasonably requests. Immediately following any approved assignment or sublease, Tenant shall deliver to Landlord an assumption agreement reasonably acceptable to Landlord executed by Tenant and the transferee, together with a certificate of insurance evidencing the transferee's compliance with the insurance requirements of Tenant under this Lease. Tenant agrees to reimburse Landlord for reasonable administrative and attorneys' fees in

connection with the processing and documentation of any Transfer for which Landlord's consent is requested, not to exceed $2,500.

(e)    Notwithstanding anything contained herein to the contrary, Landlord's consent shall not be required for the occupancy of the Premises by any customer of Tenant; provided, however, that all such customers shall not occupy more than 50% of the Premises in the aggregate.

**19. Subordination**.

(a)    Tenant accepts this Lease subject and subordinate to any Mortgage now or in the future affecting the Premises, provided that Tenant's right of possession of the Premises shall not be disturbed by the Mortgagee so long as there is no Event of Default under this Lease. This clause shall be self-operative, but within thirty (30) days after request, Tenant shall execute and deliver any further instruments confirming the subordination of this Lease and any further instruments of attornment that the Mortgagee may reasonably request; provided that Tenant's right of possession of the Premises shall not be disturbed by the Mortgagee so long as there is no Event of Default under this Lease and that Landlord delivers a subordination, non-disturbance and attornment agreement ("SNDA") with respect to the current Mortgage, or with respect to any future Mortgage, prior to such Mortgage affecting the Property, which form shall be on such lender's standard form, including customary qualifications and limitations for Tenant's benefit. So long as Landlord's obligations under the prior sentence have been satisfied, but within thirty (30) days after request, Tenant shall execute and deliver any further commercially reasonable instruments confirming the subordination of this Lease and any further commercially reasonable instruments of attornment that the Mortgagee may reasonably request. However, any Mortgagee may at any time subordinate its Mortgage to this Lease, without Tenant's consent, by giving notice to Tenant, and this Lease shall then be deemed prior to such Mortgage without regard to their respective dates of execution and delivery; provided that such subordination shall not affect any Mortgagee's rights with respect to condemnation awards, casualty insurance proceeds, intervening liens or any right which shall arise between the recording of such Mortgage and the execution of this Lease. Upon Tenant's request, Landlord agrees to use commercially reasonable efforts, at no cost to Landlord, to obtain a SNDA for the benefit of Tenant from any Mortgagee on the standard form of such Mortgagee[, the form of which is attached hereto as Exhibit "D"]. As of the date of this Lease, Landlord represents and warrants to Tenant that [the existing Mortgagee is [---], pursuant to that certain [---] recorded [---] in the land records of Hunterdon County, New Jersey / no Mortgage encumbers the Land].

(b)    Provided there is no Event of Default at the time of Tenant's request and at the time of the execution of such agreement, Landlord agrees to execute, from time to time after receipt of Tenant's written request therefor, an agreement subordinating Landlord's lien in Tenant's personal property, furniture, fixtures, equipment and other assets in form and substance reasonably acceptable to Landlord and Tenant.

**20. Tenant's Certificate**. Within thirty (30) days after Landlord's request from time to time but not more than once during a calendar year (except in the event of a sale or refinancing of the Building), Tenant shall execute and deliver to Landlord, for the benefit of Landlord,

Mortgagee, any prospective Mortgagee, and any prospective purchaser of Landlord's interest in the Premises, an estoppel certificate in a form reasonably requested by Landlord, modified as necessary to accurately state the facts represented.

21. **Surrender**.

    (a)    On the date on which this Lease expires or terminates, Tenant shall return possession of the Premises to Landlord in the condition that existed as of the Commencement Date, except for ordinary wear and tear and casualty damage or other conditions that Tenant is not required to remedy under this Lease. Prior to the expiration or termination of this Lease, Tenant shall remove from the Premises all furniture, trade fixtures, equipment, wiring and cabling (unless Landlord directs Tenant otherwise), and all other personal property installed by Tenant or its assignees or subtenants. Tenant shall repair any damage resulting from such removal and shall restore the Premises to good order and condition. Any of Tenant's personal property not removed as required shall be deemed abandoned, and Landlord, at Tenant's expense, may remove, store, sell or otherwise dispose of such property in such manner as Landlord may see fit and/or Landlord may retain such property or sale proceeds as its property. If Tenant does not return possession of the Premises to Landlord in the condition required under this Lease, Tenant shall pay Landlord all resulting damages Landlord may suffer.

    (b)    If Tenant remains in possession of the Premises after the expiration or termination of this Lease, Tenant's occupancy of the Premises shall be that of a month-to-month tenancy. Tenant's occupancy during any holdover period shall otherwise be subject to the provisions of this Lease (unless clearly inapplicable), except that for the first (1st) ninety (90) days of any holdover, the Minimum Annual Rent shall be 125% of the Minimum Annual Rent payable for the last full month immediately preceding the holdover, and thereafter, the Minimum Annual Rent shall be 150% of the Minimum Annual Rent payable for the last full month immediately preceding the holdover. No holdover or payment by Tenant after the expiration or termination of this Lease shall operate to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. Tenant shall not be liable for any damages (including reasonable attorneys' fees and expenses) of whatever type (including consequential damages) incurred by Landlord as a result of such holding over unless such holdover exceeds sixty (60) days (for the avoidance of doubt, Tenant shall nonetheless be required to pay holdover rent in accordance with this subsection (b) during such period); provided, however, Tenant shall not liable for consequential damages unless Landlord provides at least ten (10) days' prior written notice to Tenant of such potential consequential damages. If Landlord and Tenant are in good faith negotiations to renew the Term of the Lease past the Expiration Date, then it shall be deemed that Landlord has consented to any Tenant holdover and Tenant shall continue to pay the Minimum Annual Rent then being paid upon the expiration of the Term until such renewal agreement is executed.

22. **Defaults - Remedies**.

    (a)    It shall be an Event of Default:

(i)      If Tenant does not pay in full when due any and all Rent and, except as provided in Section 22(c) below, Tenant fails to cure such default on or before the date that is five (5) business days after Landlord gives Tenant notice of default;

(ii)     If Tenant enters into or permits any Transfer in violation of Section 18 above;

(iii)    If Tenant fails to observe and perform or otherwise breaches any other provision of this Lease, and, except as provided in Section 22(c) below, Tenant fails to cure the default on or before the date that is thirty (30) days after Landlord gives Tenant notice of default; provided, however, if the default cannot reasonably be cured within thirty (30) days following Landlord's giving of notice, Tenant shall be afforded additional reasonable time (not to exceed ninety (90) days) to cure the default if Tenant begins to cure the default within thirty (30) days following Landlord's notice and continues diligently in good faith to completely cure the default; or

(iv)     If Tenant becomes insolvent or makes a general assignment for the benefit of creditors or offers a settlement to creditors, or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal or state law is filed by or against Tenant, or a bill in equity or other proceeding for the appointment of a receiver for any of Tenant's assets is commenced, or if any of the real or personal property of Tenant shall be levied upon; provided that any proceeding brought by anyone other than Landlord or Tenant under any bankruptcy, insolvency, receivership or similar law shall not constitute an Event of Default until such proceeding has continued unstayed for more than sixty (60) consecutive days.

(b)      If an Event of Default occurs, Landlord shall have the following rights and remedies:

(i)      Landlord, without any obligation to do so, may elect to cure the default on behalf of Tenant, in which event Tenant shall reimburse Landlord upon demand for any sums paid or costs incurred by Landlord (together with the Administrative Fee) in curing the default, plus interest at the Interest Rate from the respective dates of Landlord's incurring such costs, which sums and costs together with interest at the Interest Rate shall be deemed additional Rent;

(ii)     To enter and repossess the Premises, by lawful means, and remove all persons and all or any property, by action at law or otherwise, without being liable for prosecution or damages. Landlord may, at Landlord's option, make Alterations and repairs in order to re-let the Premises and re-let all or any part(s) of the Premises for Tenant's account. Tenant agrees to pay to Landlord on demand any deficiency (taking into account all costs incurred by Landlord) that may arise by reason of such re-letting. In the event of re-letting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease for such previous breach;

(iii)    To terminate this Lease and the Term and recover from Tenant, in addition to any other remedies permitted at law or in equity (but subject to any limitations on such other remedies expressly set forth herein): (1) the worth, at the time of the award,

of the unpaid Rent which had been earned at the time this Lease is terminated; plus (2) the worth, at the time of the award, of the amount by which the unpaid Rent which would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of rents that Tenant proves could be reasonably avoided; plus (3) the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus (4) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. As used in this subsection (iv), "worth at the time of award" shall be computed by discounting such amount at the Discounting Rate. As used herein, the term "Discounting Rate" means the lesser of (i) the "prime rate" or "reference rate" announced from time to time by Bank of America, N.A. (or such reasonable comparable national banking institution as is selected by Landlord in the event Bank of America, N.A. ceases to publish a prime rate or reference rate), plus one percent (1%), or (ii) the maximum rate permitted by Law; and

(iv)     To terminate this Lease and the Term without any right on the part of Tenant to save the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken.

(c)     Any provision to the contrary in this Section 22 notwithstanding, (i) Landlord shall not be required to give Tenant the notice and opportunity to cure provided in Sections 22(a)(i) or (iii) (with respect to the same recurring default thereunder) above more than twice in any consecutive twelve (12)-month period, and thereafter Landlord may declare an Event of Default without affording Tenant any of the notice and cure rights provided under this Lease, and (ii) Landlord shall not be required to give such notice prior to exercising its rights under Section 22(b) in an emergency or if (1) Tenant fails to comply with the provisions of Sections 13, 20 or 28, (2) Landlord has delivered any such notice required under such Sections to Tenant in accordance with the express terms thereof and Tenant is in receipt of such notice, and (3) with respect to Section 20 only, Tenant fails to comply with the provisions of such Section 20 within five (5) days after Landlord provides Tenant with a reminder notice (which may be sent via electronic mail to Tenant or Tenant's attorney) regarding such failure.

(d)     No waiver by Landlord of any breach by Tenant shall be a waiver of any subsequent breach, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to such or any subsequent breach. Efforts by Landlord to mitigate the damages caused by Tenant's default shall not constitute a waiver of Landlord's right to recover damages hereunder. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the total amount due Landlord under this Lease shall be deemed to be other than on account, nor shall any endorsement or statement on any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or

payment without prejudice to Landlord's right to recover the balance of Rent due, or Landlord's right to pursue any other available remedy.

(e)     If either party commences an action against the other party arising out of or in connection with this Lease, the prevailing party shall be entitled to have and recover from the other party attorneys' fees, costs of suit, investigation expenses and discovery costs, including costs of appeal.

(f)     Landlord and Tenant waive the right to a trial by jury in any action or proceeding based upon or related to, the subject matter of this Lease

(g)     Landlord shall use commercially reasonable efforts to relet the Premises following Tenant's vacation of the Premises and Tenant's returning the Premises to the condition required at the time of the expiration of this Lease and to otherwise mitigate Landlord's damages under this Lease; provided, however, that Landlord shall be under no duty to market or relet the Premises prior to leasing other available space in the Building and, in no event shall Landlord be responsible or liable for any failure to relet the Premises or any part thereof, or for any failure to collect any rent due upon a reletting.

(h)     Except as set forth in <u>Sections 10 and 21</u> of this Lease, in no event shall Tenant be liable to Landlord for any loss of business or profits of Landlord or for consequential, punitive or special damages of any kind.

**23.** **Tenant's Authority**. Tenant represents and warrants to Landlord that Tenant is duly formed, validly existing and in good standing under the laws of the state under which Tenant is organized, and qualified to do business in the state in which the Premises is located, and the person(s) signing this Lease are duly authorized to execute and deliver this Lease on behalf of Tenant.

**24.** **Liability of Landlord**. The word "**Landlord**" in this Lease includes the Landlord executing this Lease as well as its successors and assigns, each of which shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this Lease as Landlord. Any such person or entity, whether or not named in this Lease, shall have no liability under this Lease after it ceases to hold title to the Premises except for obligations already accrued. Tenant shall look solely to Landlord's successor in interest for the performance of the covenants and obligations of the Landlord hereunder which subsequently accrue. Landlord shall not be deemed to be in default under this Lease for a failure to observe or perform any of its obligations under this Lease (including, without limitation, Landlord's obligations under <u>Section 10</u>), unless Landlord fails to cure such default on or before the date that is thirty (30) days after Landlord receives written notice from Tenant of such default (unless another time-period is expressly set forth in this Lease with respect to such failure, in which case such time-period shall control). If Landlord fails to take or commence to take (and diligently pursue to completion) the required curative action within such time-period, then Tenant may, subject to the terms of this Section, cure such default. Landlord shall reimburse Tenant for Tenant's costs and expenses in taking such curative action, together with a fee in the amount of fifteen percent (15%) of the costs incurred by Tenant in curing Landlord's default or performing Landlord's obligations hereunder, within thirty (30) days after receiving an invoice from

Tenant for such costs and expenses. Any repairs made by Tenant pursuant to this Section shall be in accordance with all Laws. If Landlord fails to reimburse Tenant for such costs, expenses and fee within such thirty (30)-day period, then Tenant may offset (on a dollar-for-dollar basis) such costs against the next installment(s) of Minimum Annual Rent until reimbursed in full and such offset installments shall not be subject to the late payment provisions set forth in <u>Section 5</u> hereof; provided, however that the maximum monthly offset shall not exceed fifty percent (50%) of the monthly installment of Minimum Annual Rent then payable hereunder. Neither Landlord nor any principal of Landlord nor any owner of the Premises, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Lease or the Premises; Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of any claim by Tenant against Landlord.

**25. <u>Miscellaneous</u>**.

(a)    The captions in this Lease are for convenience only, are not a part of this Lease and do not in any way define, limit, describe or amplify the terms of this Lease.

(b)    This Lease represents the entire agreement between the parties hereto and there are no collateral or oral agreements or understandings between Landlord and Tenant with respect to the Premises. No rights, easements or licenses are acquired in the Premises or any land adjacent to the Premises by Tenant by implication or otherwise except as expressly set forth in this Lease. This Lease shall not be modified in any manner except by an instrument in writing executed by the parties. The masculine (or neuter) pronoun and the singular number shall include the masculine, feminine and neuter genders and the singular and plural number. The word "including" followed by any specific item(s) is deemed to refer to examples rather than to be words of limitation. The word "person" includes a natural person, a partnership, a corporation, a limited liability company, an association and any other form of business association or entity. Both parties having participated fully and equally in the negotiation and preparation of this Lease, this Lease shall not be more strictly construed, nor any ambiguities in this Lease resolved, against either Landlord or Tenant.

(c)    Each covenant, agreement, obligation, term, condition or other provision contained in this Lease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making the same, not dependent on any other provision of this Lease unless otherwise expressly provided. All of the terms and conditions set forth in this Lease shall apply throughout the Term unless otherwise expressly set forth herein.

(d)    If any provisions of this Lease shall be declared unenforceable in any respect, such unenforceability shall not affect any other provision of this Lease, and each such provision shall be deemed to be modified, if possible, in such a manner as to render it enforceable and to preserve to the extent possible the intent of the parties as set forth herein. This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises is located.

(e)      This Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives and permitted successors and assigns. All persons liable for the obligations of Tenant under this Lease shall be jointly and severally liable for such obligations.

(f)      Landlord represents and warrants to Tenant that Landlord has obtained all required lender and third-party consents to enter into this Lease.

**26. Notices**. Any notice, consent or other communication under this Lease shall be in writing and addressed to Landlord or Tenant at their respective addresses specified in Section 1 above (or to such other address as either may designate by notice to the other) with a copy to any Mortgagee or other party designated by Landlord. Each notice or other communication shall be deemed given if sent by prepaid overnight delivery service or by certified mail, return receipt requested, postage prepaid or in any other manner, with delivery in any case evidenced by a receipt, and shall be deemed to have been given on the day of actual delivery to the intended recipient or on the business day delivery is refused. The giving of notice by Landlord's attorneys, representatives and agents under this Section shall be deemed to be the acts of Landlord.

**27. Force Majeure**. Except for Tenant's obligation to pay Rent and other charges as set forth in this Lease, the period of time during which Landlord or Tenant is prevented from performing any act required to be performed under this Lease by reason of Force Majeure shall be added to the time for performance of such act.

**28. Broker**. Landlord and Tenant represent and warrant to each other that each has dealt with no broker, agent, or other intermediary in connection with this Lease, and that insofar as each knows, no broker, agent or other intermediary negotiated this Lease. Landlord and Tenant agree to indemnify, defend and hold each other and the other's affiliates, partners, members, employees, agents, their partners, members, shareholders, directors, officers and trustees harmless from and against any claims made by any broker, agent or other intermediary with respect to a claim for any broker's commission or fee or similar compensation brought by any person in connection with this Lease, provided that the other party has not in fact retained such broker, agent, or other intermediary.

**29. OFAC**. Tenant represents and warrants that neither it nor any of its officers or directors is, and that, to the actual knowledge of the signatory to this Lease, none of its employees, representatives, or agents is, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental regulation, and that it will not transfer this Lease to, or knowingly contract with or otherwise engage in any dealings or transactions or be otherwise associated with such persons or entities. Tenant represents and warrants that it is currently in compliance with, and shall at all times during the term of this Lease remain in compliance with, the regulations of OFAC and any other governmental requirement relating thereto. Landlord represents and warrants to Tenant, that Landlord is (a) not currently identified on OFAC's

Specially Designated and Blocked Persons List and/or on any other similar list, (b) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation or Executive Order of the President of the United States, and (c) not an "Embargoed Person."

30. **Renewal Options.** Tenant shall have the option to extend the Term for two (2) additional periods of five (5) years each (each a "Renewal Option"), under and subject to the following terms and conditions:

(a)    The first renewal term ("First Renewal Term") shall be for a five (5)-year period commencing on the day immediately following the expiration date of the initial Term of the Lease and expiring on the day immediately preceding the fifth (5th) anniversary thereof. The second renewal term ("Second Renewal Term") shall be for a five (5)-year period commencing on the day immediately following the expiration date of the First Renewal Term and expiring on the day immediately preceding the fifth (5th) anniversary thereof. Collectively, the First Renewal Term and the Second Renewal Term are referred to as the "Renewal Terms".

(b)    Tenant must exercise the Renewal Option for the First Renewal Term, if at all, by written notice to Landlord delivered at least one hundred eighty (180) days prior to the expiration date of the initial Term of the Lease, time being of the essence. If Tenant fails to exercise the Renewal Option for the First Renewal Term, the Renewal Option for the Second Renewal Term shall be void and of no further force and effect. Tenant must exercise the Renewal Option for the Second Renewal Term, if at all, by written notice to Landlord delivered at least one hundred eighty (180) days prior to the expiration date of the First Renewal Term, time being of the essence.

(c)    As a condition to Tenant's exercise of either of the Renewal Options, at the time Tenant delivers its notice of election to exercise such Renewal Option to Landlord, there shall be no Event of Default, the Lease shall be in full force and effect, and Tenant shall not have assigned the Lease or sublet the Premises.

(d)    The Minimum Annual Rent for the initial year of the First Renewal Term shall be equal to one hundred five percent (105%) of the Minimum Annual Rent payable during the last year of the initial Term of the Lease, increasing annually thereafter by five percent (5%) for each subsequent year during the First Renewal Term. The Minimum Annual Rent for the initial year of the Second Renewal Term shall be equal to one hundred five percent (105%) of the Minimum Annual Rent payable during the last year of the First Renewal Term, increasing annually thereafter by five percent (5%) for each subsequent year during the Second Renewal Term.

(e)    Except as set forth in this Section 30, (i) there shall be no further options to extend the Term of the Lease, and (ii) all terms and conditions of the Lease shall remain in full force and effect during the Renewal Terms, without change.

/

**31.** **Renewal Options.** Tenant shall have the option to extend the Term for five (5) additional periods of one (1) year each (each a "Renewal Option"), under and subject to the following terms and conditions:

(a)     The first renewal term ("First Renewal Term") shall be for a one (1)-year period commencing on the day immediately following the expiration date of the initial Term of the Lease and expiring on the day immediately preceding the first (1st) anniversary thereof, and each subsequent renewal term (together with the First Renewal Term, each a "Renewal Term", and collectively, the "Renewal Terms") shall be for a one (1)-year period commencing on the day immediately following the expiration date of the expiring Renewal Term and expiring on the day immediately preceding the first (1st) anniversary thereof.

(b)     Tenant must exercise its Renewal Option for any Renewal Term, if at all, by written notice to Landlord delivered at least one hundred eighty (180) days prior to the expiration date of the initial Term of the Lease or the expiring Renewal Term, as applicable, time being of the essence (the "Renewal Notice"). If Tenant fails to exercise a Renewal Option for a particular Renewal Term, the Renewal Option for the remaining Renewal Terms shall be void and of no further force and effect.

(c)     As a condition to Tenant's exercise of either of the Renewal Options, at the time Tenant delivers its notice of election to exercise such Renewal Option to Landlord, there shall be no Event of Default, the Lease shall be in full force and effect, and Tenant shall not have assigned the Lease or sublet the Premises.

(d)     The Minimum Annual Rent for the First Renewal Term shall be the then current fair market rent for renewals for comparable space in similar buildings in the general market area in which the Premises is located (taking into account all relative factors), and the Minimum Annual Rent for each subsequent Renewal Term shall be equal to one hundred five percent (105%) of the Minimum Annual Rent payable during the expiring Renewal Term (the "Fair Market Rent"). Landlord and Tenant shall commence negotiations in an effort to reach a mutually acceptable determination of the Fair Market Rent within ten (10) days after Tenant's delivery of the Renewal Notice. If Landlord and Tenant have not agreed upon, in writing, a mutually acceptable Fair Market Rent within twenty (20) days after Tenant delivers its Renewal Notice, Fair Market Rent shall be determined by the procedure set forth in subsection (e) below.

(e)     Not more than thirty (30) days after the Renewal Notice is given, the parties shall attempt to agree upon an appraiser. If the parties agree upon an appraiser, the appraiser so selected shall determine the Fair Market Rent within thirty (30) days after selection. If the parties fail to so agree upon the selection of one such appraiser within thirty (30) days after the Renewal Notice is given, Tenant and Landlord shall each designate in a written notice to the other, within ten (10) days from the end of such thirty (30)-day period, one appraiser to determine such Fair Market Rent. When two appraisers are so selected, each appraiser shall independently determine the Fair Market Rent for the Premises and complete and forward to Landlord and Tenant its separate appraisal report within thirty (30) days after selection. Neither appraiser shall be told of the Fair Market Rent determined by the other appraiser prior to the completion of both appraisals.

When the two reports are both timely forwarded and the lower appraisal is not then less than ninety-five percent (95%) of the higher appraisal, then the arithmetic mean of the two appraisals shall be the Fair Market Rent. In the event the lower appraisal is less than ninety-five percent (95%) of the higher appraisal then, within twenty (20) days after preparation and forwarding of both reports, the two appraisers shall meet and select a third appraiser within ten (10) days following written request by either Tenant or Landlord. The third appraiser shall independently, and without knowledge of the other two determinations, determine the Fair Market Rent for the Premises and promptly complete and forward its report to Landlord and Tenant. The Fair Market Rent applicable to the Renewal Term shall be equal to the arithmetic average of the three (3) determinations; provided, however, that if one (1) appraiser's determination deviates by more than five percent (5%) from the median of the three (3) determinations, the Fair Market Rent shall be an amount equal to the average of the other two (2) determinations. The establishment of Fair Market Rent made through the foregoing appraisal process shall be final and binding upon Landlord and Tenant as to the Fair Market Rent for the applicable Renewal Term. All appraisers shall be either (i) members in good standing of the American Institute of Real Estate Appraisers or any organization succeeding thereto, or (ii) real estate brokers having no affiliation with Tenant, Landlord or any Mortgagee or with any owner of any direct or indirect interest in Tenant or Landlord. Each appraiser shall have had not less than ten (10)-years' experience with commercial real estate of the type of the Premises in the location where the Premises are located. Each party shall pay the fees of its appraiser and 50% of any (3rd) third appraiser.

(f)    Except as set forth in this Section 30, (i) there shall be no further options to extend the Term of the Lease, and (ii) all terms and conditions of the Lease shall remain in full force and effect during the Renewal Terms, without change.]

**32.** **Right of First Refusal.** In the event that Landlord receives a bona fide offer in writing from a third-party to purchase the Premises that Landlord is willing to accept ("**Purchase Offer**"), Landlord shall deliver a copy of such Purchase Offer to Tenant ("**Offer Notice**"), and Tenant shall have the right of first refusal to purchase the Premises on the materially same terms and conditions as set forth in the Offer Notice by giving written notice received by Landlord within twenty (20) business days after receiving Landlord's notice. If Tenant does not timely give such acceptance notice, Tenant's right of first refusal shall expire with respect to the subject Purchase Offer; provided, however, if Tenant has elected (or is deemed to have elected) to not exercise its right of first refusal and thereafter the purchase price of the sale transaction decreases by greater than one percent (1%) / two percent (2%) of the purchase price stated in the Offer Notice, Landlord shall be required to deliver a subsequent Offer Notice to Tenant promptly upon knowledge of such reduction in the purchase price; and further, provided, that if Landlord does not complete a sale of the Premises with the third-party within six (6) months after Tenant has elected (or is deemed to have elected) to not exercise its right of first refusal and the purchase and sale agreement that was the basis for such sale has been terminated by the mutual consent of the parties, Tenant shall again have the right of first refusal set forth in this Section. If Tenant timely provides an acceptance notice, Landlord shall sell the Premises to Tenant in accordance with the negotiated terms and conditions of the Offer Notice, with all other terms and conditions to be pursuant to a purchase and sale agreement acceptable to Landlord and Tenant.

*[Remainder of page left intentionally blank.]*

Landlord and Tenant have executed this Lease on the respective date(s) set forth below.

**LANDLORD**:

[**1742 SQUARE ASSOCIATES, LTD.**, a New Jersey limited partnership / **TRIMMER ROAD COMPANY, L.L.C.**, a New Jersey limited liability company],

Date signed:                          By: _____
                                      Name:
                                      Title:
_____

**TENANT**:

**CAC ACQUISITIONS, LLC,**
a Delaware limited liability company

Date signed:                          By: _____
                                      Name: _____
                                      Title: _____
_____

## **RIDER**

### **ADDITIONAL DEFINITIONS**

"ADA" means the Americans With Disabilities Act of 1990 (42 U.S.C. § 1201 et seq.), as amended and supplemented from time to time.

"Administrative Fee" means fifteen percent (15%) of the costs incurred by Landlord in curing Tenant's default or performing Tenant's obligations hereunder.

"Affiliate" means (i) any entity controlling, controlled by, or under common control of, Tenant, (ii) any successor to Tenant by merger, consolidation or reorganization, and (iii) any purchaser of all or substantially all of the assets of Tenant as a going concern.

"Agents" of a party mean such party's employees, agents, representatives, contractors, licensees or invitees.

"Alteration" means any addition, alteration or improvement to the Premises, as the case may be.

"Building Systems" means any electrical, mechanical, plumbing, heating, ventilating, air conditioning, sprinkler, life safety or security systems serving any Building.

"CAC" has the meaning set forth in Section 10(d) of this Lease.

"Casualty Termination Date" has the meaning set forth in Section 15 of this Lease.

"Common Area Charges" has the meaning set forth in Section 9(a) of this Lease.

"Effective Date" has the meaning set forth in the introductory paragraph of this Lease.

"Environmental Laws" means any and all federal, state or local law, whether common law, statute, ordinance, rule, regulation, or judicial or administrative decision or policy or guideline, pertaining to hazardous substances, health, industrial hygiene, environmental conditions, or the regulation or protection of the environment, and all amendments thereto as of this date and to be added in the future and any successor statute or rule or regulation promulgated thereto, including, but not limited to, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. §§6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1231-1387; the Clean Air Act, 42 U.S.C. §§7401 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. §§11001 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§2601 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§651 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§136 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§300f et seq.; the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq.; the Site Remediation Reform Act, N.J.S.A. 58:10C-1 et seq.; the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the New Jersey Water

Pollution Control Act, N.J.S.A. 58:10A-1 et seq.; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq.; and the New Jersey Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq.; and any and all rules and regulations promulgated thereunder, and any amendments to such legislation or regulations.

"Environmental Report" has the meaning set forth in Section 10(d) of this Lease.

"Event of Default" means a default described in Section 22(a) of this Lease.

["Fair Market Rent" has the meaning set forth in Section 30(d) of this Lease.]

"First Renewal Term" has the meaning set forth in Section 30(a) of this Lease.

"Force Majeure" means any circumstances outside of a party's reasonable control, including, but not limited to, events of nature (including snow or ice storm, tornadoes, windstorms, flooding and severe weather), catastrophe, labor disputes, industrial disputes or disturbances, civil disturbances, pandemic, acts of God, interruptions by government or court order, valid orders of any regulatory body having proper jurisdiction, wars, riots, inability to secure materials (including inability to secure materials by reason of allocations promulgated by authorized governmental agencies but not including any such inability to obtain materials due to cost), inability to obtain Permits, fires, explosions, breakage or accident to machinery.

"Hazardous Materials" means pollutants, contaminants, toxic or hazardous wastes or other materials the removal of which is required or the use of which is regulated, restricted, or prohibited by any Environmental Laws and are defined or become defined by any Environmental Laws.

"HVAC System" has the meaning set forth in Section 9(a) of this Lease.

"Interest Rate" means interest at the rate of one percent (1.00%) per month.

"Interruption" has the meaning set forth in Section 7 of this Lease.

"ISRA" shall mean the Industrial Site Recovery Act, N.J.S.A. 13:1K- 6, et seq.

"Laws" means all laws, ordinances, rules, orders, regulations, guidelines and other requirements of federal, state or local governmental authorities or of any private association or contained in any restrictive covenants or other declarations or agreements, now or subsequently pertaining to the Premises or the use and occupation of the Premises.

"LSRP" has the meaning set forth in Section 10(e) of this Lease.

"Maintain" means to provide such maintenance and repair as may be needed to keep the subject property in good condition and repair.

"Monthly Rent" means the monthly installment of Minimum Annual Rent plus all additional Rent payable by Tenant under this Lease (if any).

"Mortgage" means any mortgage, deed of trust or other lien or encumbrance on Landlord's interest in the Premises or any portion thereof, including without limitation any ground or master lease if Landlord's interest is or becomes a leasehold estate.

"Mortgagee" means the holder of any Mortgage, including any ground or master lessor if Landlord's interest is or becomes a leasehold estate.

"NAICS" means the North American Industry Classification System.

"NJDEP" means the New Jersey Department of Environmental Protection.

"OFAC" has the meaning set forth in Section 29 of this Lease.

"On-going Remediation" has the meaning set forth in Section 10(d) of this Lease.

"OSHA Standards" has the meaning set forth in Section 10(d) of this Lease.

"Permits" means any permits, certificates of occupancy, consents, environmental permits and approvals, authorization, variances, waivers, licenses, certificates or approvals required by any governmental or quasi-governmental authority.

"Permitted Hazardous Materials" has the meaning set forth in Section 10(d) of this Lease.

"Permitted Activities" has the meaning set forth in Section 10(d) of this Lease.

"Qualified Appraiser" has the meaning set forth in Section 30(d) of this Lease.

"RAO" has the meaning set forth in Section 10(d) of this Lease.

"Renewal Option" has the meaning set forth in Section 30 of this Lease.

"Renewal Terms" has the meaning set forth in Section 30(a) of this Lease.

"Rent" means the Minimum Annual Rent and any other amounts payable by Tenant to Landlord under this Lease.

"Rules and Regulations" means the rules and regulations attached to this Lease as **Exhibit "B"** as they may be amended from time to time.

"Secured Area" has the meaning set forth in Section 14 of this Lease.

["Second Renewal Term" has the meaning set forth in Section 30(a) of this Lease.]

"SNDA" has the meaning set forth in Section 19(a) of this Lease.

"Statement" has the meaning set forth in Section 6 of this Lease.

"Taken" or "Taking" means acquisition by a public authority having the power of eminent domain by condemnation or conveyance in lieu of condemnation.

"Tenant's Share" means the percentage obtained by dividing the aggregate rentable square feet of the Buildings leased to Tenant by the total rentable square feet of the Buildings, as set forth in <u>Section 1</u> of this Lease.

"Transfer" means (i) any assignment, transfer, pledge or other encumbrance of all or a portion of Tenant's interest in this Lease (specifically excluding any pledge or mortgage of Tenant's personal property, furniture, fixtures and equipment at the Premises), (ii) any sublease, license or concession of all or a portion of Tenant's interest in the Premises, (iii) any division of Tenant, or (iv) any transfer of a controlling interest in Tenant, including, without limitation, by division of any entity directly or indirectly controlling Tenant.

**EXHIBIT "A"**

**PLAN SHOWING PREMISES**

[Insert]

**EXHIBIT "B"**

**RULES AND REGULATIONS**

1.	Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

2.	Tenant shall not change any locks nor place additional locks upon any doors.

3.	Tenant shall comply with all parking regulations promulgated by Landlord from time to time for the orderly use of the vehicle parking areas.

4.	Tenant shall provide Landlord with a written identification of any vendors engaged by Tenant to perform regular services for Tenant at the Premises (examples: cleaners, security guards/monitors, trash haulers, telecommunications installers/maintenance).

5.	Tenant shall comply with commercially reasonable move-in/move-out rules provided by Landlord.

6.	Tenant shall cause all of Tenant's Agents to comply with these Rules and Regulations.

7.	Landlord reserves the right to rescind, suspend or modify any rules or regulations and to make such other rules and regulations as, in Landlord's reasonable judgment, may from time to time be needed for the safety, care, maintenance, operation and cleanliness of the Premises. New rules or regulations will not, however, be unreasonably inconsistent with the proper and rightful enjoyment of the Premises by Tenant under the Lease.

**EXHIBIT "C"**

**PERMITTED HAZARDOUS MATERIALS**

[Insert]

**EXHIBIT "D"**

**FORM OF SNDA**

[See Attached]

Exhibit I        -        Form of Transition Services Agreement

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement (this "Agreement") is made as of [●], 2023 (the "Effective Date"), by and between Custom Alloy Corporation, a Delaware corporation ("CAC"), and CAC Michigan, LLC, a Michigan limited liability company, (together with CAC, "Sellers" and each individually, a "Seller"), on the one hand, and CAC Acquisitions, LLC, a Delaware limited liability company ("Buyer"), on the other hand. Each Seller and Buyer are referred to individually herein as a "Party" and collectively as the "Parties."

**WHEREAS**, Sellers and Buyer are parties to that certain Asset Purchase Agreement, dated as of April ___, 2023, (the "Purchase Agreement"), pursuant to which Sellers are selling, transferring and assigning to Buyer the Acquired Assets and the Assumed Liabilities; and

**WHEREAS**, the Parties desire to enter into this Agreement to address the provision of certain post-Closing services by Sellers to Buyer.

**NOW, THEREFORE**, in consideration of the mutual provisions set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Transition Services.

(a)    Transition Services. During the Term (as defined herein), Sellers shall provide to Buyer and its Affiliates, on the terms set forth herein, the following services (each such service, a "Transition Service"): (i) the services listed on Schedule A hereto, solely in support of the Business post-Closing, and (ii) any additional services as may be mutually agreed in writing by the Parties which are reasonably necessary to the operation of the Business.

(b)    Standard of Performance. Each Seller shall perform the Transition Services in compliance with all applicable Laws and in a commercially reasonable manner, but in all cases in a manner that uses the same, in all material respects, degree and level of care, skill, and performance used by such Seller in the provision of such Transition Service as it was provided as of the Effective Date by Seller to the Business, either directly or indirectly through Affiliates or any other person, during the twelve (12) month period prior to the Effective Date (such period, the "Baseline Period"). Seller shall not alter or make more than *de minimis* changes to its degree of care, skill, or performance with respect to the provision of, or the manner or nature of, any of the Transition Services.

(c)    Service Failure. In the event that Seller becomes aware of any actual or anticipated failure in the provision of any Transition Services which material impacts, or is reasonably likely to materially impact any Transition Service (an "Incident"), it shall notify Buyer's Relationship Manager (as defined below) as soon as reasonably practicable. Seller shall cooperate in good faith to resolve such Incident and use commercially reasonable efforts to minimize the impact of such Incident on Buyer.

(d)    Delegation of Transition Services. Seller shall not delegate or subcontract to any person, or utilize any service provider, contractor, consultant, or other person in connection with, its performance of any Transition Service without Buyer's prior written consent (which consent

shall not be unreasonably withheld); provided that, Seller may, without such consent, so delegate or subcontract to, or so utilize, (i) any of its Affiliates; and (ii) any service provider, contractor, consultant, or other person to the extent the performance of a Transition Service for the Business was so delegated or subcontracted to, or utilized, such service provider, contractor, consultant, or other person during the Baseline Period.

2.     Change Order. Either Party may, at any time, request changes to the nature and scope of Transition Services to be provided under this Agreement. The Parties may revise, amend, alter, or otherwise change the nature and scope of the Transition Services being provided hereunder by mutual written agreement (each, a "Change Order"). The Parties agree to consider any proposed changes in good faith and to make a good faith effort to accept equitable adjustments to the Transition Services where appropriate to accomplish the mutual objectives of Sellers and Buyer, it being agreed that neither Party shall have to make a good faith effort to accept any such adjustments that increases the costs to render such Transition Services without a corresponding increase to the Fees hereunder or that requires any material increase in the use or deployment of internal resources in order to render such Transition Services. Each Change Order shall be deemed to be incorporated into, and made a part of, this Agreement.

3.     Pricing and Payment for Transition Services. The fees for each Transition Service are set forth on Schedule A (the "Fees"). In addition to the Fees, Buyer shall pay all of Sellers' out-of-pocket costs and expenses that are incurred by Sellers in connection with providing the Transition Services (the "Costs and Expenses").  Buyer shall not be responsible or liable for any fees, taxes or other amounts in connection with this Agreement except for the Fees and the Costs and Expenses. Sellers shall invoice Buyer monthly in arrears for the Fees and the Costs and Expenses incurred with respect to the Transition Services provided in the immediately prior month and shall provide with such invoices reasonable supporting details and documentation as reasonably necessary for Buyer to verify the direct costs and expenses accrued or incurred in such month that form the basis for the Fees and the Costs and Expenses charged hereunder. Buyer shall pay Sellers all undisputed amounts within thirty (30) days after Buyer's receipt of a properly issued invoice. In the event of an invoice dispute, Buyer shall deliver a written statement to Sellers no later than ten (10) days prior to the date payment is due on the disputed invoice listing all disputed items and providing a reasonably detailed description of each disputed item. Amounts not so disputed shall be deemed accepted and shall be paid, notwithstanding disputes on other items, within the period set forth in this Section 3. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Sellers shall continue performing the Transition Services in accordance with this Agreement pending resolution of any dispute.  Notwithstanding anything contained herein to the contrary, it is understood and agreed to by Buyer that the performance of the Transition Services shall be at no cost to the Sellers.

4.     Representatives. Each of Buyer and Sellers shall designate a representative to act as its relationship manager (collectively, the "Relationship Managers") to coordinate the provision of the Transition Services. Each Party may treat an act of a Relationship Manager of the other Party as being authorized by such other Party without inquiring behind such act or ascertaining whether such Relationship Manager had authority to so act so long as such actions of the Relationship Manager are consistent with the terms of this Agreement and provided that, no Relationship

2

Manager has authority to amend this Agreement by virtue of being a Relationship Manager. Buyer and Sellers shall notify each other promptly (and in any event within three (3) Business Days) in writing after any change in the Relationship Managers. Buyer and Sellers agree that all day-to-day, operational communications relating to the provision of the Transition Services shall be directed to Relationship Managers. Each Party agrees to ensure that the Relationship Managers are available at all reasonable times for consultation on any matter relating to the Transition Services. The initial Relationship Managers shall be, for Sellers, [●], and for Buyer, [●].

5.     Cooperation. During the Term, at the Buyer's sole cost and expense, the Parties shall use commercially reasonable efforts to cooperate with each other in all matters relating to the provision and receipt of the Transition Services.

6.     Term; Termination.

(a)     Term. This Agreement shall become effective upon the Effective Date of this Agreement and shall remain in effect until the expiration or termination of all Transition Services (the "Term"); provided, however, that notwithstanding anything to the contrary herein, the Term shall not exceed 120 days without the written agreement of the Parties.

(b)     Termination by Buyer. Buyer may terminate this Agreement or any Transition Service (in whole or in part), (i) if any Seller breaches any of its obligations under this Agreement and such breach is not cured within fifteen (15) days after such Seller's receipt of written notice of such breach, or (ii) at any time by providing Seller not less than five (5) days' written notice of such termination. For the avoidance of doubt, any termination of a Transition Service by Buyer shall be solely with respect to such specified Transition Service, and such termination shall not terminate this Agreement with respect to any other Transition Services to be provided by Sellers or otherwise terminate any other Transition Services.

(c)     Termination by Sellers. Sellers may terminate this Agreement or any Transition Service, upon prior written notice to Buyer, solely if (i) Buyer fails to pay Sellers an undisputed invoiced amount due and payable under this Agreement, (ii) Sellers provide Buyer with a written notice of such failure (which shall describe such failure and state that Sellers intend to terminate this Agreement unless such failure is remedied within five (5) Business days after the date on which Buyer receives such notice), and (iii) Buyer fails to pay such undisputed invoiced amount within five (5) Business Days after the date on which Buyer receives such notice. For the avoidance of doubt, any termination of this Agreement or a Transition Service by Sellers shall be solely with respect to such specified Transition Service, and such termination shall not terminate this Agreement with respect to any other Transition Services to be provided by Sellers or otherwise terminate any other Transition Services.

(d)     Effect of Termination or Expiration.

(i)     Neither Party shall have any right to terminate this Agreement or any Transition Services other than as expressly set forth in this Section 6 (Term; Termination). Upon termination or expiration of this Agreement or any Transition Service, or otherwise upon request by Buyer, Shellers shall (and shall cause their Representatives to), promptly destroy or, at Buyer's

3

option, deliver to Buyer, all written, electronic or other tangible Confidential Information. The destruction or return of any Confidential Information shall not relieve Sellers of any other obligations with respect to such Confidential Information set forth in this Agreement. If Buyer elects that Sellers return Confidential Information, all such Confidential Information shall be provided (or, at Buyer's request, migrated to a system (or systems) specified by Buyer), in a timely and efficient manner using automated means where feasible, in an industry standard format, or such other format agreed between the Parties at the relevant time, such agreement not to be reasonably withheld, delayed, or denied.

(ii)    Upon termination or expiration of this Agreement or any Transition Service (including any part thereof), Buyer shall remain obligated to pay Sellers for all unpaid, undisputed Fees and Costs and Expenses due and owing pursuant to <u>Section 3</u> (Pricing and Payment for Transition Services) for such terminated or expired Transition Services (or parts thereof) performed prior to the date of such termination or expiration (prorated for any partial month). Each Seller acknowledges and agrees that, except pursuant to the immediately preceding sentence, after termination or expiration of this Agreement or any Transition Service (including any part thereof), Buyer shall have no payment obligations to Sellers with respect to the terminated or expired Transition Services (or any such part thereof, as applicable), the Fees shall be reduced by the amount of the Fees for such Transition Services or parts thereof (or if not specified, equitably reduced), and Sellers' obligation to perform any other Transition Services or parts shall continue unaffected.

(e)    <u>Survival</u>. <u>Sections 5</u> (Cooperation), <u>8</u> (Indemnification), <u>9</u> (Limitations of Liability), <u>10</u> (Confidentiality), and <u>11</u> (General Provisions) and <u>Sections 6(d)</u> (Effect of Termination or Expiration), and this <u>Section 6(e)</u> (Survival) shall survive any termination or expiration of this Agreement.

7.    <u>Representations and Warranties</u>.

(a)    Each Party represents and warrants that (i) it possesses full legal right and all requisite power and authority, and has taken all actions necessary, to authorize, execute, deliver and perform this Agreement and to consummate the transactions contemplated by this Agreement, in accordance with the terms of this Agreement, and no other corporate or limited liability company action on the part of such Party is necessary to authorize the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement; and (ii) this Agreement constitutes a valid and legally binding obligation of such Party, enforceable against such Party in accordance with its terms and conditions.

(b)    EXCEPT AS EXPRESSLY SET FORTH HEREIN, NEITHER PARTY HERETO, THEIR AFFILIATES, NOR ANY OF THEIR AFFILIATES' RESPECTIVE DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, AGENTS, ADVISORS OR OTHER REPRESENTATIVES MAKES OR HAS MADE, UNDER THIS AGREEMENT, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED OR STATUTORY, AT LAW OR IN EQUITY, IN RESPECT OF THE TRANSITION SERVICES OR ANY OF THE PROPERTIES OR ASSETS USED TO PROVIDE SUCH TRANSITION SERVICES, INCLUDING AS TO (I) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE

4

OR PURPOSE OR NON-INFRINGEMENT; (II) THE OPERATION OF THE BUSINESS AFTER THE CLOSING; OR (III) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING AND ANY SUCH REPRESENTATION OR WARRANTY IS HEREBY EXPRESSLY DISCLAIMED.

8.    <u>Indemnification</u>.

(a)    <u>Indemnification Obligations</u>. Sellers, on the one hand, and Buyer, on the other hand (as applicable, the "<u>Indemnifying Party</u>"), shall indemnify, defend and hold harmless, and pay on behalf of or reimburse, the other Party and its Affiliates and their respective directors, officers, employees, and agents (each, an "<u>Indemnified Party</u>") from and against any and all losses, liabilities, obligations, costs, damages, charges, awards, judgments, fines, penalties, assessments, and expenses (including, in each case, interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense, or settlement) (collectively, "<u>Losses</u>") to the extent arising out of any claim by any third party in connection with or by reason of:   (i) any breach of this Agreement by the Indemnifying Party; or (ii) gross negligence, willful misconduct, or actual fraud by the Indemnifying Party in connection with this Agreement. The foregoing provision shall not apply to the extent that a court of competent jurisdiction determines that such Losses arose as a result of any Indemnified Party's gross negligence, willful misconduct, or actual fraud.

(b)    <u>Procedures</u>. An Indemnified Party shall notify the Indemnifying Party in writing of the nature of the claim as soon as reasonably practicable after the Indemnified Party receives actual notice of the assertion of the claim. The failure by the Indemnified Party to give notice as provided in the immediately preceding sentence shall not relieve the Indemnifying Party of its obligations under this <u>Section 8</u> (Indemnification), except to the extent that the Indemnifying Party is materially prejudiced with respect to such claim as a result of the failure to give such written notice. Upon receipt of notice of the claim, the Indemnifying Party may elect by written notice to the Indemnified Party within ten (10) days following receipt of notice from the Indemnified Party, to assume and control the defense of the claim and shall employ counsel reasonably acceptable to the Indemnified Party; *provided* that (i) the Indemnifying Party shall have acknowledged in writing its obligations to indemnify the Indemnified Party in connection with such claim and (ii) prior to such acknowledgement described in clause (i), the Indemnified Party is hereby authorized (but not obligated) to, at its own cost and expense, file any motion, answer or other pleading and to take any other action that the Indemnified Party shall reasonably deem necessary or appropriate to protect the Indemnified Party's interests. The Indemnified Party shall have the right to employ separate counsel and to participate in any such action, but the fees and expenses of such counsel shall be at the sole cost and expense of the Indemnified Party. If the Indemnifying Party does not assume the defense within ten (10) days following receipt of notice from the Indemnified Party, the Indemnified Party shall have the right to employ counsel and to control any such action, and the reasonable fees and expenses of such counsel shall be at the sole cost and expense of the Indemnifying Party. Except with the prior written consent of the Indemnified Party, no Indemnifying Party shall consent to the entry of any judgment or enter into any settlement of any claim or related proceedings, unless (A) the judgment or settlement provides solely for the payment of monetary damages and does not impose injunctive or other equitable relief against the

5

Indemnified Party or its Affiliates nor require any admission or acknowledgement of liability or fault of the Indemnified Party or its Affiliates, (B) the Indemnifying Party makes such payment in full, and (C) the Indemnified Party and its Affiliates receive an unconditional release from all liability with respect to such claim. Each Party shall reasonably cooperate with the other Party in the defense of any claim for which indemnification is available pursuant to this <u>Section 8</u> (Indemnification) and shall furnish such records, information, testimony and attend such conferences, discovery proceedings, hearings, trials and appeals (at the cost and expense of the Indemnifying Party) as may reasonably be requested by the other Party.

9.     <u>Limitations of Liability</u>.

    (a)     <u>Exclusion of Certain Damages</u>. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT THAT MAY BE TO THE CONTRARY, EXCEPT AS PROVIDED IN <u>SECTION 9(b)</u> (EXCEPTIONS), OR AS OTHERWISE REQUIRED BY LAW, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SUCH DAMAGES THAT ARE LOSS OF REVENUE, LOSS OF CUSTOMERS OR CLIENTS, LOSS OF GOODWILL OR LOSS OF PROFITS, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE GROUNDS, REGARDLESS OF WHETHER SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND WHETHER ANY SUCH DAMAGES ARE REASONABLY FORESEEABLE UNDER THE CIRCUMSTANCES.

    (b)     <u>Exceptions</u>. Section 9(a) (Exclusion of Certain Damages) shall not apply with respect to any (i) breach of <u>Section 10</u> (Confidentiality), (ii) indemnification obligation under <u>Section 8</u> (Indemnification) with respect to amounts paid to a third party in connection with any third party claim, or (iii) intentional breach, gross negligence, willful misconduct, or actual fraud by or on behalf of Sellers.

    (c)     <u>Inherited Issues</u>. Notwithstanding anything to the contrary contained in this Agreement, neither Buyer nor any of its Affiliates shall be in breach of this Agreement as a result of, and neither Buyer nor any of its Affiliates shall be liable to any Seller or any of their respective Affiliates under this Agreement for any Losses to the extent arising out of, any defects, imperfections, conditions, circumstances, or characteristics that existed as of the Effective Date with respect to the Business.

10.     <u>Confidentiality</u>.

    (a)     <u>Use and Disclosure of Confidential Information</u>. Each Party (a "<u>Receiving Party</u>") will protect the Confidential Information of the other Party (the "<u>Disclosing Party</u>") using at least the same degree of care it would use with respect to its own confidential and proprietary information or, if greater, a reasonable degree of care. Except as otherwise provided in this Agreement, the Receiving Party will, and will cause its Representatives to, (i) keep confidential and not disclose to any person, (ii) not use for the benefit of itself or any person, and (iii) not use for any purpose other than solely as necessary to provide or receive the Transition Services, any

6

or all Confidential Information; provided, however, that the Receiving Party may disclose Confidential Information to any of its Representatives who need to know the Confidential Information for the purpose of assisting the Receiving Party in performing its obligations or exercising its rights (including to receive the Transition Services) under this Agreement and are bound by confidentiality, non-use, and non-disclosure obligations no less stringent than contained in this Agreement. "Representatives" shall mean, with respect to a Party, (A) an Affiliate of such Party or a permitted subcontractor, delegate, service provider, contractor, consultant, or other person providing Transition Services; (B) any director, officer, or employee of such Party or of any such Party's Affiliates; or (C) any attorney, accountant, business, financial, technical or other advisor, or consultant retained by such Party.

(b)     Permitted Disclosure. In the event that the Receiving Party or any of its Representatives is requested or required to disclose any Confidential Information of the Disclosing Party pursuant to any applicable Law or pursuant to the applicable terms of a deposition, interrogatory, request for documents, subpoena, order, civil investigative demand or similar judicial process or otherwise, the Receiving Party shall promptly notify the Disclosing Party in writing (to the extent practicable without prejudicing any of the Receiving Party's or its Representative's legal rights, privileges or obligations or unless prohibited by Law) and shall reasonably cooperate with Disclosing Party in taking legally available steps (at the sole cost and expense of the Disclosing Party) to seek a protective order or other appropriate remedy. In the event such Disclosing Party seeks but fails to obtain a protective order or other appropriate remedy, the Receiving Party or its Representatives, as applicable, may disclose only that portion of the Confidential Information that is legally required to be disclosed and shall reasonably cooperate (at the sole cost and expense of the Disclosing Party) with Disclosing Party in its efforts to ensure that confidential treatment will be accorded to Confidential Information disclosed in such manner.

(c)     "Confidential Information" shall mean, with respect to a Disclosing Party, any and all data and information relating to the Disclosing Party or any of its Affiliates (including their respective businesses), which is disclosed to the Receiving Party or any of its Representatives in connection with this Agreement by or on behalf of the Disclosing Party (or, in the case of Sellers, is known to or in the possession of Sellers or any of its Representatives as of the Effective Date), orally or in writing, electronically, digitally or by any other media or form, whether disclosed before, on, or after the date hereof; provided that Confidential Information does not include, and there shall be no obligation under this Section 10 (Confidentiality), with respect to information that (i) is or becomes generally available to the public other than as a result of disclosure by the Receiving Party or its Representatives in violation of this Agreement, (ii) is or becomes available to the Receiving Party on a non-confidential basis from any person other than the Disclosing Party or its Representatives, which source, to the Receiving Party's knowledge, is not bound by any contractual or other obligation of confidentiality to the Disclosing Party with respect thereto, or (iii) is developed by the Receiving Party or its Representatives independently of the Confidential Information disclosed to it under this Agreement. The terms and conditions of this Agreement shall constitute the Confidential Information of each Party.

11.     General Provisions.

(a)     Notices. All notices, requests, demands, claims and other communications

7

hereunder shall be in writing except as expressly provided herein.   Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Sellers:

Custom Alloy Corporation
3 Washington Ave
High Bridge, New Jersey 08829
Attention: Adam Ambielli
Email:  amambielli@customalloy.us

with a copy (which shall not constitute notice to Sellers) to:

Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601
Attention:  Roger Iorio, Esq.
Email:  riorio@coleschotz.com

And

Rabinowitz, Lubetkin & Tully, LLC
293 Eisenhower Parkway, Suite 100
Livingston, New Jersey 07039
Attn: Jonathan I.  Rabinowitz, Esq.
Email: jrabinowitz@rltlawfirm.com

If to Buyer:

CAC Acquisitions, LLC
[_____]
[_____]
Attention:  [_____]
Email:  [_____]

and with a copy (which shall not constitute notice to Buyer) to:

> Keller Benvenutti Kim LLP
> 650 California Street, Suite 1900
> San Francisco, CA 94108
> Attention:  Tobias S.  Keller, Esq.; Jane Kim
> Email: tkeller@kbkllp.com; jkim@kbkllp.com

> and

> Blank Rome LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention:  Peter Schnur; Thomas Cournoyer
> Email:  peter.schnur@blankrome.com; thomas.cournoyer@blankrome.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 11(a) (Notices).

(b)    Amendment; Waiver. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 11(b) except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

(c)    Entire Agreement. This Agreement (including the Schedules attached hereto) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes any prior understandings, agreements or representations by the Parties, written or oral, which may have related to the subject matter hereof in any way. All Schedules attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)    Successors and Assigns. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and

9

permitted assigns, except that (subject to <u>Section 1(d)</u>) neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by either Party without the prior written consent of the other Party, and any attempted assignment without such consent shall be void and of no force and effect; provided, however, that either Party may assign this Agreement, and its rights and obligations hereunder, without such prior written consent of the non-assigning Party (i) in whole to any of assigning Party's Affiliates or (ii) in connection with a merger, reorganization, acquisition of, or sale of all or any business or assets of, the assigning Party, in whole or, to the extent relating to such business or assets, in part; provided further that in each case of (i) and (ii), the assigning Party shall provide the other Party with notice of the occurrence of (or any agreement to engage in) any of the activities referenced in clause (i) or (ii). Except as expressly set forth in this Agreement, nothing expressed or referred to in this Agreement will be construed to give any person any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement except such rights as may inure to a successor or permitted assignee under this <u>Section 11(d)</u> (Successors and Assigns).

(e)    <u>Severability</u>. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

(f)    <u>Expenses</u>. Except as otherwise provided in this Agreement, each Party shall bear its own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement and the transactions contemplated hereby.

(g)    <u>Specific Performance</u>. Sellers assume an independent obligation to continue performance of Sellers' obligations under this Agreement in all respects regardless of a dispute that may arise between the Parties. Sellers acknowledge that Buyer will be irreparably harmed and that there will be no adequate remedy at Law for any violation or threatened violation by Sellers of any of the covenants or agreements contained in this Agreement. It is accordingly agreed that, in addition to any other remedies which may be available upon the breach of any such covenants or agreements, Buyer shall be entitled to seek equitable relief, without the proof of actual damages, including an injunction or injunctions or orders for specific performance to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which it is entitled at Law or in equity as a remedy for any such breach or threatened breach. Sellers agree that such explicit rights of specific enforcement are an integral part of the transactions contemplated by this Agreement. Sellers agree that Buyer shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 11(g)</u> (Specific Performance), and Sellers irrevocably waives any right it may have to require the obtaining, furnishing or posting of

10

any such bond or similar instrument.

(h)     <u>Governing Law; Jurisdiction</u>. This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New Jersey, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of New Jersey, sitting in Hunterdon County, Jersey, and the federal courts of the United States of America sitting in in Essex County, New Jersey, shall have exclusive jurisdiction over such Litigation.

(i)     <u>WAIVERS OF JURY TRIAL</u>. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

(j)     <u>No Joint Venture</u>. Nothing in this Agreement creates a joint venture or partnership between the Parties. This Agreement does not authorize either Party (i) to bind or commit, or to act as an agent, employee or legal Representative of, the other Party, except as may be specifically set forth in other provisions of this Agreement, or (ii) to have the power to control the activities and operations of the other Party. The Parties are independent contractors with respect to each other under this Agreement. Each Party agrees not to hold itself out as having any authority or relationship contrary to this <u>Section 11(i)</u> (No Joint Venture).

(k)     <u>Force Majeure</u>. Other than with respect to any payment obligation, each of the Parties shall be excused from the performance of any of its obligations hereunder in the event and to the extent that performance of such obligation is prevented by Force Majeure and such excuse shall continue as long as the condition constituting such force majeure continues, provided that the Party affected shall promptly notify the other of the force majeure condition and shall exert commercially reasonable efforts to eliminate, cure or overcome any such causes; and further provided that such Party shall continue to perform to the extent feasible in view of such force majeure event. For purposes of this Agreement, "Force Majeure" is defined as any cause beyond the reasonable control of Sellers or Buyer, which is not attributable to any legal violation, gross negligence, breach or default of the affected Party, including an act of God, acts, regulations, or laws of any government, civil commotion, shortage of raw materials, terrorism, general unavailability of necessary equipment, substantial damage to or destruction of production facilities or material by fire, earthquake or storm, epidemics and failure of public utilities or common carriers. Labor issues (including strikes) shall not be considered to be a Force Majeure.

(l)     <u>Counterparts; Facsimile and Email Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and

11

delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

(m)   <u>Purchase Agreement</u>. Nothing contained herein is intended to (or shall be construed to) modify, limit, or otherwise affect the representations, warranties, covenants, agreements, liabilities, and indemnifications contained in the Purchase Agreement, and such representations, warranties, covenants, agreements, liabilities, and indemnifications shall remain in full force and effect in accordance with the terms of the Purchase Agreement.

(n)   <u>Further Assurance</u>. Sellers and Buyer shall, and shall cause their respective Affiliates to, from time to time at the request of the other Party, without any additional consideration, furnish such requesting Party such further information or assurances, execute and deliver such additional documents, instruments and conveyances, and take such other actions and do such other things, as may be reasonably necessary or appropriate to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.

(o)   <u>No Third-Party Beneficiaries</u>. Except with respect to the Indemnified Parties, who shall be third-party beneficiaries, this Agreement and the Schedules hereto, is solely for the benefit of the Parties and their respective successors and permitted assigns, and nothing herein expressed or implied shall give or be construed to give any person, other than the Parties and their respective successors and permitted assigns, any legal or equitable rights hereunder.

(p)   <u>Construction</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof."  Except as otherwise provided herein, references to Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, and Appendices herein are references to Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits and Appendices of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars. Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement.

(q)   <u>Mutual Drafting</u>. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden

12

of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

*   *   *   *

53429/0003-45148295v2

IN WITNESS WHEREOF, each of the Parties have caused this Agreement to be executed as of the Effective Date by their duly authorized representatives.

**CUSTOM ALLOY CORPORATION**

By: _____
Name:
Title:


**CAC MICHIGAN, LLC**

By: _____
Name:
Title:


**CAC ACQUISITIONS, LLC**

By: _____
Name:
Title:


[*Signature Page to Transition Services Agreement*]

**Schedule A**

**Transition Services and Fees**

| | | Description of Service | Service Fees | Service Period |
|---|---|---|---|---|
| 1. | | Export to customers of items subject to U.S. export licensing requirements, as follows: <br><br> a.  Shipment of unshipped balances under export license # 050756377 issued by the U.S. Department of State's Directorate of Defense Trade Controls under the International Traffic in Arms Regulations ("ITAR"), pursuant to purchase order # 237170 issued to Seller, or any other relevant purchase order; <br><br> b.  Shipment of unshipped balances under any other export license issued under the ITAR or the Export Administration Regulations ("EAR") held by Seller, pursuant to any currently open customer purchase order; <br><br> c.  With respect to purchase order # 243946, to the extent it is reasonably anticipated that shipment will be made to the customer during the Term, obtaining the appropriate export license under the ITAR or the EAR and shipping the relevant items to the customer, in consultation with Buyer; and <br><br> d.  With respect to any other open or newly received purchase orders regarding which it is reasonably anticipated that shipment will be made to the relevant customer during the Term, obtaining the appropriate export license under the ITAR or the EAR and shipping the relevant items to the customer, in consultation with Buyer. | $0 | Through September 1, 2023. |
| 2. | | | | |

Exhibit J       -       Form of Subcontract Pending Novation

## SUBCONTRACT AGREEMENT PENDING NOVATION

This Subcontract Agreement Pending Novation ("Agreement") is made as of [●], 2023, by and between CAC Acquisitions, LLC, a Delaware limited liability company ("Buyer"), and Custom Alloy Corporation, a Delaware corporation ("Seller"). Buyer and Seller are sometimes referred to herein as a "Party" or collectively as the "Parties."

## RECITALS

WHEREAS, Buyer and Seller are parties to that certain Asset Purchase Agreement dated as of [●], 2023 (the "Purchase Agreement"), pursuant to which Seller and CAC Michigan, LLC are selling, transferring and assigning to Buyer the Acquired Assets and the Assumed Liabilities (as defined in Purchase Agreement) (capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement);

WHEREAS, [i) Contract No. W911PT20C0001, by and between Seller and the Army Contracting Command-Warren, dated July 15, 2019 and (ii) Purchase Order No. N00104-23-P-BC45, issued by the Department of the Navy to Seller, dated October 27, 2022] (collectively, the "Prime Contracts") constitute Acquired Assets and, as such, the Prime Contracts will be novated to Buyer in accordance with the terms and conditions set forth in the Purchase Agreement;

WHEREAS, pending the execution of novation agreements and receipt of any required consents for novation of the Prime Contracts to Buyer, the Seller shall remain party to each Prime Contract; and

WHEREAS, the Parties desire to enter into this Agreement to affect a subcontracting of the rights and obligations under the Prime Contracts to Buyer pending novation of such Prime Contracts, all in accordance with the terms and conditions of the Purchase Agreement;

NOW, THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants and agreements of the parties contained herein, payment by Buyer of the Purchase Price and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS AND PRIME CONTRACT INCORPORATION

1.01    Definitions. Capitalized terms used in this Agreement but not defined herein shall have the meanings given to them in the Purchase Agreement.

1.02    Incorporation of Prime Contracts. The Prime Contracts, each in its entirety, and all contract documents relating thereto, including but not limited to task or delivery orders, modifications, supplements, schedules, amendments, and change orders issued and to be issued by the United States Government ("Government"), are hereby incorporated by reference in this Agreement. Once made a part of this Agreement, any reference in such Prime Contracts to the "Government" or the "Contracting Officer" will mean Seller, and any reference to the "Contractor"

will mean Buyer, except "Government" and "Contracting Officer", as applicable, do not change (i) in the phrase "Government Property," "Government Owned Property," "Government Equipment," and "Government Owned Equipment"; (ii) when a right, act, authorization, or obligation can be granted or performed only by the Government, the Contracting Officer, or a duly appointed representative of either of the foregoing; (iii) except as otherwise provided in the Purchase Agreement or this Agreement, when access to proprietary financial information or other proprietary data is required; (iv) when title to property is to be transferred directly to the Government; and (v) when rights to intellectual property are to be granted to the Government. With respect to these and other incorporated clauses, the Parties agree that said clauses are not subject to literal interpretation if such interpretation is inconsistent with the prime/subcontractor relationship as specified by subcontract provisions that have been included specifically in this Agreement.

## ARTICLE II
## COVENANTS

2.01    <u>Mutual Covenants</u>. The Parties hereby mutually covenant and agree that;

(a)    Seller hereby awards this Agreement to Buyer for the performance of all of the obligations of Seller under the Prime Contracts following the Closing, including the statements of work and task orders issued under the Prime Contracts, to the extent such Prime Contracts have not yet been fully performed by Seller as of the Closing, and Buyer hereby accepts this award.

(b)    Buyer shall inure to all rights and benefits conferred or accruing under the Prime Contracts, including all payments to be made under the Prime Contracts, whether such rights and benefits are conferred or accrue before, on or after the Closing. Seller shall promptly pay to Buyer, when received, all  monies received by the Seller under each Prime Contract and any claim, right, or benefit arising thereunder regardless of whether such payment relates to the performance of the applicable Prime Contract prior to, on, or after the Closing.

2.02    <u>Seller Covenants.</u> Seller hereby covenants and agrees with Buyer that:

(a)    In the event Seller shall receive any payments relating to a Prime Contract, Seller shall promptly, but in no event later than five (5) business days after receipt of such payments, transfer such payments to Buyer. Seller hereby grants to Buyer a limited power of attorney authorizing Buyer to prepare, execute and submit invoices under the Prime Contracts in the name of Seller.

(b)    Seller (i) authorizes Buyer to act as agent on behalf of Seller for purposes of performing and administering the Prime Contracts, including executing documents, discussing matters with customers and taking all other actions Buyer deems necessary or desirable in connection with its performance of the Prime Contracts, and (ii) grants to Buyer a limited power of attorney to make such changes and amendments in the terms of the Prime Contracts, in the name of Seller, as Buyer deems necessary or desirable in order to assure that Buyer receives all benefits, including economic benefits, of the Prime Contracts.

-2-

(c)    Seller shall not take any action or fail to take any action in connection with any of the Prime Contracts that would affect or diminish, in any way, any of Seller's rights or obligations thereunder or the rights or obligations of Buyer under this Agreement without the prior written consent of Buyer. Seller shall not terminate or enter into any amendment or modification of any of the Prime Contracts without the prior written consent of Buyer.

(d)    To the extent not already in Buyer's possession, Seller shall deliver to Buyer the full and complete contract file maintained by Seller for each Prime Contract.

(e)    At Buyer's sole cost and expense, Seller shall use commercially reasonable efforts to cause the Prime Contracts to be novated to Buyer as soon as practicable after the Closing.

2.03    <u>Buyer Covenants.</u> Buyer hereby covenants and agrees with Seller that:

(a)    Buyer shall take such timely action to enable Seller to perform each Prime Contract and to protect any rights of Seller that may exist or accrue under any such Prime Contract.

(b)    Buyer agrees to perform, on behalf of Seller, all the requirements, responsibilities and obligations of each Prime Contract, to the extent permissible under the terms of each Prime Contract and applicable law, in accordance with all terms and conditions in or incorporated by reference into, and all applicable laws and regulations applicable to, each such Prime Contract.

(c)    For each Prime Contract, if any, that prohibits the other party to such Prime Contract from making payments as designated by Buyer, Buyer shall prepare all invoices to be submitted by Seller to the other party to such Prime Contract. Buyer shall submit all such invoices in the name of Seller.

(d)    Buyer shall reasonably consult and cooperate with Seller in their efforts to cause the Prime Contracts to be novated to Buyer.

(e)    Buyer hereby indemnifies and holds the Seller and the Seller's members, managers, employees, shareholders, officers, directors, employees, agents, representatives and professionals (including, without limitation, the Seller's outside accountants and attorneys) and their respective successors and assigns harmless from and against any and all liabilities, damages, claims, suits, penalties, demands and causes of action arising out of, in connection with or resulting from (i) any breach of any representation, warranty, covenant or agreement under any Prime Contract, (ii) any act or omission taken or not taken by, on behalf of, or at the direction of, Buyer in connection with any Prime Contract, (iii) any action taken by Seller under this Agreement in connection with a Prime Contract, and (iv) the enforcement of this Agreement, including this indemnification.  All actions, suits, proceedings, demands, assessments, judgments, costs and expenses, of whatever nature, incident to the foregoing, including but not limited to reasonable attorneys' fees and court costs, shall be included in the foregoing indemnification.

-3-

**ARTICLE III**
**MISCELLANEOUS**

3.01   <u>Term.</u> The term of this Agreement shall begin on the Closing and shall continue with  respect to each Prime Contract until the earlier to occur of (a) novation of the Prime Contracts to Buyer, or (b) the satisfaction of all of Seller's obligations under, and the receipt of final payment of all amounts payable under, the Prime Contracts; <u>provided</u>, <u>however</u>, that in no event shall the term of this Agreement exceed 120 days from the Closing.

3.02   <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be provided in accordance with the terms of the Purchase Agreement.

3.03   <u>Amendments; Waivers</u>.

(a)    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)    No failure or delay by either Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Except as otherwise provided herein, no action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement. Any term, covenant or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but only by a written notice signed by such Party expressly waiving such term or condition. The waiver by any Party of a breach of any provision hereunder shall not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder.

3.04   <u>Successors and Assigns</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign, delegate, or otherwise transfer, directly or indirectly, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of the other Party; <u>provided</u>, <u>however</u>, that Buyer may transfer or assign any or all of its rights, interests, and obligations under this Agreement to one or more of its affiliates with Seller's prior written consent. Notwithstanding the foregoing, no assignment, delegation, or other transfer of rights under this Agreement shall relieve the Seller of any liability or obligation hereunder or modify the rights of the Parties hereunder. Any attempted assignment, delegation or transfer in violation of this <u>Section 3.04</u> shall be null and void.

3.05   <u>Construction</u>. As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and singular shall include the plural. References in this Agreement to a Party or other Person include their respective successors and assigns. The words "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" unless such phrase

-4-

otherwise appears. Unless the context otherwise requires, references in this Agreement to Articles and Sections shall be deemed references to Articles and Sections of and the Schedule to this Agreement. Unless the context otherwise requires, the words "hereof," "hereby," and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section, or provision hereof.

Except when used together with the word "either" or otherwise for the purpose of identifying mutually exclusive alternatives, the term "or" has the inclusive meaning represented by the phrase "and/or." With regard to each and every term and condition of this Agreement, the Parties understand and agree that the same have or has been mutually negotiated, prepared, and drafted, and that if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument thereto, no consideration shall be given to the issue of which Party actually prepared, drafted, or requested any term or condition of this Agreement. Any period of time hereunder ending on a day that is not a business day shall be extended to the next business day.

3.06   <u>Entire Agreement</u>. This Agreement, together with the Purchase Agreement and any other agreements contemplated hereby, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter hereof.

3.07   <u>Conflicts with Purchase Agreement</u>. This Agreement shall be subject in all respects to the Purchase Agreement and shall be construed so as to carry out the intentions of the Parties thereto as expressed in the Purchase Agreement. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern.

3.08   <u>Governing Law; Jurisdiction</u>.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New Jersey, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of New Jersey, sitting in Hunterdon County, Jersey, and the federal courts of the United States of America sitting in in Essex County, New Jersey, shall have exclusive jurisdiction over such Litigation.

3.09   <u>Waiver of Right to Jury Trial</u>. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

3.10    Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts (including by facsimile or PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall not become effective until and unless (a) the Purchase Agreement is executed and delivered by all parties thereto, and (b) each Party has received a counterpart hereof signed by the other Party.

3.11    Severability. To the maximum extent permitted by law, the invalidity, illegality, or unenforceability of any provision in this Agreement shall not affect any other provision in this Agreement. If any provision hereof or any portion thereof or the application of any such provision or any portion thereof shall be held invalid, illegal, or unenforceable in any respect by a court or tribunal of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision (or the remaining portion thereof) to any other persons or circumstances, and any court or tribunal having jurisdiction shall have the power to modify, and it is the intent of the Parties that such court or tribunal shall modify, such provision to the least extent necessary to render it enforceable and, in its modified form, such provision shall then be enforceable.

3.12    Captions. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

3.13    Third Party Beneficiaries.    Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the Parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement or result in such person being deemed a third-party beneficiary of this Agreement.

3.14    Disclaimer of Agency. The relationship established hereunder shall be solely that of contractor and subcontractor. Except as otherwise provided in this Agreement, nothing in this Agreement shall be deemed in any way or for any purpose to constitute either Party an agent of the other Party in the conduct of such Party's business or to create a partnership or joint venture between the Parties.

*[Signature page follows]*

-6-

IN WITNESS WHEREOF, the Parties caused this Agreement to be duly executed by their respective authorized representatives on the day and year first written above.

**CUSTOM ALLOY CORPORATION**

By: _____
Name:
Title:

**CAC ACQUISITIONS, LLC**

By: _____
Name:
Title:

*[Signature Page to Subcontract Agreement Pending Novation]*

**EXHIBIT B**

**CURE AMOUNTS**

| NAME OF NON-DEBTOR PARTY TO CONTRACT OR LEASE | ADDRESS OF NON-DEBTOR PARTY | CONTRACT OR LEASE AT ISSUE | PROPOSED CURE AMOUNT |
|---|---|---|---|
| 1742 Square Associates, Ltd. | 412 Trimmer Road Califon, NJ 07830 | Lease of real property | $685,090.63 |
| Amerigas Propane | P.O. Box 371473 Pittsburgh, PA 15250-7473 | Contract for propane | $18,156.89 |
| Cigna Behavioral Health, Inc. | 900 Cottage Grove Road, Bloomfield, CT 06002 | Agreement for employee assistance program services | To be determined |
| Cigna Health and Life Insurance Company | 900 Cottage Grove Road, Bloomfield, CT 06002 | Administrative services agreement | To be determined |
| Cintas Corporation | P.O. Box 630910 Cincinnati, OH 45263-0910 | Contract for uniforms | $52,636.12 |
| Constellation NewEnergy—Gas Division, LLC | 9960 Corporate Campus Drive Suite 2000 Louisville, KY 40223 | Natural gas supply agreement | To be determined |
| Constellation NewEnergy, Inc. | 900A Lake Street Suite 2 Ramsey, NJ 07446 | Electricity supply agreement | To be determined |
| Edwards Business Systems | 2240 City Line Road Bethlehem, PA 08017 | Leases of printers and copiers | $43,299.82 |
| Equipment Depot Pennsylvania, Inc. | 810 Hickory Lane Allentown, PA 18106 | Planned maintenance program | To be determined |
| Infor Global Solutions, Inc. | 13560 Morris Road, Suite 4100, Alpharetta, GA 30004 | Contract for computer system licensing and maintenance | To be determined |
| LEAF Capital Funding, LLC | 1720A Crete St. Moberly, MO 65270 | Lease of LeBlond lathe | To be determined |
| Republic Services | P.O. Box 9001099 Louisville, KY 40290-1099 | Contract for dumpsters | $1,818.05 |
| Signature Vacuum Systems, Inc. | 3982 Main Street Adamsville, PA 16110 | Purchase order for vacuum furnace | To be determined |

| Signature Vacuum Systems, Inc. | 3982 Main Street Adamsville, PA 16110 | Purchase order for chiller | To be determined |
|---|---|---|---|
| Trimmer Road Company, LLC | 412 Trimmer Road Califon, NJ 07830 | Real property lease | $392,550.16 |
| US Bank Equipment Finance | 1310 Madrid St. Marshall, MN 56258 | Lease of boring mill and tooling | $9,261.00 |

Except as set forth above, for those executory contracts and unexpired leases as to which the Debtors have previously designated the cure amount as zero (0), no cure shall be required.

## EXHIBIT C

## ASSIGNED CONTRACTS WITH ELECTRIC BOAT CORPORATION

| NAME OF NON-DEBTOR PARTY TO CONTRACT OR LEASE | ADDRESS OF NON-DEBTOR PARTY | CONTRACT OR LEASE |
|---|---|---|
| General Dynamics/ Electric Boat Division | 75 Eastern Point Road, Groton, CT 06340-0949 | Purchase Order ## 1000016695 1000017282 1000017302 1000017352 1000019260 1000020671 1000021232 1000021719 1000023177 1000023272 1000023566 1000024154 1000024371 1000025154 1000025579 1000025587 1000025902 1000026492 1000026497 1000026925 1000026942 1000028437 1000028582 1000028693 1000028807 1000029237 1000029475 1000030522 1000030596 1000030602 1000030630 1000030830 1000031172 1000031753 1000031842 1000031940 1000032032 1000032315 |

| | | |
|---|---|---|
| | | 1000033322 |
| | | 1000033401 |
| | | 1000033468 |
| | | 1000034399 |
| | | 1000034457 |
| | | 1000034939 |
| | | 1000035010 |
| | | 1000035538 |
| | | 1000035584 |
| | | 1000035585 |
| | | 1000036532 |
| | | 1000036796 |
| | | 1000036880 |
| | | 1000037328 |
| | | 1000037354 |
| | | 1000037381 |
| | | 1000037393 |
| | | 1000037562 |
| | | 1000038106 |
| | | 1000038393 |
| | | 1000038583 |
| | | 1000039588 |
| | | 1000039924 |
| | | 1000041215 |
| | | 1000041278 |
| | | 1000041282 |
| | | 1000041301 |
| | | 1000041307 |
| | | 1000041369 |
| | | 1000041619 |
| | | 1000041762 |
| | | 1000042016 |
| | | 1000042806 |
| | | 1000042938 |
| | | 1000043157 |
| | | 1000043164 |
| | | 1000043170 |
| | | 1000043780 |
| | | 1000043789 |
| | | 1000043834 |
| | | 1000043835 |
| | | 1000043875 |
| | | 1000043881 |
| | | 1000044013 |
| | | 1000044570 |
| | | 1000044922 |

| | | |
|---|---|---|
| | | 1000045565 |
| | | 1000046642 |
| | | 1000046711 |
| | | 1000046712 |
| | | 1000050545 |
| | | 1000050758 |
| | | 1000051628 |
| | | 1000051727 |
| | | 1000052703 |
| | | 1000052810 |
| | | 1000052872 |
| | | 1000053309 |
| | | 1000053387 |
| | | 1000053408 |
| | | 1000054471 |
| | | 1000026087 |
| | | 1000029543 |
| | | 1000034776 |
| | | 1000035551 |
| | | 1000008813 |
| | | PPD096=074 |
| | | PPD233=042 |
| | | PPE040=078 |
| | | PPE142=003 |
| | | PPE220=093 |
| | | PPE240=082 |
| | | PPE242=071 |
| | | PPF018=014 |
| | | PPF050=071 |
| | | PPF091=061 |
| | | PPF115=091 |
| | | PPF152=016 |
| | | PPF166=081 |
| | | PPF207=021 |
| | | PPG014=001 |
| | | PPG025=009 |
| | | PPG050=096 |
| | | PPG072=106 |
| | | PPG073=014 |
| | | PPG076=078 |
| | | PPG083=031 |
| | | PPG110=010 |
| | | PPG136=023 |
| | | PPG154=082 |
| | | PPG179=063 |
| | | PPG206=035 |

| | | |
|---|---|---|
| | | 1000055576<br>1000055577<br>1000055842<br>1000055844<br>1000002756<br>1000003056<br>1000008895<br>1000010276<br>1000015875<br><br>Any Supplier Fund Development ("SDF") Agreement entered into between Custom Alloy Corporation ("CAC") and/or CAC Michigan, LLC, on the one hand, and Electric Boat Corporation ("EB"), on the other hand, including but not limited to the following SDF Agreements: (i) the SDF Agreement pursuant to which EB agreed to provide to CAC up to the amount of $8,296,775.00 for the purchase of certain equipment (ECF No. 240); (ii) the SDF Agreement pursuant to which EB agreed to provide to CAC up to the amount of $945,601.92 for the purchase of certain equipment from Equipment Depot of Pennsylvania, Inc. (ECF No. 183); (iii) the SDF Agreement pursuant to which EB agreed to provide to CAC up to the amount of $934,000 for the purchase of certain "TrueForge" equipment from a supplier in South Korea (ECF No. 94); (iv) the SDF Addendum executed on or about January 13, 2021; and (v) the SDF Addendum executed on or about October 20, 2020. |